**21-14213**

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆

RMS OF GEORGIA, LLC, d/b/a Choice Refrigerants,

*Petitioner,*

—v.—

U.S. ENVIRONMENTAL PROTECTION AGENCY, ADMINISTRATOR,
U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

ON PETITION FOR REVIEW OF FINAL AGENCY ACTION
OF THE ENVIRONMENTAL PROTECTION AGENCY

## OPENING BRIEF FOR PETITIONER

DAVID M. WILLIAMSON
WILLIAMSON LAW & POLICY
1850 M Street NW, Suite 840
Washington, District of Columbia 20036
(202) 256-6155

*Counsel for Petitioner*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT OF RMS OF GEORGIA, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and 11th Cir. R. 26.1-1 and 26.1-2, Petitioner RMS of Georgia, LLC d/b/a Choice Refrigerants states that the following constitute "all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party."

1. Hoshijima, Tsuki – U.S. Department of Justice, Counsel for Respondents;

2. Regan, Michael S. – U.S. EPA Administrator, Respondent;

3. RMS of Georgia, LLC d/b/a Choice Refrigerants – Petitioner (a limited liability company which is not owned in whole or in part by a parent corporation or a publicly traded company and which does not issue stock);

4. U.S. Environmental Protection Agency – Respondent; and

5. Williamson, David M. – Williamson Law + Policy, PLLC, Counsel for Petitioner.

Petitioner states that no publicly traded company or corporation has an interest in the outcome of the case or appeal.


Dated: May 2, 2022

Respectfully submitted,


/s/ David M. Williamson
David M. Williamson

*Counsel for Petitioner*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner respectfully requests oral argument in order to guide the Court through the agency's complex cap-and-trade program and allowance calculation method.  In addition, because the agency provided almost no explanation in the administrative record for its action, Petitioner anticipates that the government will attempt to expound on and supply a post-hoc rationale, which may tend to confuse the issues – thus the Court may benefit from the opportunity to ask questions of counsel.

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT OF RMS OF GEORGIA, LLC ........ C-1

STATEMENT REGARDING ORAL ARGUMENT ........................... i

TABLE OF CITATIONS ..................................................... iii

GLOSSARY ............................................................... vii

STATEMENT OF JURISDICTION AND VENUE .......................... 1

STATEMENT OF THE ISSUES .............................................. 3

STATEMENT OF THE CASE ................................................ 4

    A.  Imports Owned By Choice and Imported Through a Shipping
        Agent, Which Should Be Attributed to Choice As the Actual
        Owner .............................................................. 11

    B.  Illegal Imports of Choice's Patented Product by Company B,
        Which Should Be Attributed to Choice As the Actual
        Owner .............................................................. 16

    C.  EPA's Allowance Allocations ...................................... 18

    D.  Standard of Review ................................................ 19

SUMMARY OF THE ARGUMENT ......................................... 22

ARGUMENT ............................................................... 23

    I.  EPA WAS REQUIRED TO CREDIT SHIPMENTS TO
       CHOICE, AS THE ACTUAL OWNER, NOT TO COMPANY
       A, AS THE SHIPPING AGENT ...................................... 31

    II.  EPA WAS REQUIRED TO CREDIT R-421A SHIPMENTS
       TO CHOICE, NOT REWARD INTELLECTUAL PROPERTY
       PIRATES .......................................................... 38

CONCLUSION ............................................................. 41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS*

PAGE(S)

**Cases**

*Alabama Environmental Council v. Adm'r, U.S. EPA,*
    711 F.3d 1277 (11th Cir. 2013) ................................. 20, 21, 38

*American Lung Ass'n v. EPA,*
    985 F.3d 914 (2021)................................................... 36

*Catalyst Pharm., Inc. v. Becerra,*
    14 F.4th 1299 (11th Cir. 2021)............................................ 25

*Georgia Aquarium, Inc. v. Pritzker,*
    134 F. Supp. 3d 1374 (N.D. Ga. 2014) ................................... 9

*Gonzalez v. Reno,*
    212 F.3d 1338 (11th Cir. 2000) .................................... 21, 36

*Kisor v. Wilkie,*
    139 S.Ct. 2400 (2019)........................................21, 22, 35, 36

*Maryland v. EPA,*
    958 F.3d 1185 (D.C. Cir. 2020) ........................................... 20

*Mitchell Energy Corp. v. FERC,*
    651 F.2d 414 (5th Cir. 1981) ............................................. 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................... 20, 21, 35

*Sierra Club v. EPA,*
    964 F.3d 882 (10th Cir. 2020).............................................. 9

*Sierra Club v. Martin,*
    168 F.3d 1 (11th Cir. 1999).......................................*passim*

**Statutes**

5 U.S.C. §§551–559, Administrative Procedure Act ......................... 20

28 U.S.C. §1331................................................................. 1

42 U.S.C. §7401 *et seq.*, Clean Air Act...................................*passim*

* Citations upon which we primarily rely are marked with asterisks.

PAGE(S)

42 U.S.C. §7607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. §7607(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 20

42 U.S.C. §7607(d)(1)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. §7607(d)(9)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. §7675 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. §7675(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. §7675(e)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. §7675(e)(2)(D)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. §7675(e)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. §7675(k)(1)(C), Title VI of the Clean Air Act . . . . . . . . . . . . . . . 1, 19

American Innovation and Manufacturing Act of 2020, Pub. L. 116-
    260, Div. S, § 103, Dec. 27, 2020, 134 Stat. 2255 . . . . . . . . . . . . . . . *passim*

## Regulations

40 C.F.R. Part 84 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 29, 34

40 C.F.R. §84.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

40 C.F.R. §84.7(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. §84.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. §84.11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 24

40 C.F.R. §84.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. §84.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. Part 98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

40 C.F.R. §98.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

74 Fed. Reg. 56,260 (Oct. 30, 2009), *Mandatory Reporting of
    Greenhouse Gases* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

74 Fed. Reg. 56,265 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

PAGE(S)

85 Fed. Reg. 34,416 (June 4, 2020), *Hydrofluorocarbon Blends From the People's Republic of China: Final Scope Ruling on Unpatented R-421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A* ................................................................ 17

86 Fed. Reg. 9,059 (Feb. 11, 2021), *Notice of Data Availability Relevant to the United States Hydrofluorocarbon Baselines and Mandatory Allocations* (EPA–HQ–OAR–2021–0044; FRL–10020–30–OAR) ................................................... 8

86 Fed. Reg. 55,116 (Oct. 5, 2021), *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act* (EPA–HQ–OAR–2021–0044) ..................... 5, 28

86 Fed. Reg. 55,118 ................................................. 5, 23

86 Fed. Reg. 55,140-41 ................................................ 8

86 Fed. Reg. 55,144-45 ................................................ 8

86 Fed. Reg. 55,145 ................................................... 5

86 Fed. Reg. 55,152 ................................................... 8

86 Fed. Reg. 55,155 ................................................... 5

86 Fed. Reg. 55,202 .................................................. 24

86 Fed. Reg. 55,203 ................................................ 6, 24

86 Fed. Reg. 55,841 (Oct. 7, 2021), *Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act of 2020* (EPA–HQ–OAR–2021–0669) ............................... 4, 18, 19, 26

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ...................... 25

PAGE(S)

*Preliminary Decision Memorandum for Scope Ruling and Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China; Unpatented R-421A* (A-570-028) (Barcode: 3947714-01) (Feb. 26, 2020), available at https://access.trade.gov/ ................. 17

*Restatement (Third) of Agency* §8.05 cmt b. (2006) ......................... 33

U.S. EPA, *Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act: Response to Comments*, p. 152 (EPA-HQ-OAR-2021-0044-0227_attachment_3) (Sept. 2021), available at https://www.regulations.gov/document/EPA-HQ-OAR-2021-0044-0227 ("*Response to Comments*")............................. 33

## GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act of 2020 |
| Addm. | Addendum |
| A | Appendix |
| CAA | Clean Air Act |
| EPA | U.S. Environmental Protection Agency |
| HFC | Hydrofluorocarbon |
| GHGRP | Greenhouse Gas Reporting Program |

## STATEMENT OF JURISDICTION AND VENUE

This Court has jurisdiction under 42 U.S.C. §§7607(b)(1) and 7675(k)(1)(C) to review a final action of the U.S. Environmental Protection Agency ("*EPA*") published October 7, 2021, allocating cap-and-trade allowances under the American Innovation and Manufacturing Act of 2020 ("*AIM Act*").  In the AIM Act, Congress declared (somewhat unusually) that the statute is <u>not</u> part of the Clean Air Act but that certain provisions of the Clean Air Act, including §307 which governs judicial review, "shall apply to" the AIM Act and "any rule, rulemaking, or regulation" promulgated under the statute is treated "as though [the statute] were expressly included in title VI of [the Clean Air Act]." 42 U.S.C. §7675(k)(1)(C).   In addition, this Court has jurisdiction over this action and over the parties pursuant to 28 U.S.C. §1331.  Petitioner RMS of Georgia, LLC (herein referred to by its trade name, Choice Refrigerants) timely filed a petition for review on December 6, 2021 (ECF# 011112054197).

On December 22, 2021, this Court issued a Jurisdictional Notice (ECF# 011112080778; ECF# 011112080775) asking the parties to brief jurisdiction in light of the venue provision in section 307 of the Clean Air Act, 42 U.S.C. §7607(b)(1).[1]

---

[1] The Court's jurisdictional question was presented as: "Please address whether the Petitioner was required to file its petition for review in the United States Court of Appeals for the District of Columbia. *See* 42 U.S.C. § 7607(b)(1) (distinguishing

Petitioner filed a response on January 19, 2022 (ECF# 011112114675) and

Respondents filed a response on January 18, 2022 (ECF# 011112112493). On April 1,

2022, the Court ordered the venue issue identified in the jurisdictional question to be

carried with the case (ECF# 011112221192).

Petitioner respectfully refers the Court to its January 19 response discussing

venue under the Clean Air Act, 42 U.S.C. §7607(b)(1).  In short, because the agency

action in question concerns the calculation and allocation of allowances issued to an

individual company in Alpharetta, Georgia, which is based on that company's

particular historic import activity, it is a "locally or regionally applicable" action for

which the Clean Air Act places venue exclusively in this Court.[2]  That the agency

chose to notify all companies receiving allowances in a single *Federal Register*

notice does not detract from the fact that each allocation calculation is unique to the

particular company, is based on that company's past business activities, and impacts

each company (and its business, owners and employees) in an inherently

individualized and local manner. As discussed in Petitioner's response, the weight of

---

between actions where review is obtained 'only in the United States Court of Appeals
for the District of Columbia' and other local or regional actions where review is
obtained 'only in the United States Court of Appeals for the appropriate circuit')."

[2] Petitioner timely filed a protective petition in the D.C. Circuit (No. 21-1253),
however no party has waived venue and the D.C. Circuit has placed that case in
abeyance pending the decision of the Court in this case.  *See* D.C. Cir. Order, dated
March 14, 2022 in No. 22-1025 (ECF# 1939003).

precedent holds that the consolidated publication does not convert EPA's company-specific action into a "nationally applicable" rule or action for purpose of the Clean Air Act venue provision. Moreover, EPA had the statutory authority to designate its action as nationally applicable under section 307(b)(1) of the Clean Air Act, but declined to do so, and should be considered to have waived that position. Accordingly, jurisdiction exists and venue is proper, under the Clean Air Act and by extension the AIM Act, in this forum.

## STATEMENT OF THE ISSUES

1.    Whether EPA acted unlawfully in allocating cap-and-trade allowances to Petitioner's shipping agent and acted unlawfully in allocating allowances to a company that stole Petitioner's intellectual property, where in each situation Petitioner was the "actual owner" of the underlying HFC imports and therefore entitled to those allowances under the agency's implementing regulations.

2.    Whether EPA's allocation of allowances without any explanation for ignoring, overlooking or rejecting Petitioner's claim to allowances which were attributed to other companies was arbitrary and capricious in light of the uncontroverted record showing that Petitioner was the actual owner of the underlying HFC imports and in light of the agency's own policy choice to allocate allowances based on historic market activity.

3

## STATEMENT OF THE CASE

This case involves a final action of EPA allocating market share to individual companies under a newly minted cap-and-trade program for reducing hydrofluorocarbons ("***HFCs***"), which are chemicals commonly used as refrigerants in air conditioners, refrigerators and freezers.  EPA announced the number of allowances issued to each individual company in a *Federal Register* notice entitled *Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act of 2020*, 86 Fed. Reg. 55,841 (Oct. 7, 2021) (EPA–HQ–OAR–2021–0669) ("***Allocation Notice****)* (A17).  Petitioner appeals that final agency action because EPA failed to allocate to it certain allowances to which it is entitled under EPA's regulations and which Petitioner needs to continue its business.

In the American Innovation and Manufacturing Act of 2020 ("***AIM Act***"),[3] Congress directed EPA to create a cap-and-trade program using "allowances" (*i.e.*, tradable permits to import HFCs) with the goal of phasing out HFCs over a 15-year timeframe. 42 U.S.C. §7675(e)(2). The AIM Act prohibits any person from consuming (*i.e.*, importing) HFCs without a corresponding allowance starting in

---

[3] Pub. L. 116-260, Div. S, § 103, Dec. 27, 2020, 134 Stat. 2255, *codified at* 42 U.S.C. § 7675.

calendar year 2022.[4] §7675(e)(2)(A); §7675(e)(2)(D)(ii) (allowance is a "limited

authorization for the production or consumption of a regulated substance").

Finally, the Act directs EPA to "issue a final rule . . . (B) phasing down the

consumption of regulated substances in the United States through an allowance

allocation and trading program."  42 U.S.C. §7675(e)(3).

In an implementing regulation promulgated in late 2021 (the "***Framework***

***Rule***"), EPA created an allowance system which was supposed to fairly allocate

"allowances" to companies in the United States refrigerant market according to

their historic market activity.[5]  *See, e.g.*, 86 Fed. Reg. at 55,145 (allowance

allocation "based on their historical market activity") (Addm.48); 86 Fed. Reg. at

55,155 (AIM Act applies to "entities already operating in the HFC market")

(Addm.50). The Framework Rule stated that EPA will "issue [HFC] allowances for

2022 by October 1, 2021" to individual companies based on a formulaic

methodology to calculate allowances for each eligible company. 86 Fed. Reg. at

55,118.  The calculation formula states that the "number of consumption

---

[4] The AIM Act also mandates the phaseout of domestic HFC production (*i.e.*, manufacturing) using a similar cap-and-trade system, but only import allowances are at issue in this case.

[5] *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 55,116 (Oct. 5, 2021) (EPA–HQ–OAR–2021–0044), codified at 40 C.F.R. Part 84 (Addm.41).

allowances allocated to each eligible entity for 2022–2023 is calculated" through an averaging formula based on each company's historical "consumption amounts." 40 C.F.R. §84.11 (Addm.16)[6]; 86 Fed. Reg. at 55,203 (Addm.52). EPA did not define the term "consumption amount" (nor is the term defined in the AIM Act) but "consumption" is defined in the regulations in terms of "imports" of HFCs. *See* §84.3 (Definitions) ("Consumption, with respect to a regulated substance, means production plus imports minus exports") (Addm.11).[7] At bottom, EPA made a

---

[6] 40 C.F.R. §84.11(a) reads in its entirety: "Allocation of calendar-year consumption allowances. (a) The relevant agency official will issue, through a separate notification, calendar year consumption allowances to entities that imported or produced a bulk regulated substance in 2020, unless an individual accommodation is permitted by a relevant Agency official. If multiple importers are related through shared corporate or common ownership or control, the relevant agency official will calculate and issue allowances to a single corporate or common owner. The number of consumption allowances allocated to each eligible entity for 2022–2023 is calculated as follows: (1) Take the average of the three highest annual exchange value-weighted consumption amounts chosen at the corporate or common ownership level for eligible entities reporting to the agency for each calendar year 2011 through 2019; (2) Sum the 'average high year' values determined in step 1 of all eligible entities and determine each entity's percentage of that total; (3) Determine the amount of general pool consumption allowances by subtracting the quantity of application specific allowances for that year as determined in accordance with § 84.13 and the set-aside in § 84.15 from the consumption cap § 84.7(b)(3); (4) Determine individual entity consumption allowance quantities by multiplying each entity's percentage determined in step 2 by the amount of general pool allowances determined in step 3."

[7] There is no question that Petitioner was an eligible company for purposes of §84.11, as it was active in the U.S. refrigerant market since at least 2011 and EPA did allocate some allowances to it (although an inadequate amount).

policy choice to allocate allowances to individual companies based on their historic

imports of HFCs.

In its regulations, EPA chose to define "importer" for purposes of the

allowance system as a person who "imports a regulated substance into the United

States."[8]  EPA's definition of importer expressly identifies the persons that qualify

as an importer, which includes the "actual owner" and the "consignee" of HFC

shipments:

> Importer means any person who imports a regulated substance into
> the United States. 'Importer' includes the person primarily liable for
> the payment of any duties on the merchandise or an authorized
> agent acting on his or her behalf. The term also ***includes***: (1) The
> consignee; (2) The importer of record; (3) The ***actual owner***; or (4)
> The transferee, if the right to draw merchandise in a bonded
> warehouse has been transferred.

40 C.F.R. §84.3 (emphasis added) (Addm.11).  EPA did not however clarify how

allowances would be allocated if more than one company qualified as an importer

under this definition.

During the development of its Framework Rule, EPA solicited information

from market participants regarding the history of imports of each company.  The

agency then based its allocation of allowances on information reported by these

---

[8] 40 C.F.R. § 84.3 (Definitions). The AIM Act does not itself use or define the term
"importer."

companies reflecting imports in the 2011-2019 timeframe.[9]  Although the

Framework Rule was developed in a public notice-and-comment process, EPA

never opened a separate public docket for its allocation of allowances.  EPA's

calculations of allowances for specific companies were not disclosed and reported

until their publication in the October 7, 2021 Allocation Notice.  However, in the

months leading up to the Framework Rule, EPA invited stakeholders to submit

data and information relating to historic HFC imports via email, and as noted EPA

also received comments through its "regulations.gov" comment portal for the

public docket in the Framework Rule rulemaking process.[10]

_____

[9] *Notice of Data Availability Relevant to the United States Hydrofluorocarbon Baselines and Mandatory Allocations*, 86 Fed. Reg. 9,059 (EPA–HQ–OAR–2021–0044; FRL–10020–30–OAR) (Feb. 11, 2021); *see also* Framework Rule, 86 Fed. Reg. at 55,152 ("EPA determined a company's historic HFC usage based on responses to EPA information requests, invoices, sales records, GHGRP reporting, supplier data, and other information available to the Agency.") (Addm.49); 86 Fed. Reg. at 55,140-41 (Addm.45-46); 86 Fed. Reg. at 55,144-45 ("The proposal was based on data available through the GHGRP; the February 11, 2021 NODA; stakeholder outreach meetings; outreach to trade associations . . . and direct communication with companies . . . EPA is issuing allowances to importers listed in the proposed rule, as well as importers that provided data that were sufficiently verifiable, for example through import records to EPA such as Customs forms or bills of lading.") (Addm.47-48).

[10] Although public comment letters in EPA's Framework Rule proceeding were available to the agency for its consideration of allowance allocations, for reasons that the agency fails to explain it chose not to include these documents in the administrative record in this proceeding.  Petitioner does not seek to supplement the record, as the agency's decision-making must be judged solely on the record

In four separate letters to EPA (which EPA accepted and acknowledged at the time of submission), Choice Refrigerants[11] informed EPA that it is a small business in Alpharetta, Georgia that recycles and sells refrigerants for heating and cooling in the U.S. market.  Choice explained that its flagship product is a patented, proprietary HFC product known as Choice® R-421A, which is popular as an environmentally friendly substitute for older chlorofluorocarbon refrigerants that depleted the ozone layer.  Choice also informed EPA that for the past 15 years, Choice has produced and distributed its Choice® R-421A product in Alpharetta and that, as a small business, it would depend heavily on a fair allocation of HFC

─────────────────────

that it identified, but the Court may take judicial notice of the existence of germane comment letters in the Framework Rule docket and the Court may consider the fact that the agency chose to exclude these comment letters from the Allocation Notice docket despite their obvious relevance to allowance allocations – which reinforces that the agency's action was artificially blinkered, that the agency failed to consider information available to it, and thus that the agency action was arbitrary and capricious.  *Georgia Aquarium, Inc. v. Pritzker*, 134 F. Supp. 3d 1374, 1377–78 (N.D. Ga. 2014) ("While the Eleventh Circuit has yet to specify what circumstances may justify going beyond the record, it has noted exceptions recognized by other circuits . . . The D.C. Circuit recognizes at least four accepted exceptions, permitting supplementation on a showing that the agency: (1) acted in bad faith in reaching its decision, i.e. an illegal motive; (2) engaged in improper behavior in reaching its decision; (3) failed to examine all relevant factors; or (4) failed to adequately explain its grounds for decision.") (internal punctuation omitted); *Sierra Club v. EPA*, 964 F.3d 882, 893 n.9 (10th Cir. 2020) (taking judicial notice of information on the EPA's database).

[11] Petitioner RMS of Georgia, LLC, is known in the refrigeration business by its trade name Choice Refrigerants.

allowances to continue its business. *See* Choice Letter, dated Feb. 25, 2021 (A41); Choice Letter, dated Mar. 29, 2021 (A52); Choice Letter, dated July 6, 2021 (Addm.112)[12]; Choice Letter dated Sept. 29, 2021 (A37).

Importantly for this case, Choice Refrigerants reported to EPA in these letters that it was the actual owner of certain HFC imports which Choice suspected EPA might allocate to other companies. As described in greater detail below, Choice provided uncontroverted information supporting these concerns. However, EPA overlooked, rejected and/or ignored this information –without any explanation – by giving credit for these imports to Choice's shipping agent rather than Choice, even though it is Choice that needs the allowances to continue its business. Adding insult to injury, EPA also gave credit for imports to a company that illegally imported Choice's patented refrigerant product, which resulted in Choice losing allowances (and sales) due to those imports – thus, giving the intellectual property pirate an illicit windfall worth millions of dollars. In both of these situations, the agency had uncontroverted information before it in the administrative record that Choice was the "actual owner" of the HFC imports

_____

[12] Oddly, although Choice's July 6, 2021 letter was submitted in the Framework Rule public comment docket (https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0044-0168), EPA chose not to include this document in the administrative record to support its Allocation Notice, which is additional indication that the agency's consideration of Choice's information was flawed.

within the meaning of EPA's regulations.  Prior to EPA's final action, Choice even provided EPA with detailed calculations reflecting its imports of HFCs and the number of allowances that Choice expected to receive.  Choice Letter, dated Sept. 29, 2021 p. 1 ("We are providing these calculations to assist EPA in issuing the correct amount of HFC allowances.") (A37). Yet the agency failed to follow its own regulations, failed to explain its decision, and rejected Choice's requests for an accounting of the agency's calculations.  Moreover, EPA betrayed the purposes of the AIM Act and its own policy choices by giving allowances to companies that do not need them and by giving allowances to intellectual property thieves.

A.    **Imports Owned By Choice and Imported Through a Shipping Agent, Which Should Be Attributed to Choice As the Actual Owner**

First, Choice reported to EPA that from 2011 thru 2017, it produced its proprietary product Choice® R-421A in the United States by importing R-421A or its blending components (*i.e.*, feedstocks) from overseas.  Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 1 (Addm.112).  R-421A and the blending components are all considered to be HFCs under the AIM Act. Choice had arranged with an overseas chemical supplier to manufacture and ship these HFCs to Choice's production facility in Alpharetta, where the materials were blended together with a proprietary lubricant additive that makes the product suitable for air conditioning equipment.  Choice Letter, dated Feb. 25, 2021 p. 3

11

(A43). The final blended product was then packaged and labeled in Alpharetta and sold to various downstream distributors in the U.S. refrigerant market.[13] Choice Letter, dated Feb. 25, 2021 p. 2 (A42).

During that time period, Choice had a commercial distribution arrangement with a non-affiliated company (Company A)[14] under which Company A would arrange the overseas shipments of HFCs on behalf of Choice Refrigerants. Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 3-4 (Addm.114-15). The shipments were shipped through a U.S. port of entry (typically Charleston) to Choice's production facility in Alpharetta. Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 3-4 (Addm.114-15). The imported chemicals were earmarked for and used exclusively by Choice for the production of its proprietary HFC products. Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 3-4 (Addm.114-15).

---

[13] Choice also explained in the letters that it was unable to source HFC chemicals from domestic U.S. chemical manufacturers because, as has been documented in official government reports, the major domestic HFC chemical producers are unwilling to supply HFC components to smaller producers such as Choice that compete against their own products. These large manufacturers also have so-called "swap" agreements among themselves which exclude small businesses such as Choice. Choice Letter, dated Feb. 25, 2021 p.3 n.4 (A43).

[14] Because some of the letters submitted by Choice contain confidential business information and are being filed under seal, and because it is not necessary for purposes of this appeal to identify these other companies by name in the briefs, Choice uses the generic reference to "Company A" and "Company B."

All production of the HFC products occurred in Choice's Alpharetta facility as described above.  Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 3-4 (Addm.114-15).

Choice also informed EPA that, although the cost of shipping these HFCs under this arrangement was initially advanced by Company A and although Company A arranged with U.S. customs for the imports, those costs were actually paid by Choice through a credit to Company A, such that the purchase price of the HFCs was in reality borne by Choice Refrigerants.  Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 3-4 (Addm.114-15).  Similarly, although the distributor's name appears on customs records, the parties intended that the shipments were owned by Choice, destined for Choice's Alpharetta production facility, and intended for Choice's use in blending Choice®-branded products.  Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 3-4 (Addm.114-15).  Thus, the agency had uncontroverted information that Company A essentially acted as Choice's shipping agent in arranging for overseas shipments of HFCs, advancing the initial purchase costs, and being reimbursed through an adjustment to its accounts for products distributed from Choice.  Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 3-4 (Addm.114-15).  In fact, in a public comment letter in the cap-and-trade rulemaking docket (which EPA also omitted from the

13

record in this proceeding), Company A acknowledged that it had at times "provided import services" to various companies. *See* https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0044-0106 (Addm.95).

Because Company A arranged imports, Company A reported the import of the HFCs which it had arranged on Choice's behalf in EPA's Greenhouse Gas Reporting Program ("***GHGRP***"), which is a program pre-dating the AIM Act for reporting greenhouse gas emissions from industrial and commercial sectors. As discussed below, the fact that the shipping agent filed the GHGRP paperwork may have been significant in EPA's decision not to credit Choice with these imports (although, as noted, EPA entirely failed to explain its rationale). Choice Letter, dated Feb. 25, 2021 p. 3 (A43); Choice Letter, dated July 6, 2021 p. 4 (Addm.115). Of course, at the time of this arrangement in the years 2011-2017, there was no indication that Congress would years later pass the AIM Act or that EPA would use the GHGRP reports in any future HFC allowance scheme.

Because Choice was concerned that EPA might mis-construe the GHGRP reports, months in advance of EPA's Allocation Notice, Choice cautioned EPA in a February 25 letter that "because the data is drawn from [GHGRP] greenhouse gas reporting that does not necessarily reflect commercial market realities, it is not appropriate or accurate data for purposes of . . . allocation of annual emissions allowances for HFCs." Choice Letter, dated Feb. 25, 2021 p. 1 (A41); Choice

14

Letter, dated July 6, 2021 p. 4 (Addm.115).  Choice also noted the importance of allocating allowances under the AIM Act to the company that actually owned the HFCs being imported, as otherwise that company would "suffer an unfair and economically devastating mismatch between the party that receives allowances and the party that ultimately bears the economic burden of the allowance system." Choice Letter, dated Feb. 25, 2021 p. 2 (A42); Choice Letter, dated July 6, 2021 p. 6 (Addm.117).  Choice also beseeched the agency to make fair decisions as "EPA's decisions on allowance allocation, quite literally, may mean life or death for small businesses like Choice Refrigerants."  Choice Letter, dated Feb. 25, 2021 p. 2 (A42); Choice Letter, dated July 6, 2021 p. 2 (Addm.113).

Choice's arrangement with Company A ended in 2017 and the companies currently have no commercial relationship.  Because EPA calculated the allowance allocations at issue in this appeal in a black box and did not publicly reveal calculations for any companies, there is no indication in the record of how EPA considered the information submitted by Choice.  However, based on the shortfall of allowances it actually received compared to the number of allowances it was expecting to receive, Choice believes that Company A was credited with the disputed imports in the 2011-2017 time period.  The HFCs imported by Company A as shipping agent for Choice represent approximately 914,578 allowances, which would have increased Choice's allocation of allowances by about 27 percent

(applying EPA's somewhat complicated calculation methodology), even after considering the otherwise applicable reduction for all companies mandated by the cap-and-trade phasedown.

### B.    Illegal Imports of Choice's Patented Product by Company B, Which Should Be Attributed to Choice As the Actual Owner

Choice also provided undisputed information in the administrative record that, during calendar year 2017, a different company (Company B)[15] had illegally imported some 1,410,944 pounds of pirated R-421A without paying federal antidumping duties and in infringement of Choice's exclusive U.S. patent.  Choice Letter, dated Mar. 29, 2021 p. 1 (A52); Choice Letter, dated July 6, 2021 p. 7-8 (Addm.118-19).  The letters submitted by Choice notified EPA that agents with U.S. Customs and Border Protection had seized certain shipments of pirated R-421A imported by Company B, which led to an investigation by the U.S. Department of Commerce of Company B's activities.  Ultimately, the federal government determined that Company B had imported Choice's proprietary R-421A product in circumvention of federal trade laws.  Choice Letter, dated Mar. 29, 2021 p. 2 (A53); Choice Letter, dated July 6, 2021 p. 8 n.8 (Addm.119); *see*

---

[15] Petitioner uses the anonymous designation "Company B" to refer to a group of affiliated companies that are treated by EPA as a single corporate group, and which were investigated by the Commerce Department for trade circumvention as a group.

*also Hydrofluorocarbon Blends From the People's Republic of China: Final Scope Ruling on Unpatented R-421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A*, 85 Fed. Reg. 34,416 (June 4, 2020) (Addm.69); *Preliminary Decision Memorandum for Scope Ruling and Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China; Unpatented R-421A* (A-570-028) (Barcode: 3947714-01) (Feb. 26, 2020), available at https://access.trade.gov/ (Addm.73). Choice also provided information showing that the illegal imports of pirated R-421A were part of a larger effort by Company B and other companies with strong ties to China to distort the U.S. refrigerants market in order to improperly gain more HFC allowances through price dumping, circumvention of trade laws, abusive contract practices, and other illegal means.  Choice Letter, dated July 6, 2021 p. 8-15 (Addm.119-26).

It was uncontested in the administrative record before the agency that, if Company B had not illegally imported this quantity of pirated R-421A, Choice Refrigerants would have supplied that market demand with its genuine R-421A product and Choice's imports would have been correspondingly higher in 2017, which would have entitled Choice to additional allowances.  It was also uncontested that rewarding Company B for its illegal behavior ran counter to the policies of the AIM Act.  Collectively, the Choice-owned products imported by

Company B represent approximately 1,687,36 allowances, which if properly

credited to Choice would have increased Choice's allocation by 18% (applying

EPA's calculation methodology).

### C.    EPA's Allowance Allocations

As required by its Framework Rule, EPA published its notice in the *Federal*

*Register* on October 7, 2021, stating that it had allocated consumption allowances

to some 40 companies that had historically participated in the U.S. HFC market by

importing HFCs.[16]  Table 3 of EPA's Allocation Notice, titled "CONSUMPTION

ALLOWANCES FOR CALENDAR YEAR 2022," reflects the number of

allowances issued to each company, including 1,615,592.9 allowances to RMS of

Georgia (*i.e.*, Choice Refrigerants).  86 Fed. Reg. at 55,843 (A19). According to

the table, some 40 other companies were also issued varying amounts of

allowances based on their own particular circumstances, ranging from a minimal

number of allowances for some companies to over 82 million allowances for the

company with the largest market share. The Allocation Notice reported the name

of the company group and number of allowances for each company, but provided

no other information and did not disclose the calculations that the agency had used

---

[16] *Allocation Notice,* 86 Fed. Reg. at 55,841-42 (EPA "has issued calendar year
2022 allowances for the production and consumption of hydrofluorocarbons in
accordance with the Agency's regulations . . . EPA has allocated calendar year
2022 consumption allowances as shown in Table 3.") (A17-18).

to compute the allocations, nor did EPA disclose which import had been credited to which company. 86 Fed. Reg. 55,841 (A17).  In fact, EPA refused to provide its calculations, even to the particular companies receiving allowances.  However, based on the total number of allowances reported, Choice was able to reverse-engineer the calculations to determine that EPA had <u>not</u> credited Choice for the shipments that Choice had reported to EPA during the rulemaking process.  In other words, Choice was not credited with the HFC imports arranged by Company A that were owned by Choice. Nor was Choice credited with the imports of its patented product by Company B.  Because EPA failed to properly credit Choice with all the imports associated with its business, Choice received 33% fewer allowances than it should have received, even after considering across-the-board cuts to all companies as part of the AIM Act's phaseout of HFC refrigerants.[17]

### D.    Standard of Review

The AIM Act provides that certain sections of the Clean Air Act "shall apply to" the AIM Act and "any rule, rulemaking, or regulation promulgated by the [EPA] Administrator pursuant to [the AIM Act] as though [the AIM Act] were expressly included in title VI of [the Clean Air Act]." 42 U.S.C. §7675(k)(1)(C).

---

[17] Choice is prepared to demonstrate these computations if the Court deems it necessary, but the administrative record contains no contradiction or refutation of the facts and the precise number of credits is not necessary to determine the legal principles at issue in this appeal.

Among the applicable sections of the Clean Air Act is §307, 42 U.S.C. 7607, which includes provisions on judicial review.

A court may set aside EPA action under the Clean Air Act if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," which echoes the familiar standard for Administrative Procedure Act review of agency action. §7607(d)(1)(I), (d)(9)(A); *Alabama Environmental Council v. EPA*, 711 F.3d 1277, 1285 (11th Cir. 2013) (review of EPA actions pursuant to 42 U.S.C. §7607(b)(1) apply the standard of review in the Administrative Procedure Act); *Sierra Club v. Martin*, 168 F.3d 1, 3 (11th Cir. 1999) ("agency actions should be reversed if they are found to be 'arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law'") (citing APA, 5 U.S.C. §706(2)(A)); *Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020) ("[W]e apply the same standard of review under the Clean Air Act as we do under the Administrative Procedure Act.")).  Agency action is considered arbitrary or capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").  In order for a court to sustain agency

action as non-arbitrary, "the agency must . . . articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The Court must review the agency's action solely on the administrative record before it. *State Farm*, 463 U.S. at 50 ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself."). In this appeal, the record consists only of a short *Federal Register* notice with no explanation for its action with respect to Choice Refrigerants. Should the agency belatedly attempt to supply a justification for its action in its litigation briefs, the Court is not required to accept litigation positions as official justifications for agency action. *Alabama Environmental Council*, 711 F.3d at 1288 n.11; *Gonzalez v. Reno*, 212 F.3d 1338, 1350 (11th Cir. 2000) ("An after-the-fact rationalization of agency action – an explanation developed for the sole purpose of defending in court the agency's acts – is usually entitled to no deference from the courts."); *Kisor v. Wilkie*, 139 S.Ct. 2400, 2417-18 (2019) (no deference to agency reading of rule unless a "fair and considered judgment" that does not "create[] unfair surprise").

Courts must hold federal agencies to applying their regulations as written and must not allow agencies to misapply the regulations, change regulations in secret, or morph their interpretation beyond the plain language of the regulation.

As the Supreme Court recently admonished, "[f]irst and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous . . . [d]eference in that circumstance would permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Kisor*, 139 S.Ct. at 2415 (citing *Christensen v. Harris County*, 529 U.S. 576, 588 (2000), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). Even "[i]f genuine ambiguity remains, moreover, the agency's reading must still be 'reasonable.'" *Kisor*, 139 S.Ct. at 2415 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)). In short, the agency's interpretation need not be taken as gospel. "Under *Auer*, as under *Chevron*, the agency's reading must fall 'within the bounds of reasonable interpretation' . . . And let there be no mistake: That is a requirement an agency can fail." *Kisor*, 139 S.Ct. at 2416 (citing *Arlington v. FCC*, 569 U.S. 290, 296 (2013)).

## SUMMARY OF THE ARGUMENT

This case involves a final action of the U.S. Environmental Protection Agency allocating environmental permits to individual companies under a cap-and-trade program for reducing HFCs commonly used as refrigerants. The agency's regulations require allowances to be allocated to companies that historically imported HFCs, and EPA defined importer as *inter alia* the "actual owner" of the imported HFCs.

Petitioner Choice Refrigerants informed the EPA that it was the actual owner of various HFC import shipments for purposes of the HFC allowance program. But the government ignored Choice's uncontroverted information and allocated Choice 34% fewer allowances than Choice should have received under those regulations, leaving Choice far short of the permits it needs to continue its business. EPA's allocation process was done in a black box without transparency. The agency refused to disclose the computations that it used to allocate allowances and did not publicly reveal any findings of fact supporting its action, which itself is arbitrary and capricious. However, by reverse engineering the allowance totals, Petitioner has calculated that EPA failed to follow its own regulations and failed to credit Choice Refrigerants with millions of allowances which the agency instead credited to two other companies – in one case to a shipping agent that Choice had used for certain shipments, and in another case, to a company that had illegally imported Choice's patented product.

## ARGUMENT

EPA's Framework Rule calls for the agency "to issue allowances for [the calendar year] 2022 by October 1, 2021, according to the framework and procedure established through this rulemaking." Framework Rule, 86 Fed. Reg. at 55,118 (Addm.43). EPA issued its Allocation Notice on October 7, 2021, announcing allocations of allowances to some 40 market participants, including Choice Refrigerants. Unfortunately, EPA did its calculations of allowance allocations in a

black box, and has declined to 'show its work.'  However, it is apparent from the

deficient number of allowances that EPA actually allocated to Choice Refrigerants

that the agency departed from its regulations, which require allowances to be issued to

"importers" − a term which includes the "actual owner" of historical refrigerant

imports − and did not credit Choice Refrigerants with HFC imports under its shipping

arrangement with Company A.  It is also apparent from the deficient number of

allowances issued to Choice that EPA also did not credit Choice credit for imports of

Choice's proprietary HFC product, which Company B had illegally imported.

  In its Framework Rule, EPA adopted regulations which require the agency to

allocate allowances "to entities that imported" HFCs based on historical imports during

the period 2011 − 2019.  §84.11(a) (Addm.16); 86 Fed. Reg. at 55,203 (Addm.52).

EPA defined "importers" by referring explicitly at subclause (3) to the "actual owner"

of the HFC imports.  §84.3 (definition of "importer") (Addm.11); 86 Fed. Reg. at

55,202 (Addm.51).  Although EPA's definition includes other entities within the

definition of "importer," the inclusion of the term "actual owner" is explicit and

unambiguous.[18]  And because EPA did not further define "actual owner," that term

--------------------------------------------------------------------------------

[18] The fact that EPA chose a definition of "importer" that could encompass more
than one company does not negate the fact that the "actual owner" of HFC imports
is entitled to allowances.  The agency apparently did not think ahead about its
definition of "importer" and had no plan for allocating allowances in instances
where the definition pointed to more than one entity.

should be given its ordinary meaning as a person "who has the right to possess, use, and convey something; a person in whom one or more interests are vested." Black's Law Dictionary (11th ed. 2019) (definition of "owner"); *Catalyst Pharm., Inc. v. Becerra*, 14 F.4th 1299, 1307 (11th Cir. 2021) ("statute is not ambiguous merely because it contains a term without a statutory definition . . . we interpret words that are not defined in a statute with their ordinary and plain meaning") (internal punctuation omitted). EPA's regulations also expressly include for purposes of allocating allowances at subclause (1) of the definition of "importer," the "consignee" – a term which is commonly understood as a "person named in a bill to whom or to whose order the bill promises delivery." Black's Law Dictionary (11th ed. 2019) (definition of "consignee").

In four letters to EPA, Choice Refrigerants notified the agency that Choice was the actual owner of certain imported HFCs arranged by Company A and stolen by Company B. Choice described in detail why it should be considered the "actual owner" or "consignee" of certain historic imports of HFCs for purposes of the AIM Act, and Choice's position was uncontroverted by anything else in the administrative record at the time the agency allocated the allowances. As described above, Choice notified EPA that it had arranged and paid for HFC imports to be sent to its Alpharetta facility to manufacture its patented proprietary HFC product and that Company A acted as its shipping agent under this arrangement. In the letters, Choice also provided uncontroverted information

25

showing that Choice was the consignee of the shipments arranged by Company A, as those shipments were all sent to Choice's Alpharetta production facility. Choice also informed EPA that Company B had been caught pirating Choice's proprietary product in a scheme to circumvent U.S. trade laws and that Choice had exclusive ownership rights to the HFCs that had been imported.

Given this uncontroverted evidence in the record, EPA should have determined that Choice Refrigerants was the actual owner of those imports and should have credited those imports in the calculation of Choice's allowances. Yet EPA departed from its own regulations by denying credit for imports that Choice Refrigerants owned and had imported through the shipping arrangement with Company A. EPA also ignored the record evidence in denying Choice credit for imports of the patented product that Choice owned and which Company B had illegally imported.

The administrative record is devoid of any explanation for the agency's action with respect to the imports claimed by Choice Refrigerants. EPA's Allocation Notice in the *Federal Register* itself states only that the allocation was based on individualized consideration of the circumstances of "each entity" that was eligible to receive allowances. 86 Fed. Reg. at 55,841 (A17). The only document in the administrative record that explains how EPA actually undertook the allocation process is an October 1, 2021 memorandum ("***October 1 Memo***") (A20). The October 1 Memo states that "[e]ntities that . . . imported . . . were eligible for . . .

26

allowances," and sets out generic calculation methodology for all companies that were eligible to receive allowances. October 1 Memo p. 3 (A22). The memo also acknowledges that allowances were intended to be allocated on the basis of "historic activity" in the HFC market. October 1 Memo p. 3 (A22). But the memorandum contains no discussion of the facts submitted by Choice. Although the October 1 Memo contains short entries for each individual company that received AIM Act allowances, the entry for Choice Refrigerants says nothing about the Company A or Company B imports. October 1 Memo p. 14-15 (A33-34).[19] EPA made no attempt to explain its decision-making or to reconcile its apparent rejection of Choice's imports with the regulatory definition of "importer" at 40 C.F.R. §84.3.

EPA's October 1, 2021 memorandum states throughout the document that "EPA used historic data reported to GHGRP to calculate allowance allocation levels." October 1 Memo p. 5 (A24). This suggests that EPA may have looked solely at data in its Greenhouse Gas Reporting Program at 40 C.F.R. Part 98 as the basis for allocating allowances. But EPA's framework regulations say nothing about greenhouse gas reporting or using the GHGRP as the exclusive data source. Indeed, neither the AIM Act nor EPA's implementing regulations even mention greenhouse

---

[19] Notably, the entry in the October 1 Memo for "FluoroFusion" indicates that Company A and FluoroFusion were "grouped together into one entity," which suggests that the imports which Company A imported as shipping agent for Choice Refrigerants might have been allocated instead to FluoroFusion. (A29).

gases.  EPA's regulations nowhere require that the "importer" or "actual owner" (or the "consignee") be the entity that reported the imports to EPA's GHGRP database. To the extent that EPA attempts, as its litigation strategy in this appeal, to assert that only companies reporting HFC imports to EPA's greenhouse gas reporting program can be the "importer" for AIM Act purposes, the Court should reject that position as inconsistent with EPA's regulatory definition of "importer" and not allow the agency to invent a post-hoc litigation rationalization for the agency's unlawful action.

The GHGRP is an entirely different regulatory program that has no linkage with the AIM Act.  The GHGRP was created by EPA in 2009 (over a decade before the AIM Act).  *See Mandatory Reporting of Greenhouse Gases*, 74 Fed. Reg. 56,260 (Oct. 30, 2009).  The GHGRP was never designed or intended to determine what company is the "importer" for purposes of the AIM Act.  Rather, the purpose of the GHGRP was to gather information about use of greenhouse gases in the United States for purposes of creating a national climate change inventory and to regulate greenhouse gas emissions. 74 Fed. Reg. at 56,265.  In contrast, as noted above, the purpose of the AIM Act is to phase out older chemicals in order to promote American innovation and manufacturing; the AIM Act literally has no mention of greenhouse gas regulation.[20]

---

[20] Although EPA attempted in its Framework Rule to describe the AIM Act as directed at greenhouse gases, 86 Fed. Reg. at 55,116 ("[t]his Act mandates the

Although the definition of "importer" under the GHGRP uses similar phrasing as the definition in EPA's AIM Act regulations,[21] the AIM Act regulations at 40 C.F.R. Part 84 (like the statute) contain no mention of the GHGRP nor do the AIM Act regulations even mention the term "greenhouse gas."[22]  Nor were market participants ever given fair notice that GHGRP data would be used (a decade after the GHGRP was created) for a future HFC allowance system.  For example, in the case of Choice's imports arranged by

_____

phasedown of hydrofluorocarbons, which are highly potent greenhouse gases"), it is clear that the purpose of the AIM Act is not to regulate greenhouse gases.  The statute itself never mentions greenhouse gases or climate change – for good reason, the political divisiveness of climate change prevented Congress from reaching consensus on any policy explicitly directed at climate change – and instead (as evident in the title of the statute "Innovation and Manufacturing") focused on the economic benefits to certain U.S. chemical manufacturers of fostering innovation in the chemicals industry.

[21] 40 C.F.R.§98.6 reads in relevant part: "Importer means any person, company, or organization of record that for any reason brings a product into the United States from a foreign country, excluding introduction into U.S. jurisdiction exclusively for United States military purposes. An importer is the person, company, or organization primarily liable for the payment of any duties on the merchandise or an authorized agent acting on their behalf. The term includes, as appropriate: (1) The consignee. (2) The importer of record. (3) The actual owner. (4) The transferee, if the right to draw merchandise in a bonded warehouse has been transferred."

[22] As with the AIM Act definition of "importer," it is possible that more than one entity would be an importer under the GHGRP. To Petitioner's knowledge this issue was never addressed by EPA in the context of the GHGRP, most probably because the GHGRP is a reporting program with no associated award of allowances, so as a practical matter it mattered little to market participants what company filed the GHGRP reporting paperwork for particular HFC shipments.

Company A, Choice understood at the time of these imports that Company A would file the paperwork for the GHGRP reporting requirement − but Choice never intended to forfeit its status as the actual owner of the shipments nor its entitlement to any future HFC allowances based on past imports as a result of using a shipping agent to file GHGRP reports.  As noted, when the Company A and Company B imports took place, the AIM Act was still years away and EPA never notified companies that GHGRP data would be used as a basis to allocate valuable market allowances. If the agency had provided fair warning, Choice would have either re-ordered its business affairs or itself filed GHGRP reports for the imports at issue.  Importantly, EPA never explains in the record of the agency action before this Court how it reconciled GHGRP reporting data with its definition of "importer" in its AIM Act regulations, which expressly designate the "actual owner" and "consignee" as importers for purposes of AIM Act allowances.[23]

Similarly, to the extent that EPA's definition of "importer" would qualify two different companies as importer for the same shipment, it was incumbent on

_____

[23] EPA's October 1 Memo also states that the agency compared GHGRP data to customs records as a verification check for purposes of computing HFC allowance allocations. (A21). But again, EPA never explains how it used customs records to determine what company was the "actual owner" of particular HFC shipments and should be allocated allowances as the importer for AIM Act purposes.

the agency under *State Farm* to acknowledge the situation and propose a rational resolution, but here the agency did neither. The Allocation Notice tells the Court nothing about how the agency construed the regulatory language, nor how the agency applied the regulations to Choice's imports, nor why the result was fair and consistent with policies underlying the AIM Act and the allowance program. Even if EPA had determined that Choice was not the "importer" of the HFC shipments at issue (it is not clear how this could be in light of EPA's regulations) – or was not the only importer – it was arbitrary and capricious for EPA to have given allowances to other companies and not to have allocated allowances to Choice, given the agency's policy decision to allocate allowances to companies to reflect historic market share in the U.S. HFC market.

In short, because EPA did not follow its own regulations in allocating allowances to the actual owner of relevant imports, the Court must set aside the agency action as unlawful. Similarly, the Court cannot sustain the agency's unexplained, arbitrary and capricious approach to allocating allowances under the applicable standard of review under the Clean Air Act.

## I. EPA WAS REQUIRED TO CREDIT SHIPMENTS TO CHOICE, AS THE ACTUAL OWNER, NOT TO COMPANY A, AS THE SHIPPING AGENT

Choice submitted sufficient information to EPA for the agency to determine that Choice was the actual owner or consignee of these imports consistent with the

definition of "importer" in the agency's regulations at §84.3. EPA's failure to credit Choice for imports of HFCs facilitated by Company A that were either Choice's proprietary product or components used to blend Choice's proprietary product was inconsistent with the AIM Act regulations, which recognize that the "actual owner" of a shipment qualifies as an importer. The effect of EPA not crediting Choice with the imports arranged by Company A reduced Choice's net allowance allocation by 27 percent beyond the otherwise applicable reduction for all general pool participants.

EPA had before it an administrative record showing that these imports were arranged by Company A under a shipping agent relationship in which Company A imported HFCs on behalf of Choice under an arrangement in which the shipments were owned and paid for by Choice, delivered to Choice's Alpharetta facility, and imported in recognition of Choice's exclusive intellectual property rights. Thus, the record shows that Company A was acting as a shipping agent or arranger for its principal: Choice. EPA was also notified that Choice is the exclusive patent holder of R-421A and that Company A could not legally have imported these products without Choice's approval. It was also uncontroverted that Company A facilitated the import of allowances for Choice so that Choice would blend the patented refrigerants, and Choice would then supply some of the blended product to Company A for its needs. Moreover, as noted above, Company A informed the

agency that it had performed a similar shipping agent role for other companies.  It was arbitrary and capricious for the agency to have ignored the commercial realities of this arrangement.

In this situation, there is no question that Choice was the actual owner of the HFC imports arranged by Company A.  It is black letter law that an agent cannot use or claim the property of its principal.  *Restatement (Third) Of Agency* §8.05 cmt b. (2006) (recognizing principal's right, as an owner of property, to exclude usage by others) (citing *Annesley v. Tricentrol Oil Trading, Inc.*, 841 S.W.2d 908 (Tex. App. 1992), *abrogated on other grounds by Van Allen v. Blackledge*, 35 S.W.3d 61 (Tex. App. 2000) (agent who held seats on commodities exchange on principal's behalf had duty to transfer seats to principal's designate)).  It is also undisputed in the record that, because of Choice's exclusive patent rights, Company A could not have imported these quantities of HFCs but for the shipping agent arrangement with Choice.[24]

---

[24] This shipping arrangement appears substantially identical to the shipping agent arrangement that EPA recognized as valid in crediting shipments by Company A for other companies in years after Company A ceased importing on behalf of Choice.  *See* U.S. EPA, *Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act: Response to Comments*, p. 152 (EPA-HQ-OAR-2021-0044-0227_attachment_3) (Sept. 2021), available at https://www.regulations.gov/document/EPA-HQ-OAR-2021-0044-0227 ("*Response to Comments*") (Addm.59).

Given these uncontroverted facts, it is clear that Choice was the "person who imports a regulated substance into the United States" as defined in EPA's regulations at §84.3 (definition of "importer"). Choice clearly fits subclause (3) of EPA's definition of "importer" because it was the "actual owner" of the imports as described §84.3. Choice also fits EPA's definition of "importer" because it was the consignee of the imported HFCs as described in subsection (1) of the definition, where the HFCs at issue were indisputably shipped to Choice's facility in Alpharetta.  EPA's Part 84 regulations, and particularly the definition of "importer," which expressly includes the "actual owner" of HFCs being imported, require EPA to recognize (and certainly do not prevent EPA from recognizing) the substance of a commercial import arrangement. Although Company A filed GHGRP reports in its own name in EPA's greenhouse gas reporting system, as discussed above, the GHGRP serves a different regulatory purpose.  Moreover, on the facts in this case, the HFCs at issue were intended as chemical feedstocks for the production of Choice's patented products, to which Company A had no legal or intellectual property rights.

Although EPA did not explain its allocation decisions in the record, it is apparent from the end result that the agency did not credit the information provided by Choice.  By failing to allocate allowances to the "actual owner" or "consignee" of the underlying imports, EPA failed to follow its own regulations, which is

34

unlawful.  *Sierra Club*, 168 F.3d at 5 (rejecting "agency's position [that] is contrary to the clear language" of a regulation).  And by failing to consider the uncontroverted information before it (*i.e.*, that Choice was the actual owner of the HFC imports and that Company A had acted as its shipping agent), the agency "failed to consider . . . important aspect[s]" of the issue before it, failed to engage in reasoned decision making, and reached a result that "[ran] counter to the evidence" before it.  *State Farm*, 463 U.S. at 43.  Each of these errors constitute grounds for vacating agency action under the Clean Air Act standard of review, which tracks the Administrative Procedure Act.  *Sierra Club*, 168 F.3d at 3 ("agency actions should be reversed if they are found to be 'arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law'") (citing 5 U.S.C. §706(2)(A)).

Notably, the record is devoid of any suggestion that EPA interprets its regulations to grant allowances to shipping agents rather than the actual owner of HFC imports.  Because EPA's own regulations are unambiguously explicit that the "actual owner" and "consignee" of HFCs is an importer for purposes of allowance allocation, the Court owes no deference to the agency in interpreting or in applying its regulations to these facts.  *Kisor*, 139 S.Ct. at 2417-18 (no deference to agency reading of rule unless a "fair and considered judgment" that does not "create[] unfair surprise").  To the extent that the government might now attempt to re-

interpret those regulations, the Court need not extend any deference to the agency, as the agency's position would be "contrary to the clear language" of the regulations, which expressly state that the actual owner of HFC imports is an importer for purposes of allowance allocations. *Kisor*, 139 S.Ct. at 2415 (a court should not afford deference unless, after exhausting all the traditional tools of construction, the regulation is genuinely ambiguous; no deference to ad hoc litigating positions that are not authoritative or official interpretations based on fair and considered judgment); *Gonzalez*, 212 F.3d at 1350 ("An after-the-fact rationalization of agency action – an explanation developed for the sole purpose of defending in court the agency's acts – is usually entitled to no deference from the courts."); *Mitchell Energy Corp. v. FERC*, 651 F.2d 414, 418 (5th Cir. 1981) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action") (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947)).[25] Moreover, the Court should reject any attempt by EPA to read out of its regulations the explicit reference to "actual owner," as this Court has noted "[i]nterpreting a

---

[25] Because, in light of the scant administrative record, Petitioner can not guess at how the agency might defend its action, Petitioner has not forfeited any argument that it might raise in a reply brief to address new justifications that the government might assert. *American Lung Ass'n v. EPA*, 985 F.3d 914, 991 (2021) (sufficient for petitioner to support the claim with citations to the record and sources of legal authority to avoid forfeiture of argument) (citing *Tribune Co. v. FCC*, 133 F.3d 61, 69 n.8 (D.C. Cir. 1998) (argument that the agency's action was arbitrary and capricious sufficed to preserve the claim).

regulation in a manner that robs it of all meaning is unacceptable." *Sierra Club*, 168 F.3d at 7.

At bottom, it appears that EPA handed out valuable allowances to a company that was merely acting as a shipping agent for Choice, where the shipping agent did not own or produce the products being imported. This is akin to handing the deed to a parcel of real estate to the realtor that brokered the sale, rather than to the homeowner who paid for the property. Moreover, EPA's action is inconsistent with its stated policy to reflect market share in the HFC allocation program. EPA's failure to explain this disconnect in the record makes the action arbitrary, which necessitates vacating the action. *Sierra Club*, 168 F.3d at 5 ("[a]gency actions must be reversed as arbitrary and capricious when the agency fails to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (cleaned up).

In sum, because EPA provided absolutely no explanation at all in the record of its decision with regard to Choice Refrigerants, other than publishing the total number of allowances allocated, the agency action should be set aside and remanded with direction for EPA to issue the proper number of allowances to Choice considering the imports by Company A that ought to be attributed to Choice as the

actual owner of those imports. *Alabama Environmental Council*, 711 F.3d at 1292

(court must set aside agency action not in accordance with Clean Air Act).

## II.    EPA WAS REQUIRED TO CREDIT R-421A SHIPMENTS TO CHOICE, NOT REWARD INTELLECTUAL PROPERTY PIRATES

Similarly, with regard to imports of pirated R-421A by Company B, the

agency was provided uncontroverted evidence that Choice was the actual owner of

those imports by virtue of having exclusive patent rights to that product in the U.S.

Yet the EPA apparently ignored or overlooked that information.  Again, EPA

provided no explanation in the record for its allocation computations.  However, by

reverse engineering the number of allowances actually issued to Choice, it is

apparent that EPA did not allocate any allowances to Choice based on imports of

R-421A in 2017.  The adverse effect on Choice of this issue was a reduction in its

allowance allocation by nearly 18 percent.

It also appears that EPA may have perversely credited Company B for its

illegal behavior.  EPA had sufficient information before it to determine not only

that Choice was the legal owner of these HFC imports, but also that Company B's

imports had been determined by the Commerce Department to have circumvented

U.S. trade laws.  Crediting Company B for imports of pirated HFCs is equivalent

to giving a 'salesman of the year' bonus to criminals selling flat screen TVs or

counterfeit Rolex watches out of the back of a truck in a side alley.

EPA provided absolutely no response to this information in the administrative record for its action in this matter. However, in the Framework Rule docket, EPA alluded to Choice's notification as to Company B's illegal activities as "unproven allegations."[26] To the contrary, the record contains ample evidence that the Department of Commerce concluded after an extensive investigation that imports of R-421A by Company B circumvented U.S. trade laws and were subject to antidumping duties, all of which was documented in official findings that were available to EPA in the rulemaking record. *See, e.g.*, Choice Letter, dated July 6, 2021 p. 8 n.8 (Addm.119) (citing *Hydrofluorocarbon Blends From the People's Republic of China: Final Scope Ruling on Unpatented R-421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A*, 85 Fed. Reg. 34,416).

EPA also asserted in its Response to Comments document in the Framework Rule rulemaking proceeding that it cannot "enforce patents."[27] To be clear, Choice was not asking EPA to enforce its patents, but rather Choice was asking EPA to not reward companies that violate trade laws and infringe U.S. intellectual property

---

[26] Response to Comments at 143 (Addm.58). Again, EPA (oddly) did not include this document in the administrative record of its Allocation Notice, so the agency should not be allowed to rely on this statement as support for its challenged action.

[27] Response to Comments at 191 (Addm.66).

rights by handing out allowances based on these illegal actions. Just like buying cut-rate TVs out of the back of a truck in an alley, in the face of strong indications of illegal behavior, it was incumbent on EPA to not blind itself to the reality of the circumstances. EPA should have credited the volume of these imports to Choice Refrigerants rather than to a company that the U.S. government had already determined was a bad actor. To the extent that EPA required additional information to verify the information that Choice had provided, it was incumbent on the agency to request or gather additional information.

Like the Forest Service's failure to gather adequate information in *Sierra Club*, the EPA here has failed to do its homework and either ignored information in the record or failed to gather information needed to make a decision on its HFC allocations. *Sierra Club*, 168 F.3d at 5 (information the agency deemed adequate was "in reality no information at all"). Accordingly, the Court may find the EPA's action arbitrary under *State Farm* where the agency failed to explain its decisions in the record, apparently overlooked or ignored uncontroverted evidence of Choice's intellectual property ownership of the Company B shipments, and apparently failed to consider important aspects of how valuable allowances should be allocated to companies in these circumstances.

In sum, EPA's decision to reject or ignore uncontroverted information that Choice was the true owner of the pirated R-421A imports was unexplained,

arbitrary and capricious, and contrary to its own regulations. EPA's action should be set aside and remanded with direction for EPA to issue the proper number of allowances to Choice considering the imports by Company B that ought to be attributed to Choice as the legal owner of the patented R-421A product.

## CONCLUSION

Together, EPA's refusal to credit Choice with the Company A (shipping agent) imports and the Company B (pirated) imports leaves Choice with some 1,232,100 fewer allowances than it was entitled to under EPA's regulations. This translates to a combined 34% fewer allowances than Choice needs to conduct its business as before, even after accounting for the cap-and-trade reductions applicable to allowance pool participants generally. In order to stay in business, Choice will be forced to buy allowances from the companies who were given those allowances by the government, including the very companies that were unfairly given Choice's allowances. Although there are no published reports of allowance pricing (the allowance program is still in its initial days), anecdotally allowances may be worth as much as $10 per allowance, making the loss to Choice as much as $12 million each year. This is a staggering blow for a small business. And because EPA adopted a policy of allocating allowances to companies based on historic market activity, leaving Choice with only 2/3 of its needed allowances is inconsistent with EPA's own policy choices.

41

In sum, because the agency's allocation of allowances to Choice Refrigerants was inconsistent with the agency's own regulation it is unlawful. And because the agency's action was unexplained and inconsistent with the record, it is arbitrary and capricious. Accordingly, Petitioner prays that this Court remand the agency action reflected in the Allocation Notice with instructions to issue allowances to Choice Refrigerants consistent with the information in the administrative record.

Respectfully submitted,

/s/ David M. Williamson

David M. Williamson
WILLIAMSON LAW + POLICY, PLLC
1850 M Street NW, Suite 840
Washington, DC 20036
(202) 256-6155
maxwilliamson@williamsonlawpolicy.com

*Counsel for RMS of Georgia, LLC*

May 2, 2022

## CERTIFICATE OF COMPLIANCE

1.      Pursuant to Fed. R. App. P. 27(d)(2), I hereby certify that the foregoing filing complies with the type-volume limitations. According to the word processing system used in this office, this document, exclusive of the parts of the filing exempted by Fed. R. App. P. 32(f), contains 10,368 words.

2.      Pursuant to Fed. R. App. P. 32(a)(5)-(6), I hereby certify that the foregoing filing complies with the typeface requirements and the type-style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: May 2, 2022

/s/  David M. Williamson
David M. Williamson
WILLIAMSON LAW + POLICY, PLLC
1850 M Street NW, Suite 840
Washington, DC 20036
(202) 256-6155
maxwilliamson@williamsonlawpolicy.com

*Counsel for RMS of Georgia, LLC*

## CERTIFICATE OF SERVICE

I certify that on this day, I caused to be filed a copy of this brief using the Court's case management electronic case filing system, which will automatically serve notice of the filing on registered users of that system.


/s/ David M. Williamson
David M. Williamson


May 2, 2022

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

PAGE

American Innovation and Manufacturing Act of 2020,
42 U.S.C. § 7675 ............................................. Addm.1

40 C.F.R. Part 84, Phasedown of Hydrofluorocarbons .............. Addm.10

*Phasedown of Hydrofluorocarbons: Establishing the Allowance
Allocation and Trading Program Under the American Innovation
and Manufacturing Act*, 86 Fed. Reg. 55,116 (Oct. 5, 2021)
(EPA–HQ–OAR–2021–0044), codified at 40 C.F.R. Part 84
(excerpted) .................................................. Addm.41

U.S. EPA, *Establishing the Allowance Allocation and Trading
Program under the American Innovation and Manufacturing Act:
Response to Comments* (EPA-HQ-OAR-2021-0044-
0227_attachment_3) (Sept. 2021), available at
https://www.regulations.gov/document/EPA-HQ-OAR-2021-
0044-0227 (excerpted) ........................................ Addm.53

*Hydrofluorocarbon Blends From the People's Republic of China:
Final Scope Ruling on Unpatented R-421A; Affirmative Final
Determination of Circumvention of the Antidumping Duty Order
for Unpatented R-421A*, 85 Fed. Reg. 34,416 (June 4, 2020) .... Addm.69

*Preliminary Decision Memorandum for Scope Ruling and Anti—
Circumvention Inquiry of the Antidumping Duty Order on
Hydrofluorocarbon Blends from the People's Republic of China;
Unpatented R-421A* (A-570-028) (Barcode: 3947714-01)
(Feb. 26, 2020), available at https://access.trade.gov/ ........... Addm.73

Comment submitted by FluoroFusion Speciality Chemicals Inc and
Kivlan and Company, Inc., EPA-HQ-OAR-2021-0044-0106,
dated July 2, 2021 ......................................... Addm.95

Comment submitted by RMS of Georgia, LLC d/b/a Choice
Refrigerants, EPA-HQ-OAR-2021-0044-0168, dated July 6, 2021
....................................................... Addm.112

### SUBCHAPTER VII—AMERICAN INNOVATION AND MANUFACTURING

## § 7675. American innovation and manufacturing

**(a) Short title**

This section may be cited as the ''American Innovation and Manufacturing Act of 2020''.

**(b) Definitions**

In this section:

**(1) Administrator**

The term ''Administrator'' means the Administrator of the Environmental Protection Agency.

**(2) Allowance**

The term ''allowance'' means a limited authorization for the production or consumption of a regulated substance established under subsection (e).

**(3) Consumption**

The term ''consumption'', with respect to a regulated substance, means a quantity equal to the difference between—

(A) a quantity equal to the sum of—

(i) the quantity of that regulated substance produced in the United States; and

(ii) the quantity of the regulated substance imported into the United States; and

(B) the quantity of the regulated substance exported from the United States.

**(4) Consumption baseline**

The term ''consumption baseline'' means the baseline established for the consumption of regulated substances under subsection (e)(1)(C).

**(5) Exchange value**

The term ''exchange value'' means the value assigned to a regulated substance in accordance with subsections (c) and (e), as applicable.

**(6) Import**

The term ''import'' means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, regardless of whether that landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

**(7) Produce**

**(A) In general**

The term ''produce'' means the manufacture of a regulated substance from a raw ma-

terial or feedstock chemical (but not including the destruction of a regulated substance by a technology approved by the Administrator).

**(B) Exclusions**

The term "produce" does not include—
(i) the manufacture of a regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or
(ii) the reclamation, reuse, or recycling of a regulated substance.

**(8) Production baseline**

The term "production baseline" means the baseline established for the production of regulated substances under subsection (e)(1)(B).

**(9) Reclaim; reclamation**

The terms "reclaim" and "reclamation" mean—
(A) the reprocessing of a recovered regulated substance to at least the purity described in standard 700–2016 of the Air-Conditioning, Heating, and Refrigeration Institute (or an appropriate successor standard adopted by the Administrator); and
(B) the verification of the purity of that regulated substance using, at a minimum, the analytical methodology described in the standard referred to in subparagraph (A).

**(10) Recover**

The term "recover" means the process by which a regulated substance is—
(A) removed, in any condition, from equipment; and
(B) stored in an external container, with or without testing or processing the regulated substance.

**(11) Regulated substance**

The term "regulated substance" means—
(A) a substance listed in the table contained in subsection (c)(1); and
(B) a substance included as a regulated substance by the Administrator under subsection (c)(3).

**(c) Listing of regulated substances**

**(1) List of regulated substances**

Each of the following substances, and any isomers of such a substance, shall be a regulated substance:

| Chemical Name | Common Name | Exchange Value |
|---|---|---|
| CHF₂CHF₂ | HFC-134 | 1100 |
| CH₂FCF₃ | HFC-134a | 1430 |
| CH₂FCHF₂ | HFC-143 | 353 |
| CHF₂CH₂CF₃ | HFC-245fa | 1030 |
| CF₃CH₂CF₂CH₃ | HFC-365mfc | 794 |
| CF₃CHFCF₃ | HFC-227ea | 3220 |
| CH₂FCF₂CF₃ | HFC-236cb | 1340 |
| CHF₂CHFCF₃ | HFC-236ea | 1370 |
| CF₃CH₂CF₃ | HFC-236fa | 9810 |
| CH₃CF₂CHF₂ | HFC-245ca | 693 |
| CF₃CHFCHFCF₂CF₃ | HFC-43-10mee | 1640 |
| CH₂F₂ | HFC-32 | 675 |
| CHF₂CF₃ | HFC-125 | 3500 |
| CH₃CF₃ | HFC-143a | 4470 |
| CH₃F | HFC-41 | 92 |
| CHF₂CH₂F | HFC-152 | 53 |
| CH₃CHF₂ | HFC-152a | 124 |
| CHF₃ | HFC-23 | 14800. |

**(2) Review**

The Administrator may—

(A) review the exchange values listed in the table contained in paragraph (1) on a periodic basis; and
(B) subject to notice and opportunity for public comment, adjust the exchange values solely on the basis of—
(i) the best available science; and
(ii) other information consistent with widely used or commonly accepted existing exchange values.

**(3) Other regulated substances**

**(A) In general**

Subject to notice and opportunity for public comment, the Administrator may designate a substance not included in the table contained in paragraph (1) as a regulated substance if—
(i) the substance—
(I) is a chemical substance that is a saturated hydrofluorocarbon; and
(II) has an exchange value, as determined by the Administrator in accordance with the basis described in paragraph (2)(B), of greater than 53; and
(ii) the designation of the substance as a regulated substance would be consistent with the purposes of this section.

**(B) Savings provision**

**(i) In general**

Nothing in this paragraph authorizes the Administrator to designate as a regulated substance a blend of substances that includes a saturated hydrofluorocarbon for purposes of phasing down production or consumption of regulated substances under subsection (e), even if the saturated hydrofluorocarbon is, or may be, designated as a regulated substance.

**(ii) Authority of Administrator**

Clause (i) does not affect the authority of the Administrator to regulate under this Act[1] a regulated substance within a blend of substances.

**(d) Monitoring and reporting requirements**

**(1) Production, import, and export level reports**

**(A) In general**

On a periodic basis, to be determined by the Administrator, but not less frequently than annually, each person who, within the applicable reporting period, produces, imports, exports, destroys, transforms, uses as a process agent, or reclaims a regulated substance shall submit to the Administrator a report that describes, as applicable, the quantity of the regulated substance that the person—
(i) produced, imported, and exported;
(ii) reclaimed;
(iii) destroyed by a technology approved by the Administrator;
(iv) used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or

---

[1] So in original. Probably means "this section".

(v) used as a process agent.

**(B) Requirements**

**(i) Signed and attested**

The report under subparagraph (A) shall be signed and attested by a responsible officer (within the meaning of the Clean Air Act (42 U.S.C. 7401 et seq.)).

**(ii) No further reports required**

A report under subparagraph (A) shall not be required from a person if the person—

(I) permanently ceases production, importation, exportation, destruction, transformation, use as a process agent, or reclamation of all regulated substances; and

(II) notifies the Administrator in writing that the requirement under subclause (I) has been met.

**(iii) Baseline period**

Each report under subparagraph (A) shall include, as applicable, the information described in that subparagraph for the baseline period of calendar years 2011 through 2013.

**(2) Coordination**

The Administrator may allow any person subject to the requirements of paragraph (1)(A) to combine and include the information required to be reported under that paragraph with any other related information that the person is required to report to the Administrator.

**(e) Phase-down of production and consumption of regulated substances**

**(1) Baselines**

**(A) In general**

Subject to subparagraph (D), the Administrator shall establish for the phase-down of regulated substances—

(i) a production baseline for the production of all regulated substances in the United States, as described in subparagraph (B); and

(ii) a consumption baseline for the consumption of all regulated substances in the United States, as described in subparagraph (C).

**(B) Production baseline described**

The production baseline referred to in subparagraph (A)(i) is the quantity equal to the sum of—

(i) the average annual quantity of all regulated substances produced in the United States during the period—

(I) beginning on January 1, 2011; and

(II) ending on December 31, 2013; and

(ii) the quantity equal to the sum of—

(I) 15 percent of the production level of hydrochlorofluorocarbons in calendar year 1989; and

(II) 0.42 percent of the production level of chlorofluorocarbons in calendar year 1989.

**(C) Consumption baseline described**

The consumption baseline referred to in subparagraph (A)(ii) is the quantity equal to the sum of—

(i) the average annual quantity of all regulated substances consumed in the United States during the period—

(I) beginning on January 1, 2011; and

(II) ending on December 31, 2013; and

(ii) the quantity equal to the sum of—

(I) 15 percent of the consumption level of hydrochlorofluorocarbons in calendar year 1989; and

(II) 0.42 percent of the consumption level of chlorofluorocarbons in calendar year 1989.

**(D) Exchange values**

**(i) In general**

For purposes of establishing the baselines pursuant to subparagraphs (B) and (C), the Administrator shall use the exchange values listed in the table contained in subsection (c)(1) for regulated substances and the following exchange values for hydrochlorofluorocarbons and chlorofluorocarbons:

| Table 2 | | |
|---|---|---|
| **Chemical Name** | **Common Name** | **Exchange Value** |
| $CHFCl_2$ | HCFC-21 | 151 |
| $CHF_2Cl$ | HCFC-22 | 1810 |
| $C_2HF_3Cl_2$ | HCFC-123 | 77 |
| $C_2HF_4Cl$ | HCFC-124 | 609 |
| $CH_3CFCl_2$ | HCFC-141b | 725 |
| $CH_3CF_2Cl$ | HCFC-142b | 2310 |
| $CF_3CF_2CHCl_2$ | HCFC-225ca | 122 |
| $CF_2ClCF_2CHClF$ | HCFC-225cb | 595 |

| Table 3 | | |
|---|---|---|
| **Chemical Name** | **Common Name** | **Exchange Value** |
| $CFCl_3$ | CFC-11 | 4750 |
| $CF_2Cl_2$ | CFC-12 | 10900 |
| $C_2F_3Cl_3$ | CFC-113 | 6130 |
| $C_2F_4Cl_2$ | CFC-114 | 10000 |
| $C_2F_5Cl$ | CFC-115 | 7370 |

**(ii) Review**

The Administrator may—

(I) review the exchange values listed in the tables contained in clause (i) on a periodic basis; and

(II) subject to notice and opportunity for public comment, adjust the exchange values solely on the basis of—

(aa) the best available science; and

(bb) other information consistent with widely used or commonly accepted existing exchange values.

**(2) Production and consumption phase-down**

**(A) In general**

During the period beginning on January 1 of each year listed in the table contained in subparagraph (C) and ending on December 31 of the year before the next year listed on that table, except as otherwise permitted under this section, no person shall—

(i) produce a quantity of a regulated substance without a corresponding quantity of production allowances, except as provided in paragraph (5);

(ii) consume a quantity of a regulated substance without a corresponding quantity of consumption allowances; or

(iii) hold, use, or transfer any production allowance or consumption allowance allo-

cated under this section except in accordance with regulations promulgated by the Administrator pursuant to subsection (g).

**(B) Compliance**

For each year listed on the table contained in subparagraph (C), the Administrator shall ensure that the annual quantity of all regulated substances produced or consumed in the United States does not exceed the product obtained by multiplying—

(i) the production baseline or consumption baseline, as applicable; and

(ii) the applicable percentage listed on the table contained in subparagraph (C).

**(C) Relation to baseline**

On January 1 of each year listed in the following table, the Administrator shall apply the applicable percentage, as described in subparagraph (A):

| Date | Percentage of Production Baseline | Percentage of Consumption Baseline |
|---|---|---|
| 2020–2023 | 90 percent | 90 percent |
| 2024–2028 | 60 percent | 60 percent |
| 2029–2033 | 30 percent | 30 percent |
| 2034–2035 | 20 percent | 20 percent |
| 2036 and thereafter | 15 percent | 15 percent |

**(D) Allowances**

**(i) Quantity**

Not later than October 1 of each calendar year, the Administrator shall use the quantity calculated under subparagraph (B) to determine the quantity of allowances for the production and consumption of regulated substances that may be used for the following calendar year.

**(ii) Nature of allowances**

**(I) In general**

An allowance allocated under this section—

(aa) does not constitute a property right; and

(bb) is a limited authorization for the production or consumption of a regulated substance under this section.

**(II) Savings provision**

Nothing in this section or in any other provision of law limits the authority of the United States to terminate or limit an authorization described in subclause (I)(bb).

**(3) Regulations regarding production and consumption of regulated substances**

Not later than 270 days after December 27, 2020, which shall include a period of notice and opportunity for public comment, the Administrator shall issue a final rule—

(A) phasing down the production of regulated substances in the United States through an allowance allocation and trading program in accordance with this section; and

(B) phasing down the consumption of regulated substances in the United States through an allowance allocation and trading program in accordance with the schedule under paragraph (2)(C) (subject to the same exceptions and other requirements as are applicable to the phase-down of production of regulated substances under this section).

**(4) Exceptions; essential uses**

**(A) Feedstocks and process agents**

Except for the reporting requirements described in subsection (d)(1), this section does not apply to—

(i) a regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical; or

(ii) a regulated substance that is used and not entirely consumed in the manufacture of another chemical, if the remaining amounts of the regulated substance are subsequently destroyed.

**(B) Essential uses**

**(i) In general**

Beginning on December 27, 2020, and subject to paragraphs (2) and (3) and clauses (ii) and (iii), the Administrator may, by rule, after considering technical achievability, commercial demands, affordability for residential and small business consumers, safety, and other relevant factors, including overall economic costs and environmental impacts compared to historical trends, allocate a quantity of allowances for a period of not more than 5 years for the production and consumption of a regulated substance exclusively for the use of the regulated substance in an application, if—

(I) no safe or technically achievable substitute will be available during the applicable period for that application; and

(II) the supply of the regulated substance that manufacturers or users of the regulated substance for that application are capable of securing from chemical manufacturers, as authorized under paragraph (2)(A), including any quantities of a regulated substance available from production or import, is insufficient to accommodate the application.

**(ii) Petition**

If the Administrator receives a petition requesting the designation of an application as an essential use under clause (i), the Administrator shall—

(I) not later than 180 days after the date on which the Administrator receives the petition—

(aa) make the complete petition available to the public; and

(bb) when making the petition available to the public under item (aa), propose and seek public comment on—

(AA) a determination of whether to designate the application as an essential use; and

(BB) if the Administrator proposes to designate the application as an essential use, making the requisite allocation of allowances; and

(II) not later than 270 days after the date on which the Administrator re-

ceives the petition, take final action on the petition.

**(iii) Limitation**

A person receiving an allocation under clause (i) or (iv) or as a result of a petition granted under clause (ii) may not produce or consume a produced quantity of regulated substances that, considering the respective exchange values of the regulated substances, exceeds the number of allowances issued under paragraphs (2) and (3) that are held by that person.

**(iv) Mandatory allocations**

**(I) In general**

Notwithstanding clause (i) and subject to clause (iii) and paragraphs (2) and (3), for the 5-year period beginning on December 27, 2020, the Administrator shall allocate the full quantity of allowances necessary, based on projected, current, and historical trends, for the production or consumption of a regulated substance for the exclusive use of the regulated substance in an application solely for—

(aa) a propellant in metered-dose inhalers;

(bb) defense sprays;

(cc) structural composite preformed polyurethane foam for marine use and trailer use;

(dd) the etching of semiconductor material or wafers and the cleaning of chemical vapor deposition chambers within the semiconductor manufacturing sector;

(ee) mission-critical military end uses, such as armored vehicle engine and shipboard fire suppression systems and systems used in deployable and expeditionary applications; and

(ff) onboard aerospace fire suppression.

**(II) Requirement**

The allocation of allowances under subclause (I) shall be determined through a rulemaking.

**(v) Review**

**(I) In general**

For each essential use application receiving an allocation of allowances under clause (i) or (iv), the Administrator shall review the availability of substitutes, including any quantities of the regulated substance available from reclaiming or prior production, not less frequently than once every 5 years.

**(II) Extension**

If, pursuant to a review under subclause (I), the Administrator determines, subject to notice and opportunity for public comment, that the requirements described in subclauses (I) and (II) of clause (i) are met, the Administrator shall authorize the production or consumption, as applicable, of any regulated substance used in the application for renewable periods of not more than 5 years for exclusive use in the application.

**(5) Domestic manufacturing**

Notwithstanding paragraph (2)(A)(i), the Administrator may, by rule, authorize a person to produce a regulated substance in excess of the number of production allowances held by that person, subject to the conditions that—

(A) the authorization is—

(i) for a renewable period of not more than 5 years; and

(ii) subject to notice and opportunity for public comment; and

(B) the production—

(i) is at a facility located in the United States;

(ii) is solely for export to, and use in, a foreign country that is not subject to the prohibition in subsection (j)(1); and

(iii) would not violate paragraph (2)(B).

**(f) Accelerated schedule**

**(1) In general**

Subject to paragraph (4), the Administrator may, only in response to a petition submitted to the Administrator in accordance with paragraph (3) and after notice and opportunity for public comment, promulgate regulations that establish a schedule for phasing down the production or consumption of regulated substances that is more stringent than the production and consumption levels of regulated substances required under subsection (e)(2)(C).

**(2) Requirements**

Any regulations promulgated under this subsection—

(A) shall—

(i) apply uniformly to the allocation of production and consumption allowances for regulated substances, in accordance with subsection (e)(3);

(ii) ensure that there will be sufficient quantities of regulated substances, including substances available from reclaiming, prior production, or prior import, to meet the needs for—

(I) applications that receive an allocation under clause (i) of subsection (e)(4)(B); and

(II) all applications that receive a mandatory allocation under items (aa) through (ff) of clause (iv)(I) of that subsection; and

(iii) foster continued reclamation of and transition from regulated substances; and

(B) shall not set the level of production allowances or consumption allowances below the percentage of the consumption baseline that is actually consumed during the calendar year prior to the year during which the Administrator makes a final determination with respect to the applicable proposal described in paragraph (3)(C)(iii)(I).

**(3) Petition**

**(A) In general**

A person may petition the Administrator to promulgate regulations for an accelerated schedule for the phase-down of production or consumption of regulated substances under paragraph (1).

Addm. 6

**(B) Requirement**

A petition submitted under subparagraph (A) shall—

(i) be made at such time, in such manner, and containing such information as the Administrator shall require; and

(ii) include a showing by the petitioner that there are data to support the petition.

**(C) Timelines**

**(i) In general**

If the Administrator receives a petition under subparagraph (A), the Administrator shall—

(I) not later than 180 days after the date on which the Administrator receives the petition—

(aa) make the complete petition available to the public; and

(bb) when making the petition available to the public under item (aa), propose and seek public comment on the proposal of the Administrator to grant or deny the petition; and

(II) not later than 270 days after the date on which the Administrator receives the petition, take final action on the petition.

**(ii) Factors for determination**

In making a determination to grant or deny a petition submitted under subparagraph (A), the Administrator may, to the extent practicable, factor in—

(I) the best available data;

(II) the availability of substitutes for uses of the regulated substance that is the subject of the petition, taking into account technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import;

(III) overall economic costs and environmental impacts, as compared to historical trends; and

(IV) the remaining phase-down period for regulated substances under the final rule issued under subsection (e)(3), if applicable.

**(iii) Regulations**

After receiving public comment with respect to the proposal under clause (i)(I)(bb), if the Administrator makes a final determination to grant a petition under subparagraph (A), the final regulations with respect to the petition shall—

(I) be promulgated by not later than 1 year after the date on which the Administrator makes the proposal to grant the petition under that clause; and

(II) meet the requirements of paragraph (2).

**(D) Publication**

When the Administrator makes a final determination to grant or deny a petition

under subparagraph (A), the Administrator shall publish a description of the reasons for that grant or denial, including a description of the information considered under subclauses (I) through (IV) of subparagraph (C)(ii).

**(E) Insufficient information**

If the Administrator determines that the data included under subparagraph (B)(ii) in a petition are not sufficient to make a determination under this paragraph, the Administrator shall use any authority available to the Administrator to acquire the necessary data.

**(4) Date of effectiveness**

The Administrator may not promulgate under paragraph (1) a regulation for the production or consumption of regulated substances that is more stringent than the production or consumption levels required under subsection (e)(2)(C) that takes effect before January 1, 2025.

**(5) Review**

**(A) In general**

The Administrator shall review the availability of substitutes for regulated substances subject to an accelerated schedule established under paragraph (1) in each sector and subsector in which the regulated substance is used, taking into account technological achievability, commercial demands, safety, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import, by January 1, 2026 (for the first review), by January 1, 2031 (for the second review), and at least once every 5 years thereafter.

**(B) Public availability**

The Administrator shall make the results of a review conducted under subparagraph (A) publicly available.

**(6) Savings provision**

Nothing in this subsection authorizes the Administrator to promulgate regulations pursuant to this subsection that establish a schedule for phasing down the production or consumption of regulated substances that is less stringent than the production and consumption levels of regulated substances required under subsection (e)(2)(C).

**(g) Exchange authority**

**(1) Transfers**

Not later than 270 days after December 27, 2020, which shall include a period of notice and opportunity for public comment, the Administrator shall promulgate a final regulation that governs the transfer of allowances for the production of regulated substances under subsection (e)(3)(A) that uses—

(A) the applicable exchange values described in the table contained in subsection (c)(1); or

(B) the exchange value described in the rule designating the substance as a regulated substance under subsection (c)(3).

Page 7001    TITLE 42—THE PUBLIC HEALTH AND WELFARE    § 7675

**(2) Requirements**

The final rule promulgated pursuant to paragraph (1) shall—

(A) ensure that the transfers under this subsection will result in greater total reductions in the production of regulated substances in each year than would occur during the year in the absence of the transfers;

(B) permit 2 or more persons to transfer production allowances if the transferor of the allowances will be subject, under the final rule, to an enforceable and quantifiable reduction in annual production that—

(i) exceeds the reduction otherwise applicable to the transferor under this section;

(ii) exceeds the quantity of production represented by the production allowances transferred to the transferee; and

(iii) would not have occurred in the absence of the transaction; and

(C) provide for the trading of consumption allowances in the same manner as is applicable under this subsection to the trading of production allowances.

**(h) Management of regulated substances**

**(1) In general**

For purposes of maximizing reclaiming and minimizing the release of a regulated substance from equipment and ensuring the safety of technicians and consumers, the Administrator shall promulgate regulations to control, where appropriate, any practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment (including requiring, where appropriate, that any such servicing, repair, disposal, or installation be performed by a trained technician meeting minimum standards, as determined by the Administrator) that involves—

(A) a regulated substance;

(B) a substitute for a regulated substance;

(C) the reclaiming of a regulated substance used as a refrigerant; or

(D) the reclaiming of a substitute for a regulated substance used as a refrigerant.

**(2) Reclaiming**

**(A) In general**

In carrying out this section, the Administrator shall consider the use of authority available to the Administrator under this section to increase opportunities for the reclaiming of regulated substances used as refrigerants.

**(B) Recovery**

A regulated substance used as a refrigerant that is recovered shall be reclaimed before the regulated substance is sold or transferred to a new owner, except where the recovered regulated substance is sold or transferred to a new owner solely for the purposes of being reclaimed or destroyed.

**(3) Coordination**

In promulgating regulations to carry out this subsection, the Administrator may coordinate those regulations with any other regulations promulgated by the Administrator that involve—

(A) the same or a similar practice, process, or activity regarding the servicing, repair, disposal, or installation of equipment; or

(B) reclaiming.

**(4) Inapplicability**

No regulation promulgated pursuant to this subsection shall apply to a regulated substance or a substitute for a regulated substance that is contained in a foam.

**(5) Small business grants**

**(A) Definition of small business concern**

In this paragraph, the term ''small business concern'' has the same meaning as in section 632 of title 15.

**(B) Establishment**

Subject to the availability of appropriations, the Administrator shall establish a grant program to award grants to small business concerns for the purchase of new specialized equipment for the recycling, recovery, or reclamation of a substitute for a regulated substance, including the purchase of approved refrigerant recycling equipment (as defined in section 609(b) of the Clean Air Act (42 U.S.C. 7671h(b))) for recycling, recovery, or reclamation in the service or repair of motor vehicle air conditioning systems.

**(C) Matching funds**

The non-Federal share of a project carried out with a grant under this paragraph shall be not less than 25 percent.

**(D) Authorization of appropriations**

There is authorized to be appropriated to carry out this paragraph $5,000,000 for each of fiscal years 2021 through 2023.

**(i) Technology transitions**

**(1) Authority**

Subject to the provisions of this subsection, the Administrator may by rule restrict, fully, partially, or on a graduated schedule, the use of a regulated substance in the sector or subsector in which the regulated substance is used.

**(2) Negotiated rulemaking**

**(A) Consideration required**

Before proposing a rule for the use of a regulated substance for a sector or subsector under paragraph (1), the Administrator shall consider negotiating with stakeholders in the sector or subsector subject to the potential rule in accordance with the negotiated rulemaking procedure provided for under subchapter III of chapter 5 of title 5 (commonly known as the ''Negotiated Rulemaking Act of 1990'').

**(B) Negotiated rulemakings**

If the Administrator negotiates a rulemaking with stakeholders using the procedure described in subparagraph (A), the Administrator shall, to the extent practicable, give priority to completing that rulemaking over completing rulemakings under this subsection that were not negotiated using that procedure.

**(C) No negotiated rulemaking**

If the Administrator does not negotiate a rulemaking with stakeholders using the pro-

cedure described in subparagraph (A), the Administrator shall, before commencement of the rulemaking process for a rule under paragraph (1), publish an explanation of the decision of the Administrator to not use that procedure.

**(3) Petitions**

**(A) In general**

A person may petition the Administrator to promulgate a rule under paragraph (1) for the restriction on use of a regulated substance in a sector or subsector, which shall include a request that the Administrator negotiate with stakeholders in accordance with paragraph (2)(A).

**(B) Response**

The Administrator shall grant or deny a petition under subparagraph (A) not later than 180 days after the date of receipt of the petition.

**(C) Requirements**

**(i) Explanation**

If the Administrator denies a petition under subparagraph (B), the Administrator shall publish in the Federal Register an explanation of the denial.

**(ii) Final rule**

If the Administrator grants a petition under subparagraph (B), the Administrator shall promulgate a final rule not later than 2 years after the date on which the Administrator grants the petition.

**(iii) Publication of petitions**

Not later than 30 days after the date on which the Administrator receives a petition under subparagraph (A), the Administrator shall make that petition available to the public in full.

**(4) Factors for determination**

In carrying out a rulemaking using the procedure described in paragraph (2) or making a determination to grant or deny a petition submitted under paragraph (3), the Administrator shall, to the extent practicable, factor in—

(A) the best available data;

(B) the availability of substitutes for use of the regulated substance that is the subject of the rulemaking or petition, as applicable, in a sector or subsector, taking into account technological achievability, commercial demands, affordability for residential and small business consumers, safety, consumer costs, building codes, appliance efficiency standards, contractor training costs, and other relevant factors, including the quantities of regulated substances available from reclaiming, prior production, or prior import;

(C) overall economic costs and environmental impacts, as compared to historical trends; and

(D) the remaining phase-down period for regulated substances under the final rule issued under subsection (e)(3), if applicable.

**(5) Evaluation**

In carrying out this subsection, the Administrator shall—

(A) evaluate substitutes for regulated substances in a sector or subsector, taking into account technological achievability, commercial demands, safety, overall economic costs and environmental impacts, and other relevant factors; and

(B) make the evaluation under subparagraph (A) available to the public, including the factors associated with the safety of those substitutes.

**(6) Effective date of rules**

No rule under this subsection may take effect before the date that is 1 year after the date on which the Administrator promulgates the applicable rule under this subsection.

**(7) Applicability**

**(A) Definition of retrofit**

In this paragraph, the term ''retrofit'' means to upgrade existing equipment where the regulated substance is changed, which—

(i) includes the conversion of equipment to achieve system compatibility; and

(ii) may include changes in lubricants, gaskets, filters, driers, valves, o-rings, or equipment components for that purpose.

**(B) Applicability of rules**

A rule promulgated under this subsection shall not apply to—

(i) an essential use under clause (i) or (iv) of subsection (e)(4)(B), including any use for which the production or consumption of the regulated substance is extended under clause (v)(II) of that subsection; or

(ii) except for a retrofit application, equipment in existence in a sector or subsector before December 27, 2020.

**(j) International cooperation**

**(1) In general**

Subject to paragraph (2), no person subject to the requirements of this section shall trade or transfer a production allowance or, after January 1, 2033, export a regulated substance to a person in a foreign country that, as determined by the Administrator, has not enacted or otherwise established within a reasonable timeframe after December 27, 2020, the same or similar requirements or otherwise undertaken commitments regarding the production and consumption of regulated substances as are contained in this section.

**(2) Transfers**

Pursuant to paragraph (1), a person in the United States may engage in a trade or transfer of a production allowance—

(A) to a person in a foreign country if, at the time of the transfer, the Administrator revises the number of allowances for production under subsection (e)(2), as applicable, for the United States such that the aggregate national production of the regulated substance to be traded under the revised production limits is equal to the least of—

(i) the maximum production level permitted for the applicable regulated substance in the year of the transfer under this section, less the production allowances transferred;

(ii) the maximum production level permitted for the applicable regulated substances in the transfer year under applicable law, less the production allowances transferred; and

(iii) the average of the actual national production level of the applicable regulated substances for the 3-year period ending on the date of the transfer, less the production allowances transferred; or

(B) from a person in a foreign country if, at the time of the trade or transfer, the Administrator finds that the foreign country has revised the domestic production limits of the regulated substance in the same manner as provided with respect to transfers by a person in United [2] States under this subsection.

**(3) Effect of transfers on production limits**

The Administrator may—

(A) reduce the production limits established under subsection (e)(2)(B) as required as a prerequisite to a transfer described in paragraph (2)(A); or

(B) increase the production limits established under subsection (e)(2)(B) to reflect production allowances acquired under a trade or transfer described in paragraph (2)(B).

**(4) Regulations**

The Administrator shall—

(A) not later than 1 year after December 27, 2020, promulgate a final rule to carry out this subsection; and

(B) not less frequently than annually, review and, if necessary, revise the final rule promulgated pursuant to subparagraph (A).

**(k) Relationship to other law**

**(1) Implementation**

**(A) Rulemakings**

The Administrator may promulgate such regulations as are necessary to carry out the functions of the Administrator under this section.

**(B) Delegation**

The Administrator may delegate to any officer or employee of the Environmental Protection Agency such of the powers and duties of the Administrator under this section as the Administrator determines to be appropriate.

**(C) Clean Air Act**

Sections 113, 114, 304, and 307 of the Clean Air Act (42 U.S.C. 7413, 7414, 7604, 7607) shall apply to this section and any rule, rulemaking, or regulation promulgated by the Administrator pursuant to this section as though this section were expressly included in title VI of that Act (42 U.S.C. 7671 et seq.).

**(2) Preemption**

**(A) In general**

Subject to subparagraph (B), during the 5-year period beginning on December 27, 2020,

and with respect to an exclusive use for which a mandatory allocation of allowances is provided under subsection (e)(4)(B)(iv)(I), no State or political subdivision of a State may enforce a statute or administrative action restricting the management or use of a regulated substance within that exclusive use.

**(B) Extension**

**(i) In general**

Subject to clause (ii), if, pursuant to subclause (I) of subsection (e)(4)(B)(v), the Administrator authorizes an additional period under subclause (II) of that subsection for the production or consumption of a regulated substance for an exclusive use described in subparagraph (A), no State or political subdivision of a State may enforce a statute or administrative action restricting the management or use of the regulated substance within that exclusive use for the duration of that additional period.

**(ii) Limitation**

The period for which the limitation under clause (i) applies shall not exceed 5 years from the date on which the period described in subparagraph (A) ends.

(Pub. L. 116–260, div. S, § 103, Dec. 27, 2020, 134 Stat. 2255.)

References in Text

The Clean Air Act, referred to in subsecs. (d)(1)(B)(i) and (k)(1)(C), is act July 14, 1955, ch. 360, 69 Stat. 322, which is classified generally to this chapter. Title VI of the Act is classified generally to subchapter VI (§ 7671 et seq.) of this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

Codification

Section was enacted as the American Innovation and Manufacturing Act of 2020, and also as part of the Consolidated Appropriations Act, 2021, and not as part of the Clean Air Act which comprises this chapter.

## CHAPTER 86—EARTHQUAKE HAZARDS REDUCTION

Sec.
7701. Congressional findings.
7702. Congressional statement of purpose.
7703. Definitions.
7704. National Earthquake Hazards Reduction Program.
7704a. Report on seismic safety property standards.
7705, 7705a. Repealed.
7705b. Seismic standards.
7705c. Acceptance of gifts.
7705d. Repealed.
7705e. Post-earthquake investigations program.
7706. Authorization of appropriations.
7707. Advanced National Seismic System.
7708. Network for Earthquake Engineering Simulation.
7709. Scientific Earthquake Studies Advisory Committee.

## § 7701. Congressional findings

The Congress finds and declares the following:

(1) All 50 States, and the Commonwealth of Puerto Rico, are vulnerable to the hazards of

---

[2] So in original. Probably should be preceded by ''the''.

The *Code of Federal Regulations* (CFR) is the official legal print publication containing the codification of the general and permanent rules published in the *Federal Register* by the departments and agencies of the Federal Government. You are viewing a representation of the Electronic Code of Federal Regulations (eCFR), a continuously updated version of the CFR. It is not an official legal edition of the CFR.

 Displaying title 40, up to date as of 2/25/2022. Title 40 was last amended 2/25/2022.

**Title 40 - Protection of Environment**
**Chapter I - Environmental Protection Agency**
**Subchapter C - Air Programs**

ENHANCED CONTENT - TABLE OF CONTENTS

| | | |
|---|---|---|
| **Part 84** | Phasedown of Hydrofluorocarbons | 84.1 – 84.35 |
| **Subpart A** | Production and Consumption Controls | 84.1 – 84.35 |
| § 84.1 | Purpose and scope. | |
| § 84.3 | Definitions. | |
| § 84.5 | Prohibitions relating to regulated substances. | |
| § 84.7 | Phasedown schedule. | |
| § 84.9 | Allocation of calendar-year production allowances. | |
| § 84.11 | Allocation of calendar-year consumption allowances. | |
| § 84.13 | Allocation of application-specific allowances. | |
| § 84.15 | Set-aside of application-specific allowances, production allowances, and consumption allowances. | |
| § 84.17 | Availability of additional consumption allowances. | |
| § 84.19 | Transfers of allowances. | |
| § 84.21 | Sale or conveyance of regulated substances produced or imported with application-specific allowances. | |
| § 84.23 | Certification identification generation and tracking. | |
| § 84.25 | Required processes to import regulated substances as feedstocks or for destruction. | |
| § 84.27 | Controlling emissions of HFC-23. | |
| § 84.29 | Destruction of regulated substances. | |
| § 84.31 | Recordkeeping and reporting. | |
| § 84.33 | Auditing of recordkeeping and reporting. | |
| § 84.35 | Administrative consequences. | |
| *Subpart B [Reserved]* | | |
| **Appendix A to Part 84** | | |
| | Regulated Substances | |

# PART 84 - PHASEDOWN OF HYDROFLUOROCARBONS

**Authority:** Pub. L. 116-260, Division S, Sec. 103.

**Source:** 86 FR 55201, Oct. 5, 2021, unless otherwise noted.

**Subpart A - Production and Consumption Controls**

**§ 84.1 Purpose and scope.**

(a)   The purpose of the regulations in this subpart is to implement certain provisions of the American Innovation and Manufacturing Act of 2020 (AIM Act), enacted as part of Public Law 116-260. In particular, the AIM Act imposes limits on the production and consumption of certain regulated substances, according to a specified schedule, which are addressed by this subpart.

(b)   This subpart applies to any person that produces, transforms, destroys, imports, exports, sells or distributes, offers for sale or distribution, recycles for fire suppression, or reclaims a regulated substance and to end users in the six applications listed in subsection (e)(4)(B)(iv) of the AIM Act.

*[86 FR 55206, Oct. 5, 2021]*

**§ 84.3 Definitions.**

As used in this subpart, the term:

*Administrator*   means the Administrator of the United States Environmental Protection Agency or his or her authorized representative.

# Addm.11

*Allowance*  means a limited authorization for the production or consumption of a regulated substance established under subsection (e) of section 103 in Division S, Innovation for the Environment, of the Consolidated Appropriations Act, 2021 (Pub. L. 116-260) (the AIM Act). An allowance allocated under subsection (e) of section 103 in Division S of the AIM Act does not constitute a property right.

*Application-specific allowance*  means a limited authorization granted in accordance with subsection (e)(4)(B)(iv) of the AIM Act for the production or import of a regulated substance for use in the specifically identified applications that are listed in that subsection and in accordance with the restrictions contained in § 84.5(c). An application-specific allowance does not constitute a property right.

*Bulk*  means a regulated substance of any amount that is in a container for the transportation or storage of that substance such as cylinders, drums, ISO tanks, and small cans. A regulated substance that must first be transferred from a container to another container, vessel, or piece of equipment in order to realize its intended use is a bulk substance. A regulated substance contained in a manufactured product such as an appliance, an aerosol can, or a foam is not a bulk substance.

*Chemical vapor deposition chamber cleaning*  means, in the context of semiconductor manufacturing, a process type in which chambers used for depositing thin films are cleaned periodically using plasma-generated fluorine atoms and other reactive fluorine-containing fragments.

*Confer*  means to shift unexpended application-specific allowances obtained in accordance with subsection (e)(4)(B)(iv) of the AIM Act from the end user allocated such allowances to one or more entities in the supply chain for the production or import of a regulated substance for use by the end user.

*Consumption,*  with respect to a regulated substance, means production plus imports minus exports.

*Consumption allowances*  means a limited authorization to produce and import regulated substances; however, consumption allowances may be used to produce regulated substances only in conjunction with production allowances. A person's consumption allowances are the total of the allowances obtained under § 84.11 or § 84.15 as may be modified under §§ 84.17 (availability of additional consumption allowances), 84.19 (transfer of allowances), and 84.35 (administrative consequences).

*Defense spray*  means an aerosol-based spray used for self-defense, including pepper spray and animal sprays, and containing the irritant capsaicin and related capsaicinoids (derived from oleoresin capsicum), an emulsifier, and an aerosol propellant.

*Destruction*  means the expiration of a regulated substance to the destruction and removal efficiency actually achieved. Such destruction might result in a commercially useful end product, but such usefulness would be secondary to the act of destruction.

*Etching*  means, in the context of semiconductor manufacturing, a process type that uses plasma-generated fluorine atoms and other reactive fluorine-containing fragments that chemically react with exposed thin films (*e.g.,* dielectric, metals) or substrate (*e.g.,* silicon) to selectively remove portions of material. This includes semiconductor production processes using fluorinated GHG reagents to clean wafers.

*Exchange value*  means the value assigned to a regulated substance in accordance with AIM Act subsections (c) and (e), as applicable, and as provided in appendix A to this part.

*Exchange value equivalent (EVe)*  means the exchange value-weighted amount of a regulated substance obtained by multiplying the mass of a regulated substance by the exchange value of that substance.

*Export*  means the transport from inside the United States or its territories to persons outside the United States or its territories, excluding United States military bases and ships for onboard use.

*Exporter*  means the person who contracts to sell regulated substances for export or transfers regulated substances to his affiliate in another country.

*Facility*  means one or more production lines at the same location owned by or under common control of the same person.

*Final customer*  means the last person to purchase a bulk regulated substance before its intended use. Final customer includes, but is not limited to, air conditioning contractors in the residential air conditioning market, foam systems houses, aerosol fillers, semiconductor manufacturers, air conditioning and refrigeration equipment manufacturers that ship equipment pre-charged, and fire extinguisher manufacturers.

*Foreign country*  means an entity that is recognized as a sovereign nation or country other than the United States of America.

*Heel*  means the amount of a regulated substance that remains in a container after the container is discharged or offloaded (that is no more than 10 percent of the volume of the container).

*Import*  means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, regardless of whether that landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States. Offloading used regulated substances recovered from equipment aboard a marine vessel, aircraft, or other aerospace vehicle during servicing is not considered an import.

*Importer*  means any person who imports a regulated substance into the United States. "Importer" includes the person primarily liable for the payment of any duties on the merchandise or an authorized agent acting on his or her behalf. The term also includes:

(1)  The consignee;

(2)  The importer of record;

(3)  The actual owner; or

(4)  The transferee, if the right to draw merchandise in a bonded warehouse has been transferred.

**Addm-12**

*Individual shipment* means the kilograms of a regulated substance for which a person may make one

(1) U.S. Customs entry, as identified in the non-objection notice obtained from the relevant Agency official in accordance with § 84.25.

*Metered dose inhaler (MDI)* means a handheld pressurized inhalation system that delivers small, precisely measured therapeutic doses of medication directly to the airways of a patient. MDIs treat health conditions such as asthma and chronic obstructive pulmonary disease and are approved for such use by the U.S. Food and Drug Administration (FDA).

*Mission-critical military end uses* means those uses of regulated substances by an agency of the Federal Government responsible for national defense that have a direct impact on mission capability, as determined by the U.S. Department of Defense, including, but not limited to uses necessary for development, testing, production, training, operation, and maintenance of Armed Forces vessels, aircraft, space systems, ground vehicles, amphibious vehicles, deployable/expeditionary support equipment, munitions, and command and control systems.

*Non-objection notice* means the limited authorization granted by the relevant Agency official to import a specific individual shipment of a regulated substance in accordance with § 84.25.

*On board aerospace fire suppression* means use of a regulated substance in fire suppression equipment used on board commercial and general aviation aircraft, including commercial-derivative aircraft for military use; rotorcraft; and space vehicles. On board commercial aviation fire suppression systems are installed throughout mainline and regional passenger and freighter aircraft, including engine nacelles, auxiliary power units (APUs), lavatory trash receptacles, baggage/crew compartments, and handheld extinguishers.

*Person* means any individual or legal entity, including an individual, corporation, partnership, association, state, municipality, political subdivision of a state, Indian tribe; any agency, department, or instrumentality of the United States; and any officer, agent, or employee thereof.

*Process agent* means the use of a regulated substance to form the environment for a chemical reaction or inhibiting an unintended chemical reaction (*e.g.*, use as a solvent, catalyst, or stabilizer) where the regulated substance is not consumed in the reaction, but is removed or recycled back into the process and where no more than trace quantities remain in the final product. A feedstock, in contrast, is consumed during the reaction. *Production/Produce* means the manufacture of a regulated substance from a raw material or feedstock chemical (but not including the destruction of a regulated substance by a technology approved by the Administrator as provided in § 84.29). The term production does not include:

(1) The manufacture of a regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical;

(2) The reclamation, reuse, or recycling of a regulated substance; or

(3) Insignificant quantities of a regulated substance inadvertently or coincidentally generated from any of the following, independent circumstances: during a chemical manufacturing process, resulting from unreacted feedstock, from the listed substance's use as a process agent present as a trace quantity in the chemical substance being manufactured, as an unintended byproduct of research and development applications, or during semiconductor manufacturing processes.

*Production allowances* means the limited authorization to produce regulated substances; however, production allowances may be used to produce regulated substances only in conjunction with consumption allowances. A person's production allowances are the total of the allowances obtained under § 84.9 or § 84.15 as may be modified under §§ 84.19 (transfer of allowances) and 84.35 (administrative consequences).

*Production line* means any process equipment (*e.g.*, reactor, distillation column) used to convert raw materials or feedstock chemicals into regulated substances or consume regulated substances in the production of other chemicals.

*Reclaim* means the reprocessing of regulated substances to all of the specifications in appendix A to 40 CFR part 82, subpart F (based on AHRI Standard 700-2016) that are applicable to that regulated substance and to verify that the regulated substance meets these specifications using the analytical methodology prescribed in section 5 of appendix A to 40 CFR part 82, subpart F.

*Regulated substance* means a hydrofluorocarbon listed in the table contained in subsection (c)(1) of the AIM Act and a substance included as a regulated substance by the Administrator under the authority granted in subsection (c)(3). A current list of regulated substances can be found in appendix A to this part.

*Space vehicle* means a man-made device, either manned or unmanned, designed for operation beyond Earth's atmosphere. This definition includes integral equipment such as models, mock-ups, prototypes, molds, jigs, tooling, hardware jackets, and test coupons. Also included is auxiliary equipment associated with tests, transport, and storage, which through contamination can compromise the space vehicle performance.

*Structural composite preformed polyurethane foam* means a foam blown from polyurethane that is reinforced with fibers and with polymer resin during the blowing process, and is preformed into the required shape (*e.g.*, specific boat or trailer design) to increase structural strength while reducing the weight of such structures.

*Transform* means to use and entirely consume (except for trace quantities) a controlled substance in the manufacture of other chemicals. A regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical is called a feedstock.

*Transhipment* means the continuous shipment of a regulated substance, from a foreign country of origin through the United States or its territories, to a second foreign country of final destination, as long as the shipment does not enter U.S. commerce. A transhipment, as it moves through the United States or its territories, cannot be repackaged, sorted, or otherwise changed in condition.

**Addm.13**

*Used regulated substances* means regulated substances that have been recovered from their intended use systems (including regulated substances that have been, or may be subsequently, recycled or reclaimed).

[86 FR 55201, 55206, Oct. 5, 2021]

## § 84.5 Prohibitions relating to regulated substances.

(a) *Production.*

(1) As of January 1, 2022, no person may produce regulated substances, intentionally or unintentionally, in excess of the quantity of unexpended production allowances and consumption allowances or unexpended application-specific allowances held by that person under the authority of this subpart at that time in that control period. Every kilogram of production in excess of allowances expended constitutes a separate violation of this subpart. The required amount of allowances that must be expended will be calculated to the tenth with a minimum expenditure of 0.1 allowances for any production of regulated substances.

(2) As of January 1, 2022, no person may expend production allowances to produce a quantity of regulated substances unless that person expends an equal quantity of consumption allowances at the same time.

(3) A person is not required to expend production, consumption, or application-specific allowances to produce regulated substances if the regulated substances are destroyed using a technology approved by the Administrator for destruction under § 84.29 within 30 days of generating the regulated substance if the destruction technology is located at the facility where production occurred or 120 days of generating the regulated substance if the destruction technology is not located at the facility where production occurred.

(4) No person may expend production or consumption allowances for generation of HFC-23 that is emitted at the same facility as where it is produced. Consistent with this prohibition, prior to the emissions standard compliance date established in § 84.27, neither production nor consumption allowances are required for HFC-23 emitted at the same facility as where it is produced.

(b) *Import.* This paragraph applies starting January 1, 2022.

(1) No person may import bulk regulated substances, except:

(i) By expending, at the time of the import, consumption or application-specific allowances in a quantity equal to the exchange-value weighted equivalent of the regulated substances imported, with the required amount of allowances calculated to the tenth, but a minimum expenditure of 0.1 allowances is required for any import of regulated substances;

(ii) After receipt of a non-objection notice for substances for use in a process resulting in their transformation or their destruction in accordance with § 84.25(a);

(iii) After receipt of a non-objection notice for used regulated substances imported for destruction in accordance with § 84.25(b); or

(iv) As a transhipment in accordance with § 84.31(c)(3) if all transhipped regulated substance is exported from the United States within six months of its import.

(2) Each person meeting the definition of importer for a particular regulated substance import transaction is jointly and severally liable for a violation of paragraph (b)(1) of this section, unless they can demonstrate that another party who meets the definition of an importer met one of the exceptions set forth in paragraph (b)(1).

(3) Imports authorized under paragraph (b)(1)(ii) of this section may not be in containers designed to hold 100 pounds or less of a regulated substance.

(4) A person issued a non-objection notice for the import of an individual shipment of regulated substances under paragraph (b)(1)(ii) or (iii) of this section may not transfer or confer the right to import.

(5) No person may introduce into U.S. commerce any regulated substance claimed as a transhipment.

(6) Every kilogram of bulk regulated substances imported contrary to this paragraph (b) constitutes a separate violation of this subpart. Import of less than one kilogram of bulk regulated substance contrary to this paragraph (b) constitutes a separate violation of this subpart.

(c) *Application-specific uses.*

(1) As of January 1, 2022, no person may confer application-specific allowances for the production or import of a regulated substance in excess of the amount of unexpended application-specific allowances held by that person under the authority of this subpart at that time in that control period. No person may expend an application-specific allowance for regulated substances to be used in any application other than the one identified by the application-specific allowance expended. Every kilogram of production or import in excess of the application-specific allowances expended by the producer or importer constitutes a separate violation of this subpart. Production or import of less than one kilogram of regulated substance in excess of the application-specific allowances expended by the producer or importer constitutes a separate violation of this subpart.

(2) No person may use a regulated substance produced or imported by expending application-specific allowances for any purpose other than those for which the application-specific allowance was allocated, and as set forth in this paragraph (c). Application-specific allowances are apportioned to a person under §§ 84.13 and 84.15 for the production or import of regulated substances solely for the individual application listed on the allowance, which may include:

(i) A propellant in metered dose inhalers;

    (ii)  Defense sprays;

    (iii)  Structural composite preformed polyurethane foam for marine use and trailer use;

    (iv)  The etching of semiconductor material or wafers and the cleaning of chemical vapor deposition chambers within the semiconductor manufacturing sector;

    (v)  Mission-critical military end uses, such as armored vehicle engine and shipboard fire suppression systems and systems used in deployable and expeditionary applications; and

    (vi)  On board aerospace fire suppression.

(3)  This provision applies starting January 1, 2022.

    (i)  No person may acquire application-specific allowances unless for use in the same application as associated with the application-specific allowance. No person may transfer or confer application-specific allowances unless for use in the same application as associated with the application-specific allowance.

    (ii)  No person may acquire or sell regulated substances produced or imported using application-specific allowances for use in anything other than the application for which it was originally allocated. Every kilogram of a regulated substance imported or exported in contravention of this paragraph constitutes a separate violation of this subpart. Import or export of less than one kilogram of regulated substance in contravention of this paragraph constitutes a separate violation of this subpart.

(d)  *Calendar-year allowances.* All production, consumption, and application-specific allowances are valid only for the calendar year for which they are allocated (*i.e.*, January 1 through December 31). No person may expend, transfer, or confer a production, consumption, or application-specific allowance after December 31 of the year for which it was issued.

(e)  *International transfers.* This paragraph applies starting January 1, 2022.

(1)  No person subject to the requirements of this subpart may transfer a production allowance to a person in a foreign country unless that country has established the same or similar requirements or otherwise undertaken commitments regarding the production and consumption of regulated substances as are contained in the AIM Act, as determined by the relevant agency official.

(2)  No person may transfer production allowances to or from a person in a foreign country without satisfying the requirements in § 84.19. Every production allowance transferred in contravention of this paragraph constitutes a separate violation of this subpart.

(f)  *Sale and distribution.* No person may sell or distribute, or offer for sale or distribution, any regulated substance that was produced or imported in violation of paragraphs (a) through (d) of this section, except for such actions needed to re-export the regulated substance. Every kilogram of a regulated substance sold or distributed, or offered for sale or distribution, in contravention of this paragraph constitutes a separate violation of this subpart. Sale or distribution, or offer for sale or distribution, of less than one kilogram of regulated substance in contravention of this paragraph constitutes a separate violation of this subpart.

(g)  *False information.* No person may provide false, inaccurate, or misleading information to the EPA when petitioning, reporting, or for any communication required under this subpart.

(h)  *Disposable cylinders.*

(1)  As of July 1, 2025, no person may import or domestically fill a regulated substance in a non-refillable cylinder.

(2)  As of January 1, 2027, no person may sell or distribute, or offer for sale or distribution regulated substances contained in a non-refillable cylinder.

(3)  Small cans containing less than two pounds of regulated substances that have a self-sealing valve that meets the requirements in 40 CFR 82.154(c)(2) are not subject to this restriction.

(i)  *Labeling.*

(1)  As of January 1, 2022, no person may sell or distribute, offer for sale or distribution, or import containers containing a regulated substance that lacks a label or other permanent markings stating the common name(s), chemical name(s), or ASHRAE designation of the regulated substance(s) or blend contained within, and the percentages of the regulated substances if a blend.

(2)  No person other than the importer may repackage regulated substances that were initially unlabeled or mislabeled. In order to repackage the regulated substances, the importer must either:

    (i)  Expend consumption allowances equal to the amount of allowances that would be required if each cylinder were full of HFC-23; or

    (ii)  Verify the contents with independent laboratory testing results and affix a correct label on the container that matches the lab-verified test results before the date of importation (consistent with the definition at 19 CFR 101.1) of the container.

(3)

    (i)  No person producing, importing, reclaiming, recycling for fire suppression, or repackaging regulated substances may sell or distribute, or offer for sale or distribution, regulated substances without first testing a representative sample of the regulated substances that they are producing, importing, reclaiming, recycling for fire suppression, or repackaging to verify that the composition of the regulated substance(s) matches the container labeling. For regulated substances sold or distributed or offered for sale and distribution as refrigerants, sampling must be done consistent with appendix A to 40 CFR part 82, subpart F - Specifications for Refrigerants.

(ii) No person may sell or distribute, or offer for sale or distribution, regulated substances as a refrigerant that do not meet the specifications in appendix A to 40 CFR part 82, subpart F - Specifications for Refrigerants.

(j) *Relationship to other laws.* Section

(k) of the AIM Act states that sections 113, 114, 304, and 307 of the Clean Air Act (42 U.S.C. 7413, 7414, 7604, 7607) shall apply to this section and any rule, rulemaking, or regulation promulgated by the Administrator pursuant to this section as though this section were expressly included in title VI of that Act (42 U.S.C. 7671 *et seq.*). Violation of this part is subject to Federal enforcement and the penalties laid out in section 113 of the Clean Air Act.

*[86 FR 55206, Oct. 5, 2021]*

## § 84.7 Phasedown schedule.

(a) *Phasedown from baseline.* Total production and consumption of regulated substances in the United States in each year cannot exceed the amounts (shown as a percentage of baseline) in the following table:

| Date | Percentage of production baseline (percent) | Percentage of consumption baseline (percent) |
|---|---|---|
| (1) 2022-2023 | 90 | 90 |
| (2) 2024-2028 | 60 | 60 |
| (3) 2029-2033 | 30 | 30 |
| (4) 2034-2035 | 20 | 20 |
| (5) 2036 and thereafter | 15 | 15 |

(b) *Annual production and consumption limits.*

(1) The production baseline for regulated substances is 382,554,619 metric tons of exchange value equivalent.

(2) The consumption baseline for regulated substances is 303,887,017 metric tons of exchange value equivalent.

(3) Total production and consumption in metric tons of exchange value equivalent for regulated substances in the United States in each year is derived by multiplying the production baseline or consumption baseline by the percentage in paragraph (a) of this section. Total production and consumption allowances issued under this subpart may not exceed the quantities shown in the following table:

| Year | Total production (MTEVe) | Total consumption (MTEVe) |
|---|---|---|
| (i) 2022-2023 | 344,299,157 | 273,498,315 |
| (ii) 2024-2028 | 229,532,771 | 182,332,210 |
| (iii) 2029-2033 | 114,766,386 | 91,166,105 |
| (iv) 2034-2035 | 76,510,924 | 60,777,403 |
| (v) 2036 and thereafter | 57,383,193 | 45,583,053 |

## § 84.9 Allocation of calendar-year production allowances.

(a) The relevant agency official will issue, through a separate notification, calendar year production allowances to entities that produced a regulated substance in 2020. The number of production allowances allocated to each eligible entity for 2022-2023 is calculated as follows:

(1) Take the average of the three highest annual exchange value-weighted production amounts that each eligible entity reported to the agency for calendar years 2011 through 2019;

(2) Sum the "average high year" values determined in step 1 of all eligible entities and determine each entity's percentage of that total;

(3) Determine the amount of general pool production allowances by subtracting the quantity of application-specific allowances for that year as determined in accordance with § 84.13 and the set-aside in § 84.15 from the production cap in § 84.7(b)(3);

(4) Determine individual entities' production allowance quantities by multiplying each entity's percentage determined in step 2 by the amount of general pool allowances determined in step 3.

(b)

(1) EPA will allocate calendar year production allowances to individual entities by October 1 of the calendar year prior to the year in which the allowances may be used based on the exchange value-weighted quantities calculated in paragraph (a)(4) of this section.

(2) EPA will provide public notice of the list of companies receiving production allowances as well as the quantities they will be allocated by that date.

(3) In addition to the procedure in paragraph (a) of this section, the relevant agency official will allocate calendar year production allowances to entities that qualified for allowances under § 84.15.

(4) If there are remaining production allowances after distribution from the set-aside under § 84.15, the relevant agency official will distribute such allowances on a pro rata basis to the entities in paragraph (a) of this section by March 31 of the calendar year in which the allowances may be used.

## § 84.11 Allocation of calendar-year consumption allowances.

(a) The relevant agency official will issue, through a separate notification, calendar year consumption allowances to entities that imported or produced a bulk regulated substance in 2020, unless an individual accommodation is permitted by a relevant Agency official. If multiple importers are related through shared corporate or common ownership or control, the relevant agency official will calculate and issue allowances to a single corporate or common owner. The number of consumption allowances allocated to each eligible entity for 2022-2023 is calculated as follows:

(1) Take the average of the three highest annual exchange value-weighted consumption amounts chosen at the corporate or common ownership level for eligible entities reporting to the agency for each calendar year 2011 through 2019;

(2) Sum the "average high year" values determined in step 1 of all eligible entities and determine each entity's percentage of that total;

(3) Determine the amount of general pool consumption allowances by subtracting the quantity of application-specific allowances for that year as determined in accordance with § 84.13 and the set-aside in § 84.15 from the consumption cap § 84.7(b)(3);

(4) Determine individual entity consumption allowance quantities by multiplying each entity's percentage determined in step 2 by the amount of general pool allowances determined in step 3.

(b)

(1) EPA will allocate calendar year consumption allowances to individual entities by October 1 of the calendar year prior to the year in which the allowances may be used based on the exchange value-weighted quantities calculated in paragraph (a)(4) of this section.

(2) EPA will provide public notice of the list of companies receiving consumption allowances as well as how they will be allocated by that date.

(c)

(1) In addition to the procedure in paragraph (a) of this section, the relevant agency official will allocate calendar year consumption allowances to entities that qualified for allowances under § 84.15.

(2) If there are remaining consumption allowances after distribution from the set-aside under § 84.15, the relevant agency official will distribute such allowances on a pro rata basis to the entities in paragraph (a) of this section by March 31 of the calendar year.

## § 84.13 Allocation of application-speci ic allowances.

(a) Application-specific allowances are available to entities for calendar years 2022, 2023, 2024, and 2025 that use a regulated substance in the following applications:

(1) As a propellant in metered dose inhalers;

(2) In the manufacture of defense sprays;

(3) In the manufacture of structural composite preformed polyurethane foam for marine use and trailer use;

(4) In the etching of semiconductor material or wafers and the cleaning of chemical vapor deposition chambers within the semiconductor manufacturing sector;

(5) For mission-critical military end uses; and

(6) For on board aerospace fire suppression.

(b) Entities identified in paragraph (a) of this section must request application-specific allowances by July 31 of the calendar year prior to the year in which the allowances may be used starting with the calendar year 2023 allocation. The application must include the information required in § 84.31(h)(2) except for applications for mission-critical military end uses, which must include the information required in §

**Addm.17**

84.31(h)(3).

(1) Entities must provide additional information if requesting that EPA consider unique circumstances that are not reflected by the rates of growth calculated in paragraph (c)(1) of this section. The relevant agency official will consider the following situations as unique circumstances:

    (i) Demonstrated manufacturing capacity coming on line;

    (ii) The acquisition of another domestic manufacturer or its manufacturing facility or facilities; or

    (iii) A global pandemic or other public health emergency that increases patients diagnosed with medical conditions treated by metered dose inhalers.

(2) [Reserved]

(c) The relevant agency official will determine the quantity of application-specific allowances to issue to each company by:

    (1) Taking the higher of the use of regulated substances by the company in the specific application in the prior year multiplied by:

        (i) The average growth rate of use for the company over the past three years; or

        (ii) The average growth rate of use by all companies requesting allowances for that specific application over the past three years; and

    (2) Accounting for any additional information provided regarding unique circumstances described in paragraph (b)(1) of this section; and

    (3) Subtracting out any general pool allowances allocated to the company for that calendar year.

(d)

    (1) EPA will allocate application-specific allowances by October 1 of the calendar year prior to the year in which the allowances may be used. The relevant agency official will issue, through a separate notification, application-specific allowances to eligible entities consistent with paragraphs (a) through (c) of this section.

    (2) EPA will provide public notice by that date of the list of entities receiving application-specific allowances, the quantity of allowances for each entity, and the specific application(s) for which the allowances may be used.

(e) Entities that use regulated substances in one of the six applications listed in paragraph (a) of this section and were not issued allowances as of October 1, 2021, may request allowances under the procedure in § 84.15. Such entities must meet the criteria for eligibility in this section and are subject to the requirements of this section and § 84.31(h).

(f) EPA will publish a list of entities allocated application-specific allowances, the application for which they may use regulated substances, and the quantity of allowances allocated.

(g) Application-specific allowances may be expended for either the import or production of a regulated substance.

(h) Entities allocated application-specific allowances may confer application-specific allowances to a producer, importer, or other supplier without being subject to the offset required of transfers of allowances in § 84.19. The recipient of a conferred application-specific allowance may continue to confer the allowance until it is expended for production or import. When conferring application-specific allowances, the conferring party must provide a statement certifying that the regulated substances produced or imported with the conferred allowances will only be used for the application-specific use associated with the allowance(s). The producer(s), importer(s), and/or supplier(s) receiving application-specific allowances must certify to the conferring party that they will not sell regulated substances produced or imported with application-specific allowances for any application or use other than the application-specific use associated with the allowance(s).

*[86 FR 55201, 55208, Oct. 5, 2021]*

## § 84.15 Set-aside of application-specific allowances, production allowances, and consumption allowances.

(a) Total allowances available under this section to be allocated for calendar years 2022 and 2023 are:

    (1) Up to 7.5 million metric tons of exchange value equivalent consumption allowances annually for calendar years 2022 and 2023.

    (2) Up to 2.5 million metric tons of exchange value equivalent production allowances for calendar years 2022 and 2023.

(b)

    (1) Consumption and production allowances in paragraph (a) of this section are available in the form of application-specific allowances to entities that qualify for application-specific allowances under § 84.13 that were not issued allowances as of October 1, 2021.

    (2) Entities must provide the relevant Agency official with the information contained in § 84.13 by November 30, 2021 to be eligible for consideration.

(c) Consumption allowances in paragraph (a) of this section are available to either:

    (1) Persons who imported regulated substances in 2020 that were not required to report under 40 CFR part 98 and were not issued allowances as of October 1, 2021; or

(2) Persons who are newly importing regulated substances, do not share corporate or common ownership, corporate affiliation in the past five years, or familial relations with entities receiving allowances through this rule.

(d)

  (1) Persons who meet the criteria listed in paragraph (c)(1) of this section must provide the relevant Agency official with the following information by November 30, 2021, to be eligible for consideration:

    (i) Name and address of the company, the complete ownership of the company (with percentages of ownership), and contact information for a designated representative at the company;

    (ii) The following information on an annual basis for all years between 2011 and 2020 where the person imported regulated substances:

      (A) The total quantity (in kilograms) imported of each regulated substance each year, including each shipment, dates of and port of entry for each import, and country from which the imported regulated substances were imported;

      (B) The Harmonized Tariff Schedule codes and CAS numbers for the regulated substances or blends imported;

      (C) The quantity (in kilograms) of regulated substances imported for use in processes resulting in their transformation or destruction; and

      (D) The quantity (in kilograms) of regulated substances sold or transferred during that year to each person for use in processes resulting in their transformation or destruction.

    (iii) The following information on an annual basis for all years between 2011 and 2020 where the person exported regulated substances:

      (A) The names and addresses of the exporter and the recipient of the exports;

      (B) The exporter's Employer Identification Number;

      (C) The quantity of each specific regulated substance exported, including the quantity of regulated substance that is used, reclaimed, or recycled;

      (D) The date on which, and the port from which, the regulated substances were exported from the United States or its territories;

      (E) The country to which the regulated substances were exported; and

      (F) The Harmonized Tariff Schedule codes and CAS numbers for the regulated substances shipped.

  (2) Persons who meet the criteria listed in paragraph (c)(2) of this section must provide the relevant Agency official with the following information by November 30, 2021, to be eligible for consideration:

    (i) Name and address of the company, the complete ownership of the company (with percentages of ownership), and contact information for a designated representative at the company;

    (ii) Whether the company is a woman- or minority-owned business;

    (iii) Contact information for the owner of the company;

    (iv) The date of incorporation and State in which the company is incorporated;

    (v) State license identifier;

    (vi) A plan for importing regulated substances;

    (vii) A prospective foreign exporter that the applicant anticipates working with;

    (viii) A certification that the business owner understands the regulatory requirements of this part and will make best efforts to comply with the regulatory requirements; and

    (ix) A certification that the information submitted is complete, accurate, and truthful.

(e) The relevant Agency official will allocate calendar-year 2022 and 2023 allowances in paragraph (a) of this section no later than March 31, 2022, in the following manner:

  (1) First, persons who meet the criteria listed in paragraph (b) of this section are allocated application-specific allowances (subtracted from both the production and consumption portions of the set-aside pool) for 2022 equal to the estimated need, based on projected, current, and historical trends, and subject to the same conditions for such allowances in § 84.13;

  (2) Second, persons who meet the criteria listed in paragraph (c)(1) of this section are allocated allowances for 2022 by calculating their "average high year" based on the formula in § 84.11(a)(1) and then applying the same reduction percentage between the values calculated in § 84.11(a)(1) and (4) for all general pool allowance holders; and

  (3) Third, persons who meet the criteria listed in paragraph (c)(2) of this section are allocated up to 0.2 million metric tons exchange value equivalent in allowances for 2022 and 2023.

(4) If the eligible requests received total an amount of allowances that exceeds the remaining quantity of allowances in the set-aside pool, after subtracting allowances issued under paragraphs (b)(1) and (c)(1) of this section, the amount provided to each person who meets the criteria listed in paragraph (c)(2) of this section that has applied to the set-aside pool will be allocated an amount of allowances that is reduced on a pro rata basis. If any allowances remain after the steps outlined in paragraphs (b)(1) and (c)(1) and (2) of this section, those allowances will be distributed to the persons who meet the criteria listed in §§ 84.9 and 84.11 on a pro rata basis.

(f) EPA is placing restrictions on allowances allocated under this section.

(1) Allowances allocated to persons under paragraph (e)(3) of this section, due to their eligibility of meeting the criteria in paragraph (c)(2) of this section, may not be transferred to another entity.

(2) Allowances issued under this section are not available to companies that are a subsidiary of, have any common ownership stake with, had corporate affiliation in the past five years with, or have a familial relationship with another allowance holder.

(g) EPA will provide public notice by March 31, 2022, of the list of entities receiving allowances under this paragraph, the quantity of allowances for each entity, and the specific application(s) for which the allowances may be used, where applicable.

## § 84.17 Availability of additional consumption allowances

A person may obtain at any time during the year, in accordance with the provisions of this section, consumption allowances equivalent to the quantity of regulated substances that the person exported from the United States and its territories to a foreign country in accordance with this section.

(a) The exporter must submit to the relevant Agency official a request for consumption allowances setting forth the following:

(1) The identities and addresses of the exporter and the recipient of the exports;

(2) The exporter's Employer Identification Number;

(3) The names, telephone numbers, and email addresses of contact persons for the exporter and the recipient;

(4) The quantity (in kilograms) and name of the regulated substances exported;

(5) The source of the regulated substances and the date purchased;

(6) The date on which, and the port from which, the regulated substances were exported from the United States or its territories;

(7) The country to which the regulated substances were exported;

(8) A copy of the bill of lading and the invoice indicating the net quantity (in kilograms) of regulated substances shipped and documenting the sale of the regulated substances to the purchaser; and

(9) The Harmonized Tariff Schedule codes of the regulated substances exported.

(b) The relevant Agency official will review the information and documentation submitted under paragraph (a) of this section and will issue a notice to the requestor within 15 working days.

(1) The relevant Agency official will determine the quantity of regulated substances that the documentation verifies was exported and issue consumption allowances equivalent to the quantity of regulated substances that were exported.

(i) The grant of the consumption allowances will be effective on the date the notice is issued.

(ii) The consumption allowances will be granted to the person the exporter indicates, whether it is the producer, the importer, or the exporter.

(iii) The consumption allowances will be valid until December 31 of the same calendar year in which the regulated substances were exported.

(2) The relevant Agency official will issue a notice that the consumption allowances are not granted if the official determines that the information and documentation do not satisfactorily substantiate the exporter's claims.

*[86 FR 55208, Oct. 5, 2021]*

## § 84.19 Transfers of allowances.

(a) **Inter-company transfers.** As of January 1, 2022, a person ("transferor") may transfer to any other person ("transferee") any quantity of the transferor's production allowances, consumption allowances, or application-specific allowances for use by the same type of application, as long as the following conditions are met:

(1) An offset equal to five percent of the amount of allowances transferred will be deducted from the transferor's production allowance balance if a transfer is made of production allowances, or deducted from the transferor's consumption allowance balance if a transfer is made of consumption allowances. In the case of transferring application-specific allowances, one percent of the amount of allowances transferred will be deducted from the transferor's application-specific allowance balance.

(2) The transferor must submit to the relevant Agency official a transfer claim setting forth the following:

**Addm 20**

(i) The identities and addresses of the transferor and the transferee;

(ii) The names, telephone numbers, and email addresses of contact persons for the transferor and the transferee;

(iii) The type of allowances being transferred, including the specific application (if applicable), for which allowances are to be transferred;

(iv) The quantity (in MTEVe) of allowances being transferred;

(v) The total cost of the allowances transferred;

(vi) The amount of unexpended allowances of the type and for the year being transferred that the transferor holds under authority of this subpart as of the date the claim is submitted to EPA;

(vii) The quantity of the offset to be deducted from the transferor's allowance balance; and

(viii) For transfers of application-specific allowances, a signed document from the transferee certifying that the transferee will use the application-specific allowances only for the same application for which the application-specific allowance was allocated.

(3) The relevant Agency official will determine whether the records maintained by EPA indicate that the transferor possesses unexpended allowances sufficient to cover the transfer claim as of the date the transfer claim is processed. The transfer claim is the quantity in EVe to be transferred plus the quantity of the offset. The relevant Agency official will take into account any previous transfers, any production, and allowable imports and exports of regulated substances reported by the transferor. Within three working days of receiving a complete transfer claim, the relevant Agency official will take action to notify the transferor and transferee as follows:

(i) The relevant Agency official will issue a non-objection notice to both the transferor and transferee indicating if EPA's records show that the transferor has sufficient unexpended allowances to cover the transfer claim. In the case of transfers of production allowances or consumption allowances, the relevant agency official will reduce the transferor's balance of unexpended allowances by the quantity to be transferred plus five percent of that quantity. In the case of transfers of application-specific allowances the relevant agency official will reduce the transferor's balance of unexpended allowances by the quantity to be transferred plus one percent of that quantity. The transferor and the transferee may proceed with the transfer when the relevant agency official issues a non-objection notice. However, if EPA ultimately finds that the transferor did not have sufficient unexpended allowances to cover the claim, the transferor and transferee will be liable for any violations of the regulations of this subpart that occur as a result of, or in conjunction with, the improper transfer.

(ii) The relevant Agency official will issue an objection notice disallowing the transfer if EPA's records show that the transferor has insufficient unexpended allowances to cover the transfer claim, that the transferor has failed to respond to one or more Agency requests to supply information needed to make a determination, or that the transferor or transferee has been notified of an impending administrative consequence and therefore is disallowed from transferring allowances in accordance with § 84.35. Either transferor or transferee may file a notice of appeal, with supporting reasons, with the relevant Agency official within 10 working days after receipt of the objection notice. The official may affirm or vacate the disallowance. If no appeal is filed electronically by the tenth working day after notification, the disallowance shall be final on that day.

(4) The transferor and transferee must maintain a copy of the transfer claim and a copy of EPA's non-objection or objection notice for five years.

(b) *International transfers of production allowances* -

(1) *Requests.* A person may request to increase or decrease their production allowances for a specified control period through transfers of such allowances with a person in a foreign country if the applicable conditions in this paragraph are met. Once transferred, all allowances transferred consistent with this paragraph will function as a production allowance, as defined in § 84.3.

(i) *Timing of requests.* Any request for an increase or decrease in production allowances based on an international transfer under this paragraph must be submitted by October 1 of the year prior to the calendar year in which the transferred allowances would be usable.

(ii) *Timing of the transfer.* International transfers under this paragraph will be deemed to occur, and the transferred allowances will be usable, as of January 1 of the calendar year to which the transfer applies.

(2) *Transfer from a person in a foreign country - information requirements.*

(i) A person requesting to change their production allowances based on a transfer from a person in a foreign country must submit to the relevant Agency official at the time the international transfer is requested a signed document from an official representative in that country's embassy in the United States stating that the appropriate authority within that country has revised the domestic production limits for that country equal to the lowest of the following three production quantities and identifying which of the following three production quantities was lowest:

(A) The maximum production level permitted in § 84.7(b) in the year of the international transfer minus the quantity of production allowances (in exchange value-weighted kilograms) to be transferred;

(B) The maximum production level for the applicable regulated substances that are allowed under applicable law (including the foreign country's applicable domestic law) minus the quantity of production allowances (in exchange value-weighted kilograms) to be transferred; or

**Addm 21**

  (C) The average of the foreign country's actual national production level of the applicable regulated substances for the three calendar years prior to the year of the transfer minus the quantity of production allowances (in exchange value-weighted kilograms) to be transferred.

 (ii) A person requesting a revision based on a transfer from a foreign country ("transferee") must also submit to the relevant Agency official a true copy of the document that sets forth the following:

  (A) The identity and address of the transferee;

  (B) The foreign country authorizing the transfer;

  (C) The names, telephone numbers, and email addresses of contact persons for the transferee and for the person in the foreign country;

  (D) The name of the chemical and quantity (in kilograms) of production being transferred;

  (E) Documentation that the foreign country possesses the necessary quantity of unexpended production rights;

  (F) The calendar year to which the transfer applies; and

  (G) A signed statement from a responsible official describing whether the increased production is intended for export or the market in the United States.

(3) *Transfer to a person in a foreign country - Information requirements.* A person requesting a transfer to a person in a foreign country must submit a request to the relevant Agency official that sets forth the following information:

 (i) The identity and address of the person seeking to transfer the allowances ("transferor");

 (ii) The foreign country authorizing the transfer;

 (iii) The names, telephone numbers, and email addresses of contact persons for the transferor and for the person in the foreign country;

 (iv) The name of the chemical and quantity (in kilograms) of allowable production being transferred; and

 (v) The calendar year to which the transfer applies;

 (vi) A signed statement from a responsible official requesting that the relevant Agency official revise the number of production allowances the transferor holds such that the aggregate national production in the United States is equal to the lowest of the following three production quantities and identifying which of the following three production quantities was lowest:

  (A) The maximum production level permitted in § 84.7(b) in the year of the international transfer minus the quantity of production allowances (in exchange value-weighted kilograms) to be transferred;

  (B) The maximum production for the applicable regulated substances that are allowed under applicable law minus the quantity of production allowances (in exchange value-weighted kilograms) to be transferred; or

  (C) The average of the United States' actual national production level of the applicable regulated substances for the three calendar years prior to the year of the transfer minus the quantity of production allowances (in exchange value-weighted kilograms) to be transferred.

(4) *Review of international transfer request to a foreign country.* After receiving a transfer request that meets the requirements of paragraph (b)(3) of this section, the relevant Agency official may, at his/her discretion, consider the following factors in deciding whether to approve such a transfer:

 (i) Possible economic hardships created by a transfer;

 (ii) Potential effects on trade;

 (iii) Potential environmental implications; and

 (iv) The total quantity of unexpended production allowances held by entities in the United States.

(5) *Notice of transfer.* The relevant Agency official will review the submitted requests to determine whether the foreign country in which the person is located has enacted or otherwise established the same or similar requirements or otherwise undertaken commitments regarding the production and consumption of regulated substances as are contained in the AIM Act, within a reasonable time frame of the date of its enactment. If it is determined that these conditions are not met, the relevant Agency official will notify the requestor in writing that no transfers to or from the country can occur. If these conditions are satisfied such that transfers to or from the country can occur, the relevant Agency official will consider if the request meets the applicable requirements of paragraph (b) of this section. If the request meets the requirements of paragraph (b)(2) of this section for transfers from foreign countries and paragraph (b)(3) of this section for transfers to foreign countries, and if the relevant Agency official has not decided to disapprove the request based on consideration of factors listed in paragraph (b)(4) of this section if applicable, the relevant Agency official will notify the person in writing that the appropriate production allowances were either granted or deducted and specify the control period to which the transfer applies. Notifications of production allowances granted or deducted will be provided before January 1 of the calendar year to which the transfer applies.

**Addm.22**

(i)   For transfers from a foreign country, such notification will reflect a revision of the balance of allowances held by the recipient of the transfer to equal the unexpended production allowances held by the recipient of the transfer plus the quantity of allowable production transferred from the foreign country minus an offset of five percent of the quantity transferred. The relevant Agency official will not adjust available allowances until the foreign country's representative has confirmed the appropriate number of allowances were deducted in the foreign country.

(ii)  For transfers to a foreign country, such notification will reflect a revision of the balance of production allowances for the transferor such that the aggregate national production of the regulated substance to be transferred is equal to the value the relevant Agency official determines to be the lowest of:

(A)  The maximum production level permitted in § 84.7(b) in the year of the international transfer minus the quantity of production allowances transferred and minus an offset of five percent of the quantity transferred; or

(B)  The maximum production level for the applicable regulated substances that is allowed under applicable law (in exchange-value weighted kilograms) minus the quantity of production allowances transferred and minus an offset of five percent of the quantity transferred; or

(C)  The average of the actual annual U.S. production of the applicable regulated substances for the three years prior to the date of the transfer (in exchange-value weighted kilograms minus the quantity of production allowances transferred and minus an offset of five percent of the quantity transferred).

(6)   *Revised production limit for previous transferors.* If the average actual U.S. production during the three most recent calendar years before the date of the transfer is less than the total allowable U.S. production for the applicable regulated substances permitted in § 84.7(b) for a calendar year for which international transfers are approved to occur, the aggregate allowed national U.S. production of those substances will be reduced by an additional amount beyond a simple deduction of the number of allowances reflected in the notifications under paragraph (b)(5)(ii)(B) of this section. In these circumstances, the relevant Agency official will revise the production limit for each transferor who obtained approval of a transfer of the applicable regulated substances to a foreign country in the same calendar year and notify each transferor of the revision in writing. The amount of the revision will equal the result of the following set of calculations:

(i)   The total U.S. allowable production of the applicable regulated substances minus the average of the actual annual U.S. production of those substances during the three most recent calendar years prior to the calendar year of the transfer.

(ii)  The quantity of production allowances for the applicable regulated substances transferred by the transferor in that calendar year divided by the total quantity of production allowances for those substances approved for transfer to a person in a foreign country by all the persons approved to make such transfers in that calendar year.

(iii) The result of paragraph (b)(6)(i) of this section multiplied by the result of paragraph (b)(6)(ii) of this section.

(iv)  The unexpended production allowances held by the person minus the result of paragraph (b)(6)(iii) of this section.

(7)   *Effective date of revised production limit* s. If a revision is issued under paragraph (b)(6) of this section, the change in production allowances will be effective on the date that the notification is issued.

*[86 FR 55208, Oct. 5, 2021]*

## § 84.21 Sale or conveyance of regulated substances produced or imported with application-speci ic allowances.

(a)   *Sale or conveyance of regulated substances produced or imported using application-specific allowances.*

(1)   As of January 1, 2022, any person receiving an application-specific allowance (application-specific seller) may sell or convey regulated substances produced or imported by expending that allowance to another person within the same application (application-specific purchaser) provided that the relevant Agency official approves the sale or conveyance.

(2)   The application-specific seller must submit a claim to the relevant Agency official for approval before the sale or conveyance can take place. The claim must set forth the following:

(i)   The identities and addresses of the application-specific seller and the application-specific purchaser;

(ii)  The name, telephone numbers, and email addresses of contact persons for the application-specific seller and the application-specific purchaser;

(iii) The amount of each regulated substance being sold or conveyed;

(iv)  The cost of the regulated substance being sold or conveyed;

(v)   The application for which allowances were allocated and the specific products that the application-specific purchaser plans to produce with the regulated substances; and

(vi)  Certification that the regulated substances will be used only for the same application for which the application-specific allowance under which the substances were produced or imported was allocated.

(3)   The application-specific purchaser must submit a letter to the relevant Agency official stating that it concurs with the terms of the sale or conveyance as requested by the application-specific seller.

**Addm.23**

(4) Once the claim is complete, and if EPA does not object to the sale or conveyance, the relevant agency official will issue letters to the application-specific seller and the application-specific purchaser within 10 business days indicating that the transaction may proceed. EPA reserves the right to disallow a transaction if the claim is incomplete, or if it has reason to believe that the application-specific purchaser plans use the regulated substance in anything other than the stated application. If EPA objects to the transaction, the relevant agency official will issue letters to the application-specific seller and the application-specific purchaser stating the basis for disallowing the transaction.

(5) The burden of proof is placed on the application-specific purchaser to retain sufficient records to prove that the sold or conveyed regulated substances are used only for the stated application.

(b) [Reserved]

*[86 FR 55208, Oct. 5, 2021]*

## § 84.23 Certification identification generation and tracking.

(a) *Scope and applicability.* Certification identifications may only be generated by a person that produces, imports, reclaims, recycles for fire suppression use, repackages, or blends regulated substance for distribution or sale in bulk and reports to EPA consistent with paragraph (d) of this section. All containers of bulk regulated substance, with the limited exceptions described in paragraph (b)(4) of this section, must be associated with certification identifications on the following schedule:

(1) As of January 1, 2025, all containers of bulk regulated substances imported and all containers sold or distributed by producers and importers must have a QR code.

(2) As of January 1, 2026, all containers of bulk regulated substances filled and all containers sold or distributed by all other repackagers and cylinder fillers in the United States not included in paragraph (a)(1) of this section, including reclaimers and fire suppressant recyclers must have a QR code.

(3) As of January 1, 2027, every container of bulk regulated substances sold or distributed, offered for sale or distribution, purchased or received, or attempted to be purchased or received must have a QR code.

(b) *Prohibitions.* Every kilogram of bulk regulated substances imported, sold or distributed, offered for sale or distribution, purchased or received, or attempted to be purchased or received in violation of this section is a separate violation of this subpart. Import, sale or distribution, offer for sale or distribution, purchase or receipt, or attempt to purchase or receive less than one kilogram of regulated substances in violation of this section is a separate violation of this subpart.

(1) No person may import, sell or distribute, or offer for sale or distribution, and no person may purchase or receive, or attempt to purchase or receive, a bulk regulated substance unless the container has a valid certification identification.

(2) No person may import, sell or distribute, or offer for sale or distribution, bulk regulated substances unless that person is registered with EPA consistent with paragraph (d) of this section.

(3) No person may purchase or receive, or attempt to purchase or receive, bulk regulated substances from a person that is not registered with EPA consistent with paragraph (d) of this section;

(4) The following situations are exempt from the prohibitions in paragraphs (b)(1) through (3) of this section:

(i) The regulated substances are part of a transhipment and the person transhipping the regulated substance has reported to EPA consistent with § 84.31(c)(3);

(ii) The regulated substances were previously used, have been recovered from a piece of equipment, and are intended for reclamation or fire suppressant recycling and:

(A) The person selling or distributing the regulated substances certifies in writing to the person purchasing or receiving the regulated substances that they were recovered from a piece of equipment and provides the date of recovery; and

(B) The person purchasing or receiving the regulated substances is an EPA-certified reclaimer, a registered fire suppressant recycler consistent with paragraph (d) of this section, or a registered supplier of regulated substances consistent with paragraph (d).

(iii) The regulated substances were imported consistent with the petition process described in § 84.25;

(iv) The regulated substances were collected for destruction and sent to a destruction facility directly or through an aggregator that is reporting to EPA consistent with § 84.31(c)(5); or

(v) The regulated substances were recovered from a motor vehicle air conditioner (MVAC) or MVAC-like appliance in accordance with 40 CFR part 82, subpart B and are sold or distributed or offered for sale or distribution by the same person who recovered the regulated substances for use only in MVAC equipment or MVAC-like appliances.

(5) No producer or importer may request certification identifications that would exceed their currently available allowances.

(6) A person who reclaims regulated substances or recycles regulated substances for fire suppression uses may request certification identifications at a level equal to their reported reclamation or recycling for the prior year plus an amount based on the average annual growth in total U.S. reclamation of regulated substances in the prior three years or 10 percent, whichever is higher. If further certification identifications are needed, the reclaimer or recycler must notify EPA 45 days in advance of exceeding their allowed level and request approval to generate additional certification identifications. The request must estimate the additional certification

**Addm 24**

identifications needed for the next six months and provide an explanation for the increased level of reclamation or recycling. The relevant agency official will review the request and adjust the amount of certification identifications for the person as appropriate within 21 days. Additional requests can be submitted throughout the year as needed.

(7) No regulated substance repackager or blender may request certificate identifications unless they have allowances. They may generate QR codes based on the certification identifications associated with the containers they acquire.

(c) *Required Practices.* The following practices are required, unless the person purchasing or receiving the bulk regulated substance is listed in paragraph (b)(4) of this section:

(1) Any person producing, importing, reclaiming, recycling for fire suppression uses, repackaging, selling or distributing, or offering to sell or distribute bulk regulated substances must register with EPA consistent with paragraph (d) of this section.

(2) Any person who imports, sells or distributes, or offers for sale or distribution a container of regulated substance, reclaimed regulated substance, or recycled regulated substances for fire suppression uses must permanently affix a QR code to the container that documents a valid certification identification using the standards defined by EPA prior to the import, sale or distribution, or offer for sale or distribution of the container. For the purposes of this subpart, examples of when a container of regulated substance or reclaimed regulated substance is imported, sold or distributed, or offered for sale or distribution include the date of importation (consistent with 19 CFR 101.1) and departure from a production, reclamation, fire suppressant recycling, repackaging or filling facility.

(3) At the time of sale or distribution or offer for sale or distribution, a person selling or distributing or offering for sale or distribution a container of regulated substance must ensure there is a valid and legible certification identification on each container of regulated substance, scan the certification identification system to identify a transaction, identify the person receiving the regulated substance, and indicate whether the person receiving the regulated substance is a supplier or final consumer.

(4) At the time of sale or distribution, a person taking ownership of a container of regulated substance that is a registered supplier must ensure there is a valid and legible certification identification on each container of regulated substance and scan the certification identification in the certification identification system to identify a transaction.

(d) *Recordkeeping and Reporting* -

(1) *Importers.* Any person importing a container of bulk regulated substance must enter the following information in the certification identification system to generate a QR code and associated certification identification for each container of regulated substance imported: the name or brand the regulated substance is being sold and/or marketed under, the date it was imported, the unique serial number associated with the container, the amount and name of the regulated substance(s) in the container, the name, address, contact person, email address, and phone number of the responsible party at the facility where the container of regulated substance(s) was filled, and certification that the contents of the cylinder match the substance(s) identified on the label.

(2) *Reclaimers.* Any person filling a container with a reclaimed regulated substance must enter the following information in the certification identification system to generate a QR code and associated certification identification for each container of regulated substance sold or distributed or offered for sale or distribution: the name or brand the regulated substance is being sold and/or marketed under, when the regulated substance was reclaimed and by whom, the date the reclaimed regulated substance was put into a container, the unique serial number associated with the container, the amount and name of the regulated substance(s) in the container, and certification that the purity of the batch was confirmed to meet the specifications in appendix A to 40 CFR part 82, subpart F. If a container is filled with reclaimed and virgin regulated substance(s), the reclaimer must provide the amount of virgin regulated substance included in the container and the certification identification(s) associated with that regulated substance.

(3) *Fire suppressant recyclers.* Any person filling a container with a recycled regulated substance for fire suppression purposes must enter the following information in the certification identification system to generate a QR code and associated certification identification for each container of regulated substance sold or distributed or offered for sale or distribution: the name or brand the regulated substance is being sold and/or marketed under, the date the container was filled and by whom, the unique serial number associated with the container, and the amount and name of the regulated substance(s) in the container. If a container is filled with recycled and virgin regulated substance(s), the recycler must provide the amount of virgin regulated substance included in the container and the certification identification(s) associated with that regulated substance.

(4) *Producers and repackagers.* Anyone who is filling a container, whether for the first time after production or when transferring regulated substances from one container to one or more smaller or larger containers, must enter information in the certification identification system and generate a QR code for the container(s) of packaged regulated substances sold or distributed or offered for sale or distribution: the name or brand the regulated substance is being sold and/or marketed under, the date the container was filled and by whom, the certification identification(s) associated with the regulated substance being packaged, the unique serial number associated with the container, the amount and name of the regulated substance(s) in the container, the quantity of containers it was packaged in, the size of the containers, and the name, address, contact person, email address, and phone number of the responsible party at the facility where the container(s) were filled.

(5) *Receiving recovered regulated substances.* Any person receiving recovered regulated substances for purposes of reclamation or fire suppressant recycling must keep a copy of the written certification required under paragraph (b)(4)(ii) of this section for five years.

(6) *Certification identification generators registration.* Any person who produces, imports, reclaims, recycles for fire suppression uses, repackages or fills a container of regulated substances, reclaimed regulated substances, or recycled regulated substances for fire suppression uses must register with EPA in the certification identification system at least six months before the date they are subject to the requirement in paragraph (a) of this section. The report must contain the name and address of the company, contact information for the owner of the company, the date(s) of and State(s) in which the company is incorporated and State license identifier(s), the address of each facility that sells or distributes or offers for sale or distribution regulated substances, how the

company introduces bulk regulated substances into U.S. commerce, and the categories of final customers the entity sells or distributes regulated substances to. If any of the registration information changes, these reports must be updated and resubmitted within 60 days of the change.

(7) *Supplier registration.* Any person who sells, distributes, or offers for sale or distribution, bulk regulated substances must register with EPA in the certification identification system at least six months before the date they are subject to the requirement in paragraph (a) of this section. The report must contain the name and address of the company, contact information for the owner of the company, the date(s) of and State(s) in which the company is incorporated and State license identifier(s), the address of each facility that sells or distributes regulated substances, and the categories of final customers the supplier sells or distributes regulated substances to. If any of the registration information changes, these reports must be updated and resubmitted within 60 days of the change.

*[86 FR 55208, Oct. 5, 2021]*

## § 84.25 Required processes to import regulated substances as feedstocks or for destruction.

(a)

(1) *Petition to import regulated substances for use in a process resulting in transformation or destruction.* A person must petition the relevant Agency official for the import of each individual shipment of a regulated substance imported for use in a process resulting in transformation or destruction in order to not expend allowances. A petition is required at least 30 days before the shipment is to arrive at a U.S. port, and must contain the following information:

    (i) Name, Harmonized Tariff Schedule code, and quantity in kilograms of each regulated substance to be imported;

    (ii) Name and address of the importer, the importer ID number, and the contact person's name, email address, and phone number;

    (iii) Name and address of the consignee and the contact person's name, email address, and phone number;

    (iv) Source country;

    (v) The U.S. port of entry for the import, the expected date of import, and the vessel transporting the material. If at the time of submitting the petition the importer does not know this information, and the importer receives a non-objection notice for the individual shipment in the petition, the importer is required to notify the relevant Agency official of this information prior to the date of importation of the individual shipment into the United States;

    (vi) Name and address of any intermediary, including a contact person's name, email address and phone number, who will hold the material before the regulated substances are transformed or destroyed;

    (vii) Name, address, contact person, email address, and phone number of the responsible party at the facility where the regulated substance will be used in a process resulting in the substance's transformation or destruction;

    (viii) An English translation, if needed, of the export license, application for an export license, or official communication acknowledging the export from the appropriate government agency in the country of export;

    (ix) The capacity of the container; and

    (x) The unique identification number of the container used to transport the regulated substances as part of the petition.

(2) *Review of petition to import for use in a process resulting in transformation or destruction.*

    (i) The relevant Agency official will initiate a review of the information submitted under paragraph (a)(1) of this section and take action within 21 days to issue either an objection notice or a non-objection notice for the individual shipment to the person who submitted the petition.

    (ii) The relevant Agency official may issue an objection notice to a petition for the following reasons:

        (A) If the relevant Agency official determines that the information is insufficient; that is, if the petition lacks or appears to lack any of the information required under paragraph (a)(1) of this section or other information that may be requested during the review of the petition necessary to verify that the regulated substance is for use in a process resulting in transformation or destruction;

        (B) If the relevant Agency official determines that any portion of the petition contains false, inaccurate, or misleading information, or the official has information from other U.S. or foreign government agencies indicating that the petition contains false, inaccurate, or misleading information.

    (iii) Within 10 working days after receipt of an objection notice with the basis being "insufficient information," the importer may re-petition the relevant Agency official. If no re-petition is taken by the tenth working day after the date on the objection notice, the objection shall become final. Only one re-petition will be accepted for any petition received by EPA.

    (iv) Any information contained in the re-petition which is inconsistent with the original petition must be identified and a description of the reason for the inconsistency must accompany the re-petition.

    (v) In cases where the relevant Agency official does not object to the petition, the official will issue a non-objection notice.

(vi) If, following EPA's issuance of a non-objection notice, new information is brought to EPA's attention which shows that the non-objection notice was issued based on false, inaccurate, or misleading information, then EPA has the right to:

    (A) Revoke and void the non-objection notice from the approval date;

    (B) Pursue all means to ensure that the regulated substance is not imported into the United States; and

    (C) Take appropriate enforcement and apply administrative consequences.

(3) *Timing.*

    (i) An individual shipment authorized through a non-objection notice must be used in the process resulting in its transformation within one year of import.

    (ii) An individual shipment authorized through a non-objection notice must be used in the process resulting in its destruction within 120 days of import.

(4) *Quantity.* An individual shipment authorized through a non-objection notice may not exceed the quantity (in MTEVe) of the regulated substance stated in the non-objection notice.

(b)

(1) *Petition to import used regulated substances for disposal by destruction.* A person must petition the relevant Agency official for the import of each individual shipment of a used regulated substance imported for purposes of destruction in order to not expend allowances. A petition is required at least 30 working days before the shipment is to leave the foreign port of export, and contain the following information:

    (i) Name, Harmonized Tariff Schedule code, and quantity in kilograms of each regulated substance to be imported;

    (ii) Name and address of the importer, the importer ID number, and the contact person's name, email address, and phone number;

    (iii) Name and address of the consignee and the contact person's name, email address, and phone number;

    (iv) Name and address of any intermediary who will hold regulated substances imported for destruction, and the contact person's name, email address, and phone number;

    (v) Source country;

    (vi) An English translation, if needed, of the export license (or application for an export license) from the appropriate government agency in the country of export;

    (vii) The U.S. port of entry for the import, the expected date of import, and the vessel transporting the material. If at the time of submitting the petition the importer does not know this information, and the importer receives a non-objection notice for the individual shipment in the petition, the importer is required to notify the relevant Agency official of this information prior to the entry of the individual shipment into the United States; and

    (viii) Name, address, contact person, email address, and phone number of the responsible party at the destruction facility.

(2) *Review of petition to import for destruction.*

    (i) The relevant Agency official will initiate a review of the information submitted under paragraph (b)(1) of this section and take action within 30 working days to issue either an objection notice or a non-objection notice for the individual shipment to the person who submitted the petition.

    (ii) The relevant Agency official may issue an objection notice to a petition for the following reasons:

        (A) If the relevant Agency official determines that the information is insufficient; that is, if the petition lacks or appears to lack any of the information required under paragraph (b)(1) of this section or other information that may be requested during the review of the petition necessary to verify that the regulated substance is used;

        (B) If the relevant Agency official determines that any portion of the petition contains false, inaccurate, or misleading information, or the relevant Agency official has information from other U.S. or foreign government agencies indicating that the petition contains false, inaccurate, or misleading information;

        (C) If allowing the import of the used regulated substance would run counter to government restrictions from either the country of recovery or export regarding regulated substances;

        (D) If destruction capacity is installed or is being installed for that specific regulated substance in the country of recovery or country of export and the capacity is funded in full or in part through the Multilateral Fund to the Montreal Protocol.

    (iii) Within 10 working days after receipt of an objection notice with the basis being "insufficient information," the importer may re-petition the relevant Agency official. If no re-petition is taken by the tenth working day after the date on the objection notice, the objection shall become final. Only one re-petition will be accepted for any petition received by EPA.

    (iv) Any information contained in the re-petition that is inconsistent with the original petition must be identified and a description of the reason for the inconsistency must accompany the re-petition.

    (v) In cases where the relevant Agency official does not object to the petition, the official will issue a non-objection notice.

(vi) If, following EPA's issuance of a non-objection notice, new information is brought to EPA's attention which shows that the non-objection notice was issued based on false, inaccurate, or misleading information, then EPA and the relevant Agency official has the right to:

(A) Revoke and void the non-objection notice from the approval date;

(B) Pursue all means to ensure that the regulated substance is not imported into the United States; and

(C) Take appropriate enforcement and apply administrative consequences.

(3) *Timing.* An individual shipment authorized through a non-objection notice must be destroyed within 120 days of import.

(4) *Quantity.* An individual shipment authorized through a non-objection notice may not exceed the quantity (in MTEVe) of the regulated substance stated in the non-objection notice.

(5) *Proof of destruction.* For each individual shipment of a used regulated substance imported with the intent to destroy that substance for which EPA issues a non-objection notice, an importer must submit to the Administrator records indicating that the substance has been destroyed with their quarterly reports in § 84.31(c)(1).

(6) *Recordkeeping.* The person receiving the non-objection notice from the relevant Agency official for a petition to import used regulated substances must maintain the following records for five years:

(i) A copy of the petition;

(ii) The EPA non-objection notice;

(iii) The bill of lading for the import;

(iv) The U.S. Customs entry number; and

(v) Records demonstrating that the substance has been destroyed in accordance with approved technologies in § 84.29.

*[86 FR 55208, Oct. 5, 2021]*

## § 84.27 Controlling emissions of HFC-23.

(a) No later than October 1, 2022, as compared to the amount of chemical intentionally produced on a facility line, no more than 0.1 percent of HFC-23 created on the line may be emitted.

(1) *Requests for extension.* The producer may submit a request to the relevant Agency official to request a six-month extension, with a possibility of one additional six-month extension, to meet the 0.1 percent HCFC-23 limit. No entity may have a compliance date later than October 1, 2023.

(2) *Timing of request.* The extension request must be submitted to EPA no later than August 1, 2022, for a first-time extension or February 1, 2023, for a second extension.

(3) *Content of request.* The extension request must contain the following information:

(i) Name of the facility submitting the request, contact information for a person at the facility, and the address of the facility.

(ii) A description of the specific actions the facility has taken to improve their HFC-23 control, capture, and destruction; the facility's plans to meet the 0.1 percent HFC-23 limit including the expected date by which the equipment will be installed and operating; and verification that the facility has met all applicable reporting requirements.

(4) *Review of request.* Starting on the first working day following receipt by the relevant Agency official of a complete request for extension, the relevant Agency official will initiate review of the information submitted under paragraph (a)(3) of this section and take action within 30 working days. Any grant of a compliance deferral by the relevant Agency official will be made public.

(b) Captured HFC-23 is permitted to be destroyed at a different facility than where it is produced. In such instances, HFC-23 emissions during the transportation to and destruction at the different facility will be incorporated into calculations of whether the producer meets the 0.1 percent standard outlined in paragraph (a) of this section.

*[86 FR 55208, Oct. 5, 2021]*

## § 84.29 Destruction of regulated substances.

(a) The following technologies are approved by the Administrator for destruction of all regulated substances except for HFC-23:

(1) Cement kiln;

(2) Gaseous/fume oxidation;

(3) Liquid injection incineration;

(4) Porous thermal reactor;

(5) Reactor cracking;

**Addm 28**

(6) Rotary kiln incineration;

(7) Argon plasma arc;

(8) Nitrogen plasma arc;

(9) Portable plasma arc;

(10) Chemical reaction with hydrogen and carbon dioxide;

(11) Gas phase catalytic de-halogenation; and

(12) Superheated steam reactor.

(b) The following technologies are approved by the Administrator for destruction of HFC-23:

(1) Gaseous/fume oxidation;

(2) Liquid injection incineration;

(3) Reactor cracking;

(4) Rotary kiln incineration;

(5) Argon plasma arc;

(6) Nitrogen plasma arc;

(7) Chemical reaction with hydrogen and carbon dioxide; and

(8) Superheated steam reactor.

*[86 FR 55208, Oct. 5, 2021]*

## § 84.31 Recordkeeping and reporting.

(a) *Recordkeeping and reporting.* Any person who produces, imports, exports, transforms, uses as a process agent, destroys, reclaims, or repackages regulated substances or is receiving application-specific allowances in the six applications listed in subsection (e)(4)(B)(iv) of the AIM Act must comply with the following recordkeeping and reporting requirements:

(1) Reports required by this section must be submitted within 45 days of the end of the applicable reporting period, unless otherwise specified.

(2) Reports, petitions, and any related supporting documents must be submitted electronically in a format specified by EPA.

(3) Records and copies of reports required by this section must be retained for five years.

(4) Quantities of regulated substances must be stated in terms of kilograms unless otherwise specified.

(5) Reports are no longer required if an entity notifies the Administrator that they have permanently ceased production, import, export, destruction, transformation, use as a process agent, reclamation, or packaging of regulated substances, but the entity must continue to comply with all applicable recordkeeping requirements.

(b) *Producers.* Persons ("producers") who produce regulated substances must comply with the following recordkeeping and reporting requirements:

(1) *One-time report.* Within 120 days of January 1, 2022, or within 120 days of the date that a producer first produces a regulated substance, whichever is later, every producer must submit to the Administrator a report describing:

(i) The method by which the producer in practice measures daily quantities of regulated substances produced;

(ii) Conversion factors by which the daily records as currently maintained can be converted into kilograms of regulated substances produced, including any constants or assumptions used in making those calculations (*e.g.,* tank specifications, ambient temperature or pressure, density of the regulated substance);

(iii) Internal accounting procedures for determining plant-wide production;

(iv) The quantity of any fugitive losses accounted for in the production figures;

(v) A list of any coproducts, byproducts, or emissions from the production line that are other regulated substances; ozone-depleting substances listed in 40 CFR part 82, subpart A; or hazardous air pollutants initially identified in section 112 of the Clean Air Act, and as revised through rulemaking and codified in 40 CFR part 63;

(vi) The estimated percent efficiency of the production process for the regulated substance; and

(vii) A description of any processes that use a regulated substance as a process agent. Within 60 days of any change in the measurement procedures or the information specified in the above report, the producer must submit a report specifying the changes to the relevant Agency official.

**Addm.29**

(2) *Reporting - producers.* Within 45 days after the end of each quarter, each producer of a regulated substance must provide to the relevant Agency official a report containing the following information for each facility:

    (i)   The quantity (in kilograms) of production of each regulated substance used in processes resulting in their transformation by the producer and the quantity (in kilograms) intended for transformation by a second party;

    (ii)  The quantity (in kilograms) of production of each regulated substance used in processes resulting in their destruction by the producer and the quantity (in kilograms) intended for destruction by a second party;

    (iii) The quantity (in kilograms) of production of each regulated substance used as a process agent by the producer and the quantity (in kilograms) intended for use as a process agent by a second party;

    (iv) The quantity (in exchange value equivalents) of allowances expended for each regulated substance and the quantity (in kilograms) of each regulated substance produced;

    (v)  The quantity (in kilograms) of regulated substances sold or transferred during the quarter to a person other than the producer for use in processes resulting in their transformation, destruction, or use as a process agent;

    (vi) The quantity (in kilograms) of regulated substances produced by the producer that were exported by the producer or by other U.S. companies to a foreign country that will be transformed or destroyed and therefore were produced without expending production or consumption allowances;

    (vii) For transformation in the United States or by a person in a foreign country, one copy of a transformation verification from the transformer for the specific regulated substance(s) and a list of additional quantities shipped to that same transformer for the quarter;

    (viii) For destruction in the United States or by a person in a foreign country of a regulated substance that was produced without allowances, one copy of a destruction verification for each particular destroyer confirming it destroyed the same regulated substance, and a list of additional quantities shipped to that same destroyer for the quarter;

    (ix) A list of the entities conferring application-specific allowances from whom orders were placed, and the quantity (in kilograms) of specific regulated substances produced for those listed applications; and

    (x)  For the fourth quarter report only, the quantity of each regulated substance held in inventory on December 31.

(3) *Recordkeeping - producers.* Every producer of a regulated substance must maintain the following records:

    (i)   Dated records of the quantity (in kilograms) of each regulated substance produced at each facility;

    (ii)  Dated records of the quantity (in kilograms) of regulated substances produced for use in processes that result in their transformation, destruction, or as a process agent;

    (iii) Dated records of the quantity (in kilograms) of regulated substances sold for use in processes that result in their transformation, destruction, or as a process agent;

    (iv) Dated records of the quantity (in kilograms) of regulated substances produced by expending conferred application-specific allowances and quantity sold for use in each listed application;

    (v)  Copies of invoices or receipts documenting sale of regulated substances for use in processes that result in their transformation, destruction, or as a process agent;

    (vi) Dated records of the quantity (in kilograms) of each regulated substance used at each facility as feedstocks or destroyed in the manufacture of a regulated substance or in the manufacture of any other substance, and any regulated substance introduced into the production process of the same regulated substance at each facility;

    (vii) Dated records of the quantity (in kilograms) of each regulated substance used at each facility as a process agent;

    (viii) Dated records identifying the quantity (in kilograms) of each coproduct and byproduct chemical not a regulated substance produced within each facility also producing one or more regulated substances;

    (ix) Dated records of the quantity (in kilograms) of raw materials and feedstock chemicals used at each facility for the production of regulated substances;

    (x)  Dated records of the shipments of each regulated substance produced at each plant;

    (xi) Dated records of batch tests of regulated substances packaged for sale or distribution;

    (xii) The quantity (in kilograms) of regulated substances, the date received, and names and addresses of the source of used materials containing regulated substances which are recycled or reclaimed at each plant;

    (xiii) Records of the date, the regulated substance, and the estimated quantity of any spill or release of a regulated substance that equals or exceeds 100 pounds;

    (xiv) The transformation verification in the case of transformation, or the destruction verification in the case of destruction, showing that the purchaser or recipient of a regulated substance, in the United States or in another foreign country, certifies the intent to either transform or destroy the regulated substance, or sell the regulated substance for transformation or destruction in cases when allowances were not expended; and

Addm.30

(xv)  The certifications from application-specific allowance holders stating that the regulated substances were purchased solely for an application listed in § 84.5(c)(2) and will not be resold for use in a different application or used in any other manufacturing process.

(4)  *Additional Requirements: producers of HFC-23.*

    (i)  Each producer of HFC-23 must include the following additional information in their one-time report in paragraph (b)(1) of this section:

        (A)  Information on the capacity to produce the intended chemical on the line on which HFC-23 is produced;

        (B)  A description of actions taken at the facility to control the generation of HFC-23 and its emissions;

        (C)  Identification of approved destruction technology and its location intended for use for HFC-23 destruction;

        (D)  A copy of the destruction removal efficiency report associated with the destruction technology; and

        (E)  Within 60 days of any change in the information specified in the above report, the producer must submit a report specifying the changes to the relevant Agency official.

    (ii)  Each producer of HFC-23 must include the following additional information in their fourth quarter report:

        (A)  Annual facility-level data on HFC-23 (in metric tons) on amounts: Emitted; generated; generated and captured for any purpose; generated and captured for consumptive use; generated and captured for feedstock use in the United States; generated and captured for destruction; used for feedstock without prior capture; and destroyed without prior capture.

        (B)  [Reserved]

    (iii)  If captured HFC-23 is destroyed in a subsequent control period, producers must submit records to EPA indicating the HFC-23 has been destroyed in their next quarterly report.

    (iv)  In developing any required report, each producer of HFC-23 must abide by the following monitoring and quality assurance and control provisions:

        (A)  To calculate the quantities of HFC-23 generated and captured for any use, generated and captured for destruction, used for feedstock without prior capture, and destroyed without prior capture, facilities shall comply with the monitoring methods and quality assurance and control requirements set forth at 40 CFR 98.414 and the calculation methods set forth at 40 CFR 98.413, except 40 CFR 98.414(p) shall not apply.

        (B)  To calculate the quantity of HFC-23 emitted, facilities shall comply with the monitoring methods and quality assurance and control requirements set forth at 40 CFR 98.124 and the calculation methods set forth at 40 CFR 98.123.

(5)  *Agency assumption* - For any person who fails to maintain the records required by this paragraph, or to submit the reports required by this paragraph, EPA may assume that the person has produced at full capacity during the period for which records were not kept.

(c)  *Importers.* Persons ("importers") who import regulated substances must comply with the following recordkeeping and reporting requirements:

(1)  *Reporting - importers.* Within 45 days after the end of each quarter, an importer of a regulated substance must submit to the relevant Agency official a report containing the following information:

    (i)  Summaries of the records required in paragraph (c)(2) of this section for the previous quarter;

    (ii)  The total quantity (in kilograms) imported of each regulated substance for that quarter;

    (iii)  The Harmonized Tariff Schedule codes for the regulated substances or blends imported;

    (iv)  A list of the application-specific allowance holders from whom orders were placed, number of application-specific allowances conferred, and the quantity (in kilograms) of specific regulated substances imported for those listed applications;

    (v)  The quantity (in kilograms) of regulated substances imported for use in processes resulting in their transformation or destruction;

    (vi)  The quantity (in kilograms) of regulated substances sold or transferred during that quarter to each person for use in processes resulting in their transformation or destruction;

    (vii)  The transformation verifications showing that the purchaser or recipient of imported regulated substances intends to transform those substances or destruction verifications showing that the purchaser or recipient intends to destroy the regulated substances;

    (viii)  Records required under § 84.25(b)(5) documenting proof that material imported for destruction was destroyed; and

    (ix)  For the fourth quarter report only, the quantity of each regulated substance held in inventory on December 31.

(2)  *Recordkeeping - importers.* An importer of a regulated substance must maintain the following records:

    (i)  The quantity (in kilograms) of each regulated substance imported, either alone or in mixtures, including the percentage of each mixture that consists of a regulated substance;

    (ii)  The quantity (in kilograms) of used regulated substances imported for destruction under the process described in § 84.25(b);

**Addm.31**

(iii)  The quantity (in kilograms) of regulated substances imported for use in processes resulting in their transformation or destruction;

(iv)  The quantity (in kilograms) of regulated substances imported and sold for use in processes that result in their transformation or destruction;

(v)  The date on which the regulated substances were imported;

(vi)  The port of entry through which the regulated substances passed;

(vii)  The country from which the imported regulated substances were imported;

(viii)  The company that produced the imported regulated substances;

(ix)  The Harmonized Tariff Schedule code for the regulated substances imported;

(x)  The importer number for the shipment;

(xi)  A copy of the bill of lading for the import;

(xii)  The invoice for the import;

(xiii)  The U.S. Customs entry number;

(xiv)  Dated records documenting the sale or transfer of regulated substances for use in processes resulting in their transformation or destruction;

(xv)  Copies of transformation verifications or destruction verifications indicating that the regulated substances will be transformed or destroyed;

(xvi)  Dated records of the quantity of regulated substances imported for an application listed at § 84.5(c)(2);

(xvii)  The certifications from application-specific allowance holders stating that the regulated substances were purchased solely for an application listed in § 84.5(c)(2) and will not be resold for use in a different application or used in any other manufacturing process;

(xviii)  Dated records of batch tests of regulated substances packaged for sale or distribution; and

(xix)  For any entity subject to an order issued by the Department of Commerce that is receiving allowances for 2022 or 2023, documentation of cash deposit of and final payment of the antidumping and countervailing duty for regulated substances imported.

(3)  ***Transhipments.***

(i)  A person must notify the relevant Agency official of each shipment of a regulated substance that is to be transhipped through the United States. The notification is required at least 30 working days before the shipment is to leave the foreign port of export for importation into the United States as a transhipment, and must contain the following information:

(A)  Name, Harmonized Tariff Schedule code, and quantity in kilograms of each regulated substance to be transhipped;

(B)  Name and address of the importer, the importer ID number, and the contact person's name, email address, and phone number;

(C)  Source country; and

(D)  The U.S. port of entry, the expected date of importation, and the vessel transporting the material. If at the time of submitting the petition the importer does not know this information, the importer is required to notify the relevant Agency official of this information prior to the entry of each shipment into the United States.

(ii)  The person in paragraph (c)(3)(i) of this section must notify the relevant Agency official of each shipment of a regulated substance that has been transhipped when it is exported from the United States. The notification is required at least 10 working days after the shipment is exported from the United States, and must contain the following information:

(A)  Name, Harmonized Tariff Schedule code, and quantity in kilograms of each regulated substance to be transhipped;

(B)  Name and address of the importer, the importer ID number, and the contact person's name, email address, and phone number; and

(C)  Date of departure and name of vessel.

(iii)  Any person who tranships a regulated substance must maintain records that indicate:

(A)  That the regulated substance shipment originated in a foreign country;

(B)  That the regulated substance shipment is destined for another foreign country; and

(C)  That the regulated substance shipment will not enter U.S. commerce within the United States.

(4)  ***Additional recordkeeping requirements - importers of used regulated substances for destruction.*** A person receiving a non-objection notice from the relevant Agency official to import used regulated substances for destruction must maintain the following records:

(i)   A copy of the petition to import for destruction;

(ii)   The EPA non-objection notice;

(iii)   A copy of the export license, export license application, or official communication from the appropriate government agency in the country of export;

(iv)   An English translation of the document in paragraph (c)(4)(iii) of this section;

(v)   U.S. Customs entry documents for the import that must include the Harmonized Tariff Schedule codes;

(vi)   The date, amount, and name of the regulated substances sent for destruction, per shipment;

(vii)   An invoice from the destruction facility verifying the shipment was received; and

(viii)   Records from the destruction facility indicating that the substance has been destroyed.

(5)   *Recordkeeping requirements - aggregators.* A person aggregating a regulated substance prior to destruction, regardless of whether the person is an importer, must:

(i)   Maintain transactional records that include the name and address of the entity from whom they received the regulated substance imported for destruction;

(ii)   Maintain transactional records that include the name and address of the entity to whom they sent the regulated substance imported for destruction;

(iii)   Maintain records that include the date and quantity of the imported regulated substance received for destruction;

(iv)   Maintain records that include the date and quantity of the imported regulated substance sent for destruction; and

(v)   If the person is the final aggregator of such a regulated substance before the material is destroyed, maintain a copy of records indicating that the substance has been destroyed.

(6)   *Recordkeeping requirements - vessel owners/operators.* A person offloading regulated substances recovered from equipment aboard a marine vessel, aircraft, or other aerospace vehicle while in a U.S. port must maintain records of the company name, vessel name or identifier, location of the appliance, date of recovery, person doing the recovery, the amount of regulated substances recovered and type of refrigerant recovered for each servicing event, and the amount of each regulated substance or blend of regulated substances offloaded and the date it was offloaded.

(7)   *Additional reporting for importers.* A person importing a regulated substance, or their agent, must include the following no later than 14 days before importation via a Customs and Border Protection-authorized electronic data interchange system, such as the Automated Broker Interface:

(i)   Cargo Description;

(ii)   Quantity;

(iii)   Quantity Unit of Measure Code;

(iv)   Quantity Unit of Measure;

(v)   Weight;

(vi)   Weight Unit of Measure;

(vii)   Port of Entry;

(viii)   Scheduled Entry Date;

(ix)   Harmonized Tariff Schedule (HTS) code;

(x)   Harmonized Tariff Schedule (HTS) Description;

(xi)   Origin Country;

(xii)   Importer Name and Importer Number;

(xiii)   Consignee Entity Name;

(xiv)   CAS Number(s) of the regulated substance(s) imported and, for regulated substances that are in a mixture, either the ASHRAE numerical designation of the refrigerant or the percentage of the mixture containing each regulated substance;

(xv)   If importing regulated substances for transformation or destruction, a copy of the non-objection notice issued consistent with § 84.25; and

(xvi)   If importing regulated substances as a transhipment, a copy of the confirmation documenting the importer reported the transhipment consistent with paragraph (c)(3)(i) of this section.

(8)   *One-time report - payment of antidumping and countervailing duties.* By November 30, 2021, any entity importing regulated substances subject to an antidumping and countervailing duty order issued by the Department of Commerce that is receiving allowances for 2022 or 2023 must provide documentation of cash deposit of and final payment of such duties for the regulated

substances imported from January 1, 2017, through May 19, 2021, or provide evidence that those imports were not subject to such duties for those years.

(d) *Exporters.* Persons ("exporters") who export regulated substances must comply with the following reporting requirements:

   (1) *Reporting requirements - exporters.* Within 45 days after the end of each quarter, each exporter of a regulated substance must submit to the relevant Agency official a report containing the following information if such information was not already reported under paragraph (b)(2) of this section:

      (i) The names and addresses of the exporter and the recipient of the exports;

      (ii) The exporter's Employer Identification Number;

      (iii) The quantity of each specific regulated substance exported, including the quantity of regulated substance that is used, reclaimed, or recycled;

      (iv) The date on which, and the port from which, the regulated substances were exported from the United States or its territories;

      (v) The country to which the regulated substances were exported;

      (vi) The Harmonized Tariff Schedule codes for the regulated substances shipped;

      (vii) For persons exporting for transformation or destruction of the regulated substance, the invoice or sales agreement containing language similar to the transformation verifications that importers use, or destruction verifications showing that the purchaser or recipient intends to destroy the regulated substances; and

      (viii) For the fourth quarter report only, the quantity of each regulated substance held in inventory on December 31.

   (2) *Used regulated substances.* Any exporter of used regulated substances must indicate on the bill of lading or invoice that the regulated substance is used.

(e) *Second-party transformation and destruction.* Any person who transforms or destroys regulated substances produced or imported by another person must comply with the following recordkeeping and reporting requirements:

   (1) *Reporting - second-party transformation and destruction.* Any person who transforms or destroys regulated substances produced or imported by another person must report the following for each facility:

      (i) The names and quantities (in kilograms) of the regulated substances transformed for each calendar year within 45 days after the end of that year; and

      (ii) The names and quantities (in kilograms) of the regulated substances destroyed for each calendar year within 45 days after the end of that year.

   (2) *Recordkeeping - second-party transformation and destruction.* Any person who transforms or destroys regulated substances produced or imported by another person must maintain the following:

      (i) Copies of the invoices or receipts documenting the sale or transfer of the regulated substances to the person;

      (ii) Records identifying the producer or importer of the regulated substances received by the person;

      (iii) Dated records of inventories of regulated substances at each plant on the first day of each quarter;

      (iv) Dated records of the quantity (in kilograms) of each regulated substance transformed or destroyed;

      (v) In the case where regulated substances were purchased or transferred for transformation purposes, a copy of the person's transformation verification;

      (vi) Dated records of the names, commercial use, and quantities (in kilograms) of the resulting chemical(s) when the regulated substances are transformed;

      (vii) Dated records of shipments to purchasers of the resulting chemical(s) when the regulated substances are transformed; and

      (viii) In the case where regulated substances were purchased or transferred for destruction purposes, a copy of the person's destruction verification.

   (3) *Transformation verifications.* Any person who purchases regulated substances for purposes of transformation must provide the producer or importer of the regulated substances with a transformation verification that the regulated substances are to be used in processes that result in their transformation. The verification can only be valid for one year. The transformation verification shall include the following:

      (i) Identity and address of the person intending to transform the regulated substances;

      (ii) The quantity (in kilograms) of regulated substances intended for transformation;

      (iii) Identity of shipments by purchase order number(s), purchaser account number(s), location(s), or other means of identification;

      (iv) Period of time over which the person intends to transform the regulated substances; and

      (v) Signature and title of the verifying person.

**Addm. 34**

(4) *Destruction verifications.* Any person who purchases or receives regulated substances in processes that result in their destruction shall provide the producer or importer of the regulated substances with a destruction verification that the regulated substances are to be used in processes that result in their destruction. The verification can only be valid for up to 120 days. The destruction verification shall include the following:

    (i) Identity and address of the person intending to destroy regulated substances;

    (ii) The quantity (in kilograms) of regulated substances intended for destruction;

    (iii) Identity of shipments by purchase order number(s), purchaser account number(s), location(s), or other means of identification;

    (iv) The destruction efficiency at which such substances will be destroyed;

    (v) Period of time over which the person intends to destroy regulated substances; and

    (vi) Signature and title of the verifying person.

(5) *Transformation reporting - one-time report.* Within 120 days of January 1, 2022, or within 120 days of the date that an entity first transforms a regulated substance, whichever is later, any person who transforms a regulated substance must provide EPA with a one-time report containing the following information:

    (i) A description of the transformation use;

    (ii) A description of all technologies and actions taken to minimize emissions of regulated substances;

    (iii) The name of the product manufactured in the process;

    (iv) A list of any coproducts, byproducts, or emissions from the line on which the regulated substance is to be transformed that are other regulated substances; ozone-depleting substances listed in 40 CFR part 82, subpart A; or hazardous air pollutants initially identified in section 112 of the Clean Air Act, and as revised through rulemaking and codified in 40 CFR part 63;

    (v) The estimated annual fugitive emissions by chemical associated with the transformation process;

    (vi) The anticipated ratio of regulated substance used for transformation to the amount of end product manufactured; and

    (vii) A mass balance equation of the transformation reaction.

(f) *All destruction facilities -*

    (1) *Destruction - one-time report.* Within 120 days of January 1, 2022, or within 120 days of the date that an entity first destroys a regulated substance, whichever is later, every person who destroys regulated substances, whether in a process for destruction or for disposal of a used substance, shall provide EPA with a report containing the following information:

        (i) The destruction unit's destruction efficiency;

        (ii) The methods used to determine destruction efficiency;

        (iii) The methods used to record the volume destroyed;

        (iv) The name of other relevant federal or state regulations that may apply to the destruction process; and

        (v) Any changes to the information in this paragraph must be reflected in a revision to be submitted to EPA within 60 days of the change(s).

    (2) *Proof of destruction.* Any person who destroys used regulated substances for disposal of that substance, shall provide the importer or aggregator with a record indicating the substance was destroyed within 30 days of the date of destruction.

(g) *Process agents -*

    (1) *Reporting - one-time report.* Within 120 days of January 1, 2022, or within 120 days of the date that an entity first uses a regulated substance as a process agent, whichever is later, any person who uses a regulated substance as a process agent must provide EPA a one-time report containing the following information:

        (i) A description of the process agent use that includes details of the percentages of process agent retained within the process, recovered after the process, and emitted or entrained in the final product;

        (ii) A description of all technologies and actions taken to minimize emissions of regulated substances;

        (iii) The name of the product and byproducts manufactured in the process; and

        (iv) The anticipated ratio of process agent emissions to end product manufactured.

    (2) *Annual report.* Any person who uses a regulated substance as a process agent must provide an annual report containing the following information:

        (i) Contact information including email address and phone number for a primary and alternate contact person;

        (ii) The amount of regulated substance used as a process agent;

        (iii) The amount of product and the amount of byproducts manufactured (including amounts eventually destroyed or used as feedstock);

**Addm.35**

(iv)  The stack point source emissions; and

(v)  A description of any regulated substance emission reduction actions planned or currently under investigation.

(h)  *Holders of application-specific allowances.*

(1)  *Reporting.* Any person allocated application-specific allowances, except for persons receiving application-specific allowances for mission-critical military end uses, must submit to the relevant Agency official a report by July 31 (covering prior activity from January 1 through June 30) and January 31 (covering prior activity from July 1 through December 31) of each year. The report shall contain the following information:

(i)  The quantity (in kilograms) of regulated substances acquired through conferring allowances during the previous six months;

(ii)  The quantity (in kilograms) of regulated substances acquired through expending allowances and directly imported during the previous six months;

(iii)  The quantity (in kilograms) of regulated substances purchased for application-specific use without expending application-specific allowances during the previous six months (*i.e.,* from the open market);

(iv)  The quantity (in kilograms) of inventory on the last day of the previous six-month period of each regulated substance for application-specific use held by the reporting company or held under contract by another company for the reporting company's use;

(v)  The quantity (in kilograms) of each regulated substance for application-specific use that was destroyed or recycled during the previous six months;

(vi)  The names and contact information of each company to which application-specific allowances were conferred, and the quantity of allowances conferred from each company, and the quantity of regulated substances received from each company;

(vii)  In the July 31 report only, a description of plans to transition application-specific use of regulated substances to regulated substances with a lower exchange value or alternatives to regulated substances;

(viii)  In the July 31 report only, if a company is requesting additional allowances due to one or more of the circumstances listed in § 84.13(b)(1), the report must include a projection of the monthly quantity of additional regulated substances needed for application-specific use(s) by month in the next calendar year and a detailed explanation, including relevant supporting documentation to justify the additional need; and

(ix)  In the July 31 report only, if a company is contracting out the manufacturing of defense sprays or metered dose inhalers, or paying another person (whether it is in cash, credit, goods, or services) to perform the servicing of onboard aerospace fire suppression, the name, address, and email address for a representative of the person doing the manufacturing or servicing, and clarification on whether the responses in paragraph (h)(1) of this section apply to the company that is allocated application-specific allowances or the company receiving the contract for manufacturing and/or servicing using application-specific allowances.

(2)  *New Requests.* Persons requesting application-specific allowances for the first time must submit to EPA the following information:

(i)  A description of the use of regulated substances and a detailed explanation of how the use is an application-specific use listed in § 84.13(a);

(ii)  Total quantity (in kilograms) of all regulated substances acquired for application-specific use in the previous three years, including a copy of the sales records, invoices, or other records documenting that quantity;

(iii)  The name of the entity or entities supplying regulated substances for application-specific use and contact information for those suppliers;

(iv)  The quantities (in kilograms) of regulated substances held in inventory for application-specific use as of June 30 of the prior year and June 30 in the current year;

(v)  A description of plans to transition to regulated substances with a lower exchange value or alternatives to regulated substances;

(vi)  If a company is requesting additional allowances due to one or more of the circumstances listed in § 84.13(b)(1), the report must include a projection of the monthly quantity of additional regulated substances needed by month in the next calendar year and a detailed explanation, including relevant supporting documentation to justify the additional need; and

(vii)  If a company is contracting out the manufacturing of defense sprays or metered dose inhalers, or contracting out the servicing of onboard aerospace fire suppression, the name, address, and email address for a representative of the person doing the manufacturing or servicing, and clarification on whether the responses in paragraph (h)(2) of this section apply to the company that is requesting application-specific allowances or the company receiving the contract for manufacturing and/or servicing using application-specific allowances.

(3)  *Report for Application-specific Allowances for Mission-critical Military End Use.* The Department of Defense must provide a report to EPA biannually by July 31 (covering prior activity from January 1 through June 30) and January 31 (covering prior activity from July 1 through December 31) of each year contains the following information:

(i)  The quantity (in kilograms) of each regulated substance acquired for application-specific use by conferring application-specific allowances;

**Addm 36**

(ii) The quantity of inventory on June 30 of each regulated substance for application-specific use held by the Department of Defense or held under contract by another company for use by the Department of Defense;

(iii) The quantity of each regulated substance requested for mission-critical military end uses in the next calendar year;

(iv) The broad sectors of use covered by current mission-critical military end uses in the next calendar year; and

(v) A description of plans to transition application-specific use(s) to regulated substances with a lower exchange value or alternatives to regulated substances, including not-in-kind substitutes.

(4) *Conferral of allowances.* Entities who confer application-specific allowances, except for the conferral of allowances for mission-critical military end uses, must submit the following information about each conferral to the relevant Agency official prior to conferring allowances:

(i) The identities and addresses of the conferrer and the conferee;

(ii) The names, telephone numbers, and email addresses of contact persons for the conferrer and the conferee;

(iii) The specific application for which application-specific allowances are to be conferred;

(iv) The quantity (in MTEVe) of application-specific allowances being conferred;

(v) The amount of unexpended application-specific allowances of the type and for the year being conferred that the conferrer holds under authority of this subpart as of the date the claim is submitted to EPA; and

(vi) A certification from the conferrer and the conferee stating that the regulated substances being acquired, produced, or imported are solely for an application listed in § 84.5(c)(2) and will not be resold for use in a different application or used in any other manufacturing process.

(5) *Confirmation of conferral.* If the conferrer has sufficient application-specific allowances for the conferral, the conferral will occur and the relevant Agency official will issue a confirmation notice to both the conferrer and conferee documenting the conferral occurred. The relevant agency official will reduce the conferrer's balance of unexpended allowances by the quantity conferred. However, if EPA ultimately finds that the conferrer did not have sufficient unexpended allowances to cover the conferral or that the regulated substances produced or imported with conferred allowances are used for anything other than the specific application identified in the conferee's submittal and for the application those allowances were allocated for, the conferrer and conferee will be liable for any violations of the regulations of this subpart that occur as a result of, or in conjunction with, the improper conferral.

(6) *Recordkeeping.* Entities who receive via allocation, transfer, or conferral of application-specific allowances, except for mission-critical military end uses, must maintain the following records for five years:

(i) Records necessary to develop the biannual reports;

(ii) A copy of certifications provided to entities when conferring and transferring allowances for application-specific use;

(iii) A copy of confirmation notices when conferring allowances for application-specific use;

(iv) A copy of the annual submission requesting application-specific allowances;

(v) Invoices and order records related to the purchase of regulated substances;

(vi) Records related to the transfer and conferral of application-specific allowances to other entities; and

(vii) Records documenting how regulated substances acquired with application-specific allowances were used.

(7) *Recordkeeping - Mission-Critical Military End Uses.* The Department of Defense must maintain the following records:

(i) Records necessary to develop the annual report;

(ii) A copy of certifications provided to entities when conferring allowances for application-specific use;

(iii) Invoices and order records related to the purchase of regulated substances;

(iv) Records documenting the conferral(s) of application-specific allowances to other entities up to and including the producer and or importer of the chemical;

(v) Records documenting the transfer of regulated substances to an agent or unit of the Department of Defense where the regulated substance will be used for mission-critical applications; and

(vi) Copies of current and historical plans prescribed by the Office of the Secretary of Defense documenting internal Department of Defense monitoring and review procedures for accuracy.

(i) *Reclaimers.* Persons ("reclaimers") who reclaim regulated substances must comply with the following recordkeeping and reporting requirements:

(1) *One-time report.* By February 14, 2022, any person who reclaims a regulated substance must provide a one-time report containing the following information:

(i) The quantity of each regulated substance held in inventory as of December 31, 2021, broken out by whether the regulated substance is recovered, reclaimed, and virgin;

    (ii) The name of the laboratory that conducts batch testing and a signed statement from that laboratory confirming there is an ongoing business relationship with the reclaimer;

    (iii) The number of batches tested for each regulated substance or blend containing a regulated substance in the prior year; and

    (iv) The number of batches that did not meet the specifications in appendix A to 40 CFR part 82, subpart F in the prior year.

(2) *Quarterly Reporting.* Within 45 days after the end of each quarter, each reclaimer of a regulated substance must submit to the relevant Agency official a report containing the quantity of material (the combined mass of regulated substance and contaminants) by regulated substance sent to them for reclamation, the total mass of each regulated substance, and the total mass of waste products.

(3) *Annual Reporting.* Within 45 days after the end of the fourth quarter, each reclaimer of a regulated substance must submit to the relevant Agency official a report containing the quantity of each regulated substance held in inventory onsite as of December 31 broken out by whether the regulated substance is recovered, reclaimed, and virgin.

(4) *Recordkeeping.*

    (i) Reclaimers must maintain records, by batch, of the results of the analysis conducted to verify that reclaimed regulated substance meets the necessary specifications in appendix A to 40 CFR part 82, subpart F (based on AHRI Standard 700-2016). Such records must be maintained for five years.

    (ii) Reclaimers must maintain records of the names and addresses of persons sending them material for reclamation and the quantity of the material (the combined mass of regulated substance and contaminants) by regulated substance sent to them for reclamation. Such records must be maintained on a transactional basis for five years.

(j) *Fire suppressant recycling.* Persons ("recycler") who recycle regulated substances used as a fire suppressant must comply with the following recordkeeping and reporting requirements:

(1) *Quarterly Reporting.* Within 45 days after the end of each quarter, each recycler of a regulated substance used as a fire suppressant must submit to the relevant Agency official a report containing the quantity of material (the combined mass of regulated substance and contaminants) by regulated substance sent to them for recycling, the total mass of each regulated substance recycled, and the total mass of waste products.

(2) *Annual Reporting.* Within 45 days after the end of the fourth quarter, each recycler of a regulated substance used as a fire suppressant must submit to the relevant Agency official a report containing the quantity of each regulated substance held in inventory onsite broken out by recovered, recycled, and virgin.

(3) *Recordkeeping.* Recyclers must maintain records of the names and addresses of persons sending them material for recycling and the quantity of the material (the combined mass of regulated substance and contaminants) by regulated substance sent to them for recycling. Such records must be maintained on a transactional basis for five years.

(k) *Treatment of Data submitted under 40 CFR part 84.*

(1) Except as otherwise provided in paragraph (i) of this section, 40 CFR 2.201 through 2.215 and 2.301 do not apply to data submitted under this part that EPA has determined through rulemaking to be either of the following:

    (i) Emission data, as defined in 40 CFR 2.301(a)(2), determined in accordance with section 114(c) and 307(d) of the Clean Air Act; or

    (ii) Data not otherwise entitled to confidential treatment.

(2) Except as otherwise provided in paragraph (k)(4) of this section, 40 CFR 2.201 through 2.208 and 2.301(c) and (d) do not apply to data submitted under this part that EPA has determined through rulemaking to be entitled to confidential treatment. EPA shall treat that information as confidential in accordance with the provisions of 40 CFR 2.211, subject to paragraph (h)(4) of this section and 40 CFR 2.209.

(3) Upon receiving a request under 5 U.S.C. 552 for data submitted under this part that EPA has determined through rulemaking to be entitled to confidential treatment, the relevant Agency official shall furnish the requestor a notice that the information has been determined to be entitled to confidential treatment and that the request is therefore denied. The notice shall include or cite to the appropriate EPA determination.

(4) A determination made through rulemaking that information submitted under this part is entitled to confidential treatment shall continue in effect unless, subsequent to the confidentiality determination through rulemaking, EPA takes one of the following actions:

    (i) EPA determines through a subsequent rulemaking that the information is emission data or data not otherwise entitled to confidential treatment; or

    (ii) The Office of General Counsel issues a final determination, based on the requirements of 5 U.S.C. 552(b)(4), stating that the information is no longer entitled to confidential treatment because of change in the applicable law or newly discovered or changed facts. Prior to making such final determination, EPA shall afford the business an opportunity to submit comments on pertinent issues in the manner described by 40 CFR 2.204(e) and 2.205(b). If, after consideration of any timely comments submitted by the business, the Office of General Counsel makes a revised final determination that the information is not entitled to confidential treatment, the relevant agency official will notify the business in accordance with the procedures described in 40 CFR 2.205(f)(2).

Addm.38

[86 FR 55201, 55215, Oct. 5, 2021]

**§ 84.33 Auditing of recordkeeping and reporting.**

(a)  Any person producing, importing, exporting, reclaiming, or recycling for fire suppression a regulated substance, as well as any person receiving application-specific allowances, must arrange for annual third-party auditing of reports submitted to EPA except for persons receiving application-specific allowances for mission-critical military end uses.

(b)  For producers, importers, and exporters, auditors must review the inputs regulated entities used to develop quarterly and annual reports including:

(1)  The amount of production and consumption allowances allocated;

(2)  The amount, timing, and parties to allowance transfers, and the associated documentation and offset amount;

(3)  Records documenting the amount of regulated substances imported, exported, produced, and destroyed, transformed, or sent to another entity for such purpose;

(4)  Records documenting any application-specific allowances allocated or conferred from other companies, including the amounts of allowances conferred, regulated substances purchased and/or sold, the specific application for which the regulated substances were provided, and the names, telephone numbers, and email addresses for contact persons for the recipient companies;

(5)  The date and the port from which regulated substances were imported or exported;

(6)  A copy of the bill of lading and the invoice indicating the quantity of regulated substances imported or exported;

(7)  Relevant Harmonized Tariff Schedule codes;

(8)  The number and type of railcars, ISO tanks, individual cylinders, drums, small cans, or other containers used to store and transport regulated substances;

(9)  The inventory of regulated substances as of the end of the prior calendar year;

(10)  A random sample (5 percent or 10, whichever is higher) of batch testing results;

(11)  A random sample (5 percent or 10, whichever is higher) of certification identifications requested and generated and where associated regulated substances are sold and distributed; and

(12)  All other reports submitted to EPA under this subpart.

(c)  For companies issued application-specific allowances by EPA, auditors must review the following:

(1)  Records documenting the amount of application-specific allowances allocated;

(2)  The amount, timing, and parties to allowance transfers, and the associated documentation and offset amount;

(3)  Records documenting any application-specific allowances conferred to or from other companies, including the amounts of allowances conferred, regulated substances purchased, the specific application for which the regulated substances were provided, and the names, telephone numbers, and email addresses for contact persons for the recipient companies;

(4)  Records documenting the total amount of regulated substances purchased for the application-specific end use, and the amount of regulated substances sold to another company for application-specific used;

(5)  Inventory of regulated substances at the end of the calendar year; and

(6)  All other reports submitted to EPA under this subpart.

(d)  For reclaimers and fire suppressant recyclers, auditors must review the following:

(1)  The quantity of regulated substances received for reclamation or recycling;

(2)  A random sample (5 percent or 10, whichever is higher) of records documenting the names and addresses of persons sending them material and the quantity of the material, measured in the combined mass of refrigerant and contaminants, by regulated substance to them;

(3)  Records documenting the quantity of regulated substances reclaimed;

(4)  A random sample (5 percent or 10, whichever is higher) of certification identifications requested and generated and where the associated regulated substances are sold and distributed; and

(5)  All other reports submitted to EPA under this subpart.

(e)  An auditor must meet the following requirements:

(1)  The auditor must be a certified public accountant, or firm of such accountants, that is independent of the regulated person. Such an auditor must comply with the requirements for professional conduct, including the independence requirements, and the quality control requirements in 40 CFR 1090.1800(b)(1)(ii), as well as applicable rules of state boards of public accountancy. Such an auditor must also meet the requirements to perform an attestation engagement in 40 CFR 1090.1800(b)(1)(ii).

(2)  The auditor must meet the independence requirements in paragraph (f) of this section.

(3) Any auditor suspended or debarred under 2 CFR part 1532 or 48 CFR part 9, subpart 9.4, is not qualified to perform attestation engagements under this section.

(f) All reports required under this paragraph must be signed and certified as meeting all the applicable requirements of this subpart by the independent third-party auditor. The auditor must:

(1) Attest that the information in the audit report is accurate;

(2) Attest that the company submitted all required reports to the Agency or specify which reports are missing and provide an assessment on whether missing reports should have been submitted; and

(3) Obtain a signed statement from a responsible corporate officer that all reports submitted to the EPA for the prior calendar year are complete and accurate.

(g) The following provisions apply to each audit performed under this section:

(1) The auditor must prepare a report identifying the applicable procedures specified in this section along with the auditor's corresponding findings for each procedure. The auditor must submit the report electronically to EPA by May 31 of the year following the compliance period.

(2) The auditor must identify any instances where compared values do not agree or where specified values do not meet applicable requirements under this part.

(3) Laboratory analysis refers to the original test result for each analysis of a product's properties.

(4) For a reclaimer that relies on a third-party laboratory for batch testing, the laboratory analysis consists of the results provided by the third-party laboratory.

(h) The independent third party, their contractors, subcontractors, and their organizations must be independent of the regulated party. All the criteria listed in paragraph (a) of this section must be met by each person involved in the specified activities in this section that the independent third party is hired to perform for a regulated party.

(1) *Employment criteria.* No person employed by an independent third party, including contractor and subcontractor personnel, who is involved in a specified activity performed by the independent third party under the provisions of this section, may be employed, currently or previously, by the regulated party for any duration within the 12 months preceding the date when the regulated party hired the independent third party to provide services under this section.

(2) *Financial criteria.*

(i) The third-party's personnel, the third-party's organization, or any organization or individual that may be contracted or subcontracted by the third party must meet all the following requirements:

(A) Have received no more than one-quarter of their revenue from the regulated party during the year prior to the date of hire of the third party by the regulated party for any purpose.

(B) Have no interest in the regulated party's business. Income received from the third party to perform specified activities under this section is excepted.

(C) Not receive compensation for any specified activity in this section that is dependent on the outcome of the specified activity.

(ii) The regulated party must be free from any interest in the third-party's business.

(iii) [Reserved]

(iv) Department of Defense data and reports for application-specific allowances for mission-critical military end uses shall be subject to internal Department of Defense monitoring and review for accuracy as prescribed by the Office of the Secretary of Defense. The results of this review shall be reported electronically to EPA by May 31 of the year following the compliance period.

*[86 FR 55221, Oct. 5, 2021]*

## § 84.35 Administrative consequences.

(a) The relevant agency official may retire, revoke, or withhold the allocation of allowances, or ban a company from receiving future allowance allocations, using the process outlined in paragraph (b) of this section. Applying an administrative consequence to retire, revoke, or withhold allocation of allowances does not, in any way, limit the ability of the United States to exercise any other authority to bring an enforcement action under any applicable law or regulation.

(b) The relevant agency official will provide a company notice if the Agency intends to retire, revoke, or withhold allocation of allowances, or ban the company from receiving future allowance allocations. The notice will specify the conduct leading to the administrative consequence and what the consequence will be. The relevant agency official will provide such notice no less than 30 days before the impending consequence.

(1) After the relevant agency official provides notice of an impending administrative consequence, the company for which such consequence is pending may not expend, transfer, or confer any allowances.

(2) Any company receiving such a notification may provide information or data to EPA on why the administrative consequence should not be taken within 14 days of the date of the EPA's notice.

(3) If EPA does not receive a response within 14 days of the date of the Agency notice of impending administrative consequence, the administrative consequences will be effective on the date specified in the notice.

*[86 FR 55221, Oct. 5, 2021]*

**Subpart B [Reserved]**

**Appendix A to Part 84 - Regulated Substances**

HFCs Listed as Regulated Substances in the AIM Act[1]

| HFC | Chemical formula | Exchange value |
|---|---|---|
| HFC-134 | $CHF_2CHF_2$ | 1,100 |
| HFC-134a | $CH_2FCF_3$ | 1,430 |
| HFC-143 | $CH_2FCHF_2$ | 353 |
| HFC-245fa | $CHF_2CH_2CF_3$ | 1,030 |
| HFC-365mfc | $CF_3CH_2CF_2CH_3$ | 794 |
| HFC-227ea | $CF_3CHFCF_3$ | 3,220 |
| HFC-236cb | $CH_2FCF_2CF_3$ | 1,340 |
| HFC-236ea | $CHF_2CHFCF_3$ | 1,370 |
| HFC-236fa | $CF_3CH2CF_3$ | 9,810 |
| HFC-245ca | $CH_2FCF_2CHF_2$ | 693 |
| HFC-43-10mee | $CF_3CHFCHFCF_2CF_3$ | 1,640 |
| HFC-32 | $CH_2F_2$ | 675 |
| HFC-125 | $CHF_2CF_3$ | 3,500 |
| HFC-143a | $CH_3CF_3$ | 4,470 |
| HFC-41 | $CH_3F$ | 92 |
| HFC-152 | $CH_2FCH_2F$ | 53 |
| HFC-152a | $CH_3CHF_2$ | 124 |
| HFC-23 | $CHF_3$ | 14,800 |

[1] This table includes all isomers of the substances above, regardless of whether the isomer is explicitly listed on its own.

*[86 FR 55222, Oct. 5, 2021}*

**Addm 41**

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 9 and 84**

[EPA–HQ–OAR–2021–0044; FRL–8458–02–OAR]

**RIN 2060–AV17**

**Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency is issuing regulations to implement certain provisions of the American Innovation and Manufacturing Act, as enacted on December 27, 2020. This Act mandates the phasedown of hydrofluorocarbons, which are highly potent greenhouse gases, by 85 percent over a period ending in 2036. The Act directs the Environmental Protection Agency to implement the phasedown by issuing a fixed quantity of transferrable production and consumption allowances, which producers and importers of hydrofluorocarbons must hold in quantities equal to the amount of hydrofluorocarbons they produce or import. To establish the allowance allocation program, this rulemaking determines the hydrofluorocarbon production and consumption baselines, from which allowed production and consumption will decrease consistent with the statutory phasedown schedule; provides an initial approach to allocating calendar-year allowances and allowing for the transfer of those allowances; establishes provisions for the international transfer of allowances; and establishes recordkeeping and reporting requirements. Additionally, it establishes provisions to support implementation, compliance with, and enforcement of, statutory and regulatory requirements under the Act's phasedown provisions. Over the time period from 2022–2050, this rulemaking will avoid cumulative emissions of 4,560 million metric tons of exchange value equivalent of HFCs in the United States with a present value net benefits of $272.7 billion.

**DATES:**

*Effective dates:* This rule is effective on November 4, 2021, except for amendatory instruction 3 adding 40 CFR part 84, which is effective on October 5, 2021.

*Operational dates:* For operational purposes under the American Innovation and Manufacturing Act of 2020 (AIM Act or the Act), the regulatory text established in amendatory instruction 3, is operational as of September 23, 2021, and effective as of October 5, 2021. The remainder of this rule, and its associated regulatory text outlined in amendatory instructions 1, 2, and 4 through 10, is effective November 4, 2021.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2021–0044. All documents in the docket are listed on the *http://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard-copy form. Publicly available docket materials are available electronically through *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Andy Chang, U.S. Environmental Protection Agency, Stratospheric Protection Division, telephone number: 202–564–6658; email address: *chang.andy@epa.gov.* You may also visit EPA's website at *https://www.epa.gov/climate-hfcs-reduction* for further information.

**SUPPLEMENTARY INFORMATION:** *Effective dates:* Portions of this rule are effective less than 30 days from publication in the **Federal Register**. Section 553(d) of the Administrative Procedure Act (APA), 5 U.S.C. chapter 5, generally provides that rules may not take effect earlier than 30 days after they are published in the **Federal Register**. As further discussed in Section II.B, this rule is covered by the rulemaking procedures in section 307(d) of the Clean Air Act (CAA). See CAA section 307(d)(1)(I); AIM Act subsection (k) (providing that section 307 of the CAA "shall apply to . . . any rule, rulemaking, or regulation promulgated . . . pursuant to the [AIM Act] as though [the AIM Act] were expressly included in title VI" of the CAA). Section 307(d)(1) of the CAA states that: "The provisions of section 553 through 557 . . . of Title 5 shall not, except as expressly provided in this section, apply to actions to which this subsection applies." Thus, section 553(d) of the APA does not apply to this rule. EPA is nevertheless acting consistently with the policies underlying APA section 553(d) in

making a portion of the revisions finalized in this rule effective immediately, while the remainder of the rule will be effective 30 days after publication. The purpose of the general rule in section 553(d) of the APA that 30 days must be provided between publication and the effective date is to "give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *Omnipoint Corp.* v. *Fed. Commc'n Comm'n,* 78 F.3d 620, 630 (D.C. Cir. 1996); *see also United States* v. *Gavrilovic,* 551 F.2d 1099, 1104 (8th Cir. 1977) (quoting legislative history). Accordingly, in determining if there is "good cause" to forgo the 30-day delayed effective date per the exception at section 553(d)(3), an agency should "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling." *Gavrilovic,* 551 F.2d at 1105. Here, EPA has determined that the portions of this rule that are effective less than 30 days from publication in the **Federal Register** are not binding on any third parties, and therefore the above-stated purpose of the 30-day effective date delay is not relevant to the consideration here. The provisions of the rule taking immediate effect are only binding on the Agency in how it will determine allowance allocations, and the AIM Act establishes a deadline for these determinations, namely that by October 1 of each calendar year EPA must calculate and determine the quantity of production and consumption allowances for the following year. In addition, having these provisions become operational immediately upon signature will allow EPA to make determinations regarding allowance allocations earlier than if the effective date were delayed, which in turn will facilitate earlier notification to regulated entities about what their allowance allocation will be and provide them more time to plan accordingly. Thus, EPA's action is consistent with the APA's provision for an effective date of less than 30 days where an agency demonstrates good cause to do so.

Accordingly, it is in keeping with the policy underlying the APA for regulatory text in 40 CFR 84.3, 84.7, 84.9, 84.11, 84.13, 84.15, and 84.31(h)(2) and (3), to take effect immediately. Finally, this rule undertaken in accordance with section 307(d) of the CAA is promulgated upon signature and widespread dissemination. For operational purposes under the AIM

**Addm-42**

Act, EPA is making the regulatory text established in 40 CFR 84.3, 84.7, 84.9, 84.11, 84.13, 84.15, and 84.31 (h)(2) and (3) operational as of September 23, 2021, which is the date of signature.

*Acronyms and Abbreviations.* Throughout this document, whenever "we," "us," "the Agency," or "our" is used, we mean EPA. Acronyms that are used in this rulemaking that may be helpful include:

AD/CVD—Anti-Dumping/Countervailing Duties
AIM Act—American Innovation and Manufacturing Act of 2020
ANPRM—Advanced Notice of Proposed Rulemaking
APA—Administrative Procedure Act
CAA—Clean Air Act
CBI—Confidential Business Information
CBP—Customs and Border Protection
CFC—Chlorofluorocarbon
$CO_2$—Carbon Dioxide
CVD—Chemical Vapor Deposition
DRE—Destruction and Removal Efficiency
ECHO—Enforcement and Compliance History Online
e-GGRT—Electronic Greenhouse Gas Reporting Tool
EFCTC—European FluoroCarbons Technical Committee
EPA—Environmental Protection Agency
EVe—Exchange Value Equivalent
GHG—Greenhouse Gas
GHGRP—Greenhouse Gas Reporting Program
GWP—Global Warming Potential
HCFC—Hydrochlorofluorocarbon
HFC—Hydrofluorocarbon
HFO—Hydrofluoroolefin
IPCC—Intergovernmental Panel on Climate Change
IWG—Interagency Working Group
MDI—Metered Dose Inhaler
$MMTCO_2$ eq—Million Metric Tons of Carbon Dioxide Equivalent
MMTEVe—Million Metric Tons of Exchange Value Equivalent
MT—Metric tons
$MTCO_2$ eq—Metric Tons of Carbon Dioxide Equivalent
MVAC—Motor Vehicle Air Conditioning
NAICS—North American Industry Classification System
NATA—National Air Toxics Assessment
NODA—Notice of Data Availability
NPRM—Notice of Proposed Rulemaking
NRC—National Research Council
ODP—Ozone Depletion Potential
ODS—Ozone-Depleting Substances
RACA—Request for Additional Consumption Allowance
RIA—Regulatory Impact Analysis
RSEI–GM—Risk-Screening Environmental Indicators Geographic Microdata
SC–GHG—Social Cost of Greenhouse Gases
SC–HFCs—Social Costs of Hydrofluorocarbons
TRI—Toxics Release Inventory
TSCS—Toxic Substances Control Act
UNFCCC—United Nations Framework Convention on Climate Change
USGCRP—United States Global Change Research Program
WMO—World Meteorological Organization

This supplementary information section is arranged as follows:

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Summary of the Major Provisions of the Regulatory Action
  C. Costs and Benefits
II. General Information
  A. Does this action apply to me?
  B. What is the Agency's authority for taking this action?
III. Background
  A. What are HFCs?
  B. How do HFCs affect public health and welfare?
IV. How is EPA considering environmental justice?
V. What definitions is EPA establishing to implement the AIM Act?
VI. How is EPA establishing the HFC production and consumption baselines?
  A. What are the components of the production and consumption baselines?
  1. How is EPA determining the HFC component of the production and consumption baselines?
  2. What is the HFC component of the production and consumption baselines?
  3. What are the HCFC and CFC components of the production and consumption baselines?
  B. What are the final HFC production and consumption baselines?
VII. How is EPA establishing allowances?
  A. What is an allowance?
  B. How is EPA determining allowance allocations?
  1. Which years is EPA issuing allowances for?
  2. Which companies is EPA issuing allowances to?
  3. What is EPA's framework for determining how many allowances each company receives?
  4. What is EPA's framework for issuing allowances?
  5. What process is EPA using to respond to requests for additional consumption allowances?
  C. What is the process for issuing application-specific allowances?
  1. Who is EPA issuing application-specific allowances to?
  2. How is EPA addressing transfers of application-specific allowances?
  3. What criteria is EPA using to evaluate application-specific allowance requests?
  4. How is EPA issuing application-specific allowances for mission-critical military end uses?
  D. What are the provisions for transferring allowances?
  E. How is EPA establishing the set-aside pool of allowances?
  1. Who is eligible for allowances in the set-aside pool?
  a. Application-Specific End Users
  b. Previously Unidentified Importers
  c. New Market Entrants
  d. Suggested Additional Entities Eligible for Set-Aside Allowances
  2. How large is the set-aside pool, and what are the applicable limits for applicants?
  3. How will transfers and unused allowances be treated in the set-aside pool?
  4. What is the deadline to apply for allowances from the set-aside pool, and what information is required?
VIII. What other elements of the AIM Act is EPA addressing in this rulemaking?
  A. How is EPA addressing international trades or transfers of HFC allowances?
  B. What HFC destruction technologies is EPA approving?
  C. What is EPA requiring for HFC-23 emission controls?
IX. What enforcement and compliance provisions is EPA finalizing?
  A. What potential administrative consequences are available to EPA with respect to allowances?
  1. What are the administrative consequences?
  2. What action could merit an administrative consequence?
  3. How would EPA apply the administrative consequences?
  4. What is the process for notifying and responding to proposed administrative consequences?
  B. How is EPA transitioning to refillable cylinders?
  1. Background
  2. What is EPA's authority for prohibiting disposable cylinders?
  3. How is EPA implementing the transition to refillable cylinders?
  4. What are the costs of prohibiting disposable cylinders?
  5. What are the additional benefits of transitioning to only refillable cylinders?
  6. How is EPA responding to public comments?
  7. Treatment of Small Cans With Self-Sealing Valves
  8. Compliance Dates
  C. What are the labeling requirements?
  D. What is EPA requiring for auditing?
  E. Petitions To Import HFCs as a Feedstock or for Destruction
  F. What other limitations are there on imports of HFCs?
  1. Ban on Importing Feedstock HFCs in Cylinders
  2. Imports of Heels
  3. Transhipments
  G. How is EPA tracking the movement of HFCs?
  H. What reporting is required to support real-time review of imports?
X. What are the recordkeeping and reporting requirements?
  A. What are the generally applicable recordkeeping and reporting provisions?
  B. How is EPA responding to comments on the proposed recordkeeping and reporting provisions?
  C. How will EPA treat HFC data collected under the AIM Act?
  1. Which specific data elements are not entitled to confidential treatment?
  2. Which data elements has EPA determined are entitled to confidential treatment?
  3. How will EPA aggregate data for release?
XI. What are the costs and benefits of this action?
XII. Statutory and Executive Order Review

Addm.43

## I. Executive Summary

### A. Purpose of the Regulatory Action

EPA is issuing regulations to implement certain provisions of the American Innovation and Manufacturing (AIM) Act, as enacted on December 27, 2020. The Act mandates the phasedown of hydrofluorocarbons (HFCs), which are highly potent greenhouse gases (GHGs), by 85 percent over a period ending in 2036. The Act directs EPA to implement the phasedown by issuing a fixed quantity of transferrable production and consumption allowances, which producers and importers of HFCs must hold in quantities equal to the amount of HFCs they produce or import. To establish the allowance allocation program, this rulemaking establishes HFC production and consumption baselines, codifies the statutory phasedown schedule of allowed production and consumption relative to the baseline level, provides an initial approach to allocating calendar-year allowances and allowing for the transfer of those allowances, establishes provisions for the international transfer of allowances, and establishes recordkeeping and reporting requirements. Additionally, it establishes provisions to support implementation, compliance with, and enforcement of, statutory and regulatory requirements under the AIM Act's phasedown provisions.

The AIM Act directs EPA to issue a final rule accomplishing these Congressionally directed tasks by September 23, 2021. Additionally, under the AIM Act, by October 1 of each calendar year EPA must calculate and determine the quantity of production and consumption allowances for the following year. EPA intends to issue allowances for the 2022 calendar year no later than October 1, 2021, using the procedure established through this rulemaking, and intends to issue individual allowances for the 2023 calendar year no later than October 1, 2022, using the procedure established through this rulemaking.

The AIM Act further directs EPA to issue a final rule by September 23, 2021, governing the transfer of production and consumption allowances. The AIM Act also directs EPA to issue regulations by December 27, 2021, related to the international transfer of production allowances. This final rule addresses these statutory directives as well.

### B. Summary of the Major Provisions of the Regulatory Action

*Baselines:* This rule establishes the HFC production and consumption baselines from which the phasedown steps are measured. Using the equation provided in the AIM Act, and based on the data available to the Agency through the Greenhouse Gas Reporting Program (GHGRP) and outreach conducted for this rulemaking, EPA determines that the production baseline is 382.6 Million Metric Tons of Exchange Value Equivalent (MMTEVe) and the consumption baseline is 303.9 MMTEVe.

*Allocation:* The total annual allocations for 2022 and 2023 are 344.3 MMTEVe of production allowances and 273.5 MMTEVe of consumption allowances. EPA intends to issue allowances for 2022 by October 1, 2021, according to the framework and procedure established through this rulemaking. Company production and consumption allowance allocations are based on the three highest years (not necessarily consecutive) of production or consumption between 2011 and 2019. EPA is issuing allowances to active HFC producers and importers operating in 2020 and is giving individualized consideration to circumstances of historical importers that were not active in 2020. EPA is establishing the allowance allocation framework for two years and intends to undertake a subsequent rulemaking to govern allocations for calendar years 2024 and beyond.

*Application-specific Allowances:* EPA is issuing "application-specific allowances" to end users in six applications established by the AIM Act: Propellants in metered dose inhalers (MDIs), defense sprays, structural composite preformed polyurethane foam for marine use and trailer use, etching of semiconductor material or wafers and the cleaning of chemical vapor deposition (CVD) chambers within the semiconductor manufacturing sector, mission-critical military end uses, and onboard aerospace fire suppression. The rule details the framework for how many allowances are issued for each end use. End users within a specific application may transfer their allowances only with another end user in that same application. Allowances may also be conferred, as frequently as needed, to effectuate the production or import of HFCs for that specific use.

*Set-Aside Allowances:* EPA is establishing a set-aside pool of 7.5 MMTEVe (less than 3 percent of allowances to be allocated for 2022) that is available to three groups of companies: (1) End users in application-specific sectors that EPA has not yet identified or verified by the date of the final rule, (2) importers that otherwise would have qualified for consumption allowances but are not yet identified or verified by the date of the final rule, and (3) importers that are new market entrants. Companies seeking to receive allowances via the set-aside should submit applications by November 30, 2021.

*HFC-23 Controls:* By the established compliance date, entities that create HFC-23 must capture the HFC-23 and either (1) expend production and consumption allowances for the amounts sold for consumptive uses and/or (2) timely destroy the captured HFC-23 using a technology approved by the Administrator. As compared with the amount of chemical intentionally produced on a facility line, no more than 0.1 percent of HFC-23 created on the line may be emitted after the compliance date.

*Enforcement and Compliance:* EPA is finalizing a multifaceted approach to deter, identify, and penalize illegal activity. These tools include administrative consequences for allowance holders, requiring use of refillable cylinders, increased oversight of imports including transshipments and HFCs imported for transformation, comprehensive tracking of containers of HFCs as they are imported, sold and distributed, and third-party auditing. EPA has also determined that much of the quarterly production and consumption data provided to the Agency will not be provided confidential treatment and will be affirmatively released without further process. This data transparency will incentivize compliance and allow the public and competing companies to identify and report noncompliance to EPA.

### C. Costs and Benefits

EPA has estimated the costs and benefits of this action to provide the public with information and to comply with executive orders. EPA estimates that in 2022 the annual net benefits of this rule are $1.7 billion, reflecting compliance costs associated with recordkeeping and reporting and refillable cylinders and cost savings due to lower refrigerant replacement costs and reduced energy consumption of $300 million and social benefits of $1.4 billion. In 2036, when the final phasedown step is reached at 15 percent of the statutorily defined HFC baseline, the estimated annual net benefits of this rule are $16.4 billion. The present value of cumulative net benefits evaluated from 2022 through 2050 is $272.7 billion at a three percent discount rate or $260.9 billion at a seven percent discount rate. Over the same time

period the equivalent annualized value (EAV) of benefits is $13.6 billion when using a 3 percent discount rate; the EAV of costs is negative $0.6 billion when using a 3 percent discount rate and negative $0.5 billion when using a 7 percent discount rate; and the EAV of cumulative net benefits over the period 2022–2050 is $14.2 billion when using a 3 percent discount rate and $14.1 billion when using a 7 percent discount rate.[1] The present value of net benefits is calculated over the 29-year period from 2022–2050 to account for additional years that emissions will be reduced following the consumption reductions from 2022–2036.

TABLE 1—SUMMARY OF ANNUAL VALUES, PRESENT VALUES, AND EQUIVALENT ANNUALIZED VALUES FOR THE 2022–2050 TIMEFRAME FOR ESTIMATED ABATEMENT COSTS, BENEFITS, AND NET BENEFITS FOR THE FINAL RULE

[Billions of 2020$, discounted to 2022][a b]

| Year | Climate benefits (3%)[c d] | Costs[c] | | Net benefits | |
|---|---|---|---|---|---|
| | | 3% | 7% | 3% | 7% |
| Present Value ........................................................... | $260.9 | − $11.8 | − $6.4 | $272.7 | $267.4 |
| Equivalent Annualized Value ..................................... | 13.6 | − 0.6 | − 0.5 | 14.2 | 14.1 |

[a] Rows may not appear to add correctly due to rounding.
[b] The annualized present value of costs and benefits are calculated over a 29-year period from 2022 to 2050.
[c] The costs presented in this table are consistent with the costs presented in RIA Chapter 3, Table 3–6.
[d] Climate benefits are based on changes (reductions) in HFC emissions and are calculated using four different estimates of the SC–HFCs (model average at 2.5 percent, 3 percent, and 5 percent discount rates; and 95th percentile at 3 percent discount rate). The IWG emphasized, and EPA agrees, on the importance and value of considering the benefits calculated using all four estimates. As discussed in the Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (IWG 2021), a consideration of climate benefits calculated using discount rates below 3 percent, including 2 percent and lower, are also warranted when discounting intergenerational impacts.

Over the 15-year period of the phasedown of HFCs, at a three percent discount rate, the present value of cumulative compliance costs is negative $5.4 billion, or $5.4 billion in savings; the present value of cumulative social benefits is $94.8 billion; and the present value of cumulative net benefits is $100.2 billion. Evaluated at a seven percent discount rate, the present value of cumulative compliance costs is negative $3.7 billion, or $3.7 billion in savings, and the present value of cumulative net benefits is $98.5 billion. Over the time period of 2022–2036 the EAV of benefits is $7.9 billion when using a 3 percent discount rate; the EAV of costs is negative $0.5 billion when using a 3 percent discount rate and negative $0.4 billion when using a 7 percent discount rate; and the EAV of cumulative net benefits is $8.4 billion when using a 3 percent discount rate and $8.3 billion when using a 7 percent discount rate.

EPA estimates that for the years 2022–2036 this action will avoid cumulative consumption of 3,152 MMTEVe of HFCs in the United States. The annual consumption avoided is estimated at 42 MMTEVe in the year 2022 and 282 MMTEVe in 2036. In order to calculate the climate benefits associated with consumption abatement, the consumption changes were expressed in terms of emissions reductions. EPA estimates that for the years 2022–2050 this action will avoid emissions of 4,560

MMTEVe of HFCs in the United States. The annual avoided emissions are estimated at 22 MMTEVe in the year 2022 and 171 MMTEVe in 2036.

Climate benefits are based on changes (reductions) in HFC emissions and are calculated using four different estimates of the social costs of HFCs (SC–HFCs) (model average at 2.5 percent, 3 percent, and 5 percent discount rates; and 95th percentile at 3 percent discount rate). The SC–HFCs estimates used in this analysis were developed using methodologies consistent with the methodology underlying the Interagency Working Group on the Social Cost of Greenhouse Gases' (IWG) interim estimates of the social cost of other greenhouse gases (social cost of carbon SC–$CO_2$, social cost of methane SC–$CH_4$, and social cost of nitrous oxide SC–$N_2O$) that were developed over many years, using a transparent process, peer-reviewed methodologies, the best science available at the time of that process, and with input from the public. The benefits presented in this paragraph are the benefits associated with the average SC–HFCs at a 3 percent discount rate, but the Agency does not have a single central SC–HFCs point estimate. The IWG emphasized the importance and value of considering the benefits calculated using all four estimates.

As summarized further in Section XI of the preamble and described more fully in the Regulatory Impact Analysis

(RIA), EPA's analysis indicates the principal costs (or savings) result from industry transitioning to substitute chemicals and technology. The principal benefits result from a decrease in emissions of HFCs into the atmosphere and the corresponding effects on global warming. The benefits are monetized by using the SC–HFCs. SC–HFCs is estimated using a method consistent with the method used to estimate the Social Cost of Greenhouse Gases (SC–GHGs). An alternative method was also considered that estimates SC–HFCs by using the global warming potential (GWP) (or exchange value) of HFCs and scaling to the known social cost of another GHG, e.g., $CO_2$, $CH_4$, or $N_2O$.

## II. General Information

### A. Does this action apply to me?

You may be potentially affected by this action if you produce, import, export, destroy, use as a feedstock, reclaim, package, or otherwise distribute HFCs. You may also be potentially affected by this rule if you use HFCs to manufacture products, such as refrigeration and air conditioning systems, foams, aerosols, and fire suppression systems, or use HFCs in one of the six applications eligible for an allocation under section (e)(4)(B)(iv) of the AIM Act. Potentially affected categories, by North American Industry Classification System (NAICS) code, are included in Table 2.

---

[1] All values for costs and benefits in this section are given in 2020 dollars and are calculated by discounting future costs and benefits to 2022 using a three percent discount rate. Calculations using other discount rates and discussion of the impact of the discount rate are found in the Regulatory Impact Analysis.

**55140**    **Federal Register** / Vol. 86, No. 190 / Tuesday, October 5, 2021 / Rules and Regulations

EPA is using its discretion to interpret the terms "consume" and "consumption" to not include imports of products containing HFCs. Under this interpretation, HFCs contained in imported products are not covered by the allocation system, and they cannot be included in the baseline. Consumption allowances will not be required to import products containing HFCs, and as described in the prior paragraph, EPA intends to consider ways to address HFC use in products under other subsections of the AIM Act. For this rule, we are using a consistent accounting system for both the baseline and the allowance system that does not incorporate products containing HFCs.

Further, without adequate data to establish a baseline that accurately reflects products, EPA would run a significant risk of creating a baseline that is too small to account for the full scope of imported products used today. While Subpart QQ of the GHGRP contains data about imports of foams and appliances containing HFCs, it does not capture all regulated substances contained in items including fire suppression equipment or consumer aerosol products. If the Agency were to include HFCs contained in products in the baseline figures, it also would need to include data reflecting HCFCs and CFCs contained in products in 1989 to complete the baseline formula. The Agency does not have these data and it would be administratively impossible to comprehensively collect such decades-old data now (as opposed to bulk CFC and bulk HCFC data which the Agency already collected many years ago and has used under title VI of the CAA as a basis for establishing and implementing the phaseout schedule and allowances for both CFCs and HCFCs for 30 years).

Some commenters disagreed that it would be administratively impossible to collect data on HCFCs and CFCs contained in products in 1989 to complete the baseline formula. Commenters noted that volumes would be small given most appliances were domestically produced at that time. One commenter provided data on imports of window units to that effect. When multiplied by the percentages in the baseline formula, commenters stated, the effect would be minimal compared to the HFC element of the calculation. EPA does not dispute commenters' points, but the commenters also do not dispute EPA's fundamental point that it is administratively impossible to collect a comprehensive set of data on HCFCs and CFCs imported into the United States inside of products in 1989 of a similar quality to the data EPA holds on bulk HCFCs and CFCs. Commenters, at most, allege that EPA could make an informed guess at a number to add to the baseline calculation. But such a guess would not match the surety and caliber of data otherwise included in the baseline calculation—which is based on actual data—and is not sufficient to determine the baseline calculation with a level of certainty that is necessary to meet the directive Congress provided to EPA in the AIM Act. Further, it is reasonable to presume that Congress knew that we would lack such 1989 data given EPA's implementation of the ODS phaseout was limited to bulk substances, and this provides further support that EPA's interpretation of "consumption" as limited to bulk is reasonable. Furthermore, even if commenters' statement that we could develop a figure to estimate 1989 imports for products imported that contained CFCs and HCFCs were correct, this does not undermine all the other reasons EPA has provided for its reasonable interpretation that "consumption" is limited to bulk substances.

EPA is also finalizing its approach of not including transhipment amounts within the baseline. In addition to the prior discussion on why imports of HFCs contained in products are not included in the baseline calculation, transhipment imports are not included in the definition of "consumption." A transhipment is the continuous shipment of a regulated substance, from a foreign country of origin through the United States, to a second foreign country of final destination. Transhipments do not enter U.S. commerce. The sum effect of this activity is zero since the regulated substance is both imported (which would be added to the consumption baseline) and exported (which would be subtracted from the consumption baseline) in identical quantities.

### 1. How is EPA determining the HFC component of the production and consumption baselines?

In order to calculate the production and consumption baselines, EPA has determined the annual production and consumption of the statutorily listed HFCs in the years 2011, 2012, and 2013. EPA has used multiple sources of data to calculate HFC consumption and production figures for 2011 through 2013: (1) Data reported to EPA's GHGRP; (2) data received in response to the notice of data availability (NODA) published February 11, 2021; (3) data from Customs in the Automated Customs Environment (ACE) and confirmed through letters sent out under CAA section 114 (EPA ICR 2685.01); and (4) data received in response to the notice of proposed rulemaking by the comment due date. EPA received new or revised production, import, export, and destruction data, all of which affect the final baseline values.

The GHGRP requires various facilities and suppliers to annually report data related to GHGs to EPA (see 40 CFR part 98). Subpart OO, "Suppliers of Industrial Greenhouse Gases," is the section relevant to reporting on HFC production and consumption. Because the HFCs listed as regulated substances under the AIM Act are industrial GHGs, EPA has collected a significant amount of data relevant to HFC production and consumption as defined under the AIM Act. EPA used these data as a starting point for estimating the historical HFC production and consumption figures necessary to calculate baselines under the AIM Act. Further discussion of the GHGRP can be found in the notice for the proposed rule.

The data available through GHGRP significantly contribute to EPA's ability to calculate the amount of HFCs produced and consumed in the United States in 2011–2013 for purposes of determining the AIM Act baselines. However, there are known gaps in the GHGRP data, and EPA has made best efforts to fill these gaps. EPA published a NODA on February 11, 2021, outlining available information and perceived data gaps (86 FR 9059). Further discussion of the NODA and data collection efforts taken prior to proposal can be found in the proposed rule.

EPA invited additional public input through the proposed rulemaking and has separately sent letters under the authority of subsection (k)(1)(C) of the AIM Act and section 114 of the CAA to companies that may have relevant data.[43] Specifically, EPA attempted to contact companies that may not have been reporting to GHGRP, either because they had failed to report and were out of compliance or because they were below the GHGRP reporting threshold. These companies were asked to submit any data on HFC production, import, export, transformation, and destruction between 2011 and 2019 that they had not already submitted to GHGRP Subpart OO. To find these companies, EPA obtained a list from U.S. Customs and Border Protection (CBP) of all companies that appeared to import HFCs between 2011 and 2019. This list contained roughly 400 companies. EPA first sent letters to

---

[43] View Information Collection Request (ICR) Package at *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202103-2060-005.*

Addm 46

these companies, requesting they submit any relevant data. EPA then attempted to find email addresses for these companies and sent a copy of the request letter by email as well.

Roughly 130 companies responded to the letter or the follow-up email. A small fraction of these companies actually had relevant data to submit. EPA reviewed any new or updated data for accuracy. EPA used this more complete dataset to calculate the AIM baseline and each company's historical annual HFC production and consumption.

**2. What is the HFC component of the production and consumption baselines?**

The equations in the AIM Act for the production and consumption baselines include the average annual production and consumption of HFCs between January 1, 2011, and December 31, 2013. Based on the information reported to the GHGRP and gathered through recent data collection efforts, average HFC consumption in 2011 through 2013 was 260.7MMTEVe and average HFC

production in 2011 through 2013 was 338.3 MMTEVe for those three years. A memo in the docket ("HFC Production and Consumption Data—Final Rule") provides the aggregated data for each of the three years similar to that provided in the NODA and the proposed rule. As envisioned in the proposed rule, these values have changed by about 2 percent based on the data collected since the rule was proposed.

**3. What are the HCFC and CFC components of the production and consumption baselines?**

The equations in the AIM Act for the production and consumption baselines include HCFC and CFC components from 1989. That year was designated under the Montreal Protocol as the baseline year used for several class I substances (Groups III, IV, and V in the Montreal Protocol) as well as for class II substances (HCFCs). See, *e.g.,* 74 FR 66412 (December 15, 2009). As a result, EPA has previously developed a complete accounting of ODS production, import, and export during

that year.[44] These values are unchanged from the proposed rule.

Specifically, the 1989 production and consumption levels for HCFCs are 216.9 MMTEVe and 210.3 MMTEVe respectively, and the 1989 production and consumption baselines for CFCs are 2,799.8 MMTEVe and 2,784.5 MMTEVe respectively. Fifteen percent of the 1989 HCFC production and consumption baselines is 32.5 MMTEVe and 31.5 MMTEVe respectively, while 0.42 percent of the 1989 CFC production and consumption baselines is 11.8 MMTEVe and 11.7 MMTEVe respectively.

*B. What are the final HFC production and consumption baselines?*

Using the equation provided in the AIM Act, and based on the data available to the Agency, EPA is establishing in this final rule the production baseline of 382.6 MMTEVe and the consumption baseline of 303.9 MMTEVe. 40 CFR 84.7(b) includes the baseline values in MTEVe.

TABLE 5—INPUTS FOR CALCULATION OF PRODUCTION AND CONSUMPTION BASELINES

| Input | Value (MMTEVe) | Percentage in baseline (%) | Modified value (MMTEVe) |
|---|---|---|---|
| 2011–2013 average HFC production | 338.3 | 100 | 338.3 |
| 1989 HCFC production | 216.9 | 15 | 32.5 |
| 1989 CFC production | 2,799.8 | 0.42 | 11.8 |
| Production baseline | | | 382.6 |
| 2011–2013 average HFC consumption | 260.7 | 100 | 260.7 |
| 1989 HCFC consumption | 210.3 | 15 | 31.5 |
| 1989 CFC consumption | 2,784.5 | 0.42 | 11.7 |
| Consumption baseline | | | 303.9 |

EPA received a comment that providing draft baselines that are subject to change in the final rule deprives commenters of the ability to comment on the actual baseline. EPA disagrees. EPA provided the best data available to the Agency at the time of proposal. After further analysis EPA finds that these values have increased by approximately 8 MMTEVe and 5 MMTEVe, respectively. This is a 2.3 percent and 2.0 percent increase and is substantially similar to the proposed value for commenters to consider. While EPA acknowledges that the exact baseline figures were not identified at the proposal stage, EPA did provide sufficient information regarding the methodology to be used to reach a final baseline figure, and commenters were

able to provide comment on this methodology. EPA provided notice of the steps the Agency would take to collect data to further inform the baseline calculation, including highlighting known data gaps in the numbers provided at proposal. Commenters were also given notice of the calculation methodology EPA would use to determine the production and consumption baselines given that the formulas are provided for in the statute.

Another commenter stated that the GHGRP data are heavily flawed and result in a "possibly significant" undercount of imports because they exempt from reporting companies that import below a 25,000 MTCO2e threshold. EPA acknowledges this difference between data available

through GHGRP and data needed to inform the baseline calculations under AIM. The Agency noted this difference in the NODA and in the proposed rule. EPA has made best efforts to identify non-reporters to the GHGRP. EPA analyzed import data from Customs reported through the Automated Commercial Environment/International Trade Data System (ACE/ITDS), which has no minimum threshold for reporting, to identify potential HFC importers and then contacted them by email and certified letter. As a result, additional companies reported production and consumption data for the first time and EPA has included all verified data from these efforts into the baseline calculation. The commenter did not identify an alternate dataset or

---

[44] For more information on historical U.S. ODS production and consumption data, please visit the

United Nations Environment Programme's website at *https://ozone.unep.org/countries/profile/usa.*

**55144**    **Federal Register** / Vol. 86, No. 190 / Tuesday, October 5, 2021 / Rules and Regulations

EPA is establishing the allocation allowance framework for these two years and intends to undertake a subsequent rulemaking to govern allocations for calendar years 2024 and beyond.

Multiple commenters supported the Agency's plan to quickly establish an allowance allocation and trading program for the near term while further developing a longer-term program. Phasing down regulated substances as required under the AIM Act may have different implications for stakeholders than the Agency's past experience with phasing out ODS. EPA intends to better understand and respond to those differences by seeking input from stakeholders and developing another rule that may alter the approach and procedure for allowance allocations finalized in this rule, if necessary. However, to do so requires more time than the 270 days provided by the AIM Act. Furthermore, additional analysis of the market—as well as the effects of implementing other provisions of the AIM Act—may be necessary before issuing allowances for the 2024 stepdown, when the number of allowances will decrease from 90 percent of baseline to 60 percent of baseline.

Some commenters requested that the Agency issue allowances for 2022 and 2023 at the same time, rather than allocating on an annual basis. Commenters stated that this would increase certainty and improve business planning, something that commenters claim is challenging if only given a three month lead time. Some commenters recognized that EPA will need to adjust the allocations given updates to the application-specific allowance amounts for 2023. Those commenters encouraged EPA to issue the general pool of 2023 allowances now and adjust later in 2022 to account for any changes.

EPA responds that it does not intend to issue 2023 allowances (other than to new market entrants as discussed in Section VII.E on set-asides) in 2021. As discussed further in this section, the applications identified in AIM Act subsection (e)(4)(B)(iv) must be provided the level of allowances "necessary" to meet their market demands, so application-specific allowance holders are given priority access to the pool of available allowances. Until EPA can determine the number of application-specific allowances needed by the statutorily identified end users for 2023, it cannot know how many allowances remain

from within the cap for general allowances. As a result, EPA intends to only allocate 2022 allowances on October 1, 2021, and subsequently provide individual company allocations in 2022 after determining the general pool of available allowances for 2023. EPA understands commenters' desire for more certainty and business planning lead time, but EPA is finalizing the structure that is best to meet the Congressional directive of providing application-specific allowance holders their necessary level of allowances from within the same cap on allowances overall. With respect to one commenter's suggestion to allocate allowances for 2023 on October 1, 2021, and make adjustments in 2022 if needed, EPA responds that the interests of certainty and planning are not well served by issuing allowances now and then modifying them next year. However, as discussed in the next section, EPA is establishing a methodology to govern calculation of allocation levels that will remain the same for 2022 and 2023 for general pool allowances. Therefore, allowance holders in this general pool can expect that their percentage share of the general pool of allowances will be approximately the same for 2022 and 2023.[47] With general pool allowance holders' percentage share staying close to the same for 2022 and 2023, the only differing factor will be how much of the total available allocation is available after accounting for application-specific allowances. The amount of allowances allocated for application-specific end uses in 2023 is unknown at this time. However, application-specific allowances represent less than 3 percent of total allowances, thus changes to application-specific allowances are not expected to have a significant impact on the amount of general pool allowances available.

2. Which companies is EPA issuing allowances to?

EPA proposed to issue allowances to companies that produced or imported HFCs in 2017, 2018, and/or 2019. EPA proposed to require that a company remain active in 2020 to be eligible to receive an allowance allocation from the Agency, but also noted that the Agency

would be willing to consider individual circumstances. Considerations for determining who should receive allowances in this initial rulemaking include providing as seamless a transition as possible to a regime where allowances are needed to produce and import HFCs, promoting equity, timeliness of implementation, and availability of robust data. EPA is finalizing the proposal to issue allowances to active HFC producers and importers operating in 2020, but will also give individualized consideration to circumstances of historical importers that were not active in 2020. EPA is also creating a mechanism under which new market entrants can apply to the Agency for consumption allowances. EPA has determined that such a system balances the Agency's objectives of a smooth market transition while also not creating undue barriers to market entry for potential new participants.

*Production allowances.* EPA is issuing allowances to companies that produced HFCs in the United States in 2020. Since issuing the proposed rule, one additional company provided information documenting that it was a historical producer of HFCs.

*Consumption allowances.* EPA is generally allocating consumption allowances only to companies that produced or imported in 2020, even if they were active in prior years, to ensure that allowance holders are active in the HFC market. Except for the unique individual circumstances explained below, allocating consumption allowances to companies no longer producing or importing would be at the expense of companies that are still actively invested in HFC production and import. EPA stated in the proposal that the Agency would generally presume the business exited the production and/or import market if it did not actively produce or import in 2020. The proposal did note that EPA would undertake individual consideration of a company's inactivity, for example if it was due to the COVID–19 pandemic. Such companies would need to provide documentation to justify such inactivity and any other relevant information no later than the end of the comment period. EPA did receive requests for special consideration from certain companies.

EPA recognizes that some importers may not be aware of Congress's legislative activity in this area. EPA has undertaken best efforts to develop a comprehensive universe of importers for purposes of allowance allocation. The proposal was based on data available through the GHGRP; the February 11, 2021 NODA; stakeholder outreach

---

[47] There may be a small adjustment between 2022 and 2023 to account for companies that were historical importers that are not required to report to GHGRP and that did not provide data in time for an allocation from the general pool for 2022. These companies are eligible for allowances under the set-aside, and would be added to the general pool in 2023 based on the same criteria as other historical importers. However, any such companies are anticipated to be small given the reporting thresholds provided in the GHGRP.

by October 1, 2021, in accordance with the process described in Section VII.E of the preamble.

Federal Register / Vol. 86, No. 190 / Tuesday, October 5, 2021 / Rules and Regulations    **55145**

meetings; outreach to trade associations that can inform their members; and direct communication with companies that EPA suspects may have imported in relevant years that are not captured in the Agency's data sources. EPA continued to follow up with companies that may be eligible for allowances after proposal. EPA is issuing allowances to importers listed in the proposed rule, as well as importers that provided data that were sufficiently verifiable, for example through import records to EPA such as Customs forms or bills of lading. Additionally, as described further in Section VII.E, EPA will allow historical importers not yet identified or verified by the Agency to come in to request allowances based on their historical market activity if they were not previously required to report to the GHGRP.

EPA proposed to issue allowances at the parent company level if multiple companies that imported HFCs are controlled or owned by the same corporate entity. The proposed rationale for doing so is that it is administratively easier to implement and it improves transparency in the market. Commenters were generally in support of this proposal, with the exception of some application-specific allowance holders, which EPA will discuss in Section VII.C of this notice. One comment in support noted that it provides flexibility for retailers to address shifting needs and consumer demands across several brands, facilities, and locations. Another company recommended that ''parent'' company should be defined to be broader than simply ownership to determine if companies are related (*e.g.,* include management, employees, relatives). A few commenters suggested that companies that are under common control, but are not subsidiaries of a corporate parent, should be issued allowances together. EPA responds that for purposes of determining the quantity of past imports, EPA is treating all companies majority owned and/or controlled by the same individual(s) as a single company, even if there is no corporate parent. EPA does not agree with the comment that EPA should collect or analyze personally identifiable information to the scale that the commenter suggests. Data on the complete ownership of the company, including co-owners, is sufficient and is the type of information that corporate owners have a reasonable expectation may be requested.

Most commenters agreed with EPA's proposal to issue allowances to companies that have historical production and consumption data and were active in 2020. Some commenters

noted that this will fairly include small to medium sized businesses that have recently entered or innovated within the market. Commenters agreed with EPA's focus on more recent years of data, such as basing qualification on being active at some point in 2017–2019 as well as being active in 2020, and stated that issuing allowances only to companies operating in 2011–2013 would exclude current market participants and not be reflective of current market conditions. Commenters provided examples of this concern. One commenter stated that users of HFCs for niche, non-refrigerant uses would be harmed if the current distribution system were interrupted. Another commenter noted that it would harm the current air conditioning aftermarket and distributors supported by that business.

A few commenters disagreed that importing in 2020 should be the sole metric in determining whether a company is currently participating in the market. Three companies provided information about their operations in 2020 and requested EPA to consider them as existing market participants that qualify for the general pool of consumption allowances.

EPA agrees with commenters that issuing allowances to active companies best maintains the current distribution architecture. Recognizing the unique nature of 2020, with economic disruptions caused by a global pandemic, EPA is issuing allowances to companies that did not import in 2020, but provided documentation showing that they were still active, either by selling or purchasing HFCs domestically in 2020.

### 3. What is EPA's framework for determining how many allowances each company receives?

This section discusses how EPA will determine how many allowances each company will receive from the general allocation pool. EPA proposed that the amount of allowances issued to each producer and importer be based on a company's highest year of production or consumption, on an EVe basis, in 2017–2019. EPA also took comment on using data from 2011–2013 or some other combination of years, including all years, between 2011 and 2019. Under the proposal, EPA would sum together every company's highest year amount(s), determine a percentage share for each company, and multiply each company's percentage by the total amount of available calendar-year allowances. EPA also requested comment on whether the Agency should consider individualized circumstances to take into account a company's 2020

data for determining allowances for companies that have newly entered the HFC import market, for example a company that entered the market or acquired another company late in 2019.

Most commenters supported using production and consumption data either from 2017–2019 or the full range of years from 2011–2019. Commenters favoring 2017–2019 assert that these years provide the most accurate reflection of current production, consumption, and use of HFCs. These commenters argue the HFC market has shifted significantly since 2011. A few commenters recommended that EPA also include 2020 data as it best represents the present refrigerant market. One commenter stated that 2016 is an appropriate end-point for determining the representative picture of the market as this is before anti-dumping and countervailing duty (AD/CVD) decisions by the Department of Commerce (DOC) and International Trade Commission (ITC) (see the memo to the docket discussing these duties) and before the Kigali Amendment was agreed. Many commenters suggested that EPA consider favoring 2011–2019 because they assert that 2017–2019 period does not fairly consider longstanding market participants. Some commenters stated that considering a larger range of years is more equitable by ensuring participants are not harmed by market manipulation.

EPA has considered all the comments received, which had a broad range of recommended approaches. EPA has determined to base allowance allocations on data from the entire period from 2011–2019. However, since we are pulling data from such a wide range of years, EPA has determined it is appropriate to average a company's three highest years of data (not necessarily consecutive), as opposed to going with a single high year. Commenters that supported this approach of using the full 2011–2019 time period argued that it is more accurate, equitable, and inclusive, and the Agency agrees. Using an average of the three highest years during the 2011–2019 period incorporates consideration of both industry history and ongoing growth and market change. EPA has determined that using the full range of years allows a balancing of using the most current data, which generally provide the most accurate information on the current market to provide for less market disruption, while also incorporating data from earlier years to account for changes in market behavior (*e.g.,* actively commercializing alternatives to high-GWP HFCs) that took place earlier in the transition as a

**Addm 49**

**55152** **Federal Register**/Vol. 86, No. 190/Tuesday, October 5, 2021/Rules and Regulations

now finalizing the process by which it will determine the allocation level "necessary" for each application-specific company. Entities have the opportunity for judicial review of this framework methodology if they file a petition for review in the U.S. Court of Appeals for the District of Columbia Circuit. If an application-specific end user disagrees with how EPA applies that framework in a future individual allocation determination, that individual allocation is also subject to judicial review. EPA disagrees with the commenter that suggested EPA should allocate to each application-specific user whatever they ask for, and later determine how to support that allocation with data. Congress charged EPA with determining what is necessary for the statutorily identified end uses, and EPA is using its discretion to establish the reasonable approach described in this rule for making those determinations.

EPA will endeavor to provide companies with "necessary" levels of allowances according to the framework provided in this section, but if unforeseen events occur such that EPA's determination is inaccurate, companies can obtain application-specific allowances through other means, such as through transfers. If a company's actual demand for HFCs exceeds the amount of application-specific allowances allocated to them, any company that uses HFCs in one of the six listed applications has other avenues for acquiring HFCs. The company may acquire application-specific allowances or HFCs from another application-specific allowance holder in their end use. If a company still seeks additional HFCs beyond the application-specific amounts, the company can also acquire calendar-year allowances from the general pool or purchase HFCs produced or imported with calendar-year production or consumption allowances. EPA is requiring reporting of additional material purchased beyond the amounts associated with application-specific allowances so that future year projections and allowances will reflect that historical use. EPA will make application-specific allocations on an annual basis, so each company's allocation will be revisited each year and may be adjusted upward (or downward) as appropriate.

With regard to the semiconductor industry, some commenters requested a "loss allowance" or multiplier to adjust for HFC losses during the purification process. Commenters provided different estimates of how much regulated substance is lost in the purification process, which ranged from five to 10 percent. EPA agrees that such a multiplier is appropriate for allocations to semiconductor manufacturers. Semiconductor manufacturers will need to confer their allowances up a supply chain, and it is appropriate for them to have sufficient allowances to cover the full amount of regulated substances that must be imported or produced such that after the purification process (during which a certain percentage of the regulated substance is lost) the semiconductor manufacturer is given the amount of regulated substances necessary for their manufacturing process. Such an approach would allow semiconductor manufacturers to receive the "full quantity of allowances necessary." Therefore, EPA is finalizing a 10 percent purification loss allowance, the higher end of the range, to ensure they receive the amount that is necessary. This purification process is unique to the semiconductor industry and therefore a similar multiplier is not needed for the other applications listed in the AIM Act.

EPA requested comment on whether the Agency should distinguish between misuse and proper use when evaluating "the full quantity of allowances necessary" for defense sprays. Recent news reports indicate there may be use that is inconsistent with the labeling in the product (*i.e.*, use of bear spray on people instead of bears).[50] One commenter stated that allowances provided for defense sprays should be limited to an amount sufficient only for "appropriate uses." Another commenter acknowledged news reports indicating potential product misuse of bear sprays, but stated that this misuse cannot be addressed through this rulemaking. EPA is not finalizing an approach to allocating application-specific allowances for defense sprays that bases estimates of "necessary" allowance levels only on proper use, as it does not have sufficient information on misuse of defense sprays in order to adjust the allocation approach at this time. EPA will continue to monitor this issue and will consider whether use inconsistent with the labeling can be better documented and accounted for when allocating allowances for this application.

For the initial 2022 application-specific allocations, EPA is finalizing the following approach to issuing application-specific allowances to

companies: For companies that experienced positive growth based on their submitted data from 2018 to 2020, the Agency will (1) calculate a company's growth rate from 2018–2019; (2) calculate a company's growth rate from 2019–2020; (3) average the growth rates calculated from steps 1 and 2; (4) multiply the average growth rate by the company's 2020 purchases of EVe-weighted regulated substances for application-specific use to determine an estimated level of allowance need for 2021; and (5) multiply the estimated level of 2021 need by the average growth rate to estimate need for 2022. The number calculated in step 5 will generally be used to allocate application-specific allowances to a company for 2022. EPA determined a company's historic HFC usage based on responses to EPA information requests, invoices, sales records, GHGRP reporting, supplier data, and other information available to the Agency. This amount was used to estimate both the growth rate and 2020 purchases of regulated substances for each company. For companies that experienced negative average annual growth based on their submitted data from 2018 to 2020, in an application that also experienced a negative growth rate, the Agency will allocate allowances equal to the highest quantity of HFCs on an EVe-weighted-basis reported over the three years. EPA also took into account information provided on individual circumstances (*e.g.*, public health emergency). EPA will use this approach for 2022 because the Agency recognizes that 2020 was an unusual year given economic disruptions due to the global pandemic. For 2023–2025, EPA will use the approach detailed at the top of this section for all companies requesting application-specific allowances. Under this approach, if a company and all the companies that apply for allowances in that application experience negative growth, a company would receive fewer allowances than in the prior year.

For the calculation of average growth rate, EPA will use the average annual growth rate formula, which is the growth rate between the first and second year plus the growth rate between the second and third year, divided by two. EPA will look at growth rate by using purchase data for application-specific uses for the initial allocation given that the Agency received disparate numbers on company use data. In the future, EPA intends to adjust for net change in inventory from purchase data as the Agency is requiring reporting on annual inventory data prospectively.

Some commenters cautioned against allocating allowances based on

---

[50] Briley, John. "Bear Spray Is Showing up at Protests and Riots. Here's Why, and How It Affects Humans." *The Washington Post*, 19 Mar. 2021. Available at *www.washingtonpost.com/lifestyle/wellness/bear-spray-pepper-riot-dangerous/2021/03/19/053c3870-87fb-11eb-bfdf-4d36dab83a6d_story.html*.

Federal Register / Vol. 86, No. 190 / Tuesday, October 5, 2021 / Rules and Regulations    55155

offset of 0.1 percent given the importance of these end uses. EPA agrees that the AIM Act prioritizes these end uses, but also interprets subsection (g) to apply generally to all transfers of allowances. EPA does not have the ability under the statutory language to allow application-specific allowance transfers to occur without any offset transfer. An offset of 0.1 percent would not provide sufficient environmental benefit while a 1 percent offset would while also not being so burdensome as to discourage trading. Because EPA is issuing the full quantity of allowances necessary to each end user, the Agency anticipates that the amount of allowances transferred will be minimal.

One commenter asked EPA to allow for transfers of application-specific allowances without an offset in the event a subsidiary spins off a parent company and continues to use HFCs in a specific application. EPA agrees that requiring a transfer and an offset in such a situation would not be needed. EPA's experience is that this type of activity is rare. Historically, under CAA title VI, the Agency treated this type of situation as a change in company name and/or ownership. An authorized official at the company transferring the allowances would have to make a formal request to EPA for the transfer. This approach would apply for any change in company ownership. However, EPA retains discretion to deny such requests based on the circumstances of the particular request or to request additional information before granting the request. Circumstances where EPA would consider denying such requests include but are not limited to if a company requests this treatment more than rarely, if the new company has overlapping ownership, if the allowance holder receives allowances consistent with this final rule as a new market entrant, or if there are indications of fraud. As discussed, application-specific allowances can be conferred to an importer, producer, or intermediaries in the supply chain without any offset. The conferral of allowances is not a transfer but rather an actualization of the allowance (i.e., a use of the allowance for production or consumption) by an end user that is not a producer or importer. Because Congress made clear in subsection (e)(4)(B)(iv) of the Act that the statutorily listed applications should receive the amount of allowances necessary, based on projected, current, and historical trends, EPA is allowing these conferrals as part of the inherent process of ensuring end users can receive the necessary amount of HFCs.

*E. How is EPA establishing the set-aside pool of allowances?*

EPA proposed to establish a small set-aside pool of allowances for a limited set of end users and importers that would not otherwise qualify for allocations, in light of the relatively new and novel nature of the HFC allocation phasedown framework established in this rulemaking. While it is reasonable for this initial allocation period to largely allocate allowances to companies that are currently in the market of producing or importing HFCs, this approach could be a barrier to new market entrants. In addition, the AIM Act is still relatively new legislation and not all entities already operating in the HFC market, particularly those that have not been historically required to report to the GHGRP, may have been immediately aware of Congress's direction to begin regulating the HFC market. These entities may not have responded to EPA's multiple data requests. It is therefore appropriate, as a transitional measure, to establish a set-aside pool of consumption and production allowances as proposed.

EPA proposed to issue 5 to 15 MMTEVe of allowances for this set-aside pool. Based on comments and review of submitted data, EPA is finalizing a set-aside pool of 7.5 MMTEVe (less than 3 percent of allowances to be allocated for 2022) to accommodate the potential requests for application-specific allowances that were not timely received and the high level of interest in allowances for new market entrants. As noted previously, EPA is establishing an allowance allocation framework in this final rule for 2022 and 2023, but will promulgate another rulemaking for allowances for 2024 and beyond based on the Agency's experience implementing this rule and stakeholder feedback.

1. Who is eligible for allowances in the set-aside pool?

The set-aside pool is restricted to three groups of companies: (1) End users in applications identified for allocations under subsection (e)(4)(B)(iv) of the AIM Act that EPA has not identified for the initial allocation of allowances (i.e., the allocation called for by October 1, 2021); (2) importers of HFCs that have not been required to report through the GHGRP under 40 CFR part 98, where EPA has not learned of their past imports in time to issue allowances as part of the general pool despite the Agency's best efforts; and (3) importers that are new market entrants.[51] EPA is finalizing its

proposal not to establish a set-aside pool for companies looking to newly enter as producers of HFCs because the Agency does not wish to encourage the construction of new HFC production capacity in light of the statutory HFC phasedown.

Multiple commenters supported the set-aside generally and one commenter opposed the general concept of a set-aside pool of allowances, in particular a pool of allowances for new market entrants. The commenter asserted that a set-aside pool is neither authorized by the AIM Act, nor was EPA's rationale for its creation supportable. The commenter stated that implementing the AIM Act in a similar manner to title VI of the CAA would provide for a seamless transition, and that EPA's rationale for a set-aside where a distinction can be drawn between a phaseout under title VI of the CAA and a phasedown under the AIM Act is incorrect, as there are certain exemptions available under title VI of the CAA that in practice, do not demonstrate a phaseout. The commenter concluded that if EPA were to promulgate a set-aside pool, that it should be limited to no more than 5 MMTEVe as a one-time allocation and limited in scope and duration.

As noted elsewhere in this notice, Congress provided broad authority to EPA to establish an allocation system to phase down HFC production and consumption, and EPA concludes that creating a limited set-aside pool is within the scope of its discretion under the Act to determine a reasonable approach for allocating allowances. While EPA has noted in many instances that it is appropriate to rely on and build from the Agency's experience in implementing the ODS phaseout under title VI of the CAA, there is nothing in the AIM Act to suggest that EPA is required to create an identical allowance allocation system. For reasons explained previously, it is appropriate in this first implementation phase to allocate the majority of allowances to producers and importers that are currently in the HFC market. However, for the reasons discussed in this section, it is also reasonable to set aside a small quantity of allowances for those who may have been caught unawares or are new market entrants. Long term, EPA will revisit whether additional set-asides are needed in future years. After reviewing comments on the creation of a set-aside pool of allowances, EPA is finalizing the set-

---

[51] EPA proposed that new market entrants must be small businesses as defined by the Small

Business Administration. For reasons explained later in the preamble, the Agency is broadening the eligibility criteria for new market entrants.

offloaded (that is no more than 10 percent of the volume of the container).

*Import* means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, regardless of whether that landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States. Offloading used regulated substances recovered from equipment aboard a marine vessel, aircraft, or other aerospace vehicle during servicing is not considered an import.

*Importer* means any person who imports a regulated substance into the United States. ''Importer'' includes the person primarily liable for the payment of any duties on the merchandise or an authorized agent acting on his or her behalf. The term also includes:

(1) The consignee;
(2) The importer of record;
(3) The actual owner; or
(4) The transferee, if the right to draw merchandise in a bonded warehouse has been transferred.

*Individual shipment* means the kilograms of a regulated substance for which a person may make one (1) U.S. Customs entry, as identified in the non-objection notice obtained from the relevant Agency official.

*Metered dose inhaler (MDI)* means a handheld pressurized inhalation system that delivers small, precisely measured therapeutic doses of medication directly to the airways of a patient. MDIs treat health conditions such as asthma and chronic obstructive pulmonary disease and are approved for such use by the U.S. Food and Drug Administration (FDA).

*Mission-critical military end uses* means those uses of regulated substances by an agency of the Federal Government responsible for national defense that have a direct impact on mission capability, as determined by the U.S. Department of Defense, including, but not limited to uses necessary for development, testing, production, training, operation, and maintenance of Armed Forces vessels, aircraft, space systems, ground vehicles, amphibious vehicles, deployable/expeditionary support equipment, munitions, and command and control systems.

*Non-objection notice* means the limited authorization granted by the relevant Agency official to import a specific individual shipment of a regulated substance.

*On board aerospace fire suppression* means use of a regulated substance in fire suppression equipment used on board commercial and general aviation aircraft, including commercial-derivative aircraft for military use; rotorcraft; and space vehicles. On board commercial aviation fire suppression systems are installed throughout mainline and regional passenger and freighter aircraft, including engine nacelles, auxiliary power units (APUs), lavatory trash receptacles, baggage/crew compartments, and handheld extinguishers.

*Person* means any individual or legal entity, including an individual, corporation, partnership, association, state, municipality, political subdivision of a state, Indian tribe; any agency, department, or instrumentality of the United States; and any officer, agent, or employee thereof.

*Process agent* means the use of a regulated substance to form the environment for a chemical reaction or inhibiting an unintended chemical reaction (*e.g.,* use as a solvent, catalyst, or stabilizer) where the regulated substance is not consumed in the reaction, but is removed or recycled back into the process and where no more than trace quantities remain in the final product. A feedstock, in contrast, is consumed during the reaction.

*Production/Produce* means the manufacture of a regulated substance from a raw material or feedstock chemical (but not including the destruction of a regulated substance by a technology approved by the Administrator). The term production does not include:

(1) The manufacture of a regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical;

(2) The reclamation, reuse, or recycling of a regulated substance; or

(3) Insignificant quantities of a regulated substance inadvertently or coincidentally generated from any of the following, independent circumstances: during a chemical manufacturing process, resulting from unreacted feedstock, from the listed substance's use as a process agent present as a trace quantity in the chemical substance being manufactured, as an unintended byproduct of research and development applications, or during semiconductor manufacturing processes.

*Production allowances* means the limited authorization to produce regulated substances; however, production allowances may be used to produce regulated substances only in conjunction with consumption allowances. A person's production allowances are the total of the allowances obtained under § 84.9 or § 84.15 (with permitted modifications to be determined).

*Production line* means any process equipment (*e.g.,* reactor, distillation column) used to convert raw materials or feedstock chemicals into regulated substances or consume regulated substances in the production of other chemicals.

*Reclaim* means the reprocessing of regulated substances to all of the specifications in appendix A to 40 CFR part 82, subpart F (based on AHRI Standard 700–2016) that are applicable to that regulated substance and to verify that the regulated substance meets these specifications using the analytical methodology prescribed in section 5 of appendix A to 40 CFR part 82, subpart F.

*Regulated substance* means a hydrofluorocarbon listed in the table contained in subsection (c)(1) of the AIM Act and a substance included as a regulated substance by the Administrator under the authority granted in subsection (c)(3).

*Space vehicle* means a man-made device, either manned or unmanned, designed for operation beyond Earth's atmosphere. This definition includes integral equipment such as models, mock-ups, prototypes, molds, jigs, tooling, hardware jackets, and test coupons. Also included is auxiliary equipment associated with tests, transport, and storage, which through contamination can compromise the space vehicle performance.

*Structural composite preformed polyurethane foam* means a foam blown from polyurethane that is reinforced with fibers and with polymer resin during the blowing process, and is preformed into the required shape (*e.g.,* specific boat or trailer design) to increase structural strength while reducing the weight of such structures.

*Transform* means to use and entirely consume (except for trace quantities) a controlled substance in the manufacture of other chemicals. A regulated substance that is used and entirely consumed (except for trace quantities) in the manufacture of another chemical is called a feedstock.

*Transhipment* means the continuous shipment of a regulated substance, from a foreign country of origin through the United States or its territories, to a second foreign country of final destination, as long as the shipment does not enter U.S. commerce. A transhipment, as it moves through the United States or its territories, cannot be repackaged, sorted, or otherwise changed in condition.

*Used regulated substances* means regulated substances that have been recovered from their intended use systems (including regulated substances

that have been, or may be subsequently, recycled or reclaimed).

### § 84.5   [Reserved]

### § 84.7   Phasedown schedule.

(a) *Phasedown from baseline.* Total production and consumption of regulated substances in the United States in each year cannot exceed the amounts (shown as a percentage of baseline) in the following table:

| Date | Percentage of production baseline (percent) | Percentage of consumption baseline (percent) |
|---|---|---|
| (1) 2022–2023 ................................................................................................ | 90 | 90 |
| (2) 2024–2028 ................................................................................................ | 60 | 60 |
| (3) 2029–2033 ................................................................................................ | 30 | 30 |
| (4) 2034–2035 ................................................................................................ | 20 | 20 |
| (5) 2036 and thereafter ................................................................................. | 15 | 15 |

(b) *Annual production and consumption limits.* (1) The production baseline for regulated substances is 382,554,619 metric tons of exchange value equivalent.

(2) The consumption baseline for regulated substances is 303,887,017 metric tons of exchange value equivalent.

(3) Total production and consumption in metric tons of exchange value equivalent for regulated substances in the United States in each year is derived by multiplying the production baseline or consumption baseline by the percentage in paragraph (a) of this section. Total production and consumption allowances issued under this subpart may not exceed the quantities shown in the following table:

| Year | Total production (MTEVe) | Total consumption (MTEVe) |
|---|---|---|
| (i) 2022–2023 ................................................................................................. | 344,299,157 | 273,498,315 |
| (ii) 2024–2028 ................................................................................................ | 229,532,771 | 182,332,210 |
| (iii) 2029–2033 ............................................................................................... | 114,766,386 | 91,166,105 |
| (iv) 2034–2035 ............................................................................................... | 76,510,924 | 60,777,403 |
| (v) 2036 and thereafter ................................................................................ | 57,383,193 | 45,583,053 |

### § 84.9   Allocation of calendar-year production allowances.

(a) The relevant agency official will issue, through a separate notification, calendar year production allowances to entities that produced a regulated substance in 2020. The number of production allowances allocated to each eligible entity for 2022–2023 is calculated as follows:

(1) Take the average of the three highest annual exchange value-weighted production amounts that each eligible entity reported to the agency for calendar years 2011 through 2019;

(2) Sum the "average high year" values determined in step 1 of all eligible entities and determine each entity's percentage of that total;

(3) Determine the amount of general pool production allowances by subtracting the quantity of application-specific allowances for that year as determined in accordance with § 84.13 and the set-aside in § 84.15 from the production cap in § 84.7(b)(3);

(4) Determine individual entities' production allowance quantities by multiplying each entity's percentage determined in step 2 by the amount of general pool allowances determined in step 3.

(b)(1) EPA will allocate calendar year production allowances to individual entities by October 1 of the calendar year prior to the year in which the allowances may be used based on the exchange value-weighted quantities calculated in paragraph (a)(4) of this section.

(2) EPA will provide public notice of the list of companies receiving production allowances as well as the quantities they will be allocated by that date.

(3) In addition to the procedure in paragraph (a) of this section, the relevant agency official will allocate calendar year production allowances to entities that qualified for allowances under § 84.15.

(4) If there are remaining production allowances after distribution from the set-aside under § 84.15, the relevant agency official will distribute such allowances on a pro rata basis to the entities in paragraph (a) of this section by March 31 of the calendar year in which the allowances may be used.

### § 84.11   Allocation of calendar-year consumption allowances.

(a) The relevant agency official will issue, through a separate notification, calendar year consumption allowances to entities that imported or produced a bulk regulated substance in 2020, unless an individual accommodation is permitted by a relevant Agency official. If multiple importers are related through shared corporate or common ownership or control, the relevant agency official will calculate and issue allowances to a single corporate or common owner. The number of consumption allowances allocated to each eligible entity for 2022–2023 is calculated as follows:

(1) Take the average of the three highest annual exchange value-weighted consumption amounts chosen at the corporate or common ownership level for eligible entities reporting to the agency for each calendar year 2011 through 2019;

(2) Sum the "average high year" values determined in step 1 of all eligible entities and determine each entity's percentage of that total;

(3) Determine the amount of general pool consumption allowances by subtracting the quantity of application-specific allowances for that year as determined in accordance with § 84.13 and the set-aside in § 84.15 from the consumption cap § 84.7(b)(3);

(4) Determine individual entity consumption allowance quantities by multiplying each entity's percentage determined in step 2 by the amount of general pool allowances determined in step 3.

**Addm 53**

# Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act: Response to Comments

September 2021

United States Environmental Protection Agency

**Addm 54**

# 4. Company-specific Calendar Year Allowances

- Which years should allowance allocations be based upon?
- Responding to Anti-competitive Behavior
- Participation in the Market in 2020
- Number of Years that should be Covered by this Rule
- Establishing a Short Term Program
- Requests for additional consumption allowances
- EPA should not include others who didn't report to GHGRP
- What is an allowance?
- Parent Company
- Effect of the Phasedown of HFCs
- Quarter 1, 2022 Imports
- Other

## 4.1 Which years should allowance allocations be based upon?
105

**Organization:**  A-Gas, Inc.

A-Gas believes the best approach is to base the allocation of allowances to an entity on its single highest annual production or import total between 2017 and 2019, provided such entity participated in the market in 2020. However, for this and for any other approach, EPA should not allocate any allowances to any entity found by the Department of Commerce to have failed to pay anti-dumping duties during this time period. [EPA-HQ-OAR-2021-0044-0154, p. 4]

This approach best reflects the reality of the market as it exists today and is likely to exist at least over the next several years. A-Gas further believes this position is superior to the 2011-2013 and 2011-2019 periods because it maximizes the number of potential market participants and, as a result, provides greater liquidity in the market. This, in turn, creates more choices and provides more flexibility for purchasers of refrigerants. [EPA-HQ-OAR-2021-0044-0154, p. 4]

Furthermore, the 2011-2013 period would fall well short of representing prevailing market conditions by disproportionately favoring long-term market participants and by relying on obsolete market data nearly a decade old. [EPA-HQ-OAR-2021-0044-0154, p. 4]

A-Gas would consider supporting EPA in using an average of the three highest production or import annual totals during the 2011-2019 period - subject to several qualifications. First, where an entity has fewer than three years during that time, each missing year would be counted as zero, for purposes of averaging. A-Gas would oppose requiring any entity with fewer than three years of activity during that period to enter into a new entrant or other set aside pool. As stated, each year fewer than three should count as zero for purposes of averaging. [EPA-HQ-OAR-2021-0044-0154, p. 4]

Second, for this 2011-2019 approach, EPA need not consider whether an entity was active in 2020, given the longer timeframe involved and the averaging of highest years. A-Gas would

**Addm.55**

**EPA Response:** EPA responds in Section VII.B.1 of the final rule to the comments about which years of production and consumption the Agency should consider in determining allowance allocations for 2022 and 2023. EPA also responds to comments regarding whether and how to average historical data and the number of years for which EPA should issue allowances in that section.

## 4.2 Responding to Anti-competitive Behavior

**Organization:** Air Conditioning, Heating, and Refrigeration Institute (AHRI)

EPA should not allocate any allowances to any entity identified by the Department of Commerce as having circumvented anti-dumping duties. [EPA-HQ-OAR-2021-0044-0170, p. 4]

AHRI does not support anti-competitive practices and believes that EPA should provide allowance to companies in "good standing." EPA should reduce allowances for importers of HFCs found to circumvent anti-dumping determinations by other U.S. government agencies. [EPA-HQ-OAR-2021-0044-0170, p. 4]

Specifically, companies that were determined to circumvent the anti-dumping determinations that were published in the Federal Register by the Department of Commerce should not be provided with allowances. For example, the Department of Commerce found some companies slightly modified the ratios of refrigerant blends only to add components to create and sell blends covered by an anti-dumping determination - i.e., as "unfinished blends."[2] Separately, the Department of Commerce found refrigerants falsely labeled with country of origin shipped through a third country to circumvent duties - i.e., "product transshipment."[3]

[2] Unfinished HFC Blends - Commerce found that imports of "unfinished" blends of R-32 and R-125, which were then re-blended in the United States into a blend covered by the antidumping order, were circumventing the order. See Hydrofluorocarbon Blends from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order; Unfinished R-32/R-125 Blends, 85 Fed. Reg. 4632 (January 27, 2020) ("Unfinished Blends Affirmative Circumvention Prelim") (unchanged in final Hydrofluorocarbon Blends from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order; Unfinished R-32/R-125 Blends, 85 Fed. Reg. 15,428 (March 18, 2020) ("Unfinished Blends Affirmative Circumvention Final").

[3] Transshipment through Hong Kong, Jamaica, Panama, and South Korea - Importers mislabeled and falsely identified the origin of HFCs from China to evade the antidumping orders by transshipping through third countries. Commerce found that Indian producers and importers blended Chinese origin HFC's in India in order to evade the dumping law. See Preliminary Decision Memorandum for Scope Ruling and Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China: Indian Blends (April 3, 2020) at Part XIII )(pages 15 -25) (unchanged in final determination).

**Addm 56**

terms of gaining allowance allocations, even while they may have satisfied penalties that were levied as a result of such past misconduct. [EPA-HQ-OAR-2021-0044-0216, p. 26]

**Organization:**  Heating, Air-conditioning & Refrigeration Distributors International (HARDI)

While there is little legislative history to the AIM Act, when introducing the legislation Senator John Kennedy (R-LA) was quoted in his press release, "The world is moving away from hydrofluorocarbons, and the U.S. is in danger of getting stuck at the starting gate. We want these new refrigerants to be produced in the U.S., not in China."[10] Correcting for market manipulation, while not expressly written in the legislation is within the intent of the introducing senator and should be considered. As purchasers we want to see a healthy market that ensures a fair price for products, and we believe EPA should correct for manipulation in determining allowances. [EPA-HQ-OAR-2021-0044-0103, p. 5]

[10] Press Release, Senator John Kennedy, Sens. Kennedy And Carper File Legislation To Save Jobs During Phasedown Of Hydrofluorocarbons (Oct. 30, 2019), https://www.kennedy.senate.gov/public/press-releases?ID=47698154-41C9-4CF9-809D-DB75FF32291B.

**Organization:**  RMS of Georgia, LLC d/b/a Choice Refrigerants

EPA has proposed to allocate HFC consumption allowances on the basis of imports of HFCs into the United States during a designated period of years and has indicated its preference to use a high-water mark approach across the years 2017-2019. EPA describes its rationale for this approach as using import data as a proxy for market share in the U.S. HFC markets in order to allocate allowances to market participants in proportion to market share. [EPA-HQ-OAR-2021-0044-0168, p. 9]

We are generally supportive of an allowance system that allocates based on market share over a period of years, as Congress was surely aware that EPA had successfully used a similar system for phaseout of HCFCs and CFCs under the Clean Air Act. However, imports of HFCs into the U.S. have been heavily affected by trade distortions, including dumping of HFCs by Chinese companies, circumvention of trade duties, subsidies by the Chinese government and manipulation of markets by certain importers, all of which have artificially increased imports by certain companies. As a consequence, the raw import data that EPA would normally be able to rely on is not an accurate proxy for market conditions, market activity, or market share for all companies. [EPA-HQ-OAR-2021-0044-0168, p. 9]

These trade distortions began as early as 2015 but grew more pronounced over the years and reached a crisis level by the 2018-2019 timeframe. If EPA selects years for its allocation system that were affected by trade distortions, it is incumbent on EPA to adjust the import data for each market participant to reflect the level of imports that would have occurred in absence of the trade distortion. Although it might be inconvenient for EPA to conduct the investigation and auditing needed to correct for these market distortions, the evidence of these practices - as established through U.S. government investigations and record evidence before the agency - is so glaring that EPA cannot blind itself to these distortive effects. Only by using recent market data, but adjusting the data to correct for market distortion, can EPA achieve the goals that it identifies in the proposal: (1) to provide a seamless transition; (2) to promote equity and

fairness; and (3) to base the system on robust data. 86 Fed. Reg. at 27,169. To ignore the market distortions brought to EPA's attention by various stakeholders would be inconsistent with EPA's obligations under administrative law to act rationally, consider all factors, and explain its reasoning. [EPA-HQ-OAR-2021-0044-0168, p. 9]

A. EPA Should Adjust Import Data In Light of Market Manipulation [EPA-HQ-OAR-2021-0044-0168, p. 9]

EPA has recognized the existence of market distortions and proposed to take these into consideration, although it does not specify in the proposed rule how it will adjust for the distortion. [EPA-HQ-OAR-2021-0044-0168, p. 9]

Although EPA's proposal to link allowance allocation to payment of trade duties on a company-by-company basis is on the right track, in order to correct for trade distortion EPA must better understand how certain companies have skirted, gamed and circumvented trade laws and taken advantage of the limitations of the trade laws to artificially increase imports that EPA is using as the basis for consumption allowance allocations. [EPA-HQ-OAR-2021-0044-0168, p. 10]

**Organization:**  The American HFC Coalition

The considerable U.S. market share seized over time by these unfairly traded imports was the direct result of a persistent pattern of dumping, circumvention, and evasion of U.S. law. As a result, U.S. manufacturers of HFCs suffered declining sales revenues and profits, and failed to earn an adequate return on investment for more than six years, including the years 2017-2019 that EPA proposes to use to establish allowances. At the same time, importers of unfairly traded Chinese HFCs increased their share of the U.S. market on the basis of unfair trade practices. Having seized market share and sales volume through the use of unfairly low prices through dumping and subsidization, importers of HFC blends and components from China should not receive Consumption Allowances based on sales of those dumped and subsidized imports. [EPA-HQ-OAR-2021-0044-0160, p. 9]

The White House recently issued a comprehensive report setting a blueprint for enhancing domestic supply chains for a number of critical product groups, including computer chips and high-capacity batteries for electric vehicles.[6] Throughout, the report emphasizes the need to address overarching environmental concerns and, specifically, Chinese producers gaining U.S. market share by trading in products that were produced under lax environmental standards. "The Administration's approach to resilience must focus on building trade and investment partnerships with nations who share our values - valuing human dignity, worker rights, environmental protection, and democracy." The Report goes on to emphasize the need to support "companies with strong track records of environmental compliance at their other or past operations."

---

[6] See Building Resilient Supply Chains, Revitalizing American Manufacturing, And Fostering Broad-Based Growth, 100-Day Reviews under Executive Order 14017 (June 2021), available at https://www.whitehouse.gov/wp-content/uploads/2021/06/100-day-supply-chain-reviewreport.pdf.

Consistent with these policies, the EPA should not award a disproportionate share of Consumption Allowances to circumventing importers associated with unfairly traded HFCs from China. Such a result is inconsistent with the purpose of the AIM Act. As important, the EPA must not award Consumption Allowances on the basis of market share seized by means of unfairly traded imports. Having increased market penetration through unfair trade practices, including dumping, subsidies, and circumvention of past antidumping duty orders, Chinese manufacturers should not further benefit through the assignment of Consumption Allowances to importers of the unfairly traded HFCs. [EPA-HQ-OAR-2021-0044-0160, p. 9]

**Organization:** U.S. Chamber of Commerce

EPA should not allocate any allowances to any entity identified by the Department of Commerce as having circumvented anti-dumping duties.

> **EPA Response:** Discussion on how the Agency will determine allowance allocation levels can be found in Section VII.B of the final rule. EPA cannot factor unproven allegations in allocation decisions.

## 4.3 Participation in the Market in 2020

**Organization:** Alliance for Responsible Atmospheric Policy

In addition, the Alliance disagrees with EPA's proposal to limit the allocation of allowances to only those entities that were actively producing or importing in 2020. In the current business climate and with the uncertainties and market disruptions caused by COVID-19, EPA should not limit the allocation of allowances to entities that were actively producing or importing in 2020, provided that such entities were producing or importing between 2011 and 2019 and have not exited the business. Discernment of whether an entity has actually "exited" the business should depend on all the facts and circumstances, not simply whether an entity produced or imported in a single year. [EPA-HQ-OAR-2021-0044-0187, p. 3]

**Organization:** Altair Partners LP

EPA's proposal to disqualify companies that did not import HFCs during 2020 is not legally supportable, as the proposal is inconsistent with EPA's stated rationale to allocate allowances to companies that are active participants in the HFC market. [EPA-HQ-OAR-2021-0044-0179, p. 3]

A. Imports and Market Participation Are Not the Same for Allocation Purposes

EPA's presumption that companies without HFC imports in 2020 is illogical and contrary to actual market practices. EPA is improperly equating consumption with imports of HFCs without regard to actual market activity or the resulting fairness of using import data as an imperfect proxy for market activity or market share for purposes of an allowance allocation system that is supposed to be based on "promoting equity, timeliness of implementation, and availability of robust data." 86 Fed. Reg. at 27,169. Notwithstanding EPA's impermissible

143

**Addm 59**

there has been sufficient notice about the AIM Act allowance and phasedown schedule and the resulting rulemakings. [EPA-HQ-OAR-2021-0044-0167, p. 4]

**EPA Response:** EPA responds to comments about participation in the market in 2020 in Section VII.B.2 of the final rule. EPA is finalizing its proposed approach to generally require entities to have imported or produced regulated substances in 2020 in order to be eligible for an allowance allocation, but also is taking individual circumstances into account for companies that can demonstrate they have not exited the market. As discussed further in Section VII.B.2, EPA agrees with commenters that whether a company is still active in the regulated substance markets is a multifactor consideration.

Three companies provided information about their operations in 2020 and requested EPA to consider them as existing market participants that qualify for the general pool of consumption allowances.

FluoroFusion provided comments describing how that company was founded in 2018 as a collaboration with Kivlan & Co. which began transitioning its import responsibilities to FluoroFusion by May 2019. FluoroFusion has been the importer of record from mid-2019 to present. If EPA considered the two companies separately, Kivlan & Co. would have ceased operations and FluoroFusion would be a new market entrant. EPA does not believe that this is an accurate representation of their import history. Based on the information provided, EPA is considering FluoroFusion and Kivlan & Co. together as a single entity and is including FluoroFusion in the list of companies receiving allowances from the general pool for 2022.

The Combs Companies commented that they imported significant quantities of HFCs in the 2017-2019 period and had sufficient inventory at the beginning of 2020. When the global pandemic hit world markets they chose to not import additional HFC product until the market uncertainty was resolved and instead sell inventory. EPA agrees that this company has not ceased operations despite not having imported in 2020 and is including them in the list of companies receiving allowances from the general pool for 2022.

Altair commented that they had imported HFCs in 2017 and 2018 but in 2019 and 2020, purchased HFCs from middlemen importers, rather than importing themselves. However, at all times Altair was actively selling HFCs in the U.S. refrigerant market. Further, Altair has HFC imports completed or scheduled for delivery in 2021. EPA agrees that this company has not ceased operations despite not having imported in 2019 and 2020 and is including them in the list of companies receiving allowances from the general pool for 2022.

## 4.4 Number of Years that should be covered by this rule

**Organization:** Air Conditioning, Heating, and Refrigeration Institute (AHRI)

**Addm 60**

ComStar is of the opinion that the fourth quarter of year 2021 is too soon to set allowances for 2022. Production scheduling and raw material ordering for 2022 is well underway by the fourth quarter of 2021. As a result, the EPA's issuance of a "No Action Assurance" letter to Allocation holders may be necessary for 2022 transactions. [EPA-HQ-OAR-2021-0044-0075, p. 2]

**Organization:** Lenz Distributing

Along with this type of business activity, in the last two years much has changed in the supply chain. One of the most important issues is the maritime bottlenecks around the world. Based on factors out of our control, this fact is causing delays in orders and unprecedented lead times. We ask EPA to consider that sourcing of inventory is normally done in the 4th quarter of a calendar year. Managing inventories has become a bigger challenge than ever before. [EPA-HQ-OAR-2021-0044-0183, p. 1]

EPA will not finalize the requirements of the AIM Act until late September of 2021. The Congressional requirements of this rule place a great deal of pressure on a small business such as ours. This rule does not give us any guidance on what will happen if bonified purchased orders should arrive at a US Port after the rule has been promulgated and takes effect on December 31, 2021. We would ask EPA to take into consideration the numerous events and actions that have and continue to arise with respect to HFC consumption. Unable to domestically source enough HFCs to satisfy our business needs, we are forced to source product from overseas suppliers that take up to 3-4 months to deliver.

> **EPA Response:** EPA acknowledges the concern about timing raised by this commenter, but intends to issue 2022 allowances by October 1, 2021. Allowances will be required for imports of regulated substances starting January 1, 2022, regardless of when the regulated substances were ordered, with the exception of regulated substances imported consistent with 84.5(b)(1). This will provide sufficient notice to regulated entities of the amount of allowances available for 2022, particularly given the advance notice provided through the proposal of approaches under consideration by EPA and the Congressionally mandated schedule provided in the AIM Act. At this time, EPA does not agree that it is appropriate to issue a No Action Assurance letter for allocation holders for 2022. In addition to extensive outreach to companies that are potentially importing HFCs, EPA proposed the list of companies and the methodologies the Agency would consider using for issuing allowances to those companies in the proposed rule in May, 2021 and intends to meet the Congressionally mandated deadline of October 1 to issue allowances for the following year.

## 4.12 Other

**Organization:** Arkema Inc.

As a general matter, Arkema encourages EPA to approach allowances for regulated substances under the AIM Act by tracking the market system the Agency set up for ozone depleting substances (ODS). All the stakeholders understand how that system works, it largely has been successful, and Congress based the AIM Act on the ODS model. This is particularly important

**Addm 61**

The commenter's suggestion that the set aside is a "fudge factor" is incorrect. EPA proposed to base the level of allowances and size of the set-aside pool on the number of new HFC importers over the last decade and the median quantity of HFCs that they have imported in addition to an informed estimate of how many otherwise qualified entities operating in (e)(4)(B)(iv) applications or with historic imports may need to come into the pool late. EPA has finalized a higher set-aside pool than EPA's lead proposed option to account for the potential for more companies requesting allowances, in particular application-specific allowances, than anticipated.

**Organization:** Owens Corning (OC)

OC also supports EPA's proposal to allocate HFC production and consumption allowances at the upstream HFC manufacturing entity. OC agrees that this is an appropriate interpretation of EPA's authority the AIM Act and the most logical way for EPA to track the phase down of HFCs in the U.S. OC agrees that it would be difficult to quantify and track the amount of HFC in the end-use product.

**EPA Response:** As proposed, EPA is issuing allowances at the corporate level.

**Organization:** RMS of Georgia, LLC d/b/a Choice Refrigerants

I Allowances Must Be Allocated to the Company That Would Now Need Allowances [EPA-HQ-OAR-2021-0044-0168, p. 2]

EPA is proposing an HFC allowance allocation system that issues allowances to market participants based on import data and corresponding greenhouse gas reporting data. Import data in EPA's greenhouse gas reporting program and customs records may be appropriate for purposes of calculating the phasedown cap levels for the overall AIM Act allowance pool, but because the data does not necessarily reflect commercial market realities, it is not appropriate or accurate information for purposes of apportionment of baseline allowances or allocation of annual emissions allowances for HFCs - particularly if EPA intends to require allowances for HFC blends.[3] To the extent that EPA decides that producers or importers of HFC blends must hold allowances on the basis of HFC components "within" HFC blends, those allowances must be allocated to the HFC blends producer/importer, not to the producer/importer of the HFC component feedstocks. Otherwise, producers of HFC blends (particularly those like Choice Refrigerants which hold patent rights to proprietary HFC blends products) will suffer an unfair and economically devastating mismatch between the party that receives allowances and the party that ultimately bears the economic burden of the allowance system. EPA's decisions on allowance allocation, quite literally, may mean life or death for small businesses like Choice Refrigerants who have used middlemen importers in past years to import HFC components but would now have to hold allowances for their own products. [EPA-HQ-OAR-2021-0044-0168, p. 2]

The HFC components R-32, R-134a and R-125 that are used as feedstock to produce Choice's patented and branded products are listed in the AIM Act as regulated substances. See AIM §103(c) (table). However, HFC blends generally, and Choice R-421A specifically, are not themselves regulated substances under the AIM Act. We are concerned that EPA may require allowances for production or import of Choice' R-421A or other HFC blends on the basis of

186

their HFC feedstock components. Although it does not appear that EPA actually has the authority to regulate HFC blends in this manner, if EPA does require allowances for HFC blends, the allowances should be allocated to the blends producer/importer, rather than to the HFC components importer, regardless of what years are used to establish allowance allocations and regardless of what company name is reflected on customs documents. [EPA-HQ-OAR-2021-0044-0168, p. 3]

Because of the unusual language in the AIM Act and the nature of HFC blends, EPA must approach allowance allocations in this context differently from how allowances were allocated in the CFC and HCFC phaseout programs, which did not involve this unusual aspect. This potential mismatch between the importer of components and owner of HFC blend products would be much more aggravated if EPA uses older years of market data for purposes of allowance allocations. For example, prior to international signing of the Kigali Agreement in October 2016, there would have been little reason for market participants to anticipate that EPA would require allowances for HFCs or would use data from years before 2016. This was especially true as EPA was continuing to approve HFC substitutes under its SNAP program. [EPA-HQ-OAR-2021-0044-0168, p. 3]

Choice Refrigerants' confidential letters of February 5, 2021 and March 29, 2021, have provided information to EPA on how our HFC blend products have historically been produced, whether manufactured in the U.S. from imported components or whether imported as pre-blended HFC blends. Business data on Choice's HFC blend production and HFC component purchases for the years 2010-2019 is summarized for EPA's convenience in Appendix A (for R-421A) and Appendix B (for R-410A) of the February 5th letter. [EPA-HQ-OAR-2021-0044-0168, p. 3]

B. Choice's HFC Blend Production/Import [EPA-HQ-OAR-2021-0044-0168, p. 3]

As described in the business confidential letters, from 2011 thru approximately 2017, Choice Refrigerants produced Choice' R-421A in the United States using HFC components imported primarily from China. In that time period, Choice typically arranged to have HFC components manufactured by a Chinese chemical supplier and shipped to Choice's production facility in Alpharetta, where the components were blended together with a proprietary additive according to ASHRAE specifications. The blend product was then packaged, labeled, and sold to various downstream distributors in the U.S. refrigerant market. Notably, at that time Choice was unable to source HFC components from domestic U.S. chemical manufacturers (and is still unable to do so) because, as has been documented in official government reports, the major domestic HFC chemical producers are unwilling to supply HFC components to smaller producers of R-22 substitutes that compete against their own products and have so-called "swap" agreements among themselves which exclude small businesses such as Choice.[4] [EPA-HQ-OAR-2021-0044-0168, p. 3]

Prior to 2017, Choice had a commercial distribution arrangement with one of its distributors under which that company would arrange for the purchase of shipments of bulk HFC component feedstocks from China on behalf of Choice. The shipments were nominated and shipped through a U.S. port of entry (typically Charleston) to Choice's production facility in

Alpharetta. These components were earmarked and used exclusively by Choice for the production of its proprietary HFC blends. All production of the HFC blends occurred in Choice's Alpharetta facility as described above. Once the HFC blends were produced by Choice, Choice would ship the finished HFC blend products to its various distributors, including the distributor that facilitated the imports, for further sale to the U.S. refrigerant and air conditioning market. [EPA-HQ-OAR-2021-0044-0168, p. 4]

Although the cost of shipping the HFC components under this arrangement was initially advanced by the distributor who arranged the imports, those costs were credited to the distributor at the time of sale and delivery of the produced HFC blend, such that the purchase price of the HFC components was in reality borne by Choice Refrigerants. Similarly, although the distributor's name appears on customs records, the shipments were at all times intended for Choice and destined for Choice's Alpharetta production facility for use in production of Choice's patented and branded products. Essentially, the distributor acted as Choice's shipping agent in arranging for shipment overseas, advanced the initial purchase costs, and was reimbursed through an adjustment to the distributor's purchase of HFC blend products from Choice. Similarly, the distributor reported the import of the HFC components which it had arranged on Choice's behalf in EPA's Greenhouse Gas Reporting Program ("GHGRP"). We believe these reports were filed in the name of the distributor, but as noted those components were intended as chemical feedstocks for the production of Choice's patented and branded products, to which the distributor had no legal or intellectual property rights. Of course, at this time of this arrangement there was no indication that HFC substitutes (which were being actively encouraged under EPA's SNAP program) would be phased out or that HFC imports during these years would ever be considered for purposes of an allowance scheme. Choice and the distributor currently have no commercial relationship. [EPA-HQ-OAR-2021-0044-0168, p. 4]

Beginning in about 2017, due to market conditions, Choice transitioned to sourcing pre-blended HFC blends from Chinese chemical manufacturers. (Again, Choice was forced to source these HFC feedstocks from overseas because the domestic HFC production industry was unwilling to sell HFC components to smaller U.S. competitors.) Under this arrangement, Choice's direct Chinese supplier would blend HFC components at a Chinese chemical manufacturing facility on Choice's behalf and export the blended HFC product to Choice in Alpharetta.[5] Choice would either supply its proprietary lubricant to the Chinese supplier to be blended before shipping, or at other times, Choice would add the proprietary lubricant at its Alpharetta facility once it received the pre-blended product. Choice would then sell the finished HFC blend products, such as Choice® R-421A, to various U.S. distributors for wholesale and retail sales in the refrigerant market. [EPA-HQ-OAR-2021-0044-0168, p. 5]

C. Allowances Must Be Allocated to Producers/Importers of HFC Blends, Not to HFC Components Importers [EPA-HQ-OAR-2021-0044-0168, p. 5]

Section 103(e)(3) of the AIM Act directs EPA to phase down production and consumption of regulated HFCs "through an allowance allocation and trading program." Nothing in the statute dictates any particular method for allocation of allowances; however, under general rules of administrative law, any system that EPA adopts must be consistent with the statute and

rationally supported by data and policy considerations. Although Congress chose to establish a baseline for HFC reductions (i.e., the "cap") based on the years 2011-2013 (which is the same approach taken in the Kigali Amendment to the Montreal Protocol), EPA is not directed by the statute to use this three-year period as a reference point for allowance allocations. Similarly, to the extent that EPA chooses the 2011-2013 period as the allocation baseline (to the extent the agency could articulate a rational basis for doing so), the statute does not dictate any particular method of selecting recipients of allocations. [EPA-HQ-OAR-2021-0044-0168, p. 5]

EPA previously published a notice of data availability ("NODA") that identifies importers of HFCs during the 2011-2013 period based on self-reporting through EPA's GHGRP.[6] EPA suggested that this data might be used as a basis for allocation of HFC allowances under the AIM Act. This data, however, reflects only the reporter of HFC as a supplier of U.S. imports, which is not necessarily the entity that actually used or consumed the HFCs in the U.S. market. For example, an importer may import HFCs as blending components for a customer that then blends the components into the product that is actually sold in commerce. During the 2011-2013 period (almost a decade ago) those parties may not have had an express written agreement as to future allowances, as no legislation was anticipated at that time. In other situations, the importer of record for customs purposes may be acting as an agent for a customer who would be considered the actual user or consumer of the imported HFCs. In either situation, if EPA determines that the underlying rationale for allocating allowances is to reflect actual market share of the U.S. refrigerants market during the 2011-2013 period, allocating allowances merely on the basis of what company is listed as the GHGRP reporter or customs importer of record would distort the allocation scheme, as the actual consumer of the HFC product would not receive allowances, and the importer would receive an unwarranted windfall. These concerns are particularly heightened in the case of patented HFC products, for which importers of HFC components would have no legal license to manufacture or import a patented product except when acting on behalf of, or with the permission of, the patent holder. Where an allocation system is based on market share, it is incumbent on EPA to look to the reality behind the data to identify the companies with actual market share, not just blindly apply data that were collected for other purposes. [EPA-HQ-OAR-2021-0044-0168, p. 6]

Applied to this particular situation, it would be fundamentally unfair to require Choice to hold allowances for its continuing importation of pre-blended Choice® R-421A product, but to give free allowances to a different entity (the distributor) based on its arranger role which terminated years ago. In contrast, allocating allowances to the producer of HFC blends accords with the AIM Act's focus on what company is using HFCs in the marketplace, rather than on what company supplied the chemical feedstocks from which the HFC was produced. As discussed, EPA cannot require allowances for HFC blends except within the parameters of §103(c)(3)(B) of the Act, which refers to HFCs "within" HFC blends. [EPA-HQ-OAR-2021-0044-0168, p. 6]

Other sections of the AIM Act similarly indicate that Congress intended allowances to be allocated according to the ultimate user of HFCs, not necessarily to the party that nominally imported HFC component feedstock. For example, §103(e)(4)(B)(iv) of the Act provides for mandatory allocations of allowances to products used in particular applications such as metered-dose inhalers, defense sprays, foams and other commercial uses. This focus on the commercial use of HFCs supports an approach in which allowances for HFCs used in

commercial HFC blends should be allocated to the producer and owner of the HFC blend. [EPA-HQ-OAR-2021-0044-0168, p. 6]

The policy considerations are even more compelling when applied to the context of HFC components that were imported as components of domestically produced HFC blends. As discussed below, the statute expressly excludes listing of HFC blends as regulated substances. See AIM Act §103(c)(3)(B)(i). If, notwithstanding this express limitation, EPA includes HFC blends in the phaseout program by requiring allowances based on their constituent HFC components, then the producer of HFC blends should receive production and consumption allowances as if the HFC blends were themselves produced in the United States. [EPA-HQ-OAR-2021-0044-0168, p. 6]

This very real concern about a mismatch of allowance allocation and production of blended products has historical roots in EPA's Title VI ODS allocation system, which in certain instances resulted in price spikes and unfair burdens on blend owners. As a particularly close to home example, in the HCFC phaseout, EPA declined to provide allowances to Choice Refrigerants as the producer of the patented blend R-420A, which is a blend of R-142b (a CFC component) and R-134a (an HFC component). At the time, EPA assured Choice that there would be plenty of supply of R-142b and that prices would not increase substantially as a result of the allocation program. Yet, in reality, allowance shortages drove up the price of components such that the blended product could no longer compete in the refrigerant market. Choice Refrigerants encourages EPA to avoid the same mistake when designing the current HFC allowance allocation system. [EPA-HQ-OAR-2021-0044-0168, p. 6]

D. Greenhouse Gas Reporting Data Is Not Necessarily Appropriate for HFC Allowance Allocation [EPA-HQ-OAR-2021-0044-0168, p. 7]

As EPA recognized in the February 2021 NODA, the purposes of the GHGRP are not identical to the purposes of the AIM Act, although there is some overlap. EPA describes the NODA as reporting "information . . . regarding hydrofluorocarbon consumption and production in the United States for the years 2011, 2012, and 2013." 86 Fed. Reg. at 9,059. EPA stated that the purpose of providing the information was "in preparation for upcoming regulatory actions under the [AIM Act]." Id. However, the data in the NODA is actually greenhouse gas reporting data, which is not necessarily the same as consumption and production data as those terms are used in the AIM Act. For the reasons discussed above, the company listed as the reporter for purposes of the GHGRP is not necessarily the party that should be considered to be the importer or producer of HFCs for purposes of allowance allocations, particularly as applied to HFC blends. [EPA-HQ-OAR-2021-0044-0168, p. 7]

Accordingly, for purposes of the AIM Act, if EPA decides to regulate HFC blends for purposes of setting baselines or allocating allowances, producers/importers of HFC blends (particularly patented HFC blends) should be considered the primary market actors for purposes of regulation and should receive any allocation of HFC allowances. [EPA-HQ-OAR-2021-0044-0168, p. 7]

II. EPA Must Issue Allowances to the Patent Holder for Imports of Patented HFC Blends or Components Used to Blend Patented HFC Blends, Not to Intellectual Property Pirates [EPA-HQ-OAR-2021-0044-0168, p. 7]

As noted, Choice Refrigerants, is an American small business based in Alpharetta, Georgia that produces patented environmentally preferable HFC blend refrigerant products. One of our products, Choice® R-421A, has been "pirated" by Chinese-backed refrigerant importers and other market actors that have acted illegally. To the extent that EPA decides under the AIM Act to require producers or importers of HFC blends like Choice® R-421A to hold allowances on the basis of the HFC components "within" those blends, any allowances attributable to HFC components that were used to produce pirated versions of R-421A must be allocated to Choice Refrigerants as the owner of the patented product. Handing allowances to sellers of pirated versions of products would magnify the economic damage to U.S. intellectual property interests wreaked by Chinese-backed companies, contrary to the stated policy of Congress and the last several presidential administrations. [EPA-HQ-OAR-2021-0044-0168, p. 7]

> **EPA Response:** EPA proposed, and is finalizing, the approach of issuing allowances to importers of HFCs. EPA did not propose to issue allowances to the customers of importers and does not support that approach. Such an approach would likely double-allocate allowances by issuing to the importer and the importer's customer. EPA has created a set aside pool that will in part address some of the concerns raised by the commenter. EPA also notes that produce and producer are defined terms under this program, in which an HFC molecule is created from feedstock. This is distinct from manufacturing a refrigerant blend, which involves repackaging existing molecules of HFCs in various ratios. As such, the commenter is not entitled to production allowances for the manufacture of their blend. Lastly, the AIM Act does not give EPA authority to enforce patents or to limit allowances only to patent holders for various blends. Other laws and authorities are the appropriate avenue for addressing patent violations.

**Organization:**  RMS of Georgia, LLC d/b/a Choice Refrigerants

As noted, §103(c)(3)(B)(i) of the AIM Act prohibits EPA from designating HFC blends as regulated substances "for purposes of phasing down production or consumption of regulated substances." Accordingly, on its face the statute does not authorize EPA to require producers or importers of HFC blends to acquire or hold allowances. The subsequent sub-section, §103(c)(3)(B)(ii), states that the prohibition on designating HFC blends "does not affect the authority of the Administrator to regulate under this Act a regulated substance within a blend of substances." By its plain language, subsection (ii) is not itself a grant of regulatory authority, but rather clarifies that any other authority of EPA to regulate is not diminished by subsection (i). Subsection (ii) does nothing more than preserve EPA's ability to regulate HFC blends in ways that do not implicate "phasing down production or consumption."[28] [EPA-HQ-OAR-2021-0044-0168, p. 16]

[28] One example of EPA's authority to regulate HFCs, other than requiring allowances for listed regulated substances, is EPA's authority in §103(d) of the Act to require monitoring and reporting of HFC blends imports.

Subsection (ii) cannot permissibly be interpreted as a separate grant of authority to EPA to require allowances for HFC blends based on the chemical feedstocks that were used to produce those HFC blends before the products were imported into the United States. Such a strained reading of subsection (ii) is neither logical nor grammatical, as it would gut subsection (i) and would allow EPA for all practical purposes to treat HFC blends as regulated substances, which is exactly what subsection (i) prohibits. If Congress had intended for EPA to require allowances for HFC blends, it could have - and arguably would have - so stated in clear simple language, such as 'EPA may require allowances for regulated substances within a blend of substances.' Instead, Congress chose to specifically prohibit EPA in subsection (ii) from designating or regulating blends for phase-down purposes, while leaving intact EPA's authority to regulate HFC components for purposes other than the HFC phasedown. EPA must interpret the statute with reference to the plain language that Congress chose in the context and grammatical structure that Congress wrote. [EPA-HQ-OAR-2021-0044-0168, p. 16]

HFC blends are chemical mixtures created by physically combining component HFCs into a new product that has unique physical chemical properties, including being an azeotropic mixture in which the gaseous components physically interact to create new behaviors.[29] HFC blends cannot be easily separated back into their component feedstocks without complex fractionation equipment. For all practical purposes, an HFC blend is an entirely different substance than the chemical components from which it was manufactured. The original HFC feedstocks that were used to manufacture the blend lose their individual identity and become part of a new substance, just as sugar, flour and water mixed together become a cake or cookie and lose their identity as the original ingredients. [EPA-HQ-OAR-2021-0044-0168, p. 16]

[29] See, e.g., Oxford Dictionary of Physics (8 ed.) (definition of azeotrope); see also Air Conditioning, Heating, & Refrigeration Institute, Blends 101: an introduction to refrigerants ("Azeotrope: a blend that behaves like a single component refrigerant. When a blend forms an azeotrope, it displays unique and unexpected properties.") (https://www.achrnews.com/articles/82752-blends-101-an-introduction-to-refrigerants).

Even if EPA interprets §103(c)(3)(B) of the Act as authorizing EPA to require allowances for HFC components "within" HFC blends, as discussed in Part I above, it would be fundamentally unfair to allocate allowances to suppliers of HFC components while requiring producers/importers of the HFC blends themselves to hold allowances. This mismatch would be inconsistent with the statutory reference to a "regulated substance within a blend of substances," which implies (if not dictates) that the regulatory focus should be on the HFC substances in its state of being "within" a blend, not as a feedstock component which is physically incorporated into a new HFC blend product and loses its original identity. EPA should not interpret the Act in a manner that creates a situation where one party in the supply chain receives an economic windfall and another party bears the economic burden based on market activity nearly a decade ago. [EPA-HQ-OAR-2021-0044-0168, p. 16]

**EPA Response:** EPA disagrees with the commenter's interpretation of the AIM Act. As the commenter notes, Subsection (c)(3)(B)(i) of the AIM Act states that "[n]othing in this paragraph authorizes the Administrator to designate as a regulated substance a blend of substances." This is necessarily read in the context of paragraph (3)(A), which outlines the procedure by which "the Administrator may *designate*" (emphasis added) a

new regulated substance not included in the Congressionally provided table of regulated substances. The Agency is not, at this time, designating any new regulated substances under Subsection (c)(3), but rather in this rule the Agency is setting up a framework to allocate allowances for the regulated substances listed by Congress in Subsection (c)(1). As explained further in the preamble, the Agency is not requiring a set amount of allowances to be expended to import a blend that contains regulated substances, but rather import of the regulated HFC components contained in the blend that is imported in bulk requires expenditure of allowances. If a blend contains components that are not listed as a regulated substance, only the components of the blend that are regulated HFCs are included in determining the amount of allowances necessary to import that blend in EVe weight. As a result, allowances required to be expended would be lower than the $CO_2e$ value for blends that are not limited to regulated substances. EPA implemented a similar practice for the import of blends containing an ODS; allowances were needed only for the CFC or HCFC portion of a blend.

The commenter uses several terms in a way inconsistent with terms and definitions included in this rule. EPA seeks to clarify these distinctions. Regarding the commenter's statement that an HFC blend "is an entirely different substance than the chemical components from which it was manufactured," EPA disagrees. The components in a blend (and the amount of each component) can be identified after blending and as the commenter notes separated through technology such as fractionation and distillation. The components are not chemically altered in this process. Further, the use of the term feedstock by the commenter is not consistent with the regulatory definitions included in this final rule. The finalized definition of transform includes language defining a feedstock. A key element of that definition (consistent with the AIM Act) is that the feedstock chemical is used and "entirely consumed (except for trace quantities)" in the manufacture of another chemical. That is different from the process described by the commenter where the HFC components remain in the blend and are discernable using technology such as refrigerant analyzers or gas chromatography.

**Organization:**  Structural Composites, Inc. and Compsys

We do not believe that Congress intended to bar minor HFC uses that result in major climate benefits; it was addressing uses for which HFC emissions are the major cause of GHG emissions from a product's fabrication and use. Moreover, EPA has inherent authority under the AIM Act to exclude minor uses of HFCs that create major opportunities to reduce net GHG emissions.[62] Thus, SC recommends that EPA establish a separate exemption under the AIM Act that would exclude all EPA-approved applications that use minor amounts of HFCs but reduce net GHG emissions because of accompanying reductions in weight, improvements in thermal performance and/or fuel economy, or other characteristics. [EPA-HQ-OAR-2021-0044-0200, p. 18]

---

[62] The United States Court of Appeals for the District of Columbia Circuit has recognized that "[u]nless Congress has been extraordinarily rigid, there is likely a basis for an implication of de minimis authority to provide exemption when the burdens of regulation yield a gain of trivial or no value." Alabama Power Co. v. Costle, 636 F.2d 323, 360- 61 (D.C. Cir. 1980).

information until July 17, 2020, unless extended.[16]

**Notification to Interested Parties**

This notice is published in accordance with sections 751(b)(1) and 777(i)(1) of the Act, and 19 CFR 351.216(b), 351.221(b), and 351.221(c)(3).

Dated: May 28, 2020.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2020–12078 Filed 6–3–20; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

[A–570–028]

**Hydrofluorocarbon Blends From the People's Republic of China: Final Scope Ruling on Unpatented R–421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R–421A**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that imports of unpatented R–421A from the People's Republic of China (China) are circumventing the antidumping duty (AD) order on HFC blends from China.

**DATES:** Applicable June 4, 2020.

**FOR FURTHER INFORMATION CONTACT:** Manuel Rey or Benjamin Luberda, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–5518 or (202) 482–2185, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

On March 3, 2020, Commerce published the *Preliminary Determination*[1] of circumvention of the AD order on HFC blends from China with respect to unpatented R–421A which is imported from China and further processed into HFC blends

subject to the *Order*.[2] We invited parties to comment on the *Preliminary Determination*, and received case and rebuttal briefs from the HFC Coalition (the petitioners), BMP,[3] and Choice Refrigerants (Choice).

A summary of the events that occurred since Commerce published the *Preliminary Determination*, as well as a full discussion of the issues raised by the parties for this final determination are discussed in the Issues and Decision Memorandum.[4] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov.frn/.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

Commerce conducted this anti-circumvention inquiry in accordance with section 781(a) of the Tariff Act of 1930, as amended (the Act).

**Scope of the Order**

The products subject to the *Order* are HFC blends. HFC blends covered by the scope are R–404A, R–407A, R–407C, R–410A, and R–507A.[5] HFC blends covered by the scope of the *Order* are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) at subheadings 3824.78.0020 and 3824.78.0050. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope is dispositive.

**Merchandise Subject to the Anti-Circumvention Inquiry**

This anti-circumvention inquiry covers imports of unpatented R–421A, a blend of HFC components R–125 (also known as Pentafluoroethane) and R–134a (also known as 1,1,1,2-Tetrafluoroethane), from China that are

further processed in the United States to create an HFC blend that would be subject to the *Order*.[6]

**Final Scope Ruling and Final Determination**

In the *Preliminary Determination* we determined, pursuant to 19 CFR 351.225(k), that because the scope only covers five HFC blends, and unpatented R–421A is not one of the five blends, that consequently, unpatented R–421A is not covered by the scope of the *Order* within the meaning of 19 CFR 351.225(k). Accordingly, because unpatented R–421A is not specifically excluded from the *Order*, a circumvention analysis and determination is warranted for the unpatented R–421A blends, under 19 CFR 351.225(g). Our final determination remains unchanged from the *Preliminary Determination*.

In the *Preliminary Determination*, we determined that imports of unpatented R–421A from China are circumventing the *Order*. Specifically, we determined that imports of unpatented R–421A from China are being finished and sold in the United States pursuant to the statutory and regulatory criteria laid out in section 781(a) of the Act and 19 CFR 351.225(g). We based our *Preliminary Determination* upon record evidence submitted by the petitioners, BMP and Choice. For a complete discussion of the evidence which led to our preliminary determination, *see* the *Preliminary Determination* and accompanying Preliminary Decision Memorandum.

All issues raised in the case and rebuttal briefs by parties to this inquiry are addressed in the Issues and Decision Memorandum. A list of the issues raised is attached to this notice as Appendix I. Our final determination remains unchanged from the *Preliminary Determination*. Accordingly, we determine, pursuant to section 781(a) of the Act and 19 CFR 351.225(g), that imports of unpatented R–421A from China are circumventing the *Order*.

**Continuation of Suspension of Liquidation**

As a result of this determination, and consistent with 19 CFR 351.225(l)(3), we intend to direct CBP to continue to suspend liquidation and to require a cash deposit of estimated antidumping duties at the applicable rate on unliquidated entries of merchandise

---

[16] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 29615 (May 18, 2020).

[1] *See Hydrofluorocarbon Blends from the People's Republic of China: Scope Ruling on Unpatented R–421A; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Unpatented R–421A; and Extension of Time Limit for Final Determination,* 85 FR 12511 (March 3, 2020) (*Preliminary Determination*).

[2] *See Hydrofluorocarbon Blends from the People's Republic of China: Antidumping Duty Order,* 81 FR 55436 (August 19, 2016) (*Order*).

[3] LM Supply Inc., Cool Master USA, LLC, and their affiliated blenders, BMP USA Inc. and IGas Inc. (collectively, BMP).

[4] *See* Memorandum, "Final Decision Memorandum for Scope Ruling and Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China; Unpatented R–421A," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[5] For a complete description of the scope of the order, *see* Issues and Decision Memorandum.

[6] The scope of the order explicitly excludes Choice® R–421A (also referred to as "patented R–421A"). The scope also only covers five HFC blends; R–421A is not one of the covered blends. Patented R–421A is a blend of 58 percent R–125, and 42 percent R–134a, with a lubricant added to it. The patent holder for R–421A is Choice.

subject to this inquiry that are entered, or withdrawn from warehouse, for consumption on or after June 18, 2019, the date of initiation of this anti-circumvention inquiry.[7]

Patented Choice® R–421A produced in China is not subject to this inquiry. Therefore, cash deposits are not required for such merchandise. However, as a result of this anti-circumvention proceeding, unpatented R–421A produced in China is subject to the AD order on HFC blends from China. Accordingly, in order to prevent evasion, if an importer imports patented Choice® R–421A from China, in order not to be subject to cash deposit requirements, the importer and exporter are required to meet the certification and documentation requirements described in Appendix II. Exporters of patented Choice® R–421A produced in China must prepare and maintain an Exporter Certification and documentation supporting the Exporter Certification (*see* Appendix IV). In addition, importers of such patented Choice® R–421A must prepare and maintain an Importer Certification (*see* Appendix III) as well as documentation supporting the Importer Certification. In addition to the Importer Certification, the importer must also maintain a copy of the Exporter Certification (*see* Appendix IV) and relevant supporting documentation from its exporter of patented Choice® R–421A.

**Notification to CBP of Covered Merchandise Referral**

In our *Notice of Initiation,* we stated that, as part of this anti-circumvention inquiry, we would also address a covered merchandise referral from U.S. Customs and Border Protection (CBP).[8] In the *Covered Merchandise Referral,* we stated that, based upon allegations by Choice, CBP requested that Commerce issue a determination as to whether certain merchandise imported by LM Supply, Inc. (LM Supply) is subject to the AD order on HFCs from China. Specifically, CBP asked Commerce to clarify: (1) If the scope exclusion for Choice® R–421A is limited to only merchandise that is licensed by the rights holder or does it apply to any HFC blends that satisfy the terms of the patents, and (2) if the scope exclusion is limited to only that merchandise that

---

[7] *See Hydrofluorocarbon Blends from the People's Republic of China: Initiation of Anti-Circumvention Inquiry of Antidumping Duty Order; Unpatented R–421A,* 84 FR 28281 (June 18, 2019) (*Notice of Initiation*).

[8] *See Hydrofluorocarbon Blends from the People's Republic of China: Notice of Covered Merchandise Referral,* 83 FR 9277 (March 5, 2018) (*Covered Merchandise Referral*).

also carries the trademarks indicated in the scope exclusion.

Therefore, we intend to inform CBP of our findings in this inquiry: (1) That the scope only covers five HFCs blends (*i.e.*, R–404A, R–407A, R–407C, R–410A, and R–507A) and that unpatented R–421A is not one of those five blends; (2) based upon Commerce's anti-circumvention proceeding, unpatented R–421A, is circumventing the order on HFC blends from China, retroactive to June 18, 2019; and (3) that the exclusion for patented Choice® R–421A (applicable on or after June 18, 2019) is limited to only that merchandise which carries the trademarks indicated in the scope exclusion, and which is licensed by the rights holder, and for which the exporter and importer have prepared certifications, as explained in Appendix II of this notice.

**Notification Regarding Administrative Protective Order**

This notice also serves as a reminder to parties subject to the administrative protective order (APO) of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

**Notification to Interested Parties**

We are issuing and publishing this notice in accordance with sections 781(a) of the Act, and 19 CFR 351.225(g).

Dated: May 28, 2020.

**Joseph Laroski,**

*Deputy Assistant Secretary for Policy and Negotiations.*

**APPENDIX I**

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Merchandise Subject to the Scope and Anti-Circumvention Inquiry
IV. Scope of the Order
V. Discussion of the Issues
    Comment 1: Preliminary Scope Ruling
    Comment 2: Whether the Process of Assembly or Completion of R–421A into HFC Blends in the United States is Minor and Insignificant
    Comment 3: Value Analysis
    Comment 4: Use of Surrogate Values to Value Material Inputs
    Comment 5: Certification Requirements
VI. Recommendation

**APPENDIX II**

**Certification Requirements**

In order to import R–421A from China and declare it as patented and eligible for the exclusion specified in the scope for Choice® R–404A, and hence free of AD duties, the importer and the exporter must complete and maintain certifications, along with proof that the goods are properly patented, and identifying the license agreement authorizing the production of the goods being entered. The importer is required to complete and maintain the importer certification attached hereto as Appendix III, and all supporting documentation. Where the importer uses a broker to facilitate the entry process, it should obtain the entry summary number from the broker. Agents of the importer, such as brokers, however, are not permitted to make this certification on behalf of the importer.

The exporter is required to complete and maintain the exporter certification, attached as Appendix IV, and is further required to provide the importer a copy of that certification and all supporting documentation.

For shipments and/or entries on or after June 18, 2019 through June 26, 2020, for which certifications are required, importers and exporters should complete the required certification, as soon as practicable but not later than 30 days after the publication of this notice in the **Federal Register.** Accordingly, where appropriate, the relevant bullet in the certification should be edited to reflect that the certification was completed within the time frame specified above. For example, the bullet in the importer certification that reads: "This certification was completed at or prior to the time of Entry Summary," could be edited as follows: "The imports referenced herein entered before June 27, 2020. This certification was completed on mm/dd/yyyy, within 30 days of the **Federal Register** notice publication of the final determination of circumvention." Similarly, the bullet in the exporter certification that reads, "This certification was completed at or prior to the time of shipment," could be edited as follows: "The shipments/products referenced herein shipped before June 27, 2020. This certification was completed on mm/dd/yyyy, within 30 days of the **Federal Register** notice publication of the final determination of circumvention." For such entries/shipments, importers and exporters each have the option to complete a blanket certification covering multiple entries/shipments, individual certifications for each entry/shipment, or a combination thereof.

For shipments and/or entries on or after June 27, 2020, for which certifications are required, importers should complete the required certification at, or prior to, the date of entry summary and exporters should complete the required certification and provide it to the importer at, or prior to, the date of shipment.

The importer and exporter are also required to maintain sufficient documentation supporting their certifications. The importer will not be required to submit the certifications or supporting documentation to U.S. Customs

and Border Protection (CBP) as part of the entry process at this time. However, the importer and the exporter will be required to present the certifications and supporting documentation, to Commerce and/or CBP, as applicable, upon request by the respective agency. Additionally, the claims made in the certifications and any supporting documentation are subject to verification by Commerce and/or CBP. The importer and exporter are required to maintain the certifications (the importer must retain both certifications) and supporting documentation for the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in United States courts regarding such entries.

In the situation where no certification is provided for an entry of R–421A, and the AD China HFC blends order potentially applies to that entry, Commerce intends to instruct CBP to suspend the entry and collect cash deposits at the AD rate for the exporter, or if none exists, at the rate for the China-wide entity (216.37 percent).

### APPENDIX III

#### Importer Certification

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY};

(B) I have direct personal knowledge of the facts regarding the importation into the Customs territory of the United States of the hydrofluorocarbon (HFC) blend Choice® R–421A produced in China that entered under the entry summary number(s) identified below, and which are covered by this certification. ''Direct personal knowledge'' refers to facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the importation of the product (*e.g.,* the name of the exporter) in its records.

(C) The HFC blend Choice® R–421A covered by this certification was exported by {NAME OF EXPORTING COMPANY}, located at {ADDRESS OF EXPORTING COMPANY}.

If the importer is acting on behalf of the first U.S. customer, complete this paragraph:

(D) The HFC blend Choice® R–421A covered by this certification was imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

(E) The HFC blend Choice® R–421A covered by this certification was shipped to {NAME OF PARTY TO WHOM MERCHANDISE WAS FIRST SHIPPED IN THE UNITED STATES}, located at {ADDRESS OF SHIPMENT}.

(F) I have personal knowledge of the facts regarding the production of the imported products covered by this certification. ''Personal knowledge'' includes facts obtained from another party, (*e.g.,* correspondence received by the importer (or exporter) from the producer regarding the source of the inputs used to produce the imported products).

(G) The HFC blend Choice® R–421A covered by this certification was produced by {NAME OF PRODUCING COMPANY}, located at {ADDRESS OF PRODUCING COMPANY}; *for each additional company, repeat:* {NAME OF PRODUCING COMPANY}, located at {ADDRESS OF PRODUCING COMPANY}.

(H) This certification applies to the following entries:

{*Repeat this block as many times as necessary*}
Producer:
Entry Summary #:
Entry Summary Line Item #:
Invoice #:
Invoice Line Item #:

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product data sheets, chemical testing specifications, productions records, invoices, license agreements, *etc.*) for the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries;

(J) I understand that {NAME OF IMPORTING COMPANY} is required to, upon request, provide proof that the imported goods are properly patented, and identify the license agreement authorizing the production of the goods being entered;

(K) I understand that {NAME OF IMPORTING COMPANY} is required to provide this certification and supporting records, upon request, to U.S. Customs and Border Protection (CBP) and/or the Department of Commerce (Commerce);

(L) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to the production and/or export of the imported merchandise identified above), and any supporting records provided by the exporter to the importer, for the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in United States courts regarding such entries.

(M) I understand that {NAME OF IMPORTING COMPANY} is required to maintain, and upon request, provide a copy of the exporter's certification and any supporting records provided by the exporter to the importer, to CBP and/or Commerce;

(N) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce;

(O) I understand that failure to maintain the required certifications, and/or failure to substantiate the claims made herein, and/or failure to allow CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are within the scope if the antidumping duty (AD) order on HFC blends from China. I understand that such a finding will result in:

(i) Suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) The requirement that the importer post applicable AD cash deposits equal to the rates as determined by Commerce; and

(iii) the revocation of {NAME OF IMPORTING COMPANY}'s privilege to certify future imports of HFC blend R–421A are patented Choice® R–421A.

(P) I understand that agents of the importer, such as brokers, are not permitted to make this certification;

(Q) This certification was completed at or prior to the time of Entry Summary; and

(R) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. government.

Signature
NAME OF COMPANY OFFICIAL
TITLE
DATE

### APPENDIX IV

#### Exporter Certification

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF EXPORTING COMPANY}, located at {ADDRESS OF EXPORTING COMPANY};

(B) I am a producer of HFC blend Choice® R–421A and am under a license agreement with RMS of Georgia, LLC to produce Choice® R–421A.

(C) I have direct personal knowledge of the facts regarding the production and exportation of the hydrofluorocarbon (HFC) blend Choice® R–421A identified below. ''Direct personal knowledge'' refers to facts the certifying party is expected to have in its own books and records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(D) The HFC blends, and the individual components thereof, covered this certification were produced by {NAME OF PRODUCING COMPANY}, located at {ADDRESS OF PRODUCING COMPANY}; *for each additional company, repeat:* {NAME OF PRODUCING COMPANY}, located at {ADDRESS OF PRODUCING COMPANY}.

(E) This certification applies to the following sales:

{*Repeat this block as many times as necessary*}
Producer
Invoice No.
Invoice Line Item No.

(F) The HFC blend Choice® R–421A covered by this certification was sold to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

(G) The HFC blend Choice® R–421A covered by this certification was shipped to {NAME OF PARTY TO WHOM MERCHANDISE WAS SHIPPED}, located at {ADDRESS OF SHIPMENT}.

(H) I understand that {NAME OF EXPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, license agreement, or documents obtained by the certifying party, for example, product data

Federal Register / Vol. 85, No. 108 / Thursday, June 4, 2020 / Notices

**34419**

sheets, chemical testing specifications, productions records, invoices, *etc.*) for the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries;

(I) I understand that {NAME OF EXPORTING COMPANY} must provide this Exporter Certification to the U.S. importer by the time of shipment;

(J) I understand that {NAME OF EXPORTING COMPANY} is required to provide a copy of this certification and supporting records, upon request, to U.S. Customs and Border Protection (CBP) and/or the Department of Commerce (Commerce);

(K) I understand that the claims made herein, and the substantiating documentation are subject to verification by CBP and/or Commerce;

(L) I understand that failure to maintain the required certifications, and/or failure to substantiate the claims made herein, and/or failure to allow CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are within the scope of the antidumping duty (AD) order on HFC blends from China. I understand that such finding will result in:

(i) Suspension of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) The requirement that the importer post applicable AD cash deposits equal to the rates as determined by Commerce; and

(iii) the revocation of {NAME OF EXPORTING COMPANY}'s privilege to certify future shipments of HFC blend R–421A are patented Choice® R–421A;

(M) This certification was completed at or prior to the time of shipment; and

(N) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. government.

Signature
NAME OF COMPANY OFFICIAL
TITLE
DATE

[FR Doc. 2020–12004 Filed 6–3–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–560–826]**

**Monosodium Glutamate From the Republic of Indonesia: Final Results of the First Full Five-Year Sunset Review of the Antidumping Duty Order**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.
**SUMMARY:** The Department of Commerce (Commerce) finds that the revocation of the antidumping duty (AD) order on monosodium glutamate (MSG) from Indonesia would likely lead to

continuation or recurrence of dumping at the levels indicated in the ''Final Results of Review'' section of this notice.

**DATES:** Applicable June 4, 2020.
**FOR FURTHER INFORMATION CONTACT:** Jacqueline Arrowsmith, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–5255.

**SUPPLEMENTARY INFORMATION:**

**Background**

On February 26, 2020, Commerce published the *Preliminary Results* of the sunset review,[1] finding that dumping was likely to continue or recur if the *Order*[2] were revoked and determined that revocation of the *Order* would be likely to lead to continuation or recurrence of dumping for all exporters and producers at a weighted average margin of dumping up to 6.19 percent.[3] We invited interested parties to comment on the *Preliminary Results*. We received a case brief from respondent, CJ Companies, on April 22, 2020.[4] We received a rebuttal brief from Ajinomoto Health & Nutrition North America (petitioner) on April 27, 2020.[5]

**Scope of the Order**

The product covered by this order is MSG, whether or not blended or in solution with other products. Specifically, MSG that has been blended or is in solution with other product(s) is included in this scope when the resulting mix contains 15 percent or more of MSG by dry weight. Products with which MSG may be blended include, but are not limited to, salts, sugars, starches, maltodextrins, and various seasonings. A full description of the scope of the *Order* is contained in

the accompanying Issues and Decision Memorandum.[6]

**Analysis of Comments Received**

All issues raised for the final results of this sunset review are addressed in the Issues and Decision Memorandum, dated concurrently with this final notice, which is hereby adopted by this notice. The issues discussed in the Issues and Decision Memorandum are described in the Appendix. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http:// access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly on the internet at *http:// enforcement.trade.gov/frn/*. The signed Issues and Decision Memorandum and the electronic version of the Issues and Decision Memorandum are identical in content.

**Final Results of Review**

We determine that revocation of the *Order* on MSG from Indonesia would be likely to lead to a continuation or recurrence of dumping at a weighted average margin of dumping of up to 6.19 percent for all exporters and producers of subject merchandise.

**Administrative Protective Orders**

This notice also serves as the only reminder to each party subject to an administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305. Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

**Notification to Interested Parties**

We are issuing and publishing the final results of this sunset review, in accordance with sections 751(c)(5)(A), 752(c), and 777(i) of the Tariff Act of 1930, as amended, and 19 CFR 351.218(f)(3).

---

[1] *See Monosodium Glutamate from the Republic of Indonesia: Preliminary Results of the First Full Sunset Review of the Antidumping Duty Order*, 85 FR 12517 (March 3, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[2] *See Monosodium Glutamate from the People's Republic of China, and the Republic of Indonesia: Antidumping Duty Orders; and Monosodium Glutamate from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value (Order)*, 79 FR 70505 (November 26, 2014) (*Order*).

[3] *See Preliminary Results*.

[4] *See* CJ Companies' Letter, ''Monosodium Glutamate ('MSG') from Indonesia; First Sunset Review; CJ {Companies} Case Brief,'' dated April 22, 2020.

[5] *See* Petitioner's Letter, ''Monosodium Glutamate from Indonesia, First Sunset Review: Rebuttal to Case Brief of PT. Cheil Jedang Indonesia and CJ America, Inc.,'' dated April 27, 2020.

[6] *See* Memorandum, ''Issues and Decision Memorandum for the First Full Sunset Review of the Antidumping Duty Order on Monosodium Glutamate from the People's Republic of Indonesia,'' dated concurrently with this notice (Issues and Decision Memorandum).

Barcode:3947714-01 A-570-028 CIRC - Anti Circumvention Inquiry



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-028
CIRC - Unpatented R-421A
**Public Document**
E&C/OII:  MR

February 25, 2020

**MEMORANDUM TO:**    Christian Marsh
Deputy Assistant Secretary
for Enforcement and Compliance

**FROM:**    James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:**    Preliminary Decision Memorandum for Scope Ruling and Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China; Unpatented R-421A

---

## I.    SUMMARY

In November 2017, Choice Refrigerants (Choice) filed a scope ruling request[1] seeking that the Department of Commerce (Commerce) determine if unpatented R-421A, a blend of hydrofluorocarbon (HFC) components R-125 and R-134a, imported from China qualifies for exclusion from the antidumping duty (AD) order on HFC blends.[2]  Based, in part, on a plain reading of the scope language itself, we determine that R-421A, whether patented or unpatented, is not within the scope of the *Order* within the meaning of 19 CFR 351.225(k).

Further, in response to a request from the American HFC Coalition (the petitioners), we initiated an anti-circumvention inquiry, pursuant to section 781(a) of the Tariff Act of 1930, as amended (the Act) and 19 CFR 351.225(g),[3] to determine if imports of unpatented R-421A, exported from China, and further processed in the United States to create subject HFC blends, are subject to the *Order*.  Based on the information submitted by interested parties and the analysis below, we recommend that, pursuant to section 781(a) of the Act, Commerce preliminarily find that imports of unpatented R-421A from China are circumventing the *Order*.

---

[1] *See* Choice Refrigerant's Letter, "Application for Scope Ruling on Exclusion of Patented HFC Blends from Antidumping Duty Order A-570-028:  Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China," dated November 30, 2017 (Choice Scope Ruling Request).

[2] *See Hydrofluorocarbon Blends from the People's Republic of China:  Antidumping Duty Order*, 81 FR 55436 (August 19, 2016) (*Order*).

[3] *See Hydrofluorocarbon Blends from the People's Republic of China:  Initiation of Anti-Circumvention Inquiry of Antidumping Duty Order; Unpatented R-421A*, 84 FR 28281 (June 18, 2019) (*Notice of Initiation*).



## II.    BACKGROUND

*Scope Inquiry, Covered Merchandise Referral, and Circumvention Allegation*

On November 30, 2017, Choice Refrigerants (Choice) filed a scope ruling request that Commerce determine if unpatented R-421A HFCs imported from China qualify for the exclusion in the scope of the *Order* on HFC blends from China.[4]  On December 4, 2017, Commerce received a covered merchandise referral from CBP regarding CBP Enforce and Protect Act (EAPA) Investigation No. 7212.[5]  On December 27, 2017, LM Supply Inc. (LM Supply) submitted comments on Choice's scope request.[6]  On March 5, 2018, Commerce published a notice of covered merchandise referral, providing parties notice of the referral and inviting participation from interested parties.[7]  Also on March 5, 2018, Commerce aligned Choice's scope inquiry with the covered merchandise referral from CBP, as they cover the same product.[8]

On April 4, 2018, we sent a questionnaire to LM Supply regarding the product included in the referral from CBP;[9] on April 27, 2018, we received a response to the questionnaire from LM Supply.[10]  On May 11, 2018, the American HFC Coalition and its individual members[11] filed deficiency comments as well as factual information in response to LM Supply's April 27, 2018 submission.[12]

On August 15, 2018, the petitioners filed a request that, pursuant to section 781(a) of the Act, Commerce initiate an anti-circumvention inquiry regarding imports of unpatented R-421A (a blend of HFC components R-125 and R-134a) from China that are further processed into finished HFC blends in the United States, which the petitioners allege are circumventing the *Order*.[13]  On September 6, 2018, LM Supply filed an objection to the petitioners' request for an

---

[4] *See* Choice Scope Ruling Request; *see also* the *Order*.

[5] *See* CBP's Letter, "EAPA Case Number:  7212; Scope Referral Request for merchandise under EAPA Investigation 7212, imported by LM Supply, Inc. and concerning the investigation of evasion of the antidumping duty order on hydrofluorocarbon blends from the People's Republic of China (A–570–028)," dated December 4, 2017 (CBP EAPA Referral Letter) and accompanying Attachments.

[6] *See* LM Supply's Letter, "Comments in response to Kenneth Ponder's and Choice Refrigerants' November 30, 2017 Application for a Scope Ruling," dated December 27, 2017.

[7] *See Hydrofluorocarbon Blends from the People's Republic of China:  Notice of Covered Merchandise Referral*, 83 FR 9277 (March 5, 2018).

[8] *See* Memorandum, "Alignment of Scope Inquiry and EAPA Referral on Unpatented R421A," dated March 5, 2018.

[9] *See* Commerce's Letter, "Hydrofluorocarbon Blends from the People's Republic of China – Scope Ruling Supplemental Questionnaire," dated April 4, 2018.

[10] *See* LM Supply's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Supplemental Questionnaire Response," dated April 27, 2018 (LM Supply's April 27, 2018 SQR).

[11] The American HFC Coalition includes:  Arkema Inc., the Chemours Company FC LLC, Honeywell International Inc., and Mexichem Fluor Inc. (the petitioners).

[12] *See* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Submission of Factual Information in Response to Scope Exclusion Request," dated May 11, 2018.

[13] *See* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Scope Investigation Regarding Certain Unpatented HFC Blends:  Request to Apply Section 781(a) to Prevent Circumvention," dated August 15, 2018 (Initiation Request).

2

**Addm 75**

anti-circumvention inquiry.[14]  Also on September 6, Choice filed a response to the petitioners' allegation of circumvention, in which it reiterated its request that Commerce issue a determination in the scope ruling inquiry immediately, and also voiced its belief that LM Supply was circumventing the *Order*.[15]  On September 24, 2018, Commerce received rebuttal comments to LM Supply's objection to the application of section 781(a) from the petitioners.[16]

*Initiation and Respondent Selection*

On June 18, 2019, Commerce initiated the anti-circumvention inquiry with respect to unpatented R-421A from China that are further processed into finished HFC blends in the United States.[17]  On June 24, 2019, we requested comments from interested parties on respondent selection and the period of inquiry (POI).[18]  In July 2019, we received comments on respondent selection and the POI from the petitioners, BMP USA Inc. (BMP USA) and iGas USA, Inc. (IGas)[19] and T.T. International Co., Ltd. (TTI).[20]  BMP requested treatment as a mandatory respondent.[21]

On October 31, 2019, we placed on the record CBP data for U.S. imports under Harmonized Tariff Schedule of the United States (HTSUS) numbers 3824.78.0020 and 3824.78.0050, and solicited comments on these data.[22]  We issued quantity and value (Q&V) questionnaires to nine companies on the same date.[23]

---

[14] *See* LM Supply's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Scope Investigation Regarding Certain Unpatented HFC Blends:  Objection to Petitioners' Request to Initiate Anti-Circumvention Proceedings Pursuant to Section 781(a)," dated September 6, 2018 (LM Supply's Anti-Circumvention Rebuttal).

[15] *See* Choice's Letter, "Response of Choice Refrigerants to the American HFC Coalition's Request to Apply Section 781(a) to Prevent Circumvention; *Hydrofluorocarbon Blends from the People's Republic of China: Antidumping Duty Order*, DCK.  A-570-028, 81 Fed. Reg. 55436 (Aug. 19, 2016)," dated September 6, 2016.

[16] *See* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Scope Investigation Regarding Certain Unpatented Blends:  Response to LM Supply Inc.'s Objection to Application of Section 781(a) to Prevent Circumvention," dated September 24, 2018.

[17] *See Notice of Initiation*.

[18] *See* Memorandum, "Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China – Unpatented R-421A Anti-Circumvention Inquiry:  Request for Comments on Period of Investigation and Respondent Selection," dated June 24, 2019.

[19] LM Supply, Cool Master, and their affiliated blenders, BMP USA and IGas share common ownership and have provided a single response; therefore, for the purposes of this anti-circumvention inquiry, we are treating these companies as a single entity, hereinafter referred to as "BMP."  *See* BMP's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Initial Questionnaire Response," dated January 17, 2020 (BMP's January 17, 2020 QR).

[20] *See* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China; Unpatented R-421A Anti-Circumvention Inquiry:  Comments on the Period of Investigation and Respondent Selection," dated July 10, 2019; BMP's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Comments on Period of Investigation and Respondent Selection," dated July 5, 2019 (BMP Respondent Selection Comments); and TTI's Letter, "Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China:  Unpatented R-421 Anti-Circumvention Inquiry; Comment on Period of Investigation and Respondent Selection," dated July 10, 2019.

[21] *See* BMP Respondent Selection Comments.

[22] *See* Memorandum, "Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China – Unpatented R-421A:  Release of U.S. Customs and Border Protection Data and Clarification of Quantity and Value Questionnaires," dated October 31, 2019 (CBP Data Memo).

[23] *Id*.

3

Commerce received responses substantiating claims that certain firms neither exported nor imported unpatented R-421A. However, Commerce did not receive Q&V responses from Jinhua Yongan Electronic & Electrical Appliance Manufacture Co., Ltd. (Jinhua Yongan), and Ningbo Koman's Refrigeration Industry Co., Ltd. (Ningbo Koman).[24]

On November 7, 2019, we received comments on the CBP data from Zhejiang Quhua Fluor-Chemistry Co., Ltd. (Quhua).[25] The Q&V questionnaire responses indicate that, of the five companies responding, LM Supply and Cool Master USA, LLC (Cool Master) are the only importers of unpatented R-421A blends, and TTI is the only exporter/producer of unpatented R-421A blends, after the imposition of the *Order*.

*Questionnaires and Responses*

On December 13, 2020, we selected the Chinese exporter, TTI, and U.S. importers LM Supply and Cool Master, and their affiliated blender, BMP USA, as the mandatory respondents in this inquiry.[26] On that same date we issued an initial questionnaire to TTI and the U.S. importers.[27] On January 8, 2020, TTI notified Commerce that it did not intend to respond to the initial questionnaire issued by Commerce[28] (we collectively refer to TTI, Jinhua Yongan and Ningbo Koman as the non-responsive companies).[29] On January 17, 2020, we received a response from LM Supply and Cool Master, and their affiliated blenders, BMP USA and IGas.[30]

*Surrogate Country and Surrogate Value Submissions*

On December 17, 2019, Commerce placed on the record a list of countries that are at the same level of economic development as China, for use in this proceeding, and invited interested parties to submit comments on the list, selection of surrogate countries, and surrogate values.[31] Between January 3, 2020, and January 13, 2020, the petitioners submitted comments on surrogate country

---

[24] *See* Memorandum, "Quantity and Value Delivery Confirmation in the Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China: Unpatented R-421A," dated December 6, 2019. We note that this memorandum contained status confirmations from two companies (*i.e.*, Zhejiang Sanye Fuxin Motorcycle Co., Ltd and Sinochem Environmental Protection Chemicals (Taicang) Co., Ltd.) showing that those companies' Q&Vs were "In Transit" and "Pending" as of December 4, 2019.

[25] *See* Quhua's Letter, "Quhua Comments on CBP Data: Hydrofluorocarbon Blends from the People's Republic of China; Anti-circumvention Inquiry Covering Unpatented R-421a, A-570-028," dated November 7, 2019.

[26] *See* Memorandum, "Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China: Unpatented R-421A Anti-Circumvention Inquiry; Respondent Selection," dated December 13, 2019.

[27] *See* Commerce's Letter, "Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China: Unpatented R-421A Blends Initial Questionnaire," dated December 13, 2019.

[28] *See* TTI's Letter, "Hydrofluorocarbon Blends from the People's Republic of China: Unpatented R-421A Blends Anti-Circumvention Inquiry; Notification of TTI's Intent Not to Respond to Department Questionnaires," dated January 8, 2020 (TTI Notification of Intent Not to Respond).

[29] *See* the "Application of Facts Available and Adverse Inferences" section *infra* for further discussion regarding the non-responsive companies.

[30] *See* BMP's January 17, 2020 QR.

[31] *See* Commerce's Letter, "Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China: Unpatented R-421A Anti-Circumvention Inquiry," dated December 17, 2019.

**Addm 77**

selection and surrogate values, respectively.[32]  Between January 3, 2020 and January 13, 2020, BMP submitted comments on surrogate country and surrogate values, respectively.[33]  On January 9, 2020, the petitioners submitted surrogate country rebuttal comments.[34]  No other party submitted comments or rebuttal comments on the selection of a surrogate country or on surrogate values.

## III.    MERCHANDISE SUBJECT TO THE SCOPE AND ANTI-CIRCUMVENTION INQUIRY

The scope and anti-circumvention inquiry cover imports of unpatented R-421A, a blend of HFC components R-125 and R-134a,[35] from China.  As part of the anti-circumvention inquiry, the petitioners alleged that the unpatented R-421A – which is not subject to the exclusion for patented R-421A – is being further-processed in the United States to create HFC blends that are subject to the *Order*.[36]

According to Choice (*i.e.*, the patent holder for R-421A), unpatented R-421A is chemically similar, but not identical, to Choice® R-421A, which is specifically excluded from the order.[37]  Choice® R-421A is a proprietary refrigerant blend made of approximately 58 percent pentafluoroethane and approximately 42 percent 1,1,1,2-tetrafluoroethane, with a lubricating oil up to 20 percent of the refrigerant gases, comprised of 65-88 percent hydrotreated light napthenic distillate and 10-20 percent solvent refined light napthenic distillate petroleum.[38]

## IV.    SCOPE OF THE ORDER:

HFC blends covered by the scope are R-404A, a zeotropic mixture consisting of 52 percent 1,1,1 Trifluoroethane, 44 percent Pentafluoroethane, and 4 percent 1,1,1,2-Tetrafluoroethane; R-407A, a zeotropic mixture of 20 percent Difluoromethane, 40 percent Pentafluoroethane, and 40 percent 1,1,1,2-Tetrafluoroethane; R-407C, a zeotropic mixture of 23 percent Difluoromethane, 25 percent Pentafluoroethane, and 52 percent 1,1,1,2-Tetrafluoroethane; R-410A, a zeotropic mixture of 50 percent Difluoromethane and 50 percent Pentafluoroethane; and R-507A, an azeotropic mixture of 50 percent Pentafluoroethane and 50 percent 1,1,1-Trifluoroethane also known as R-507.  The foregoing percentages are nominal percentages by weight.  Actual

---

[32] *See* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Initial Surrogate Country Selection Comments," dated January 3, 2020 and Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Surrogate Values Submission," dated January 13, 2020.
[33] *See* BMP's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Surrogate Country Comments," dated January 3, 2020 (BMP's Surrogate Country Comments) and BMP's Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Surrogate Value Comments," dated January 13, 2020.
[34] *See* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Rebuttal Surrogate Country Comments," dated January 9, 2020.
[35] R-125 is also known as Pentafluoroethane, and R-134a is also known as 1,1,1,2-Tetrafluoroethane.
[36] The *Order* covers five HFC blends (*i.e.*, R-404A, R-407A, R-407C, R-410A, and R-507/R-507A); R-421A is not one of the covered blends.
[37] *See* Choice Scope Ruling Request at 5.
[38] *Id*.

**Addm 78**

percentages of single component refrigerants by weight may vary by plus or minus two percent points from the nominal percentage identified above.[39]

Any blend that includes an HFC component other than R-32, R-125, R-143a, or R-134a is excluded from the scope of the *Order*.

Excluded from the *Order* are blends of refrigerant chemicals that include products other than HFCs, such as blends including chlorofluorocarbons (CFCs), hydrochlorofluorocarbons (HCFCs), hydrocarbons (HCs), or hydrofluoroolefins (HFOs).

Also excluded from the *Order* are patented HFC blends, including, but not limited to, ISCEON® blends, including MO99™ (R-438A), MO79 (R-422A), MO59 (R-417A), MO49Plus™ (R-437A) and MO29™ (R-4 22D), Genetron® Performax™ LT (R-407F), Choice® R-421A, and Choice® R-421B.

HFC blends covered by the scope of the *Order* are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) at subheadings 3824.78.0020 and 3824.78.0050. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope is dispositive.[40]

## V.    STATUTORY AND REGULATORY FRAMEWORK FOR SCOPE INQUIRY

When a request for a scope ruling is filed, Commerce examines the scope language of the order at issue and the description of the product contained in the scope ruling request.[41]  Pursuant to Commerce's regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the records from the investigation, and prior scope determinations made for the same product.[42]  If Commerce determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by an order.

Conversely, where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2).  These factors are:  (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and

---

[39] R-404A is sold under various trade names, including Forane® 404A, Genetron® 404A, Solkane® 404A, Klea® 404A, and Suva®404A.  R-407A is sold under various trade names, including Forane® 407A, Solkane® 407A, Klea®407A, and Suva®407A.  R-407C is sold under various trade names, including Forane® 407C, Genetron® 407C, Solkane® 407C, Klea® 407C and Suva® 407C.  R-410A is sold under various trade names, including EcoFluor R410, Forane® 410A, Genetron® R410A and AZ-20, Solkane® 410A, Klea® 410A, Suva® 410A, and Puron®.  R-507A is sold under various trade names, including Forane® 507, Solkane® 507, Klea®507, Genetron®AZ-50, and Suva®507.  R-32 is sold under various trade names, including Solkane®32, Forane®32, and Klea®32.  R-125 is sold under various trade names, including Solkane®125, Klea®125, Genetron®125, and Forane®125.  R-143a is sold under various trade names, including Solkane®143a, Genetron®143a, and Forane®125.

[40] *See Order*.

[41] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010); *see also* 19 CFR 351.225(k).

[42] *See* 19 CFR 351.225(k)(1).

6

**Addm 79**

displayed.  The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before Commerce.

## VI.    INTERESTED PARTY SCOPE COMMENTS

<u>Choice</u>

In its November 30, 2017, scope request, Choice asked Commerce to clarify that:  (1) unpatented HFC blends (however labeled or described) generally cannot meet the exclusion for HFC patented blends; and (2) the unpatented version of Choice® R-421A in particular does not meet this exclusion.[43]  Choice points out that the scope language explicitly excludes its patented HFC blend Choice® R-421A, and it argues that this implies that a similar blend without a patent would be subject to the *Order.*  Therefore, Choice argues that Commerce should find any Chinese imports of unpatented R-421A, which are similar to its patented product, Choice® R-421A, are in-scope merchandise.[44]

Additionally, Choice requests that, in order for imports to be eligible for the patented blend exclusion, Commerce should require importers at the time of importation to demonstrate that the products in their shipments are licensed as patented blends and/or to provide documentation of an applicable patent or patent license in the name of the importer.

<u>ICOR</u>

ICOR contends that acceptance of Choice's request would improperly expand the scope to include all unpatented blends in the *Order*, despite the fact that the scope currently excludes "blends of refrigerant chemicals that include products other than HFCs."  ICOR points out Commerce directly considered the exclusion language for unpatented HFC blends that also contain products other than HFCs during the original investigation and found that these products are not covered by the *Order*.[45]  Therefore, ICOR requests that Commerce not expand the scope in this manner now.

<u>LM Supply</u>

LM Supply argues that the scope of the order excludes all R-421A that meets the terms of the "'706" patent (*i.e.*, the patent held by Choice), irrespective of whether it carries Choice's trademark.  LM Supply believes this interpretation is consistent with Commerce's past rulings.[46]

---

[43] *See* Choice Scope Ruling Request at 2.

[44] *Id*.

[45] *See* ICOR's Letter, "HFC Blends and Components from the PRC:  Response to Kenneth Ponder's and Choice Refrigerants' November 30, 2017 Application for a Scope Ruling," dated December 5, 2017 at 2 (citing *Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016), (*Final Determination*) and accompanying Issues and Decision Memorandum (IDM) at Comment 5).

[46] *See* LM Supply's Letter, "HFC Blends and Components from the PRC:  Comments in Response to Kenneth Ponder's and Choice Refrigerants' November 30, 2017, Application for a Scope Ruling," dated December 27, 2017 (LM Supply's Comments) at 5 (citing Memorandum, "Final Scope Ruling on Ancra International's Lift-A-Deck II

**Addm 80**

According to LM Supply, if Choice's concerns are related to patent infringement or patent protection, a scope ruling is the wrong venue to address these concerns because litigating patent disputes is not within Commerce's jurisdiction.

Choice Rebuttal Comments

Choice refutes LM Supply's argument that a product that meets the terms of the '706 patent is a patented product and, therefore, excluded from the scope. Choice claims that LM Supply's argument implies that it does not have a patent for its imported R-421A, and, thus, its product is ineligible for an exclusion that applies solely to a patented blend. Furthermore, Choice claims that LM Supply's imports do not meet the description of the '706 patent because they are missing a key ingredient used in the production process of R-421A. Choice also points out that LM Supply's reference to *Lift-A-Deck II Foot Assembly* and *Tool Chests*,[47] are not applicable because those cases did not address if an imported good was a patented product. Further, in *Lift-A-Deck II Foot Assembly* the product at issue was already determined to have a patent.[48]

As a final point, Choice agrees with LM Supply that Commerce should not litigate a patent dispute, but requests that Commerce clarify the meaning of the word "patented" and require supporting documentation from importers for patent ownership as an eligibility requirement for a scope exclusion.

Petitioners' Comments

The petitioners filed comments supporting Choice's interpretation of the scope.[49]

## VII.    COMMERCE'S SCOPE DETERMINATION

Commerce examined the language of the *Order*, the description of the product contained in this scope request, and Commerce's determination in the underlying investigation. In accordance with 19 CFR 351.225(k)(1), we find that the scope language and Commerce's determination in the underlying investigation are dispositive as to whether the product at issue is subject merchandise. The scope of the *Order* provides that:

> HFC blends covered by the scope are R-404A, a zeotropic mixture consisting of 52 percent 1,1,1 Trifluoroethane, 44 percent Pentafluoroethane, and 4 percent 1,1,1,2-Tetrafluoroethane; R-407A, a zeotropic mixture of 20 percent

---

Foot Assembly," dated June 20, 2016 (*Lift-A-Deck II Foot Assembly*) at 3; and Memorandum, "Certain Tool Chests and Cabinets from the People's Republic of China and the Socialist Republic of Vietnam:  Scope Comments Decision Memorandum for the Final Determinations," dated November 22, 2017 (*Tool Chests*).  LM Supply did not provide a copy of this ruling, however; therefore, there is no evidence on the record to support its claim.).
[47] *See* LM Supply's Comments at 5-6 (citing *Lift-A-Deck II Foot Assembly* at 3; and *Tool Chests* at comment 4).
[48] *See* Choice's Letter, "Rebuttal of Kenneth Ponder and Choice Refrigerants to LM Supply's December 27, 2017 Comments on Application for Scope Ruling; Hydrofluorocarbon Blends from the People's Republic of China: Antidumping Duty Order, Dck. A-570-028, 81 Fed. Reg. 55436 (August 19, 2016)," dated January 16, 2018 (Choice Rebuttal Comments) at 3-6.
[49] *See* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China:  Support of the American HFC Coalition for the Scope Request by Choice Refrigerants," dated March 1, 2018.

**Addm 81**

> Difluoromethane, 40 percent Pentafluoroethane, and 40 percent 1,1,1,2-
> Tetrafluoroethane; R-407C, a zeotropic mixture of 23 percent Difluoromethane,
> 25 percent Pentafluoroethane, and 52 percent 1,1,1,2-Tetrafluoroethane; R-410A,
> a zeotropic mixture of 50 percent Difluoromethane and 50 percent
> Pentafluoroethane; and R-507A, an azeotropic mixture of 50 percent
> Pentafluoroethane and 50 percent 1,1,1-Trifluoroethane also known as R-507.[50]

Thus, the scope of the *Order* includes the following five blends:  R-404A, R407A, R-407C, R-410A, and R-507A.  Because R-421A is not one of these blends, we find that it does not fall within the scope and thus is not covered by the *Order.*[51]

Further, we find that the scope language is dispositive as to which products qualify for a patent exclusion.  The scope of the order provides that:

> Also excluded from this order are patented HFC blends, including, but not limited
> to, ISCEON® blends, including MO99™ (R-438A), MO79 (R-422A), MO59 (R-
> 417A), MO49Plus™ (R-437A) and MO29™ (R-4 22D), Genetron® Performax™
> LT (R-407F), Choice® R-421A, and Choice® R-421B.[52]

Thus, LM Supply's argument that the "including, but not limited to" language provides an exclusion for un-patented blends that copy a held patent's blend is erroneous.[53]  Indeed, this language merely indicates that the list of patented blends excluded from the scope is non-exhaustive.  This is consistent with statements made during the HFCs investigation, where Commerce stated that, "patented HFC blends, without limitation, are excluded," and "the Department interpreted the scope language as including only the five named blends… and excluding all patented blends."[54]

In addition, we disagree with LM Supply's claim that all R-421A meeting the terms of the '706 patent, irrespective of whether it carries Choice's trademark, necessarily qualifies as patented R-421A pursuant to the terms of the exclusion language in the scope.[55]  Rather, the scope excludes patented blends; not patented blends and their parallels.  We find that simply meeting the same, or similar, physical characteristics of a patented product is not equivalent to actually being patented, and, thus, would not qualify for the patent exclusion.

---

[50] *See Order,* 68 FR at 39519.

[51] This language is consistent with statements made during the HFCs investigation, where Commerce stated that "the blend portion of the scope is limited to five named HFC blends (*i.e.*, R-404A, R-407A, R-407C, R410A, and R-507)."  *See* Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances, in Part, and Postponement of Final Determination, 81 FR 5098 (February 1, 2016), and accompanying Preliminary Decision Memorandum at 6-8.  *See also Final Determination* IDM at Comment 5 ("It is clear from this language that the blend portion of the scope is limited to five named HFC blends (*i.e.*, R-404A, R-407A, R-407-C, R410A, and R-507).  It is also clear that patented HFC blends, without limitation, are excluded." (citations omitted)).

[52] *See Order*, 81 FR at 55436.

[53] *See* LM Supply's Comments at 6.

[54] *See Final Determination* and accompanying IDM at Comment 5.

[55] *See* LM Supply's Comments at 5-6.

9

Therefore, in light of Commerce's previous findings,[56] and under a plain reading of the scope, the exclusion is solely for patented HFC blends.  As a patent is an exclusive right by the inventor to manufacture, use, or sell a product, if a company is not the holder, or licensee of a patent for the blend in question, then it is not granted the patent exclusion.

We also find that ICOR's concerns that this ruling will improperly expand the scope to include all un-patented blends in the *Order* is unfounded, regardless of the exclusion for blends containing products other than HFCs.  The scope of the *Order* remains dispositive, and the exclusion for blends containing products other than HFCs, such as blends including CFCs, HCFCs, HCs, or HFOs, is unaffected by this scope ruling.

Regarding Choice's request that Commerce require importers to submit documentation of a patent or patent license in the name of the importer at the time of entry, Commerce intends to consider whether to require importers of patented R-421A who claim their merchandise is not subject to the *Order* to maintain certification that the imported product is Choice® R-421A, and thus, meets the terms of the exclusion.  As noted below, Commerce is inviting comments on this issue.

Finally, given that the product subject to the scope inquiry is not covered by the *Order* under our analysis pursuant to 19 CFR 351.225(k), we find Choice's remaining arguments to be moot.  However, as noted in our analysis below, because imports of unpatented R-421A from China are further processed into finished HFC blends in the United States, we find that imports of unpatented R-421A, from China, should be included in the *Order*, pursuant to 781(a) of the Act and 19 CFR 351.225(g).

## VIII.   PERIOD OF ANTI-CIRCUMVENTION INQUIRY

For purposes of examining the patterns of trade for imports of unpatented R-421A, we examined the time period from January 1, 2011 through June 30, 2019.  For surrogate values (*i.e.*, for the Chinese export prices) and U.S. sales values, we used the time period December 1, 2016 through March 31, 2018.  For the purposes of examining U.S. further manufacturing costs, we used the time period of January 1, 2017 through December 31, 2017.

## IX.   SURROGATE COUNTRIES AND METHODOLOGY FOR VALUING INPUTS FROM CHINA

As explained *infra*, section 781(a)(1)(D) of the Act requires Commerce to determine whether the value of merchandise in the foreign country to which an order applies is a significant portion of the total value of the merchandise further manufactured and sold in the United States.  This analysis requires an exercise that is similar to the determination of normal value in Commerce's typical AD methodology for price comparison purposes.

BMP argues that the use of a surrogate value for the valuation of the unpatented R-421A used in the production of HFC blends is inappropriate in the instant case.[57]  Commerce disagrees with

---

[56] *See Final Determination* IDM at Comment 5.
[57] *See* BMP's Surrogate Country Comments.

**Addm 83**

BMP's claims that using surrogate values in the context of an anti-circumvention case is not permitted by the statute.[58]

Consistent with prior cases, we find that using surrogate values in this case is appropriate, because although actual prices paid for China-produced inputs are typically used in the cost buildup for market economy (ME) companies in ME proceedings, the instant inquiry is an anti-circumvention proceeding initiated under the HFCs *Order*, which is a non-market economy (NME) proceeding.[59]  Commerce is attempting to determine whether Chinese-produced merchandise is being sold to the United States in circumvention of the HFCs *Order*, which requires an analysis of certain input costs.  That analysis of the respondent's China-origin input costs appropriately falls under the purview of Commerce's NME methodology, which by statute presumes that NME costs and prices are inherently unreliable.[60]

Commerce is valuing the China-origin unpatented R-421A using, to the extent possible, the prices or costs of factors of production in one or more ME countries that are at the same level of economic development comparable to the NME country and are significant producers of comparable merchandise in accordance with section 773(c)(4) of the Act.  Based on record evidence, Commerce is preliminarily selecting Mexico as the surrogate country for China because:  (1) it is at a similar level of economic development pursuant to section 773(c)(4) of the Act; (2) it is a significant producer of comparable merchandise; (3) we have reliable data from Mexico; and (4) there is no record evidence calling into question the reliability of Mexican surrogate value data.[61]  Therefore, we calculated the value of the China-origin unpatented R-421A using a surrogate price from Mexico.

## X.      STATUTORY AND REGULATORY FRAMEWORK FOR ANTI-CIRCUMVENTION INQUIRY

### A.      The Act

Section 781(a) of the Act, dealing with merchandise completed or assembled in the United States, states:

(1) In general.  If
(A) merchandise sold in the United States is of the same class or kind as any other merchandise that is the subject of
(i) an antidumping duty order issued under section 736,
(ii) a finding issued under the Antidumping Act, 1921, or
(iii) a countervailing duty order issued under section 706 or section 303,

---

[58] *Id.*

[59] *See, e.g.*, *Small Diameter Graphite Electrodes from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 47596 (August 9, 2012), and accompanying Issues and Decision Memorandum at Comment 2.

[60] *Id.*

[61] *See* BMP's Surrogate Country Comments at 4 stating "as indicated in Exhibit 1, Mexico, Malaysia, and Russia have a high export volume of blends and could be viable alternatives."  Further, we selected Mexico as the surrogate country in the underlying investigation.

11

**Addm 84**

(B) such merchandise sold in the United States is completed or assembled in the United States from parts or components produced in the foreign country with respect to which such order or finding applies,

(C) the process of assembly or completion in the United States is minor or insignificant, and

(D) the value of the parts or components referred to in subparagraph (B) is a significant portion of the total value of the merchandise,

the administering authority, after taking into account any advice provided by the Commission under subsection (e), may include within the scope of such order or finding the imported parts or components referred to in subparagraph (B) that are used in the completion or assembly of the merchandise in the United States at any time such order or finding is in effect.

(2) Determination of whether process is minor or insignificant.  In determining whether the process of assembly or completion is minor or insignificant under paragraph (1)(C), the administering authority shall take into account

(A) the level of investment in the United States,

(B) the level of research and development in the United States,

(C) the nature of the production process in the United States,

(D) the extent of production facilities in the United States, and

(E) whether the value of the processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States.

(3) Factors to consider.  In determining whether to include parts or components in a countervailing or antidumping duty order or finding under paragraph (1), the administering authority shall take into account such factors as

(A) the pattern of trade, including sourcing patterns,

(B) whether the manufacturer or exporter of the parts or components is affiliated with the person who assembles or completes the merchandise sold in the United States from the parts or components produced in the foreign country with respect to which the order or finding described in paragraph (1) applies, and

(C) whether imports into the United States of the parts or components produced in such foreign country have increased after the initiation of the investigation which resulted in the issuance of such order or finding.

### B.    Commerce's Regulations

19 CFR 351.225(a) states:

Issues may arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order or a suspended investigation.  Such issues can arise because the descriptions of subject merchandise contained in the Department's determinations must be written in general terms.  At other times, a domestic interested party may allege that a change to an imported product or the place where the imported product is assembled constitutes circumvention under

**Addm. 85**

section 781 of the Act.  When such issues arise, the Department conducts circumvention inquiries that clarify the scope of an order or suspended investigation with respect to particular products.

19 CFR 351.225(g) states:

> Under section 781(a) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order imported parts or components referred to in section 781(a)(1)(B) of the Act that are used in the completion or assembly of the merchandise in the United States at any time such order is in effect.  In making this determination, the Secretary will not consider any single factor of section 781(a)(2) of the Act to be controlling.  In determining the value of parts or components purchased from an affiliated person under section 781(a)(1)(D) of the Act, or of processing performed by an affiliated person under section 781(a)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

## XI.     USE OF FACTS AVAILABLE WITH AN ADVERSE INFERENCE

With respect to the non-responsive companies, Commerce finds it necessary to rely on facts available pursuant to section 776(a) of the Act because these companies failed to provide necessary information upon which Commerce could rely and, thereby, withheld information requested by Commerce, failed to provide requested information within the established deadlines, and significantly impeded this anti-circumvention inquiry.  Further, as discussed *infra*, we find it appropriate to apply facts available with an adverse inference (AFA), pursuant to section 776(b) of the Act, to non-responsive companies because these companies failed to cooperate by not acting to the best of their ability to comply with Commerce's requests for information in this anti-circumvention inquiry.

### A.     Legal Standard

Section 776(a)(1) and 776(a)(2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply facts otherwise available in reaching the applicable determination if necessary information is not on the record, or if an interested party:  (A) withholds information requested by Commerce; (B) fails to provide such information by the deadlines for submission of the information, or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides such information but the information cannot be verified as provided in section 782(i) of the Act.

Section 782(c)(1) of the Act states that Commerce shall consider the ability of an interested party to provide information upon a prompt notification by that party that it is unable to submit the information in the form and manner required, and that party also provides a full explanation for the difficulty and suggests an alternative form in which the party is able to provide the information. Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met:  (1) the information is

13

submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting from among the facts otherwise available.[62]  In so doing, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.[63]  In addition, the Statement of Administrative Action explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[64]  The Court of Appeals for the Federal Circuit, in *Nippon Steel*, explained that the ordinary meaning of "best" means "one's maximum effort," and that the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.[65]  Furthermore, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[66]  It is Commerce's practice to consider, in employing adverse inferences, the extent to which a party may benefit from its own lack of cooperation.[67]

### B.      Use of Facts Available with an Adverse Inference

Commerce preliminarily finds that the non-responsive companies failed to provide necessary information, withheld information requested by Commerce, failed to provide information in a timely manner, and significantly impeded this proceeding by not submitting the requested information.  Accordingly, Commerce preliminarily determines that use of facts available is warranted in making a determination with respect to these non-responsive companies, pursuant to sections 776(a)(1) and (a)(2)(A)-(C) of the Act.  Further, Commerce finds that these non-responsive companies did not cooperate to the best of their ability by failing to provide the requested information.  Therefore, we preliminarily find that an adverse inference is warranted in selecting from the facts otherwise available with respect to these non-responsive companies in accordance with section 776(b) of the Act and 19 CFR 351.308(a).

---

[62] *See* 19 CFR 351.308(a).
[63] *See* section 776(b)(1)(B) of the Act.
[64] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) at 870.
[65] *Id*.
[66] *See Nippon Steel*, 337 F.3d at 1382-83; *see also Antidumping Duties*; *Countervailing Duties*, 62 FR 27296, 27340 (May 19, 1997).
[67] *See, e.g.*, *Steel Threaded Rod from Thailand: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013), and accompanying Preliminary Decision Memorandum (PDM) at 4, unchanged in *Steel Threaded Rod from Thailand: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014).

Addm 87

Thus, as set forth in greater detail below, relying on our application of AFA for the non-responsive companies, we preliminarily find that unpatented R-421A is exported from China in order to circumvent the HFCs *Order*, and we are applying these findings on a country-wide basis.

## XII.    ALLEGATIONS OF CIRCUMVENTION AS IDENTIFIED IN THE INITATION OF INQUIRY

As stated above, the petitioners filed a request for a circumvention determination, in which petitioners point to proprietary information to claim that imported unpatented R-421A, a blend of HFC components R-125 and R-134a, produced in China is further processed into in-scope HFC blends covered by the scope of the *Order*.[68]  The petitioners allege that the imported unpatented R-421A blend is not sold in the United States, but, rather, is consumed by BMP to make in-scope blends, which are resold in the United States.[69]  According to the petitioner, the process of blending unpatented R-421A into finished blends is "minor and insignificant" within the meaning of 781(a)(2), and the resulting finished product is squarely within the scope of the antidumping duty order.[70]

Citing the International Trade Commission (ITC)'s hearing transcript, the petitioners explain that:  (1) the blending process does not require major investment, complex equipment or research and development (R&D); (2) the production facilities for blending consist of only a handful of employees and some isotanks; and (3) the value of processing components into blends performed in the United States is a small proportion of the value of the finished HFC blend.[71]  The petitioners state that, consistent with the information from the ITC, record information shows that BMP's blending operations are relatively minor, the production facilities do not require a lot of sophisticated equipment or large numbers of personnel and the value of processing in the United States is insignificant in comparison to the product produced in China.[72]  Additionally, the petitioners argue that the value of the Chinese R-421A blend is a "significant" portion of the total value of the merchandise.  Finally, the petitioners insist that the *Order* will be invalidated if R-421A can be re-blended into subject merchandise in the United States in order to escape the HFC blends *Order*.[73]

BMP contends that R-421A is a semi-finished blend made of HFC components R-125 and R-134a.  BMP asserts that semi-finished blends are not covered by the scope, based on the ITC's negative determination which specifically excludes HFC components and points out that Commerce recognized this determination when it deleted language from Commerce's final *Order* that pertained to semi-finished blends.  Thus, a finding that BMP's imports circumvent the *Order* would improperly expand the *Order's* scope to include products where no material injury

---

[68] *See* Initiation Request at 10-12.
[69] *Id.* at 11.
[70] *Id.* at 13.
[71] *Id.* at 14-18, ITC Hearing Transcript in the Matter of:  Hydrofluorocarbon Blends and Components from China, Investigation No. 731-TA-1279 (Final), dated June 21, 2016 (ITC Final Transcript) at Exhibits 1-4.
[72] *Id.* at 9 and 11-19.
[73] *Id.* at 19-21.

15

was found.  BMP argues that Commerce should not permit an anti-circumvention proceeding to avoid or disregard a negative ITC determination.[74]

Moreover, BMP argues that the petitioners fail to demonstrate that its imports of R-421A are circumventing merchandise within the meaning of section 781(a) of the Act, because the process of assembly or completion of the finished blends is not minor or insignificant.  Citing to the ITC's report, BMP claims that its production of blends in the United States and blending process require:  (1) significant investment; (2) a high level of R&D; (3) a highly skilled workforce; and (4) a significant proportion of production in the United States.  Thus, BMP claims that its post-importation blending of semi-finished blends is neither minor nor insignificant; therefore, the anti-circumvention allegation must be dismissed for failure to meet the requirements of section 781(a) of the Act.[75]

## XIII.   ANTI-CIRCUMVENTION ANALYSIS

### A.  The Merchandise Sold in the United States Is of the Same Class or Kind As Merchandise Subject to the *Order*

The petitioners state that the unpatented R-421A that is re-blended after importation and sold in the United States is of the same class or kind as the subject merchandise.[76]  In its April 27, 2018 submission, BMP stated that it imported R-421A which it describes as a blend of HFC components in the ratio of 58 percent R-125 and 42 percent R-134a.[77]  BMP also stated that it imports the following components:  R-125; R-32; R-143a;[78] and that BMP purchases the components from Chinese suppliers.  The imported HFC components and the unpatented R-421A, from China, were used to create HFC blends.  BMP then sold the HFC blends to customers in the United States.[79]  BMP states that after importing the unpatented R-421A into the United States, it converts it into HFC blends, using a proprietary and confidential manufacturing process,[80] and that this process is relatively straightforward.[81]

Thus, record evidence indicates that after conversion, the HFC blends that BMP finishes in the United States would be subject to the antidumping duty order if they were imported in this finished condition, because such HFC blends meet the physical characteristics outlined in the scope of the *Order*.  For these reasons, we preliminarily determine that the merchandise produced from the imported unpatented R-421A, and sold in the United States, are HFC blends of the same class or kind as the subject merchandise.

---

[74] LM Supply's Anti-Circumvention Rebuttal at 6-9.

[75] *Id*. at 11-13.

[76] *See* Initiation Request at 5.

[77] *See* LM Supply's April 27, 2018 SQR at 1; *see also* Choice Refrigerants' Letter, "Application for Scope Ruling on Exclusion of Patented HFC Blends from Antidumping Duty Order A-570-028:  Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China," dated November 30, 2017 at 3 and BMP's January 17, 2020 QR at 34.

[78] *See* LM Supply's April 27, 2018 SQR at 3.

[79] *See* BMP's January 17, 2020 QR at 3.

[80] *Id*. at 4.

[81] *Id*. at 3.

16

**Addm 89**

### B. The Merchandise Sold in the United States Is Completed from Parts or Components Produced in China, the Foreign Country

The petitioners cite to LM Supply's April 27, 2018 SQR submission to support their claim that imports of unpatented R-421A are completed in the United States from parts and components produced in China.[82]  Performing the final blending operations in the United States turns the product into subject HFC blends.[83]

BMP's January 17, 2020 QR, confirms the petitioners' claim that the imports of unpatented R-421A are used in the United States to assemble HFC blends.[84]  Specifically, BMP explains that after importation into the United States from China, BMP uses the unpatented R-421A, and other components from China, to produce HFC blends that are covered by the *Order*.[85]  Thus, we preliminarily determine that the imports of unpatented R-421A blends are completed and sold in the United States from parts or components produced in the foreign country with respect to which such order or finding applies.

### C. The Process of Assembly or Completion in the United States is Minor or Insignificant

According to the petitioners, the process of converting unpatented R-421A into finished HFC blends is minor or insignificant, particularly relative to the production process as a whole.[86]  The petitioners assert that the blending operation is a simple process that does not require major investment, complex equipment, or research and development.[87]  Blending HFC components only requires a holding tank for the finished HFC blend, some pipes, and valves.[88]  According to the petitioners, to add a single HFC component to an R-125/R-134a blend only requires a holding tank into which the component would be introduced.[89]

BMP does not produce the unpatented R-421A and we do not have information from its producer regarding the production process as a whole, or the cost of HFC components.[90]  However, BMP claims that, based upon the ITC's prior determinations, its post-importation blending of semi-finished blends is neither minor nor insignificant; thus, the anti-circumvention must be dismissed for failure to meet the requirements of section 781(a)(2) of the Act.[91]  Specifically, BMP states that the ITC, in its determination, found that the post-importation blending process transforming HFC semi-finished blends into HFC blends was significant and that blending required significant investment, a high level of R&D, a highly skilled workforce, and a significant proportion of production in the United States.[92]

---

[82] *See* Initiation request at 11.
[83] *Id*.
[84] *See* BMP's January 17, 2020 QR at 13, 22 and 29.
[85] *Id*. and at Exhibit 9.
[86] *See* Initiation Request at 2-3.
[87] *Id.* at 13-14.
[88] *Id*. at 14.
[89] *See* Initiation Request at 15.
[90] *Id*. at 3.
[91] *See* LM Supply's Anti-Circumvention Rebuttal at 11-13.
[92] *Id*.

17

**Addm.90**

Section 781(a)(2) of the Act instructs us to consider the following when determining whether the process of assembly or completion is minor or insignificant under 781(a)(1)(c):

> (A) the level of investment in the United States,
> (B) the level of research and development in the United States,
> (C) the nature of the production process in the United States,
> (D) the extent of production facilities in the United States, and
> (E) whether the value of the processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States.

With regard to parts (A) through (E) under section 781(a)(2), because we have no information from the foreign producer, we are reliant on the information placed on the record by the participating parties. Thus, our analysis is based on information provided by both the petitioners and BMP.

With regard to part (A) under section 781(a)(2), the petitioners provided information demonstrating that blending requires less than a one million dollar investment, while a production facility to manufacture HFC components requires an investment of hundreds of millions of dollars in equipment needed to handle high-hazard reaction and purification processes.[93] The low level of required investment in the United States for production of blends is corroborated by BMP's response. In its January 17, 2020 submission, BMP provided a table that outlines its level of investment and R&D expenditures in the United States from 1990 through 2019.[94] Based upon BMP's level of investment, when compared to the investment required to build and maintain a components factory, we preliminarily find that the level of investment to blend HFCs in the United States is minimal, when compared to the level of investment required to manufacture the underlying components, and R-421A, which BMP is importing from China.[95]

With regard to part (B) under section 781(a)(2), the petitioners further argue that no research and development expenditures are required to perform the blending operations, as the technically complex research and development activities are performed prior to this stage and relate only to the production processes performed in China. The petitioners argue that it is the HFC component production process that is the focus of research and development activities in the HFCs industry.[96] BMP's response confirms that its R&D expenses are negligible.[97] Thus, with respect to section 781(a)(2)(B) of the Act, we preliminarily find that BMP's level of R&D spending is limited.

---

[93] *See* Petitioners' Letter, "Hydrofluorocarbon Blends from the People's Republic of China: Scope Investigation Regarding Certain Unpatented HFC Blends: Request to Apply Section 781(a) to Prevent Circumvention," dated August 15, 2018 (Initiation Request) at 15 and Exhibits 1 and 3.
[94] *See* BMP's January 17, 2020 QR at Exhibit 12.
[95] *See* Memorandum, "Anti-Circumvention Inquiry of the Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China: Unpatented R-421A; Business Proprietary Memorandum," dated concurrently with this memorandum (BPI Analysis Memorandum) for the figures underlying Commerce's conclusion.
[96] *See* Initiation Request at 15-19.
[97] *See* BMP's January 17, 2020 QR at Exhibit 20; *see also* the BPI Analysis Memorandum for the figures underlying the Commerce's conclusion.

18

With regard to part (C) above, under section 781(a)(2) of the Act, the petitioners argue that the nature of U.S. production processing is extremely minor in scope and elementary in technique, particularly relative to the production process as a whole.[98]  BMP's response confirms that the blending process is straightforward.[99]  There is also no chemical reaction or temperature change involved in blending HFCs.[100]  After the blend is tested, it is extracted from the mixing tank and packaged into smaller cylinders for resale.[101]  Finally, BMP's response demonstrates that its production process only requires a small number of employees to handle the blending operations.[102]  Based on the information BMP provided, this process requires less processing than production of the underlying components and R-421A that BMP imports from China to assemble into HFC blends in the United States.[103]  Thus, with respect to section 781(a)(2)(C) of the Act, we preliminarily find that the nature of the production process in the United States is not significant.

With regard to section 781(a)(2)(D) of the Act, the petitioners argue that the necessary production facilities in the United States are minor because blending HFC components only requires a holding tank for the finished HFC blend, some pipes, and valves.[104]  Further, the petitioners assert that production facilities can consist of ISO tanks and a handful of workers.[105]  BMP's response confirms that this is the case for its blending operations in the United States.[106]  Therefore, with respect to section 781(a)(2)(D) of the Act, we preliminarily find that BMP's production facility for completing finished HFC blends is not extensive.[107]

With regard to section 781(a)(2)(E) of the Act, the petitioners contend that the value of the processing performed in the United States represents a negligible proportion of the value of the merchandise sold in the United States.[108]  The petitioners provided an analysis and supporting evidence showing that the blending and repackaging in the United States amounts to an insignificant percentage of the value of the imported R-421A.[109]  With regard to this criterion, we preliminarily determine that the appropriate measure for valuing the processing performed in the United States is by comparing BMP's total processing costs with its average sales prices of the finished HFC blends in the United States over the same time period.[110]  As discussed in our BPI Analysis Memorandum, our comparison of BMP's total processing costs (and the components thereof) indicates that the value of the processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States.[111]  Thus,

---

[98] *See* Initiation Request at 15-19.

[99] *See* LM Supply's April 27, 2018 SQR at 4.

[100] *See* Initiation Request at 14.

[101] *Id.*

[102] *See* BMP's January 17, 2020 QR at 16.

[103] *See* the BPI Analysis Memorandum for the figures underlying the Commerce's conclusion.

[104] *See* Initiation Request at 14.

[105] *Id*. at 16-17.

[106] *See* BMP's January 17, 2020 QR at 37.

[107] *See* the BPI Analysis Memorandum for further details underlying Commerce's conclusion.

[108] *See* Initiation Request at 12-13.

[109] *See* Initiation Request at 17-18 and Exhibit 5; *see also* Memorandum to the File, "Hydrofluorocarbon Blends from the People's Republic of China:  Placement of CBP Letter and Attachments," dated March 6, 2018, enclosing LM Supply's response to a CBP Form 28, dated February 13, 2018 (and enclosed "Proforma Invoice").

[110] *See* BMP's January 17, 2020 QR at Exhibits 23 and 24.

[111] *See* the BPI Analysis Memorandum for details underlying Commerce's conclusion.

**Addm 92**

with respect section 781(a)(2)(E) of the Act, we preliminarily determine that the value of the processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States.

**D. The Value of the Parts or Components Produced in the Foreign Country Is a Significant Portion of the Total Value of the Merchandise**

Based on our analysis of the figures placed on the record by participating parties,[112] we preliminarily find that the value of the parts or components produced in the foreign country is a significant portion of the total value of the merchandise in question.[113]

**E.  Additional Factors to Consider**

Section 781(a)(3) of the Act identifies additional factors that Commerce shall consider in determining whether to include parts or components in an antidumping duty order as part of a circumvention inquiry.

   i.    Pattern of Trade, Including Sourcing Patterns

The petitioners argue that consideration of changes in patterns of trade supports an affirmative finding of anti-circumvention.[114]  According to the petitioners, after the initiation of the investigation, BMP began importing unpatented R-421A, and rerouted the imported merchandise from Jamaica into the United States.[115]  According to the petitioners, this increase in imports from a Chinese exporter included in the original investigation by BMP, represents a change in patterns of trade, and is exactly what section 781(a) was meant to address.[116]

We initiated the less-than-fair-value investigation of this proceeding on July 22, 2015.[117]  The import data provided by BMP indicate that BMP did not import unpatented R-421A prior to the *Order*.[118]  Further, BMP sold HFC blends using unpatented R-421A after we initiated the less-than-fair-value investigation and the *Order* was in place.[119]  Therefore, in light of record evidence, we preliminarily determine that the data provided on the record are conclusive, and that importation of unpatented R-421A into the United States represents a change in the pattern of trade.  Consequently, our preliminary finding with regard to this factor supports our preliminary affirmative determination that unpatented R-421A from China are circumventing the *Order*.

---

[112] S*ee* BMP's January 17, 2020 QR at Exhibit 24.
[113] S*ee* the BPI Analysis Memorandum for the figures underlying the Commerce's conclusion.
[114] *See* Initiation Request at 19.
[115] *Id.* at 15.
[116] *Id*. at 20-21.
[117] *See Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Investigation*, 80 FR 43387, 43388 (July 22, 2015) (*Initiation of Investigation*).
[118] *See* BMP USA's November 21, 2019 Q&V response; LM Supply's November 21, 2019 Q&V response; and Cool Master's November 21, 2019 Q&V response.
[119] S*ee* the BPI Analysis Memorandum.

**Addm 93**

ii.    Affiliation

Under section 781(a)(3)(B) of the Act, Commerce shall take into account whether the producer or exporter of the parts or components is affiliated with the person who assembles or completes the HFC blends in the United States from the parts or components produced in the foreign country when making a decision in a circumvention inquiry.  In September 2018, BMP USA stopped all business operations with respect to the importation, production, or sale of refrigerants and all of these operations transferred to IGas.  IGas was not involved in the production or blending of unpatented R-421A, but it does import other components to produce HFC blends.[120] Further, IGas is now partially-owned by a Chinese company, which has subsidiaries that produce and export components and subject blends.[121]  Consequently, this factor supports a finding of circumvention.

iii.    Subsequent Import Volume

Under section 781(a)(3)(C) of the Act, another factor Commerce should consider is whether imports into the United States of the parts or components produced in the foreign country increased after the initiation of the investigation, which resulted in the issuance of the *Order*, when making a decision in a circumvention case.

We initiated the less-than-fair-value investigation in July 2015,[122] and published the *Order* in August 2016.  BMP provided statistics of its imports of both HFC components and of finished HFC blends for the period January 1, 2016 to June 31, 2019.[123]  According to BMP, from 2016 to 2019, (*i.e.*, after the *Order*) imports of HFC components and semi-finished blends increased.[124]  Further, while BMP/IGas no longer imported unpatented R-421A after April 2018, IGas continues to import components for further processing in the United States.  Thus, on the whole, this factor supports an affirmative finding of circumvention.

## XIV.   INTENT TO CONSIDER CERTIFICATION REQUIREMENT

In light of Commerce's preliminary finding of circumvention, Commerce intends to consider whether to require importers of patented R-421A who claim their merchandise is not subject to the *Order* to maintain certification that the imported product is Choice® R-421A; and thus, meets the terms of the exclusion.[125]  Commerce invites comments on this issue.

---

[120] *See* BMP's January 17, 2020 QR at 3, 22 and 24.
[121] *Id.* at 19 and 22.
[122] *See Initiation of Investigation*.
[123] *See* BMP's January 17, 2020 QR at Exhibit 6; *see also* BMP USA's November 21, 2019 Q&V response; LM Supply's November 21, 2019 Q&V response; and Cool Master's November 21, 2019 Q&V response.
[124] *See* BMP's January 17, 2020 QR at Exhibit 6; *see* also BPI Analysis Memorandum.
[125] We note that, although BMP claims that its imports "{were} considered patented R-421A at the time of importation," evidence on the record demonstrates that the imported merchandise is not the patented Choice® R-421A and; thus, the product imported by BMP does not meet the terms of the exclusion of the *Order*.  *See* BMP's January 17, 2020 QR at 20.

21

Addm 94

## XV.   COUNTRY-WIDE DETERMINATION

As noted above, Commerce has identified the universe of producers, exporters, and importers of unpatented R-421A using CBP entry data for U.S. imports of unpatented R-421A, and Q&V questionnaires.[126]  We gathered information from the largest producers and exporters of unpatented R-421A, which account for the largest volume of unpatented R-421A exports to the United States, to extrapolate the best overall picture of the significance of further manufacturing on a country-wide basis.  BMP is the only importer of unpatented R-421A in the United States during the period of this inquiry.  As noted above, BMP reported using unpatented R-421A originating in China in its production of finished HFC blends in the United States subject to the *Order*, and provided a full response substantiating this fact.  Further, TTI is the largest Chinese exporter of unpatented R-421A to the United States.[127]  However, TTI did not submit a response to Commerce's anti-circumvention questionnaire.  Given that TTI accounts for the largest volume of unpatented R-421A exported from China to the United States, and BMP accounts for the largest volume of imports, we find that BMP's and TTI's production processes are representative of other exporters from China and importers in the United States.  Therefore, we are applying this affirmative preliminary finding to all shipments of unpatented R-421A from China, on or after June 18, 2019, the date of initiation of this anti-circumvention inquiry, in accordance with section 781(a) of the Act and 19 CFR 351.225(g).

## XVI.   RECOMMENDATION

For the reasons discussed above, and in accordance with 19 CFR 351.225(d) and (k)(1), we recommend finding that unpatented R-421A, which is not one of the HFC blends listed within the scope, is not within the scope of the *Order*.  However, since the imports of unpatented R-421A, exported from China, are further processed by BMP in the United States into subject HFC blends, we recommend that, pursuant to section 781(a) of the Act and 19 CFR 351.225(g), Commerce issue a preliminary affirmative circumvention determination that imports of unpatented R-421A from China are circumventing the *Order*.

☒                                      ☐
_____                _____

Agree                              Disagree

2/25/2020

X  ⎯⎯⎯⎯⎯⎯⎯

Signed by: CHRISTIAN MARSH

Christian Marsh
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[126] *See* CBP Data Memo.
[127] *See* TTI's November 21, 2019 Q&V response.

22

Addm 95



3950 Powhatan Road
Clayton, NC  27520
tel: 919.827.4748
www.fluorofusion.com

Hon. Michael Regan                                                        July 2, 2021
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

**Docket ID No. EPA-HQ-OAR-2021-0044**
Submitted via Regulations.gov, and via email to Newberg.Cindy@epa.gov; Hall-Jordan.Luke@epa.gov

> **Joint Comments of FluoroFusion Specialty Chemicals Inc. and Kivlan & Company on**
> **"*Proposed Rule; Phasedown of Hydrofluorocarbons: Establishing the Allowance***
> ***Allocation & Trading Program under the AIM Act*"**

Dear Administrator Regan:

We submit these comments jointly on behalf of FluoroFusion Specialty Chemicals Inc. ("FluoroFusion") and Kivlan and Company, Inc ("Kivlan & Co."). As explained further below, we submit these comments jointly because, as described further below, FluoroFusion and Kivlan & Co. are closely related entities.

These comments address four issues:

1. Aspects of EPA's proposed consumption allowance allocation program that inadvertently and arbitrarily penalize FluoroFusion and Kivlan & Co. in ways that contradict EPA's stated goals of the allocation;

2. Potential solutions to the above arbitrariness that account for the companies' unique circumstances;

3. Issues regarding AD/CVD; and

4. Information helpful to EPA with respect to claims that entities are stockpiling HFCs.

**FluoroFusion Specialty Chemicals Inc**. is a small business in North Carolina, formed in June 2018. We operates in Clayton, NC—less than an hour from EPA's Research Triangle Park campus. We began operations in 2019 and we currently employ a workforce of 18 full-time employees. FluoroFusion's mission is to develop products and services to reduce the emission of ozone depleting substances and greenhouse gases in the United States. We do this by employing advanced reclamation technology, complex blending processes, and by developing the next-generation of low-GWP refrigerants that can be produced using the HFCs recovered by domestic HVAC/R technicians in the United States. We are proud to supply a growing mix of reclaimed HCFC refrigerants, EPA SNAP-approved HFC refrigerant blends, next-generation HFO (hydrofluoroolefin) refrigerant blends, and zero-GWP natural refrigerants. As a patent-holding

1

**Addm 96**



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

technology company, FluoroFusion is one of the fastest growing EPA-certified reclaimers and licensed manufacturers of 14 patented HFC and HFO refrigerant blends. As a manufacturer of 5th-generation HFO/HFC/Natural refrigerant blends, we have a unique understanding of reclamation, fractionation, materials sourcing, and blending processes. These comments are supplementary to the initial comments that FluoroFusion submitted regarding the set-aside pool and the importance of setting policies that promote reclaiming.[1]

**Kivlan and Company, Inc.** was founded in 1993 as an HVAC and refrigeration import and distribution company. Kivlan & Co. was also the parent company of the HVAC/R manufacturers' representative firm Hal Kivlan Sales Agency (established in 1968) until it was divested in 2006. Kivlan & Co. has served as the importer of record for packaged refrigerant products, refillable recovery cylinders and bulk refrigerants imported from several countries, including the UK, India, and China. Kivlan & Co. has provided import services to Dynatemp International Inc., RMS of Georgia, and FluoroFusion Specialty Chemicals Inc. Kivlan & Co. was purchased in its entirety by H. Brad Kivlan in November 2016.

This joint comment includes both general comments about the design of the allowance allocation system and specific information about our two companies, their relationship, and their interrelated import history. We request that EPA take these comments into account in finalizing an equitable system for the initial allowance allocation that will not create arbitrary barriers to new market entrants like FluoroFusion that have invested heavily in the capacity of the U.S. reclaim market, and in the development of low-GWP blends that will help the U.S. meet the phasedown's climate objectives.

---

[1] *See* Initial Comments of FluoroFusion Specialty Chemicals Inc., Docket ID No. EPA-HQ-OAR-2021-0044-0056 (May 28, 2021).



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

1. __THE PROBLEM__:   **EPA's proposed allocation framework inadvertently and arbitrarily penalize FluoroFusion and Kivlan & Co. in ways that undermine EPA's own asserted goals.**

We support the core principles that EPA has enunciated as touchstones for the proposed initial allowance allocation. For example:

- We support EPA's proposal that the initial allowance allocation should be guided by the goals of "providing as seamless a transition as possible [to the allowance-based regime], promoting equity, timeliness of implementation, and availability of robust data."[2]

- Relatedly, we support EPA's solicitude for new market entrants who, like FluoroFusion, "have historic practice in the HFC market that is not reflected in EPA's existing data," and appreciate EPA's recognition that relying heavily on pre-2020 certified GHGRP data "could create a market barrier to new market entrants."[3]

Unfortunately, certain details of EPA's proposal, although not central to the proposed allocation framework, inadvertently create gaps in coverage that run contrary to these goals.  These gaps arbitrarily penalize companies like FluoroFusion and Kivlan & Co.  Specifically, EPA's proposed rule does not contemplate that the owner of a well-established bulk importer (Kivlan & Co.) might shift resources and imports to a new company (FluoroFusion) in 2019.

A. **Background on the history and close interrelationship of Kivlan & Co. and FluoroFusion**

- Kivlan & Co. has been a longstanding participant in the refrigerant business, participating continuously from 2010 through 2019 as an importer of bulk and packaged HCFC-22, HFC finished blends, and components for its sister company, Dynatemp International ("Dynatemp").  Dynatemp marketed and sold those refrigerants into the U.S. refrigerant wholesale market.  Dynatemp is owned by H. Brad Kivlan (50%), William Gresham (35%), and Hal Kivlan (15%).

- Dynatemp has also actively driven reclamation activities since 2010, starting its DynaCycle reclamation program that utilized the reclamation services of Rapid Recovery in Peoria, Arizona.  Dynatemp provides wholesalers and contractors with a financial incentive to recover and submit their recovered refrigerant to a participating wholesaler.

---

[2] 86 Fed. Reg. at 27,169.

[3] 86 Fed. Reg. at 27,176.

**Addm 98**

FluoroFusion™

3950 Powhatan Road
Clayton, NC  27520
tel: 919.827.4748
www.fluorofusion.com

- ○ Kivlan and Co. imported DynaCycle-Comet cylinders from Amtrol-Alfa in Portugal.  This revolutionary refillable cylinder is an ergonomically designed, lightweight, high-pressure composite 50lb recovery cylinder that is still in rotation in our exchange program today for which FluoroFusion is the reclaimer of record.

- ○ Between 2010 and 2016, Kivlan & Co. imported bulk ISO tanks of HCFC-22 for Rapid Recovery to blend up low-purity, recovered HCFC-22 refrigerant that came from the DynaCycle program.

- ○ Throughout the last 20 years, Dynatemp tried several times to vertically integrate into reclamation and complex blending but was unsuccessful due to the lack of technical resources capable of building these types of solutions. Kivlan & Co. and Dynatemp agreed that the future needed to be based on advanced blending inclusive of HFOs as well as HFC fractionation technology in order to be successful.

- ○ AGAS Americas (European ownership) purchased Rapid Recovery in 2016 and technical/reclamation leader Diversified Pure Chem in 2017.   AGAS then terminated the Rapid Recovery reclamation partnership with Dynatemp in 2018.

- As mentioned above, AGAS bought Diversified Pure Chem in September, 2017 which had the most sophisticated reclaim fractionation technology as well as an HFC blend plant and was growing at a 200% annual growth rate in reclaim and represented one of the largest US EPA reclaimers in the U.S. Dave Couchot was the President and technical leader of DPC since 2014 and exited the company as it changed hands.

- Dynatemp owners, H. Brad Kivlan and William Gresham entered into a business arrangement with Dave Couchot with the mission to build the best HFC technology company in the U.S. and continue its mission to solve climate change as an EPA certified reclaimer.  They co-founded FluoroFusion for that purpose.

- FluoroFusion is 100% U.S. owned and operated with ownership standing at H. Brad Kivlan (30%), William Gresham, (30%), David Couchot (25%), and Jerry Murray (15%).

- FluoroFusion conducts the DynaCycle reclamation operations.  DynaCycle is partnered with over 200 wholesale locations and is experiencing 90.3% year-over-year growth in securing recovered HFC and HCFC refrigerants that are reclaimed by FluoroFusion in addition to their growing "NFL Hub Model" and direct to contractor program.

- FluoroFusion started in 2018 and launched production at the start of 2019. FluoroFusion's quick growth out of the gate was fueled by its contract work to produce patented HCFC alternatives, some with hydrocarbons, for ComStar & Refrigerant Solutions, as well as making complex HFC blends for Dynatemp and others in the market.

4



- The plan was always for Kivlan & Co. to initially import HFC components for FluoroFusion as FluoroFusion's credit lines were established, and then transition to direct import by FluoroFusion.  FluoroFusion would also source cylinders and holds the refrigerant patents, production technology, fractionation technology and other assets.

- Per the integration plan, Kivlan & Co. began to transition its import responsibilities to FluoroFusion by May 2019.

- Kivlan & Co had primarily imported pre-packaged materials where FluoroFusion imported bulk ISOs of pure materials, as well as hydrocarbons and specialty components necessary to make some of the most complex refrigerant blends in the U.S.  In June 2019, additional antidumping duties were applied to packaged refrigerants imported from other countries.  As a result, imported blends (previously imported by Kivlan & Co.) were subject to anti-dumping duties, and therefore became more expensive.  The complete transition of import responsibilities to FluoroFusion, which imported pure materials for blending in the United States, therefore fit well with this change in the market dynamics.

- FluoroFusion has been the importer of record from mid-2019 to present.

- A shared owner, H. Brad Kivlan, has been the designated representative responsible for submitting GHGRP data to EPA on behalf of both Kivlan & Co. and FluoroFusion.

Because of this (likely unique) corporate relationship, EPA's proposal creates several arbitrary consequences for both companies:

### B.   Restrictions on the set-aside pool.

The set aside pool for new entrants is an important element of the proposed rule, and for reasons FluoroFusion previously explained, we support the spirit that motivated EPA to propose it.[4]  But if EPA's goals are to avoid the "creat[ion] of market barriers" to pre-AIM Act importers, and to "provide as seamless a transition as possible" to the allowance program, the structure of the set aside as proposed is inadequate.

**First, for certain new market entrants, particularly large actors like FluoroFusion, the set aside pool could end up more like a mirage.** EPA proposes "priority access" to the set-aside for untimely users of HFCs in the mandatory allocation categories, and after them to small importers from 2017–2019.  Accordingly, it is possible that despite all of the good reasons EPA

---

[4] In particular, we support EPA's proposed rationale that the set aside not extend to companies "looking to newly enter as producers of HFCs because the Agency does not wish to encourage the construction of new HFC production capacity." 86 Fed. Reg. at 27,176.  We support wholeheartedly.  Companies who enter the HFC production market *after* enactment of the AIM Act did so with an awareness of the likelihood of pending federal production/import limits, and thus there is less concern that their business expectations would be interrupted than a company that began operations *before* the AIM Act.

Addm-100



gave for setting aside allowances to new market entrants, and all the timely data submitted to EPA by those new market entrants, no allowances (or very few) would actually remain for new market entrants at the end of the day.  There is no reason for EPA to arbitrarily pit each of these independently deserving groups against each other—or to elevate some at the expense of others.  Indeed, EPA gives no justification for this hierarchy in the proposal.  **EPA could easily resolve the issue by simply creating three distinct set-asides:**  One for new market entrants; one for small late-discovered importers; and one for late recipients of application-specific allowances.  Any un-allocated allowances remaining in any set-aside could simply be allocated pro rata to the general pool, as EPA has already proposed with respect to the single set-aside.

**Second, the size of the set aside pool is arbitrarily small, and EPA has proposed arbitrary company-specific "caps" on available allowances.**  EPA has arbitrarily proposed to cap any new market entrant's allocation from the set aside pool at 200,000 consumption allowances, although it is taking comment on up to 1 million allowances.  But capping allowances arbitrarily treats new market entrants differently than companies in the general pool, where a company's market share for allocation purposes is not capped, but is rather divided pro rata.

EPA also derived the 200,000 figure from the *median* of "new" importers.  Using a median value ignores potentially vast differences in import data for new market entrants.  For example, with respect to FluoroFusion, a cap of 200,000 (or even 1 million EVe tons) would be arbitrarily low, given that the company imported 3.5 million $CO_2$e tons in 2020—and transparently reported those figures to EPA under subpart OO.

FluoroFusion has seen such explosive growth precisely because of the value that we provide to the HFC economy—both in terms of our advanced reclamation techniques, and our production of specialty low-GWP blends.  Yet capping our available allowances based on the median imports of new companies would stifle that American innovation and manufacturing at our North Carolina facility and prevent needed growth for U.S. HFC reclaim.

The following hypothetical illustrates the arbitrariness of EPA's proposal as applied to FluoroFusion:  Imagine a company that imported 4 million CO2e tons of HFCs in 2017, but only *one ton* per year in 2018, 2019, and 2020.  Under EPA's proposal, that company's pro rata allocation from the general consumption allowance pool would be based on its 4 million CO2e ton figure from 2017—despite the fact that it barely imported at all since.  **But a newer company like FluoroFusion that imported approximately 3.5 million $CO_2$e tons in 2020–and is growing *today* in response to *current market demand* for reclamation and low-GWP blends– would be capped at potentially 200,000 EVe tons.**  This despite the fact that FluoroFusion is exactly the type of new, cutting-edge reclamation company that Congress sought to uplift in the AIM Act.[5]  That makes no sense.

---

[5] *See, e.g.*, 42 U.S.C. § 7675(h)(2)(A) (requiring the Administrator, whenever "carrying out [the AIM Act]," to consider the use of his available to AIM Act authority "to increase opportunities for the reclaiming of regulated



3950 Powhatan Road
Clayton, NC  27520
tel: 919.827.4748
www.fluorofusion.com

Furthermore, as comments in the docket illustrate, other companies have come to rely on our capabilities—so an arbitrary cap like the one EPA proposes would have also significant ripple effects throughout the HFC market. [6]

We support a per-company cap of 5 million EVe tons or, alternatively, that EPA decline to finalize any cap at all.  Additionally, we support a separate pool solely for new market entrants, with at least 15 million EVe tons.

### C.  2020 import requirement.

Ultimately, FluoroFusion is not wedded to receiving allowances through a new market entrant set aside pool.  Ordinarily, the company might have avoided the effects of EPA's proposed hierarchy and caps by simply declining to seek allowances from the new market set-aside, and instead relying on Kivlan & Co. to secure allowances in its own right from the general pool, and transfer those to FluoroFusion.  After all, Kivlan & Co. imported millions of $CO_2e$ tons of HFCs in 2017, 2018, and 2019, and is a closely related company, by ownership and operations, as described above.

The problem is that Kivlan & Co. did not import HFCs in 2020, *precisely because FluoroFusion and Kivlan & Co. are interrelated*.  Unfortunately, EPA has proposed that bulk importers who did not import in 2020 should not receive consumption allowances—no matter what their imports were in 2017, 2018, or 2019.  We agree that the allocation process should not be a windfall for companies that have exited the HFC import market.  **But that logic falls apart with respect to Kivlan & Co., which did not exit the market but instead transitioned its business to the interrelated, jointly owned company**.

Regardless of what EPA decides to do with the above recommendations, below we suggest some minor tweaks that would advance EPA's goals with respect to the initial allowance allocation without arbitrarily erecting barriers to FluoroFusion.  We appreciate that EPA is carefully considering these comments so that it may address inadvertent effects that run contrary to the purpose of the AIM Act, EPA's own fairness-based precedents in other allowance programs, and EPA's own stated goals for this rulemaking.

---

substances used as refrigerants"); Initial Comments of FluoroFusion Specialty Chemicals Inc., Docket ID No. EPA-HQ-OAR-2021-0044-0056 (May 28, 2021), at 2–3 (discussing same).

[6] *See, e.g.*, Comment of Chadwell Supply, Docket ID No. EPA-HQ-OAR-2021-0044-0069 at p. 1 (discussing purchases from FluoroFusion); *id.* at 2 (**"I am afraid that [the] Set-Aside may do just that: we get set aside. So my cry to the EPA: Please protect us small businesses who believe in you as you protect our environment."**).



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com



2. <u>SOLUTIONS</u>: **We suggest several options for minor adjustments that EPA could finalize that would eliminate the arbitrary gaps that penalize companies like FluoroFusion, while advancing EPA's goals of a seamless and equitable transition based on robust data.**

We suggest three options for ameliorating this arbitrary and unfair result described above with respect to FluoroFusion and Kivlan & Co.: **(A)** allocating to FluoroFusion from the general pool, using its only full year of GHGRP data and then preferably, per our earlier-submitted comments, multiplying that prior year data by a "reclaimer multiplier"; [7] **(B)** allocating to FluoroFusion and Kivlan & Co. from the general pool, combining their historical imports and allocating allowances to FluoroFusion; or **(C)** waive the proposed 2020 import requirement for Kivlan & Co. in recognition of its unique circumstances, and preferably issue Kivlan & Co.'s allowances from the general pool to FluoroFusion (as the de facto successor to Kivlan & Co.'s import business), based on Kivlan & Co.'s pre-2020 import.

A. **Option A:  Allocate Consumption Allowances to FluoroFusion from the General Pool, Using FluoroFusion's Only Full Year of Data (2020) to Determine Its Pro Rata Share**

Particularly for large new market entrants like FluoroFusion—so large that they are reporting annually under subpart OO—there are few reasons to treat them differently than more-established market participants who have been importing HFCs for longer periods of time. Accordingly, the simplest option is for EPA to allocate to FluoroFusion and similar companies from the general consumption pool, using our 2020 import data (our only full calendar year) as the basis of our pro rata share.

If EPA has doubts about using 2020 GHGRP data because it has not been fully validated by the Agency, such concerns are misplaced for at least three reasons:

● First, in other contexts, EPA has proposed that it would consider non-certified data as part of allocating to importers, "so long as the company provides import and export records to EPA, such as Customs forms or bills of lading, to document their historic practice consistent with that required under subpart OO."[8]  That is of course a reasonable approach, and we support it for the bulk importers much smaller than FluoroFusion.  But here, FluoroFusion literally documented its "historic practice consistent with…subpart OO" by *filing reports under subpart OO*.  We would be happy to present EPA with the same types of direct records to substantiate our 2020 filings.

---

[7]  Initial Comments of FluoroFusion Specialty Chemicals Inc., Docket ID No. EPA-HQ-OAR-2021-0044-0056 at p. 10 (discussing design of allocation program to increase opportunities for reclaiming).

[8] 86 Fed. Reg. at 27,169.



3950 Powhatan Road
Clayton, NC  27520
tel: 919.827.4748
www.fluorofusion.com

- Second, relying solely on 2020 data would still put companies at a disadvantage relative to their peers in the general pool, because they would only have one year of full data to rely on (2020) rather than their strongest among multiple years.  But that is the nature of newer companies, and it is still much better than arbitrarily excluding new companies entirely or arbitrarily capping their access to HFC imports.

- Third, if it turns out that any 2020 GHGRP data is false, EPA has significant authorities to remedy any ill-gotten allowances.  We fully support EPA's proposal prohibiting individuals from providing false information to EPA regarding the AIM Act, and EPA's proposal to recognize the Agency's "full discretion to retire, revoke, or withhold the allocation of allowances for actions in contravention of" Part 84.[9]  Such provisions are consistent with the AIM Act,[10] as well as sound public policy.  And of course, every certification of a subpart OO report requires the designated representative to certify their awareness of the significant penalties for submitting false statements.[11]  The problem with GHGRP data are the companies who import and *don't* report—not the ones like FluoroFusion and Kivlan & Co. who have dutifully reported.

In addition to recognizing FluoroFusion's 2020 data, we also suggest that EPA modify its allocation formula to reflect the "reclaimer multiplier" that FluoroFusion proposed in its initial comments, and that other reclaimers have proposed as well.[12]  Although our original comments focused on application of that multiplier to new entrant participants in the set-aside pool, we believe that, for the reasons described in those earlier comments, the same formula should be applied when providing allowances to a reclaimer via the general allowance pool. We therefore request that FluoroFusion's 2022 allowance be determined based on its 2020 import year data multiplied by the reclaimer multiplier that we proposed for 2022.

If EPA declines to adopt a reclaimer multiplier in its initial allocation, we ask that FluoroFusion still be allocated allowances from the general pool based on 2020—its only full year of data. Such an approach would be preferable to relegating us to an inadequately small and arbitrarily capped set-aside pool.

---

[9] 86 Fed. Reg. at 27,209–10 (proposed regulations at 40 C.F.R. § 84.5(f)–(g)).

[10] 42 U.S.C. § 7675(e)(2)(D)(ii); *id.* § 7675(k)(1)(A).

[11] *See* 40 C.F.R. § 98.4(e)(1).

[12]  Initial Comments of FluoroFusion Specialty Chemicals Inc., Docket ID No. EPA-HQ-OAR-2021-0044-0056 at p. 10 (discussing design of allocation program to increase opportunities for reclaiming). **Other stakeholders have made similar comments on the proposal.** *See, e.g.*, Comments of Fireside Holdings Inc. (DBA American Refrigerants Inc.), Docket ID No. EPA-HQ-OAR-2021-0044-0086 at p. 1 (proposing "that reclaimers receive allocations on a 4:1 basis" to help enable "blending out of mixed material").

Addm. 104



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

**This option would likely be the simplest and most equitable solution, and would have the least market-disrupting effects.** For those reasons, we suggest that EPA adopt it for FluoroFusion and companies like ours. However, in the interest of offering EPA many solutions to this inadvertent problem, below we offer alternative ways EPA could make minor fixes in the final rule that would address the arbitrary consequences of the proposal as applied to us.

> **B.  Treat FluoroFusion and Kivlan & Co. as Related Entities, with Prior Year Import Levels Combined for Purposes of the General Allowance Pool, and Issue Allowances to FluoroFusion**

As described above, FluoroFusion and Kivlan & Co. are related entities. It would be entirely appropriate for EPA to treat them as the same entity for purposes of calculating recent and historic HFC import volumes, and to allocate allowances to FluoroFusion based on those combined histories.

For companies controlled or "owned by the same corporate entity," EPA has proposed to allocate allowances for subsidiaries directly to the parent company—in part to "improve transparency in the market."[13] FluoroFusion and Kivlan & Co. are so interrelated that we are prepared to make FluoroFusion the parent company of Kivlan & Co., prior to October 1, 2021, if need be. Our willingness to do that reflects how related we already are as a functional matter.

But we do not want to arbitrarily structure our business relationship solely to accommodate EPA's regulations if the same transparency goals can be achieved without it.

> **C.  Recognize an Exception for Kivlan & Co. Eligibility for Allowances Based on Prior Year Baselines, Notwithstanding the Fact that Kivlan & Co. Did Not Import in 2020, and allocate the allowances to FluoroFusion as Kivlan & Co.'s Successor.**

As a further fallback, we suggest that EPA waive the 2020 import requirement for Kivlan & Co. in light of the individual circumstances that led Kivlan & Co. to not import in 2020 (i.e., all resources went to FluoroFusion). In light of the interrelationship between Kivlan & Co. and FluoroFusion, allocating based on Kivlan & Co.'s prior imports would further the purpose of EPA's proposal. As the Agency explained:

> EPA is proposing to allocate allowances only to companies that produced or imported in 2020, even if they were active in prior years, **to increase the likelihood that allowances are allocated to companies that are active in the HFC market**. If a company was not actively producing or importing in 2020, EPA would generally **presume** this means the

---

[13] 86 Fed. Reg. at 27,169.



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

business exited the production and/or import market. Allocating allowances to companies no longer producing or importing would be **at the expense of companies who are still actively invested in HFC production and import**. However, the Agency is open to consider something different from this presumption for individual companies if their inactivity was due to the COVID-19 pandemic **or some other reason, and they have documentation to justify such inactivity**. If a company wants individualized consideration of their market inactivity or activity in 2020, it must submit comments on this rulemaking containing relevant information no later than the end of the comment period.[14]

The reason for Kivlan & Co.'s inactivity in 2020 is simple:  Because of increased competition and trade-related regulatory uncertainty, Dynatemp stopped selling HFC refrigerants that were packaged in foreign countries and shifted to selling only HFC refrigerants that were packaged domestically by FluoroFusion with foreign and domestic components sourced by FluoroFusion. In 2019, because of the interrelationship between Kivlan & Co. and FluoroFusion, Kivlan phased-out its imports to zero as FluoroFusion correspondingly ramped up its import activities. As a functional matter, the owner of Kivlan & Co. was transitioning focus and resources to the new, related business, and shifted the import model from imports of packaged blends (subject to import duties) to imports of raw materials by FluoroFusion directly, for blending here in the United States.  Accordingly, by the end of 2019, Kivlan & Co. was importing nothing and FluoroFusion (the new venture) was importing everything.  This transition is clearly reflected in the GHGRP data for 2019 for both companies (submitted by H. Brad Kivlan for both companies).

As discussed above, if Kivlan & Co. had not ramped its imports down to zero by the end of 2019—but had instead tried to contrive a continued import presence by, for example, importing a single ton of HFCs in 2020—then we would not be in this situation.  But we did not try to game the system.  We acted like normal small business owners do, shifting resources away from one venture into a related venture.

Accordingly, under this approach, **for the 2022 calendar year allocation alone**, EPA would consider the unique circumstances of Kivlan & Co. in 2020 and waive the default requirement that a company have imported in 2020.  Accordingly, Kivlan & Co.'s allocation would be determined based on pre-2020 years of data (e.g., under EPA's main proposal, the high year of 2017–2019).

Because the individual circumstances giving rise to this situation stem from FluoroFusion's direct relationship to Kivlan & Co., we ask that EPA issue the allowances directly to FluoroFusion because it is the *de facto* successor to Kivlan & Co.'s import operations (i.e., as if it were the parent company of Kivlan & Co.).

---

[14] 86 Fed. Reg. at 27,169–70.

Addm-106



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

**3. Additional Comments About the Proposed Rule:   EPA Should Provide Clarity About the Meaning of "in Arrears" with respect to AD/CVD Payments.**

EPA frames its proposed rule as requiring that:

> [A]ny entity that is subject to a [Department of Commerce] Final Determination and is requesting allowances for 2022 or 2023 must provide documentation of payment of the AD/CVD for HFC imported in 2017 through the date of this proposed rule, or provide evidence that those imports were not required to pay AD/CVD for those years.[15]

FluoroFusion and Kivlan & Co. have posted all requisite cash-deposits and has no outstanding bills issued by Customs.  Our experience with the Customs process has shown us that EPA's proposal requires additional clarity.  In the final rule, EPA should clarify and elaborate on the above statement in the following manner:

> Any entity that is subject to a Department of Commerce Final Determination pursuant to 19 U.S.C. §1671d and/or §1673d; an Antidumping or Countervailing Duty Order pursuant to 19 U.S.C. §1671e and/or 1673e; or whose entries are subject to an antidumping or countervailing duty administrative reviews pursuant to 19 U.S.C. §1675 and is requesting allowances for 2022 or 2023 must provide documentation of payment of the AD/CVD duties for HFC imported in 2017 through the date of the proposed rule at the request of EPA, or provide evidence that those imports were not required to pay AD/CVD duties for those years.

Furthermore, EPA should also specifically define the term "payment" to mean either of the following:

- o Payment means the posting of an estimated cash deposit in accordance with 19 U.S.C. §1671e(a)(3) and §1673e(a)(3); or
- o Payment shall also mean the final payment of duties upon liquidation of an entry subject to AD/CVD duties pursuant to 19 U.S.C. §1675(a)(3)(B).

Without the above definitions as prescribed by the statute governing antidumping and countervailing duties, the potential exists for the EPA to effectively institute an alternative assessment process that is in conflict with the statutory delegated authority given to the Department of Commerce.

---

[15] 86 Fed. Reg. at 27,186.



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

EPA goes on in its preamble to further state that otherwise, if CBP determines that an allowance holder is "not in compliance with or are otherwise in arrears with their AD/CVD during those years," EPA proposes that such company will not be allocated any allowances for 2022 or 2023, and could have allowances revoked if it is subject to a Final Determination "and does not pay the required AD/CVD within the required time frame…."[16]  The above explanations in EPA's preamble to its proposed regulations should not be limited to only those entries subject to a Final Determination but rather should cover Final Determinations; Antidumping and Countervailing Duty Orders; and the results of administrative reviews.

The proposed regulatory text similarly uses the phrase "in arrears" as a trigger for this potential authority:

> (h) Anti-Dumping/Countervailing Duties. The relevant Agency official reserves the right to retire, revoke, or withhold the allocation of allowances to any otherwise qualifying importer that is *in arrears* with Anti-Dumping/Countervailing Duties required under a final determination from the Department of Commerce.[17]

The proposed regulatory language should be revised to reflect the full statutory construct of antidumping and countervailing duty proceedings as follows:

> (h) Anti-Dumping/Countervailing Duties. The relevant Agency official reserves the right to retire, revoke, or withhold the allocation of allowances to any otherwise qualifying importer that is *in arrears* with Anti-Dumping/Countervailing Duties required by a Final Determination pursuant to 19 U.S.C. §1671d and/or §1673d; an Antidumping or Countervailing Duty Order pursuant to 19 U.S.C. §1671e and/or 1673e; or whose entries are subject to an antidumping or countervailing duty administrative reviews pursuant to 19 U.S.C. §1675a final determination as determined by the Department of Commerce.

EPA should further clarify the circumstances surrounding non-payment or failure to pay duties that EPA will consider "in arrears," to ensure that it does <u>not</u> include any of the following circumstances:
- entries for which cash deposits have been paid and are held in suspended status; or
- entries for which payments were made as the result of (A) a protest pursuant to 19 U.S.C. § 1514 and 19 C.F.R. §174.12, or (B) offers in compromise in accordance with 19 U.S.C. §1617 and 19 C.F.R. §§172.31-172.33 (Subpart D).

---

[16] *Id.*

[17] 86 Fed. Reg. at 27,210/1 (proposed 40 C.F.R. § 84.5(h)).

Addm-108



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

A company should not be considered in arrears while the legal proceedings are still pending, including reviews at the U.S. Department of Commerce, protests with CBP, or appeals to the courts.

EPA's proposal does not sufficiently account for the fact that there are multiple stages involved in the payment of duties during the AD/CVD process, including preliminary payments based on estimated duties. These stages are important to understand in order for EPA to truly assess whether an importer is "in arrears" or not.

1. The effect of an affirmative final determination as articulated in the Department of Commerce Regulations at 19 C.F.R. §351.210(d) is for the Secretary of Commerce to take the actions described in the statute under 19 U.S.C. §1671d(C)(1)(B)(ii) to "order the posting of a cash deposit . . . for each entry of the subject merchandise in an amount based on the estimated individual countervailable duty rate, the estimated all-others rate, or the estimated country-wide subsidy rate, whichever is applicable." The parallel provision of the statute at 19 U.S.C. §1673d(c)(1)(B)(ii) requires the "posting of a cash deposit . . . for each entry of the subject merchandise in an amount based on the estimated weighted-average dumping margin, or the estimated all-others rate, whichever is applicable."

2. At the time of entry: If an HFC component or blend is subject to antidumping and/or countervailing duties at the time of entry into the United States, then the importer must pay a cash-deposit at the current rate of duty. The cash-deposit is not a final duty but is an estimate of the final duties owed.

3. Concurrent to the posting of the cash-deposit, the entry is also "suspended" which means that duties are not finalized unless and until one of several things occur (a) an administrative review is conducted by Commerce or (b) no administrative review is conducted. The administrative review process is governed by 19 U.S.C. §1675 and follows a prescribed schedule and sequence of events.

4. Upon conclusion of the proceedings referred to as administrative reviews, the Commerce Department—pursuant to 19 U.S.C. §1671; 19 U.S.C. §1673e; and 19 C.F.R. §351.212—must instruct Customs as to which rate each individual entry must liquidate at. An entry may not be liquidated for up to three to five years after the date of entry for consumption into the United States.

5. Upon receipt of the instructions from Commerce, Customs has up to six-months to liquidate entries, and this may be extended by another 90 days depending on the circumstances. This six-month liquidation period assumes that there is no appeal of the final findings by the Department of Commerce. If an entry is subject to appeal, then the

14



3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

entry continues to be in a "suspended" status until the litigation concludes if an injunction issued which is required to maintain the appeal. Only when an entry has been liquidated and no supplemental duties are owed can an entry be determined to be complete. Therefore, EPA must confirm prior to making a determination if an importer is in arrears as to whether (1) the entry (ies) in question are no longer suspended or enjoined; and (2) whether an entry is liquidated but is not subject to a protest under 19 U.S.C. §1514.

6. Upon liquidation, Customs will then issue a bill for the payment of any duties owing plus interest if the liquidation rate is higher than the cash-deposit rate or will refund duties if the cash-deposit rate is higher than the liquidation rate. Unless and until Customs issues a bill there cannot be a determination that an importer is in arrears on any duties owing.

7. If an importer has any discrepancy with the liquidation, it must file a protest within 180 days of the date of liquidation of its entries before an entry is considered to be final. A company is not required to pay any bills during the protest period. If a protest has been filed on an entry then that entry is not considered to be complete and can be subject to revisions of the duties owed, as importers are not required under the statute or regulations to pay any additional duties while the protest is pending.

Additionally, EPA should recognize that, as of the date of filing these comments, CBP is significantly behind in issuing AD/CVD payment final bills and due notices. Our understanding is that these notices typically provide for a 30-day payment window upon issuance, and that payment terms are frequently negotiated between CBP and an affected entity. Bottom line: EPA should recognize that an entity is not "in arrears" until their payment is overdue from the payment schedule established, and EPA should not consider withholding allowances while any good faith negotiations are under way between the importer and CBP for the payment of AD/CVD duties on liquidated entries.

### 4. Additional Relevant Information About the State of the HFC Market, for EPA's Awareness as the Agency Considers Comments

In various public forums with EPA, some stakeholders have asserted that there are surplus HFC stockpiles in the marketplace.

We see no such evidence in the market data. To the contrary, sales demand is higher than forecasted, and the market price of two of the most popular A/C HFC blends on the market today are rising dramatically. As shown in the below charts, drawn from FluoroFusion internal pricing data, the average price of HFC-410A in June has averaged $131/cylinder. This compares to prices in June 2019 and 2020 of $71/cylinder and $74/cylinder, respectively. As of June 30,

**Addm-110**



3950 Powhatan Road
Clayton, NC  27520
tel: 919.827.4748
www.fluorofusion.com

2021, the price had spiked even higher, to $250/cylinder.  That is a price increase of 233% over last year's peak average price ($75/cylinder in May 2020).



Similarly, the average price of HFC-407C in June has averaged $192/cylinder.  This compares to prices in June 2019 and 2020 of $84/cylinder and $79/cylinder, respectively.  As of June 30, 2021, the price had spiked even higher, to $281/cylinder.



If there were actually stockpiles of these HFCs, then one would expect that the increased demand/price would incentivize companies to sell these stockpiled HFCs at a substantial profit.

That is not happening.  Rather, these price spikes are being driven by, among other things, (1) a short supply of HFC-125, HFC-134a, and HFC-32; (2) high replenishment costs; (3) high freight costs; and (4) HFC-125 countervailing, antidumping and critical circumstance duties.

We believe this information will be useful to EPA, including for purposes of responding to commenters who may assert that there are surplus HFC stockpiles in the marketplace.

16

**Addm 111**





3950 Powhatan Road
Clayton, NC 27520
tel: 919.827.4748
www.fluorofusion.com

* * * *

Thank you for your attention to these comments, and all that your dedicated staff are doing to ensure a fair and smooth transition to this new allowance-based framework.  Please feel free to contact Dave, at dave@fluorofusion.com, or Brad Kivlan at brad@fluorofusion.com, with any follow up questions.


Regards,


David P. Couchot                              H. Brad Kivlan, IV
President, FluoroFusion Specialty Chemicals    President, Kivlan and Company, Inc.
                                               Chairman, FluoroFusion Specialty Chemicals


17

*RMS of Georgia, LLC*
610 McFarland 400 Dr.
Alpharetta, GA  30004
770-777-0597
770-777-0599 Fax
www.rmsgas.com





*D.O.T. & E.P.A. Certified Center*

July 6, 2021

**_VIA ELECTRONIC SUBMISSION_**
Hon. Michael Regan, Administrator
U.S. Environmental Protection Agency
EPA Docket Center Air and Radiation Docket
Mail Code 28221T
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

www.regulations.gov

Docket ID: EPA–HQ– OAR–2021–0044

> **Re:    Comments of Choice Refrigerants – _Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program under the American Innovation and Manufacturing Act; Proposed Rule_, 86 Fed. Reg. 27,150 (May 19, 2021)**

Dear Administrator Regan:

RMS of Georgia, LLC d/b/a Choice Refrigerants appreciates the opportunity to submit the following comments on EPA's proposed allocation system implementing the American Innovation and Manufacturing Act phasedown of hydrofluorocarbons (HFCs).[1] Our comments are supplemented by our February 5, 2021 and March 29, 2021 letters transmitting confidential business information which were previously submitted to EPA via electronic mail.

Choice Refrigerants is a producer of patented hydrofluorocarbon ("HFC") blends, including Choice® R-421A and Choice® R-421B refrigerants, as well as Choice®-branded R-410A. Choice is a small business employer based in Alpharetta, Georgia and was one of the first EPA-certified refrigerant reclaimers in the United States.[2]

---

[1] American Innovation and Manufacturing Act of 2020, Consolidated Appropriations Act § 103 (H.R. 2764), Pub. L. No. 110—161, 121 Stat. 2128 (2020).

[2] *See* https://www.epa.gov/section608/epa-certified-refrigerant-reclaimers.

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 2

## I.     Allowances Must Be Allocated to the Company That Would Now Need Allowances

EPA is proposing an HFC allowance allocation system that issues allowances to market participants based on import data and corresponding greenhouse gas reporting data. Import data in EPA's greenhouse gas reporting program and customs records may be appropriate for purposes of calculating the phasedown cap levels for the overall AIM Act allowance pool, but because the data does not necessarily reflect commercial market realities, it is not appropriate or accurate information for purposes of apportionment of baseline allowances or allocation of annual emissions allowances for HFCs – particularly if EPA intends to require allowances for HFC blends.[3] To the extent that EPA decides that producers or importers of HFC blends must hold allowances on the basis of HFC components "within" HFC blends, those allowances must be allocated to the HFC blends producer/importer, not to the producer/importer of the HFC component feedstocks. Otherwise, producers of HFC blends (particularly those like Choice Refrigerants which hold patent rights to proprietary HFC blends products) will suffer an unfair and economically devastating mismatch between the party that receives allowances and the party that ultimately bears the economic burden of the allowance system. EPA's decisions on allowance allocation, quite literally, may mean life or death for small businesses like Choice Refrigerants who have used middlemen importers in past years to import HFC components but would now have to hold allowances for their own products.

### A.     <u>Background on Historical HFC Blend Production/Import</u>

Choice Refrigerants is an American small business based in Alpharetta, Georgia, that has invented several environmentally preferable HFC blend products that substitute for older ozone-damaging Class II refrigerants. Choice's current products include Choice® R-421A, which is a popular drop-in substitute for R-22 in refrigeration systems. Choice® R-421A is an HFC blend produced by combining 1,1,1,2-tetrafluoroethane (known as R-134a when used in stand-alone applications) and pentafluoroethane (known as R-125 when used in stand-alone applications) in a specific ratio, together with a proprietary lubricant. Choice® R-421B is a similar blend product with a different ratio of components. Choice has at times also blended a branded version of R-410A, which is a blend of difluoromethane (R-32) and pentafluoroethane (R-125).

The HFC components R-32, R-134a and R-125 that are used as feedstock to produce Choice's patented and branded products are listed in the AIM Act as regulated substances. *See* AIM §103(c) (table). However, HFC blends generally, and Choice R-421A specifically, are **not** themselves regulated substances under the AIM Act. We are concerned that EPA may require allowances for production or import of Choice® R-421A or other HFC blends on the basis of their HFC feedstock components. Although it does not appear that EPA actually has the authority to regulate HFC blends in this manner, if EPA does require allowances for HFC blends, the ***allowances should be allocated to the blends producer/importer***, rather than to the HFC

---

[3] As discussed below in Part IV, EPA lacks authority to regulate HFC blends that are manufactured from HFC component feedstocks.

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 3

components importer, regardless of what years are used to establish allowance allocations and regardless of what company name is reflected on customs documents.

Because of the unusual language in the AIM Act and the nature of HFC blends, EPA must approach allowance allocations in this context differently from how allowances were allocated in the CFC and HCFC phaseout programs, which did not involve this unusual aspect. This potential mismatch between the importer of components and owner of HFC blend products would be much more aggravated if EPA uses older years of market data for purposes of allowance allocations. For example, prior to international signing of the Kigali Agreement in October 2016, there would have been little reason for market participants to anticipate that EPA would require allowances for HFCs or would use data from years before 2016. This was especially true as EPA was continuing to approve HFC substitutes under its SNAP program.

Choice Refrigerants' confidential letters of February 5, 2021 and March 29, 2021, have provided information to EPA on how our HFC blend products have historically been produced, whether manufactured in the U.S. from imported components or whether imported as pre-blended HFC blends. Business data on Choice's HFC blend production and HFC component purchases for the years 2010–2019 is summarized for EPA's convenience in Appendix A (for R-421A) and Appendix B (for R-410A) of the February 5th letter.

B.     Choice's HFC Blend Production/Import

As described in the business confidential letters, from 2011 thru approximately 2017, Choice Refrigerants produced Choice® R-421A in the United States using HFC components imported primarily from China. In that time period, Choice typically arranged to have HFC components manufactured by a Chinese chemical supplier and shipped to Choice's production facility in Alpharetta, where the components were blended together with a proprietary additive according to ASHRAE specifications. The blend product was then packaged, labeled, and sold to various downstream distributors in the U.S. refrigerant market. Notably, at that time Choice was unable to source HFC components from domestic U.S. chemical manufacturers (and is still unable to do so) because, as has been documented in official government reports, the major domestic HFC chemical producers are unwilling to supply HFC components to smaller producers of R-22 substitutes that compete against their own products and have so-called "swap" agreements among themselves which exclude small businesses such as Choice.[4]

Prior to 2017, Choice had a commercial distribution arrangement with one of its distributors under which that company would arrange for the purchase of shipments of bulk HFC

_____

[4] *See* USITC, *Hydrofluorocarbon Blends and Components from China, Inv. No. 731-TA-1279 (Final),* Pub. 4629 at 11 (Aug. 2016) ("Three domestic integrated producers, Arkema, Chemours, and Honeywell, swap HFC components amongst themselves for use in the production of refrigerant blends. Although the swapping of components subject to these arrangements does not constitute captive production, as that term is ordinarily understood, the swap arrangements constitute something less than a pure merchant market."); *see also* Choice

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 4

component feedstocks from China on behalf of Choice.  The shipments were nominated and shipped through a U.S. port of entry (typically Charleston) to Choice's production facility in Alpharetta. These components were earmarked and used exclusively by Choice for the production of its proprietary HFC blends.  All production of the HFC blends occurred in Choice's Alpharetta facility as described above.  Once the HFC blends were produced by Choice, Choice would ship the finished HFC blend products to its various distributors, including the distributor that facilitated the imports, for further sale to the U.S. refrigerant and air conditioning market.

Although the cost of shipping the HFC components under this arrangement was initially advanced by the distributor who arranged the imports, those costs were credited to the distributor at the time of sale and delivery of the produced HFC blend, such that the purchase price of the HFC components was in reality borne by Choice Refrigerants. Similarly, although the distributor's name appears on customs records, the shipments were at all times intended for Choice and destined for Choice's Alpharetta production facility for use in production of Choice's patented and branded products.  Essentially, the distributor acted as Choice's shipping agent in arranging for shipment overseas, advanced the initial purchase costs, and was reimbursed through an adjustment to the distributor's purchase of HFC blend products from Choice.  Similarly, the distributor reported the import of the HFC components which it had arranged on Choice's behalf in EPA's Greenhouse Gas Reporting Program ("GHGRP").  We believe these reports were filed in the name of the distributor, but as noted those components were intended as chemical feedstocks for the production of Choice's patented and branded products, to which the distributor had no legal or intellectual property rights. Of course, at this time of this arrangement there was no indication that HFC substitutes (which were being actively encouraged under EPA's SNAP program) would be phased out or that HFC imports during these years would ever be considered for purposes of an allowance scheme.  Choice and the distributor currently have no commercial relationship.

Beginning in about 2017, due to market conditions, Choice transitioned to sourcing pre-blended HFC blends from Chinese chemical manufacturers. (Again, Choice was forced to source these HFC feedstocks from overseas because the domestic HFC production industry was unwilling to sell HFC components to smaller U.S. competitors.)  Under this arrangement, Choice's direct Chinese supplier would blend HFC components at a Chinese chemical manufacturing facility on Choice's behalf and export the blended HFC product to Choice in Alpharetta.[5] Choice would either

Refrigerants, *Hydrofluorocarbon Blends from the People's Republic of China: Pre-Preliminary Determination Comments of Choice Refrigerants and Request to Expand the Circumvention Inquiry* at 12 (Apr. 3, 2020) (Barcode # 3961066-01) ("Because the integrated producers trade almost exclusively amongst themselves, domestic components are not freely available to independent U.S. blenders like Choice who market competing, patented blends, and it is therefore critical that access to non-domestic HFC components remain open for such blenders.").

[5] Patented HFC blend products like Choice® R-421A have special status under U.S. trade laws in that they are expressly excluded from antidumping duties on HFC blends.  *See Hydrofluorocarbon Blends From the People's Republic of China: Antidumping Duty Order,* Dck. A–570–028, 81 Fed. Reg. 55,436 (Aug. 19, 2016) ("Also excluded from this order are patented HFC blends, including, but not limited to, ISCEON® blends, including MO99™ (R– 438A), MO79 (R–422A), MO59 (R–417A), MO49Plus™ (R-437A) and MO29™ (R–4

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 5

supply its proprietary lubricant to the Chinese supplier to be blended before shipping, or at other times, Choice would add the proprietary lubricant at its Alpharetta facility once it received the pre-blended product. Choice would then sell the finished HFC blend products, such as Choice® R-421A, to various U.S. distributors for wholesale and retail sales in the refrigerant market.

C.    Allowances Must Be Allocated to Producers/Importers of HFC Blends, Not to HFC Components Importers

Section 103(e)(3) of the AIM Act directs EPA to phase down production and consumption of regulated HFCs "through an allowance allocation and trading program."  Nothing in the statute dictates any particular method for allocation of allowances; however, under general rules of administrative law, any system that EPA adopts must be consistent with the statute and rationally supported by data and policy considerations.  Although Congress chose to establish a baseline for HFC reductions (*i.e.*, the "cap") based on the years 2011-2013 (which is the same approach taken in the Kigali Amendment to the Montreal Protocol), EPA is not directed by the statute to use this three-year period as a reference point for allowance allocations.  Similarly, to the extent that EPA chooses the 2011-2013 period as the allocation baseline (to the extent the agency could articulate a rational basis for doing so), the statute does not dictate any particular method of selecting recipients of allocations.

EPA previously published a notice of data availability ("NODA") that identifies importers of HFCs during the 2011-2013 period based on self-reporting through EPA's GHGRP.[6]  EPA suggested that this data might be used as a basis for allocation of HFC allowances under the AIM Act.  This data, however, reflects only the reporter of HFC as a supplier of U.S. imports, which is not necessarily the entity that actually used or consumed the HFCs in the U.S. market.  For example, an importer may import HFCs as blending components for a customer that then blends the components into the product that is actually sold in commerce. During the 2011-2013 period (almost a decade ago) those parties may not have had an express written agreement as to future allowances, as no legislation was anticipated at that time.  In other situations, the importer of record for customs purposes may be acting as an agent for a customer who would be considered the actual user or consumer of the imported HFCs.  In either situation, if EPA determines that the underlying rationale for allocating allowances is to reflect actual market share of the U.S. refrigerants market during the 2011-2013 period, allocating allowances merely on the basis of what company is listed as the GHGRP reporter or customs importer of record would distort the allocation scheme, as the actual consumer of the HFC product would not receive allowances, and the importer would receive an unwarranted windfall.  These concerns are particularly heightened in the case of patented HFC products, for which importers of HFC components would have no legal license to manufacture or import a patented product except when acting on behalf of, or with the permission of, the patent holder. Where an allocation system is based on market share, it is incumbent on EPA to look to

22D), Genetron® Performax™ LT (R–407F), Choice® R–421A, and Choice® R–421B.").

[6] *Notice of Data Availability Relevant to the United States Hydrofluorocarbon Baselines and Mandatory Allocations*, 86 Fed. Reg. 9,059 (Feb. 11, 2021), EPA–HQ–OAR–2021–0044; FRL–10020–30–OAR.

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 6

the reality behind the data to identify the companies with actual market share, not just blindly apply data that were collected for other purposes.

Applied to this particular situation, it would be fundamentally unfair to require Choice to hold allowances for its continuing importation of pre-blended Choice® R-421A product, but to give free allowances to a different entity (the distributor) based on its arranger role which terminated years ago. In contrast, allocating allowances to the producer of HFC blends accords with the AIM Act's focus on what company is using HFCs in the marketplace, rather than on what company supplied the chemical feedstocks from which the HFC was produced. As discussed, EPA cannot require allowances for HFC blends except within the parameters of §103(c)(3)(B) of the Act, which refers to HFCs "within" HFC blends.

Other sections of the AIM Act similarly indicate that Congress intended allowances to be allocated according to the ultimate user of HFCs, not necessarily to the party that nominally imported HFC component feedstock. For example, §103(e)(4)(B)(iv) of the Act provides for mandatory allocations of allowances to products used in particular applications such as metered-dose inhalers, defense sprays, foams and other commercial uses. This focus on the commercial use of HFCs supports an approach in which allowances for HFCs used in commercial HFC blends should be allocated to the producer and owner of the HFC blend.

The policy considerations are even more compelling when applied to the context of HFC components that were imported as components of domestically produced HFC blends. As discussed below, the statute expressly excludes listing of HFC blends as regulated substances. *See* AIM Act §103(c)(3)(B)(i). If, notwithstanding this express limitation, EPA includes HFC blends in the phaseout program by requiring allowances based on their constituent HFC components, then the producer of HFC blends should receive production and consumption allowances as if the HFC blends were themselves produced in the United States.

This very real concern about a mismatch of allowance allocation and production of blended products has historical roots in EPA's Title VI ODS allocation system, which in certain instances resulted in price spikes and unfair burdens on blend owners. As a particularly close to home example, in the HCFC phaseout, EPA declined to provide allowances to Choice Refrigerants as the producer of the patented blend R-420A, which is a blend of R-142b (a CFC component) and R-134a (an HFC component). At the time, EPA assured Choice that there would be plenty of supply of R-142b and that prices would not increase substantially as a result of the allocation program. Yet, in reality, allowance shortages drove up the price of components such that the blended product could no longer compete in the refrigerant market. Choice Refrigerants encourages EPA to avoid the same mistake when designing the current HFC allowance allocation system.

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 7

      D.    <u>Greenhouse Gas Reporting Data Is Not Necessarily Appropriate for HFC Allowance Allocation</u>

      As EPA recognized in the February 2021 NODA, the purposes of the GHGRP are not identical to the purposes of the AIM Act, although there is some overlap. EPA describes the NODA as reporting "information . . . regarding hydrofluorocarbon consumption and production in the United States for the years 2011, 2012, and 2013." 86 Fed. Reg. at 9,059. EPA stated that the purpose of providing the information was "in preparation for upcoming regulatory actions under the [AIM Act]." *Id.* However, the data in the NODA is actually greenhouse gas reporting data, which is not necessarily the same as consumption and production data as those terms are used in the AIM Act. For the reasons discussed above, the company listed as the reporter for purposes of the GHGRP is not necessarily the party that should be considered to be the importer or producer of HFCs for purposes of allowance allocations, particularly as applied to HFC blends.

      Accordingly, for purposes of the AIM Act, if EPA decides to regulate HFC blends for purposes of setting baselines or allocating allowances, producers/importers of HFC blends (particularly patented HFC blends) should be considered the primary market actors for purposes of regulation and should receive any allocation of HFC allowances.

**II.    EPA Must Issue Allowances to the Patent Holder for Imports of Patented HFC Blends or Components Used to Blend Patented HFC Blends, Not to Intellectual Property Pirates**

      As noted, Choice Refrigerants, is an American small business based in Alpharetta, Georgia that produces patented environmentally preferable HFC blend refrigerant products.  One of our products, Choice® R-421A, has been "pirated" by Chinese-backed refrigerant importers and other market actors that have acted illegally. To the extent that EPA decides under the AIM Act to require producers or importers of HFC blends like Choice® R-421A to hold allowances on the basis of the HFC components "within" those blends,[7] any allowances attributable to HFC components that were used to produce pirated versions of R-421A must be allocated to Choice Refrigerants as the owner of the patented product. Handing allowances to sellers of pirated versions of products would magnify the economic damage to U.S. intellectual property interests wreaked by Chinese-backed companies, contrary to the stated policy of Congress and the last several presidential administrations.

      The following imports of non-patented R-421A, as well as blending components R-125 and R-134a used to blend non-patented R-421A, should be credited to Choice Refrigerants under any allowance allocation and trading system. As noted, Choice Refrigerants is the only licensed producer of R-421A under U.S. law; moreover, Choice Refrigerants is the only producer to have been issued SNAP approval for R-421A and the SNAP approval was based on a data set submitted

---

[7] AIM Act §103(c)(3)(B).

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 8

solely by Choice Refrigerants. Allowances associated with the following imports of R-421A or components used to manufacture pirated R-421A are by right allocable to Choice Refrigerants:

     1.    <u>BMP Imports</u>.  All allowances associated with R-421A imported by LM Supply, Inc., Cool Master USA, LLC, BMP USA, Inc., or other affiliated companies controlled by or under common ownership of Ben Meng should be credited to Choice Refrigerants. This category includes at least 1,410,944 pounds of R-421A known to have been imported by BMP and its affiliates in the 2016-2017 timeframe. These imports represent 1,855,391 tons CO2e (at GWP/Exchange Value of 2,630) [(1,410,944/2000)*2630=1,855,391] for purposes of computing HFC phasedown allowances under the proposed allowance allocation and trading system. This pirated R-421A was imported illegally without a license and was used by Meng-controlled companies to circumvent U.S. antidumping laws, as determined in an official government investigation by the U.S. Department of Commerce, which found that the R-421A imported by Meng-related companies was non-patented and was used to circumvent antidumping duties on HFC blends.[8]

     2.    <u>Dynatemp "R-421A" Product</u>. All allowances associated with HFC blend product labeled as R-421A produced by Dynatemp International, Inc. and/or FluoroFusion Specialty Chemicals, Inc., including any blending components imported to blend such R-421A products, should also be credited to Choice Refrigerants. Beginning in or about 2019 or 2020, these companies began producing and selling a product claimed to be "R-421A", but which is neither patented by them nor licensed to them and is infringing U.S. patent rights.[9] The amount of R-421A produced by these companies is not known at this point, but EPA can determine the amount through customs records, GHGRP data, and information requests directed at those companies.

     In sum, EPA must not implement the AIM Act in a manner that allows companies that flagrantly violate American patent rights to receive economic windfalls from their illegal actions while American inventors and patent holders bear the economic burden. EPA's decisions on allowance allocation may, quite literally, mean life or death for small businesses like Choice Refrigerants who have their intellectual property stolen.

## III.    EPA Must Adjust Allowance Allocation for Market Distortion

     EPA has proposed to allocate HFC consumption allowances on the basis of imports of HFCs into the United States during a designated period of years and has indicated its preference to use a high-water mark approach across the years 2017-2019.[10] EPA describes its rationale for

---

[8] *See Hydrofluorocarbon Blends From the People's Republic of China: Final Scope Ruling on Unpatented R-421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A*, 85 Fed. Reg. 34,416 (June 4, 2020).

[9] *See* Complaint, *R421A LLC v. Dynatemp Int'l*, No. 20-cv-00142 (E.D.N.C. July 27, 2020); *see also* Choice Refrigerants*, Hydrofluorocarbon Blends from the People's Republic of China: Request to Apply Tariff Act § 781(a) and (d) to Prevent Circumvention; Later-Developed HFC Blends,* dated Sept. 9, 2020 (Barcode # 4024206-01).

[10] Proposed Rule, 86 Fed. Reg. at 27,170 ("EPA is proposing that under this initial framework, the amount of allowances to allocate to producers and importers would be determined based on the level of production and import

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 9

this approach as using import data as a proxy for market share in the U.S. HFC markets in order to allocate allowances to market participants in proportion to market share. *See, e.g.*, 86 Fed. Reg. at 27,170 ("EPA is proposing that under this initial framework, the amount of allowances to allocate to producers and importers would be determined based on the levels of production and import in 2017-2019 . . . Every company's highest year amount [of production or import] would then be added together and used to ***determine a percentage market share*** for each company. EPA proposes to then multiply each company's percentage market share with the total amount of available calendar-year allowances to determine each company's production or consumption allowances.") (emphasis added).

We are generally supportive of an allowance system that allocates based on market share over a period of years, as Congress was surely aware that EPA had successfully used a similar system for phaseout of HCFCs and CFCs under the Clean Air Act. However, imports of HFCs into the U.S. have been heavily affected by trade distortions, including dumping of HFCs by Chinese companies, circumvention of trade duties, subsidies by the Chinese government and manipulation of markets by certain importers, all of which have artificially increased imports by certain companies. As a consequence, the raw import data that EPA would normally be able to rely on is not an accurate proxy for market conditions, market activity, or market share for all companies.

These trade distortions began as early as 2015 but grew more pronounced over the years and reached a crisis level by the 2018-2019 timeframe. If EPA selects years for its allocation system that were affected by trade distortions, it is incumbent on EPA to adjust the import data for each market participant to reflect the level of imports that would have occurred in absence of the trade distortion. Although it might be inconvenient for EPA to conduct the investigation and auditing needed to correct for these market distortions, the evidence of these practices – as established through U.S. government investigations and record evidence before the agency – is so glaring that EPA cannot blind itself to these distortive effects. Only by using recent market data, but adjusting the data to correct for market distortion, can EPA achieve the goals that it identifies in the proposal: (1) to provide a seamless transition; (2) to promote equity and fairness; and (3) to base the system on robust data. 86 Fed. Reg. at 27,169. To ignore the market distortions brought to EPA's attention by various stakeholders would be inconsistent with EPA's obligations under administrative law to act rationally, consider all factors, and explain its reasoning.

A.   EPA Should Adjust Import Data In Light of Market Manipulation

EPA has recognized the existence of market distortions and proposed to take these into consideration, although it does not specify in the proposed rule how it will adjust for the distortion. As EPA states in the proposed rule preamble:

*EPA is proposing that any entity that is subject to a DoC Final Determination and is requesting allowances for 2022 or 2023 must provide documentation of payment of the AD/CVD for HFC imported in 2017 through the date of this proposed rule,*

in 2017-2019. Specifically, EPA is proposing to use a company's highest year of production or import, on an EVe basis, in those years.")

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 10

> *or provide evidence that those imports were not required to pay AD/CVD for those years. EPA is proposing not to allocate to companies in 2022 or 2023 that CBP determines are not in compliance with or are otherwise in arrears with their AD/CVD during those years. After an entity is issued allowances, if it is subject to a DoC Final Determination and does not pay the required AD/CVD within the required time frame, as determined by CBP, EPA proposes that the company may have its allowances for that year revoked or retired, or may not be issued future allowances or may receive a reduced allocation. EPA proposes that it could, after consulting with CBP, also ban a company from receiving allowances in the future as a result of noncompliance with the regulations governing payment of AD/CVD. EPA is also proposing that the Agency would have the discretion to revoke, retire, or withhold allowances for companies that fail to use the correct Harmonized Tariff Schedule (HTS) codes with each shipment of HFCs or HFC blends. Intentionally misdeclaring the HFC or HFC blend in a shipment is one way importers may attempt to illegally import HFCs without allowances or with fewer allowances.*

86 Fed. Reg. at 27,186. Although EPA's proposal to link allowance allocation to payment of trade duties on a company-by-company basis is on the right track, in order to correct for trade distortion EPA must better understand how certain companies have skirted, gamed and circumvented trade laws and taken advantage of the limitations of the trade laws to artificially increase imports that EPA is using as the basis for consumption allowance allocations.

The history of market distortion in the U.S. HFC market is extensive and well-documented and has manifested in various schemes that have distorted the market by artificially increasing imports for some market participants, which would reward wrongdoing if allowances are allocated based on import data without adjustment for market distorting behaviors and unfair advantages. These various schemes that artificially increased imports by some companies, at the expense of others, are described below.

      B.    <u>Dumping and Countervailing Subsidies</u>

It is well documented and incontrovertible that certain importers and their affiliates (which in some cases are owned or controlled by large Chinese chemical companies) unfairly and illegally increased their imports through a variety of schemes, including dumping in contravention of U.S. trade laws, circumvention of trade duties, and sharp business practices, all of which enabled those companies to sell HFCs in the U.S. market at artificially low prices and increase their own imports while strangling imports of other market participants.

The U.S. government has found that beginning in about 2015 and accelerating throughout the 2018-2019 period, Chinese exporters and certain affiliated importers took advantage of trade policies in China that encouraged and rewarded dumping of HFCs into the U.S. market in order to undermine free market pricing and build Chinese export market share in advance of an anticipated

Addm. 122

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 11

phasedown of HFCs in the United States.[11] This serious dumping activity involving a range of HFC chemicals has been documented in official findings of the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("ITC"). These findings include unfair dumping of HFC blends (specifically, R-404A, R-407A, R-407C, R-410A, and R-507A),[12] as well as dumping of HFC chemical components R-134a,[13] R-32,[14] and R-125.[15] Each of these chemicals have significant global warming potential, ranging from 675 to 3500. The degree of dumping is and continues to be so severe that the U.S. government imposed antidumping duties as high as 285% to counteract the market distorting effect of this anti-competitive market behavior.[16]

Another way that certain importers have gained an unfair market advantage is receiving government subsidies from the government of China. For example, the Commerce Department found after an extensive investigation that Chinese chemical companies such as Zhejiang Juhua Co., Ltd. ("Juhua") received Chinese government subsidies which allowed them to sell HFC-125 at below market prices, thus injuring the U.S. economy.[17] Juhua is the parent company of a prominent HFC importer that presumably will claim allowances under the proposed HFC allocation system.[18] This particular importer recently disclosed that it increased its market share of the U.S. HFC market from zero to 50% in only a few years, a distortive shift which is implausible without unfair advantage.[19] Other importers have been found to have received subsidies warranting 291% additional duties to counteract the illegal foreign government

[11] EPA has acknowledged in its rulemaking proposal the concern that "[t]o reward such behavior could harm companies that were already participating in the market." Proposed Rule, 86 Fed. Reg. at 27,170.

[12] *Hydrofluorocarbon Blends from the People's Republic of China: Antidumping Duty Order*, 81 Fed. Reg. 55,436 (Aug. 19, 2016).

[13] *See 1,1,1,2 Tetrafluoroethane (R-134a) From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 12,192) (March 1, 2017) (Barcode # 3547518-01).

[14] *See Difluoromethane (R-32) From the People's Republic of China: Antidumping Duty Order*, 86 Fed. Reg. 13,886 (March 11, 2021) (Barcode # 4097862-01).

[15] *See Pentafluoroethane (R-125) from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination* (June 14, 2021) (C-570-138) (Barcode # 4132385-01) ("R-125 Preliminary CVD Determination").

[16] *Hydrofluorocarbon Blends From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016—2017*, 84 Fed. Reg. 17,380, 17,381 (Apr. 25, 2019) (Barcode # 3825161-01).

[17] *See* R-125 Preliminary CVD Determination at 4; *see also Decision Memorandum for the Preliminary Determination of the Countervailing Duty Investigation of Pentafluoroethane (R–125) From the People's Republic of China*, dated June 11, 2021 ("R-125 PDM").

[18] See R-125 Preliminary CVD Determination at 5 n.10 ("Commerce has found the following companies to be cross-owned with [Zhejiang Quzhou Juxin Fluorine Chemical Co., Ltd. ("Juxin"), a mandatory respondent in the investigation]; Juhua Group Corporation; Zhejiang Juhua Co., Ltd.; Ningbo Juhua Chemical & Science Co., Ltd.; Zhejiang Quzhou Fluoxin Chemicals Co., Ltd.; and Zhejiang Juhua Chemical Mining Co., Ltd."); Zhejiang Juhua Co., Ltd. 2018 Annual Report (disclosing joint venture ownership of iGas USA Inc.) (Attachment A).

[19] *See* iGas USA, Inc., *Notice of Data Availability Relevant to the United States Hydrofluorocarbon Baselines and Mandatory Allocations* (Feb. 25, 2021) (EPA-HQ-OAR-2021-0044-0029) ("iGas NODA Letter").

Addm. 123

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 12

support.[20]  These importers will likely claim a share of allowance allocations on the basis of their artificially increased market shares.

Notwithstanding that Commerce has taken action on a number of illegal dumping and subsidy schemes, it is not sufficient for EPA to only consider trade distortion schemes that were actually discovered and addressed by the Department of Commerce because the trade remedies available have been inadequate to restore balance to the U.S. HFC market. In the rulemaking proposal, EPA is proposing to only take cognizance of schemes that resulted in "payment of the AD/CVD of HFC imported in 2017 through the date of this proposed rule" and where the party failed to pay the amount owed. 86 Fed. Reg. at 27,186 (allowances withheld if company is "not in compliance with or are otherwise in arrears with their AD/CVD during those years"). EPA's approach would be insufficient for several reasons. First, government investigations and findings of antidumping or countervailing subsidies are by nature after-the-fact proceedings, which result only after the distortive behavior occurs. An investigation typically begins when an injured U.S. stakeholder petitions for a proceeding. Usually duties are only imposed prospectively on the cheaters after the Commerce Department initiates an investigation, and there is no standard retroactive remedy or correction for the effects on the market of anti-competitive behavior that occurred prior to the preliminary determination.[21] Second, many cheating schemes go undetected, even if they involve avoidance or circumvention of tariffs or duties. Third, neither the Commerce Department nor apparently any other agency is screening HFC imports for schemes that involve anti-competitive pricing. In other words, Commerce only investigates imports that fall within the traditional pigeon-hole of antidumping or countervailing subsidy investigations, not those involving unfair business practices, collusion or intellectual property theft. In the HFC markets, the Commerce Department has looked at sales by exporters generally but has never investigated how certain importers were able to access unrealistically low HFC pricing in the 2017-2019 timeframe, *i.e.*, pricing that anecdotally undercut the HFC market and which most other U.S. importers could not access (or even dream of). As discussed, this pricing disparity enabled certain companies to dramatically manipulate pre-existing import levels and market shares.  Yet this effect on the HFC market apparently has never been investigated by the Commerce Department, Customs and Border Patrol, or EPA.  Ignoring illegal trading schemes because they have gone unpunished would be like giving a refund to tax dodgers who cheated on their taxes but were never audited or didn't get caught during the 3-year statute of limitations.

---

[20] Preliminary R-125 CVD Determination at 5.

[21] *See, e.g.*, 19 C.F.R. § 351.205(d) (Commerce will require posting of cash deposits only after affirmative preliminary determination months after initiation of an antidumping investigation).  Thus, EPA's memorandum of antidumping and circumvention proceedings in the docket is helpful but is in some respects inaccurate or seems to misunderstand the available trade remedies and severity of the market distortion that can be caused by cheating schemes.  For example, EPA's statement that "CBP will collect duties retroactively" is misinformed because Commerce will only impose retroactive duties for a brief period of 90 days prior to an affirmative finding in the unusual situation of finding critical circumstances under its regulations.  See EPA, *Summary of Antidumping and Countervailing Subsidy Duties Concerning Hydrofluorocarbon (HFC) Imports to the United States* (Apr. 2021) (EPA-HQ-OAR-2021-0044-0046) at 4 (citing 19 C.F.R. 351.206). In reality, Commerce rarely finds critical circumstances and in all cases any HFC imports before that brief 90-day period get away scot-free.

Addm. 124

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 13

      C.    <u>Circumvention Schemes</u>

Although the U.S. government has attempted to staunch the flood of illegal imports of HFCs into the U.S., certain importers devised various circumvention schemes to dodge import duties. Such circumvention ploys have included importing pirated versions of patented HFC blends,[22] imports of intentionally off-specification chemicals,[23] imports of HFCs processed or transshipped through other countries,[24] and imports of HFC components used to blend covered HFC blends, all of which were found by the government to be schemes to avoid paying duties on Chinese imports.[25] In each of these circumvention cheating cases, specific companies were identified that engaged in prohibited behavior to avoid duties and thereby gained market advantage over importers that abided by U.S. trade laws. However, like the antidumping and subsidy cases, no retroactive correction of the market distortion was taken by the government. However, EPA can easily identify these importers from Commerce Department investigative files and can request information from these importers that will show how these companies artificially increased their HFC imports by undercutting pricing in the U.S. market.

      D.    <u>Other Market Manipulation Schemes</u>

In addition to trade violations, certain importers have also used other stratagems to artificially snatch market share away from incumbent market participants. For example, in a

---

[22] *See Hydrofluorocarbon Blends From the People's Republic of China: Final Scope Ruling on Unpatented R-421A; Affirmative Final Determination of Circumvention of the Antidumping Duty Order for Unpatented R-421A*, 85 Fed. Reg. 34,416 (June 4, 2020). In this particularly brazen cheating scheme, the Commerce Department investigation found that certain importers imported over a million pounds of an unpatented version of the HFC product R-421A and secretly used that product to blend other HFC blend products that were covered by a 285% import duty. The Commerce Department found that this behavior constituted circumvention of the HFC Blends antidumping duties. By illegally avoiding these duties, these companies gained an immediate unfair economic advantage in the HFC market that facilitated their sales at lower prices than any other company could match, thus allowing those companies to unfairly build market share. This scheme increased their imports of HFCs, as reflected in customs records and EPA's greenhouse gas reporting system, while lowering imports by other law-abiding importers.

[23] *See Hydrofluorocarbon Blends from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order; Unfinished R-32/R-125 Blends*, 85 Fed. Reg. 15,428 (Mar. 18, 2020) (Barcode # 3955044-01).

[24] *See Hydrofluorocarbon Blends from the People's Republic of China: Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 Fed. Reg. 61,930 (Oct. 1, 2020) (Barcode # 4035170-01).

[25] *See Hydrofluorocarbon Blends from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for HFC Components; and Extension of Time Limit for Final Determination*, 85 Fed. Reg. 20,248 (Apr. 10, 2020) (Barcode # 3963390-01); *Anti-Circumvention Inquiry of Antidumping Duty Order on Hydrofluorocarbon Blends from the People's Republic of China-HFC Components: Final Determination Not to Include Within the Scope of the Order*, 85 Fed. Reg. 51,018 (Aug. 19, 2020) (Barcode # 4017378-01). Although in this proceeding the Commerce Department ultimately did not include HFC components in the HFC Blends antidumping order because of an objection by the ITC relating to the ability of the U.S. government to remedy the illegal behavior, the Commerce Department's factual finding that certain companies circumvented the antidumping duties still stands. The ITC's objection is on appeal to the Court of International Trade, which remains pending. *The American HFC Coalition, and its Members et al v. United States* (1:20-cv-00178-LMG).

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 14

federal lawsuit filed in Florida, a major Chinese supplier of HFCs has alleged that certain importers ran up over $70 million in unpaid accounts payable debt for imports of HFCs during the 2017-2018 timeframe.[26] By importing HFCs but bilking suppliers out of payments, importers can artificially lower their cost of doing business and afford to sell more refrigerant at below-market prices, thus leading to more market share and more imports, in an unending vicious circle of unfair market advantage.  In such a situation, even if an importer is sued and eventually has to repay the debt, the importer has already achieved its anti-competitive goal of importing cheap HFCs (because they didn't have to pay for the product), undercutting market pricing, and grabbing market share.  If the allegations in the T.T. International lawsuit are true, the importers named in that suit essentially got a free (non-consensual) $70 million subsidy by Chinese exporters that no other U.S. importers had access to.  As a result, these importers were able to artificially inflate their imports. EPA cannot in good conscience reward such behavior by using those distorted import volumes as a basis to allocate valuable HFC allowances.

E.    Unexplained Capture of Market Share

Certain companies in the U.S. market dramatically increased their market share of HFC imports since 2016, which raises red flags that EPA should not ignore. Not coincidentally, many of the companies that disproportionately increased market share are the same companies that were identified by the Commerce Department as benefiting from unfair trade practices. For example, in a recent letter to EPA, one group of companies boasted that "through an intense commitment to customer service, new and innovative equipment, and lean operations . . . now supplies over 50% of the aftermarket refrigerants in the United States and a significant percentage of refrigerant sales to original equipment manufacturers."[27]

The U.S. market for HFCs is very much a commodity market that is driven primarily by marginal price differentials. It is implausible that any company could enter the market and in only a few years capture 50% market share without having some economic advantage that is unavailable to the market generally.  Incidental factors such as customer service and lean operations cannot explain this distortion of the market. Similarly, the equipment used in the HFC market is well understood and generally available to any market participant. The  companies that boasted about capturing market share have not disclosed the nature of such supposed innovative equipment that could explain such an economic advantage. Notably, these companies were targets of two of the circumvention schemes investigated by the government.

Before awarding valuable allowances to companies that have increased market share in a manner that is inconsistent with market trends and economically implausible without the help of unfair market advantages, EPA must undertake an economic evaluation to determine if such a

---

[26] Complaint, *T.T. International Co. Inc. v. BMP International Inc. et al.*, No. 8:19-cv-02044 (M.D. Fla., filed Aug. 16, 2019) ¶ 59 ("Defendants failed to pay T.T. in excess of $70 million that remains outstanding for refrigerants and related products" in the 2017 to 2018 timeframe") (Attachment B).

[27] iGas NODA Letter at 1. The letter states that it is "submitted on behalf of iGas USA Inc. ("iGas") and its affiliated companies BMP USA Inc., BMP International Inc., LM Supply Inc., and Cool Master USA, Inc."

**Addm. 126**

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 15

startling jump in market share can be explained, substantiated and justified. In short, sometimes what seems too good to be true is not true.

      F.    <u>EPA Must Adjust for Market Distortion in Any Allowance System</u>

Although the U.S. government has tried to respond to these widespread anti-competitive schemes by imposing antidumping duties prospectively, the nature of our trade laws unfortunately does not remedy retroactive damage to competitors that distorts import levels and market share. In the antidumping and circumvention cases, the damage has already been done in the critical sense that importers who took advantage of dumping or dodged duties through circumvention were able to import HFCs at discounted cost, then sold those HFCs into the U.S. market at discount prices. Through these schemes, those importers increased their own market share while undermining the market share of other market participants. Indeed, in many instances, the economics of the market forced legitimate companies that would normally import directly from China from above-board suppliers to become downstream buyers of HFCs from the companies identified by the government as having gained an unfair economic advantage from dumping, subsidies or circumvention. In short, while certain companies increased their imports through questionable means, other companies unfairly suffered a decrease of imports.

Overall, the activities documented by the Commerce Department had the effect of distorting import data such that, without proper adjustment, import data cannot be used as a reliable proxy for market share. EPA simply cannot use the unadjusted import data for purposes of allocating allowances without unjustly rewarding certain companies that engaged in unfair trade practices or received subsidies from the Chinese government. Put simply, if the EPA were to allocate HFC allowances on raw import data, without adjusting for this documented and obvious market distortion, it would be rewarding Chinese-affiliated exporters and importers or companies who have access to special pricing or subsidies from Chinese connections or that engaged in unfair business practices. EPA may not have authority to enforce trade laws or police business practices, but it does not have to reward market manipulators with valuable allowances.

**IV.    EPA Has No Clear Authority to Require Allowances for HFC Blends**

As noted, §103(c)(3)(B)(i) of the AIM Act prohibits EPA from designating HFC blends as regulated substances "for purposes of phasing down production or consumption of regulated substances." Accordingly, on its face the statute does not authorize EPA to require producers or importers of HFC blends to acquire or hold allowances. The subsequent sub-section, §103(c)(3)(B)(ii), states that the prohibition on designating HFC blends "does not affect the authority of the Administrator to regulate under this Act a regulated substance within a blend of substances." By its plain language, subsection (ii) is not itself a grant of regulatory authority, but rather clarifies that any <u>other</u> authority of EPA to regulate is not diminished by subsection (i).

Addm. 127

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 16

Subsection (ii) does nothing more than preserve EPA's ability to regulate HFC blends in ways that do not implicate "phasing down production or consumption."[28]

Subsection (ii) cannot permissibly be interpreted as a separate grant of authority to EPA to require allowances for HFC blends based on the chemical feedstocks that were used to produce those HFC blends before the products were imported into the United States. Such a strained reading of subsection (ii) is neither logical nor grammatical, as it would gut subsection (i) and would allow EPA for all practical purposes to treat HFC blends as regulated substances, which is exactly what subsection (i) prohibits. If Congress had intended for EPA to require allowances for HFC blends, it could have – and arguably would have – so stated in clear simple language, such as 'EPA may require allowances for regulated substances within a blend of substances.' Instead, Congress chose to specifically prohibit EPA in subsection (ii) from designating or regulating blends for phase-down purposes, while leaving intact EPA's authority to regulate HFC components for purposes other than the HFC phasedown. EPA must interpret the statute with reference to the plain language that Congress chose in the context and grammatical structure that Congress wrote.

HFC blends are chemical mixtures created by physically combining component HFCs into a new product that has unique physical chemical properties, including being an azeotropic mixture in which the gaseous components physically interact to create new behaviors.[29] HFC blends cannot be easily separated back into their component feedstocks without complex fractionation equipment. For all practical purposes, an HFC blend is an entirely different substance than the chemical components from which it was manufactured. The original HFC feedstocks that were used to manufacture the blend lose their individual identity and become part of a new substance, just as sugar, flour and water mixed together become a cake or cookie and lose their identity as the original ingredients.

Even if EPA interprets §103(c)(3)(B) of the Act as authorizing EPA to require allowances for HFC components "within" HFC blends, as discussed in Part I above, it would be fundamentally unfair to allocate allowances to suppliers of HFC components while requiring producers/importers of the HFC blends themselves to hold allowances. This mismatch would be inconsistent with the statutory reference to a "regulated substance within a blend of substances," which implies (if not dictates) that the regulatory focus should be on the HFC substances in its state of being "within" a blend, not as a feedstock component which is physically incorporated into a new HFC blend product and loses its original identity. EPA should not interpret the Act in a manner that creates a situation where one party in the supply chain receives an economic windfall and another party

---

[28] One example of EPA's authority to regulate HFCs, other than requiring allowances for listed regulated substances, is EPA's authority in §103(d) of the Act to require monitoring and reporting of HFC blends imports.

[29] *See, e.g.*, Oxford Dictionary of Physics (8 ed.) (definition of azeotrope); *see also* Air Conditioning, Heating, & Refrigeration Institute, *Blends 101: an introduction to refrigerants* ("Azeotrope: a blend that behaves like a single component refrigerant. When a blend forms an azeotrope, it displays unique and unexpected properties.") (https://www.achrnews.com/articles/82752-blends-101-an-introduction-to-refrigerants).

Choice Refrigerants Comments – AIM Act HFC Allocation System
July 6, 2021
Page 17

bears the economic burden based on market activity nearly a decade ago.

\* \* \*

In sum, Choice Refrigerants supports EPA's approach to establishing an allowance allocation system for phasedown of HFCs, provided that the system takes into consideration the important issues discussed above. Choice Refrigerants appreciates the opportunity to comment on this proposal. If you have any questions, please contact me at (770) 777-0597 or choice.refrigerants@gmail.com.

Respectfully submitted,

Kenneth Ponder
President

Attachments

cc:   Christopher Grundler, Director, Office of Atmospheric Programs
      Cynthia Newberg, Director, Stratospheric Protection Division

**Addm.129**

<u>Attachment A</u>

(Zhejiang Juhua Co., Ltd. 2018 Annual Report)

**Addm. 130**

**PUBLIC VERSION**

The Honorable Wilbur L. Ross, Jr.
July 10, 2019
Page 4.

Imports LLC and EDX, are importing on behalf of iGas.[9]  Both TTI and Lianzhou were

respondents in the original antidumping duty investigation and continue to export HFC

components to iGas, BMP, or their affiliates.[10]  ==In addition, Juhua (aka "Quhua") is a Chinese==

==producer and supplier of TTI[11] as well as an affiliate of iGas, as evidenced by Juhua's 2018==

==annual report.==[12]

        Based on the evidence of the conduct by these specific companies, Commerce can either

make a company-specific finding of circumvention or establish a broader country-wide finding

to prevent circumvention in the future.

        *Second*, Commerce should establish a period of investigation ending May 31, 2019.  This

anti-circumvention proceeding was initiated June 18, 2019.  As shown by the statistics included

in the *Circumvention Allegation*, imports of HFC blends into Tampa (iGas's address) were

surging through the end of 2018.  In 2019, Census statistics indicate that these imports continue

---

[9] **Exhibit 1** (indicating Golden G Imports LLC and EDX are importing HFC components
destined for iGas, as shown by [
                                                          ]).

[10] *See Circumvention Allegation* at Exhibit 2.

[11] *See 1,1,1,2 Tetrafluoroethane (R-134a) from … China: Antidumping Duty Order*, 82 Fed. Reg.
18,422 (Apr. 19, 2017).

[12] *See* **Exhibit 2** ==(demonstrating Juhua recently made substantial investments in iGas) (excerpts==
==translated).==

**CASSIDY LEVY KENT**

**Addm. 131**

Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  HFC Components

Exhibit 2

公司代码：600160                                        公司简称：巨化股份

Zhejiang Juhua Co. Ltd 2018 Annual Report

# 浙江巨化股份有限公司
# 2018 年年度报告



浙江巨化股份有限公司董事会

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

□适用    √不适用

## 5  环保与安全情况

### (1). 公司报告期内重大安全生产事故基本情况
□适用    √不适用

### (2). 报告期内公司环保投入基本情况
√适用    □不适用

单位：万元  币种：人民币

| 环保投入资金 | 投入资金占营业收入比重（%） |
|---|---|
| 1,940 | 0.12 |

### 报告期内发生重大环保违规事件基本情况
□适用    √不适用

### (3). 其他情况说明
□适用    √不适用

## （五）  投资状况分析

### 1、 对外股权投资总体分析
√适用 □不适用

报告期对外股权投资总额 141991.37 万元与上年同比增加 8443.92 万元，上升 6.32%，主要原因为 2018 年度出资 37000 万元增资浙江晋巨化工有限公司、38000 万元增资浙江衢州巨塑化工有限公司、25284.88 万元收购浙江巨化技术中心有限公司、18411.20 万元收购巨化集团财务有限责任公司 16%股权所致。

单位：万元

| 被投资的公司名称 | 主要业务 | 投资方式 | 投资额 |
|---|---|---|---|
| 上海爱新液化气体有限公司 | 批发危险化学品等 | 增资入股 | 433.92 |
| 浙江衢州巨塑化工有限公司 | 聚偏二氯乙烯树脂、聚偏二氯乙烯乳液生产、销售 | 增资 | 38000 |
| 浙江衢州联州致冷剂有限公司 | 混配及单质致冷剂充装等 | 增资 | 6000 |
| iGas USA Inc. | 生产、采购、混配、储存、运输和销售致冷剂及相关产品等 | 新设 | 1000（美元） |
| 浙江晋巨化工有限公司 | 甲醇、液氨等生产和销售等 | 增资 | 37000 |
| 天津百瑞高分子材料有限公司 | 塑料薄膜制品、机械设备制造、加工、销售等 | 收购 | 3046 |
| 巨化集团财务有限责任 | 银监会批准业务 | 收购 | 18411.2 |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/12/19 2:45 PM, Submission Status: Approved

2018 年年度报告

### （六）　重大资产和股权出售

√适用　□不适用

　　经公司董事会七届十次会议、公司2018年第一次临时股东大会审议批准，公司将全资子公司浙江凯圣氟化学有限公司100%股权和浙江博瑞电子科技有限公司100%股权共同作为一个标的进行公开挂牌转让。详见公司临2017－53号《巨化股份转让全资子公司股权及变更部分募集资金投资项目公告》、临2018-02号《巨化股份2018 年第一次临时股东大会决议公告》及临2018－08号《巨化股份转让全资子公司股权进展公告》。

### （七）　主要控股参股公司分析

√适用　□不适用

Name of Subsidiaries and Associated Companies

| 子公司及联营公司全称 | 业务性质 | 经营范围 | 注册资本（万元） | 总资产（万元） | 净资产（万元） | 净利润（万元） |
|---|---|---|---|---|---|---|
| 浙江衢化氟化学有限公司 | 工业制造 | 氟化工原料及氟致冷剂生产、销售 | 22,359.22 | 197,691.08 | 166,679.27 | 60,659.54 |
| 浙江衢州巨新氟化工有限公司 | 工业制造 | 氟致冷剂生产、销售 | 113,014.10 | 170,750.75 | 151,122.08 | 31,194.45 |
| 浙江衢州氟新化工有限公司 | 工业制造 | 氢氟酸生产、销售 | 2,000.00 | 37,990.80 | 16,334.50 | 5,724.32 |
| 浙江衢州巨塑化工有限公司 | 工业制造 | 三氯乙烯、PVDC等生产、销售 | 73,000.00 | 90,601.19 | 71,118.48 | 10,073.51 |
| 天津白瑞高分子材料有限公司 | 工业制造 | 塑料薄膜制品生产、销售 | 1,036.83 | 2,049.11 | 1,652.12 | −35.49 |
| 宁波巨化工科技有限公司 | 工业制造 | 氟化工原料生产、销售 | 26,231.67 | 121,780.49 | 105,356.78 | 41,019.09 |
| 宁波巨化新材料有限公司 | 工业制造 | 化工原料及产品生产销售 | 5,000.00 | 8,012.62 | 3,374.36 | −237.48 |
| 宁波巨榭能源有限公司 | 商品贸易 | 化工原料及产品销售 | 5,000.00 | 28,063.64 | 11,173.32 | 859.59 |
| 衢州巨化锦纶有限责任公司 | 工业制造 | 己内酰胺、环己酮等生产、销售 | 102,067.00 | 94,316.64 | 80,339.95 | 10,848.15 |
| 浙江巨圣氟化学有限公司 | 工业制造 | 氟产品生产、销售 | USD1,200 | 31,394.15 | 22,555.73 | 7,850.35 |
| 浙江衢州鑫巨氟材料有限公司 | 工业制造 | 超高分子量聚四氟乙烯生产、销售 | 3,000.00 | 1,792.82 | 1,404.72 | −0.48 |
| 浙江博瑞电子科技有限公司 | 工业制造 | 电子特气产品等生产、销售 | 72,600.00 | 0.00 | 0.00 | −979.50 |
| 浙江凯圣氟化学有限公司 | 工业制造 | 电子湿化学品生产、销售 | 15,000.00 | 0.00 | 0.00 | −1,179.37 |
| 浙江凯恒电子材 | 工业 | 电子级氢氟酸生 | 1,200.00 | 0.00 | 0.00 | −45.44 |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

USCA11 Case: 21-14213    Document: 135    Filed: 05/02/2022    Page: 191 of 224

**Addm-135**
*Translated via Google Translate*
Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry  -  HFC Components
2018 年年度报告

| 工科技有限公司 | 制造 | 售 | | | | |
|---|---|---|---|---|---|---|
| 浙江硅谷巨赋投资管理有限公司 | 投资 | 投资管理,投资咨询（除证券、期货）,股权投资及相关咨询服务。 | 600.00 | 439.68 | 388.82 | -49.76 |
| 衢州巨化华辰物流有限公司 | 仓储 | 货物仓储 | 2,000.00 | 104.08 | -1,479.55 | -0.02 |
| 浙江巨化股份有限公司兰溪农药厂 | 工业制造 | 农药产品生产 | 2,688.00 | 9.40 | -9,368.56 | -0.14 |
| 中巨芯科技有限公司 | 工业制造 | 电子化学材料、化工产品等生产销售 | 100,000.00 | 111,034.18 | 100,733.58 | -789.91 |
| 上海爱新液化气体有限公司 | 商品贸易 | 危险化学品、化工产品批发,货物及技术进出口 | 428.00 | 8,782.39 | 1,852.68 | 1,048.65 |
| iGas USAInc | 商品贸易 | 化工原料及产品销售 | USD2941.17 | 41,661.58 | 19,574.19 | -595.87 |

注：公司所持浙江博瑞电子科技有限公司、浙江凯圣氟化学有限公司及其子公司浙江凯恒电子材料有限公司股权于 2018 年 4 月全部转让给中巨芯科技有限公司。

来源于单个子公司的净利润或单个参股公司的投资收益对公司净利润影响达到 10%以上的说明：

| 子公司及联营公司全称 | 营业收入（万元） | 营业利润（万元） | 净利润（万元） |
|---|---|---|---|
| 浙江衢化氟化学有限公司 | 356,047.49 | 67,074.65 | 60,659.54 |
| 浙江衢州巨新氟化工有限公司 | 214,217.99 | 40,423.18 | 31,194.45 |
| 宁波巨化化工科技有限公司 | 211,822.82 | 48,953.84 | 41,019.09 |

2018 年，本公司有 3 家子公司及联营企业绩变动在 30%以上，且对公司合并经营业绩造成重大影响，其业绩变动情况及原因如下：

| 公司名称 | 净利润(万元) | | 变动幅度% | 变动原因 |
|---|---|---|---|---|
| | 2018 年 | 2017 年 | | |
| 浙江衢化氟化学有限公司 | 60,659.54 | 28,674.83 | 111.54 | 产品价格上升及产销量增加 |
| 浙江衢州巨新氟化工有限公司 | 31,194.45 | 22,100.97 | 41.15 | 产品价格上升及产销量增加 |
| 宁波巨化化工科技有限公司 | 41,019.09 | 21,382.41 | 91.84 | 产品价格上升及产销量增加 |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

Addm-136
*Translated via Google Translate*
Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components
2018 年年度报告

| 巨化集团财务有限责任公司 | 300,543,751.19 | 184,112,00 0.00 | | 21,614,237.79 | | | | | | 506,269,988.98 | |
| 浙江硅谷巨赋投资管理有限公司 | 2,149,040.18 | | | -243,817.42 | | | | | | 1,905,222.76 | |
| 中巨芯科技有限公司 | 389,999,84 4.00 | | | -3,232,319.25 | 1,250,380.19 | | | | | 388,017,904.94 | |
| 杉杉新材料（衢州）有限公司 | 67,508,626.21 | | | -24,619,434.24 | 200,937.47 | | | | | 43,090,129.44 | |
| 杭州巨赋隆睿股权投资合伙企业（有限合伙） | 10,264,381.80 | | 10,681,433.28 | 417,051.48 | | | | | | | |
| 上海爱新液化气体有限公司 | | 4,339,200.00 | | 3,102,356.08 | | | | | | 7,441,556.08 | |
| iGas USAInc | | 68,317,000.00 | | -2,025,952.19 | 261,192.28 | | | | | 66,552,240.09 | |
| 小计 | 876,596,40 9.68 | 256,768,20 0.00 | 10,681,433.28 | -246,179.03 | 1,865,202.37 | | 4,180,000.00 | | -50,900,878.53 | 1,069,221.21 | |
| 合计 | 903,476,40 9.68 | 256,768,20 0.00 | 10,681,433.28 | -246,179.03 | 1,865,202.37 | | 4,180,000.00 | | -50,900,878.53 | 1,096,101,32 1.21 | 26,880,000.00 |

其他说明

［注1］：本期公司控股合并了原联营企业晋巨化工公司，因此原对其账面价值因合并抵消进行了

转出，同时其对浙江衢州巨化昭和电子化学材料有限公司的股权投资因纳入合并范围而增加。

［注2］：兰溪农药厂股权投资已全额计提减值准备。

## 15、 投资性房地产

投资性房地产计量模式

### (1). 采用成本计量模式的投资性房地产

单位：元  币种：人民币

| 项目 | 房屋、建筑物 | 土地使用权 | 在建工程 | 合计 |
|---|---|---|---|---|
| 一、账面原值 | | | | |
| 1.期初余额 | 34,619,200.25 | | | 34,619,200.25 |
| 2.本期增加金额 | 42,001,038.36 | 2,439,581.28 | | 44,440,619.64 |
| （1）外购 | 7,697,038.36 | | | 7,697,038.36 |
| （2）存货\固定资产\在建工程转入 | 34,304,000.00 | | | 34,304,000.00 |
| （3）企业合并增加 | | 2,439,581.28 | | 2,439,581.28 |
| 3.本期减少金额 | | | | |
| （1）处置 | | | | |
| （2）其他转出 | | | | |

**7、 本期内发生的估值技术变更及变更原因**
□适用 √不适用

**8、 不以公允价值计量的金融资产和金融负债的公允价值情况**
□适用 √不适用

**9、 其他**
□适用 √不适用

### 十二、 关联方及关联交易

**1、 本企业的母公司情况**
√适用 □不适用

单位：万元 币种：人民币

| 母公司名称 | 注册地 | 业务性质 | 注册资本 | 母公司对本企业的持股比例(%) | 母公司对本企业的表决权比例(%) |
|---|---|---|---|---|---|
| 巨化集团有限公司 | 杭州 | 制造业、商业等 | 400,000.00 | 51.91% | 54.09% |
| | | | | | |

本企业的母公司情况的说明

截至 2018 年 12 月 31 日，巨化集团有限公司直接持有本公司 38.65%的股份，另有 13.26%的股份作为 17 巨化 EB 的信托及担保财产存放于巨化集团-浙商证券-17 巨化 EB 担保及信托财产专户（由 17 巨化 EB 的受托管理人浙商证券作为名义持有人），通过全资子公司浙江巨化投资有限公司持有本公司 2.18%的股份，合计表决权比例为 54.09%。

本企业最终控制方是浙江省人民政府国有资产监督管理委员会
其他说明：
无

**2、 本企业的子公司情况**
本企业子公司的情况详见附注
√适用 □不适用
详见本财务报表附注在其他主体中的权益之说明。

**3、 本企业合营和联营企业情况**
本企业重要的合营或联营企业详见附注
□适用 √不适用

本期与本公司发生关联方交易，或前期与本公司发生关联方交易形成余额的其他合营或联营企业情况如下
√适用 □不适用

| 合营或联营企业名称 | 与本企业关系 |
|---|---|
| IGAS USA, INC. | 本公司联营企业 |
| 上海巨化实业发展有限公司 | 本公司联营企业 |
| 杉杉新材料（衢州）有限公司 | 本公司联营企业 |
| 浙江工程设计有限公司 | 本公司联营企业 |
| 浙江衢州福汇化工科技有限公司 | 本公司联营企业 |

2018 年年度报告

| 浙江菲达环保科技股份有限公司 | 同受巨化集团有限公司控制 |
|---|---|

其他说明
无

### 5、 关联交易情况
#### (1). 购销商品、提供和接受劳务的关联交易
采购商品/接受劳务情况表
√适用 □不适用

单位：元 币种：人民币

| 关联方 | 关联交易内容 | 本期发生额 | 上期发生额 |
|---|---|---|---|
| 巨化集团有限公司 | 材料、水电等 | 2,362,818,813.23 | 2,031,097,204.12 |
| 浙江晋巨化工有限公司 | 甲醇、氮气等 | 515,518,739.46 | 553,853,481.63 |
| 巨化集团公司汽车运输有限公司 | 运费、修理服务等 | 263,998,048.42 | 237,961,986.10 |
| 浙江巨化装备制造有限公司 | 工程物资、备件材料等 | 67,506,828.10 | 36,726,486.37 |
| 浙江巨化化工矿业有限公司 | 萤石矿 | 65,446,333.35 | 66,284,099.72 |
| 浙江巨化化工材料有限公司 | 工程物资、彩扩费 | 51,214,115.33 | 14,618,386.65 |
| 巨化集团公司兴化实业有限公司 | 绿化费、餐费等 | 36,646,253.99 | 43,537,992.92 |
| 浙江巨化电石有限公司 | 高纯氮、电石等 | 23,456,011.13 | 29,794,467.80 |
| 浙江巨化物流有限公司 | 运费、仓储服务等 | 5,498,919.83 | 3,869,973.74 |
| 浙江歌瑞新材料有限公司 | 钢衬 PTFE 直管等 | 5,201,834.21 | 14,506,069.67 |
| 上海巨化实业发展有限公司 | 烟煤、技术咨询服务 | 3,839,696.85 | 166,337.83 |
| 浙江巨化新联化工有限公司 | 编织袋等 | 3,692,695.75 | 60,613,224.82 |
| 衢州氟硅技术研究院 | 检测费、咨询服务 | 3,527,097.08 | 1,797,659.25 |
| 浙江南方工程建设监理有限公司 | 监理服务 | 3,389,502.01 | 2,443,138.91 |
| 巨化控股有限公司 | 咨询服务 | 1,547,169.82 | |
| 浙江博瑞电子科技有限公司 | 氯化氢 | 1,497,432.00 | |
| 浙江科健安全卫生咨询有限公司 | 危害预防评价服务 | 639,622.64 | |
| 杉杉新材料（衢州）有限公司 | 六氟磷酸锂 | 436,068.38 | 670,016.56 |
| 浙江凯圣氟化学有限公司 | 硝酸、盐酸等 | 354,128.21 | |
| 浙江巨化集团进出口有限公司 | 化工原料 | 309,860.68 | 3,802,921.92 |
| 浙江巨化汉正新材料有限公司 | 化工原料 | 287,145.21 | 1,078,888.89 |
| 巨化集团公司工程有限公司 | 修理费等 | 159,262.04 | 40,264,778.00 |
| 浙江清科环保科技有限公司 | 技术咨询服务 | 61,320.76 | |
| 浙江华江科技股份有限公司 | 技术测试服务 | 55,660.38 | 2,564.11 |
| 浙江衢州巨泰建材有限公司 | 过磅费等 | 53,070.32 | |
| 浙江工程设计有限公司 | 技术咨询服务 | 37,735.85 | 1,149,260.01 |
| 巨化集团公司制药厂 | 仓储服务 | 8,490.57 | |
| 浙江衢州福汇化工科技有限公司 | 无水氢氟酸 | | 3,896,154.70 |
| 兰溪市双凤巨龙供水有限公司 | 水电费 | | 177,366.99 |
| 合 计 | | 3,417,201,855.64 | 3,148,312,460.71 |

出售商品/提供劳务情况表 <mark>Sale of goods / provision of labor</mark>
√适用 □不适用

单位：元 币种：人民币

| 关联方 | 关联交易内容 | 本期发生额 | 上期发生额 |
|---|---|---|---|
| IGAS USA, INC. | 材料销售 | 233,708,704.68 | |

<mark>Current period</mark>

211 / 235

4、本期支付巨化集团财务有限责任公司借款利息 193,877.08 元,上年同期为 188,681.25 元。

## 6、 关联方应收应付款项 Related party receivables and payables

### (1). 应收项目

√适用 □不适用

单位:元　币种:人民币

| 项目名称 | 关联方 | 期末余额 | | 期初余额 | |
|---|---|---|---|---|---|
| | | 账面余额 | 坏账准备 | 账面余额 | 坏账准备 |
| 应收票据及应收账款 | IGAS USA, INC. | 24,593,101.95 | 1,229,655.10 | | |
| 应收票据及应收账款 | 巨化集团有限公司 | 21,277,887.26 | 295.83 | 16,045,382.49 | 751,769.11 |
| 应收票据及应收账款 | 杉杉新材料(衢州)有限公司 | 15,369.52 | 1,536.95 | 97,293.84 | 4,864.69 |
| 应收票据及应收账款 | 浙江博瑞电子科技有限公司 | 313,783.56 | 4,104.66 | | |
| 应收票据及应收账款 | 浙江歌瑞新材料有限公司 | 8,744,970.60 | 437,248.53 | | |
| 应收票据及应收账款 | 浙江锦华新材料股份有限公司 | 7,053,685.18 | 352,684.26 | | |
| 应收票据及应收账款 | 浙江凯恒电子材料有限公司 | 2,144,559.42 | 107,227.97 | | |
| 应收票据及应收账款 | 浙汀凯圣氟化学有限公司 | 1,756,659.06 | 87,832.95 | | |
| 应收票据及应收账款 | 浙江衢州福汇化工科技有限公司 | 3,977,494.45 | 198,874.72 | 13,593,935.91 | 334,696.80 |
| 应收票据及应收账款 | 浙江衢州巨化昭和电子化学材料有限公司 | 106,740.47 | 5,337.02 | | |
| 应收票据及应收账款 | 浙江巨化化工矿业有限公司 | 113.74 | 5.69 | 390.62 | 19.53 |
| 应收票据及应收账款 | 兰溪农药厂 | 60,266,197.95 | 33,507,430.15 | 60,266,197.95 | 33,507,430.15 |
| 应收票据及应收账款 | 浙江晋巨化工有限公司 | | | 3,750.00 | 187.50 |
| 应收票据及应收账款 | 浙江巨化汉正新材料有限公司 | | | 5,682,377.27 | 284,118.86 |
| 应收票据及应收账款 | 浙江巨化装备制造有限公司 | | | 6,339,527.36 | 316,976.37 |
| 应收票据及应收账款 | 巨化集团公司工程有限公司 | | | 366,630.86 | 18,331.54 |
| 应收票据及应收账款 | 浙江巨化化工材料有限公司 | 300,000.00 | | 982,000.00 | |
| 应收票据及应收账款 | 上海巨化实业发展有限公司 | | | 77,595.00 | |

Filed By: jcannon@cassidylevy.com, Filed Date: 7/10/19 2:45 PM, Submission Status: Approved

| | | | | | | 期计提减值准备 | 准备期末余额 |
|---|---|---|---|---|---|---|---|
| 宁波巨化公司 | 157,390,000.00 | | | | 157,390,000.00 | | |
| 衢化氟化公司 | 310,415,418.21 | | | | 310,415,418.21 | | |
| 兰溪氟化公司 | 39,500,000.00 | | | | 39,500,000.00 | | |
| 凯圣氟化公司 | 158,142,190.40 | | | 158,142,190.40 | | | |
| 巨塑化工公司 | 345,314,463.69 | 380,000,000.00 | | | 725,314,463.69 | | |
| 巨邦高新公司 | 8,295,155.94 | | | | 8,295,155.94 | | |
| 联州致冷公司 | 23,228,533.69 | 60,000,000.00 | | | 83,228,533.69 | | |
| 巨圣氟化公司 | 57,904,009.55 | | | | 57,904,009.55 | | |
| 宁波巨榭公司 | 50,000,000.00 | | | | 50,000,000.00 | | |
| 衢州鑫巨公司 | 19,500,000.00 | | | | 19,500,000.00 | | |
| 巨化香港公司 | 81,712,100.00 | | | | 81,712,100.00 | | |
| 巨新氟化公司 | 1,130,141,018.00 | | | | 1,130,141,018.00 | | |
| 巨化锦纶公司 | 1,162,474,055.83 | | | | 1,162,474,055.83 | | |
| 氟新化工公司 | 25,428,126.93 | | | | 25,428,126.93 | | |
| 博瑞电子公司 | 726,000,000.00 | | | 726,000,000.00 | | | |
| 丽水福华公司 | 10,000,000.00 | | | | 10,000,000.00 | | |
| 巨化检安公司 | 25,572,575.48 | | | | 25,572,575.48 | | |
| 技术中心 | | 76,528,276.98 | | | 76,528,276.98 | | |
| 研究院 | | 42,994,445.78 | | | 42,994,445.78 | | |
| 晋巨化工公司 | | 429,471,794.54 | | | 429,471,794.54 | | |
| 兰溪农药厂 | 26,880,000 | | | | 26,880,000 | | 26,880,000 |
| 合计 | 4,357,897,647.72 | 988,994,517.30 | 884,142,190.40 | 4,462,749,974.62 | | 26,880,000 |

## (2). 对联营、合营企业投资 Investment in joint ventures and joint ventures

√适用 □不适用

单位：元 币种：人民币

| 投资单位 | 期初余额 | 本期增减变动 | | | | | | | | | 期末余额 | 减值准备期末余额 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 追加投资 | 减少投资 | 权益法下确认的投资损益 | 其他综合收益调整 | 其他权益变动 | 宣告发放现金股利或利润 | 计提减值准备 | 其他 | | | |
| 一、合营企业 | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| 小计 | | | | | | | | | | | | |
| 二、联营企业 | | | | | | | | | | | | |
| 中巨芯科技有限公司 | 389,999,844.00 | | | -3,232,319.25 | 1,250,380.19 | | | | | | 388,017,904.94 | |
| 上海巨化 | 24,568, | | | 1,479,4 | | | | | | | 26,048 | |

*Translated via Google Translate*
Barcode:3858922-01 A-570-028 CIRC - Anti Circumvention Inquiry - HFC Components
2018 年年度报告

| 项目 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 实业发展有限公司 | 740.70 | | | 45.96 | | | | | ,186.66 |
| 浙江衢州巨化昭和电子化学材料有限公司 | 11,878,211.12 | | | 752,629.33 | 90,368.99 | | | | 12,721,209.44 |
| 浙江晋巨化工有限公司 | 58,762,360.14 | | | 709,434.40 | | | | -59,471,794.54 | |
| 浙江衢州福汇化工科技有限公司 | 10,921,454.34 | | | 1,660,180.60 | | | 4,180,000.00 | | 8,401,634.94 |
| 巨化集团财务有限责任公司 | 300,543,751.19 | 184,112,000.00 | | 21,614,237.79 | | | | | 506,269,988.98 |
| 浙江硅谷巨赋投资管理有限公司 | 2,149,040.18 | | | -243,817.42 | | | | | 1,905,222.76 |
| 杉杉新材料（衢州）有限公司 | 60,900,227.72 | | | -24,248,869.84 | 200,937.47 | | | | 36,852,295.35 |
| 杭州巨赋隆睿股权投资合伙企业（有限合伙） | 10,264,381.80 | | 10,681,433.28 | 417,051.48 | | | | | |
| 上海爱新液化气体有限公司 | | 4,339,200.00 | | 3,102,356.08 | | | | | 7,441,556.08 |
| iGas USAInc | | 68,317,000.00 | | -2,025,952.19 | 261,192.28 | | | | 66,552,240.09 |
| 小计 | 869,988,011.19 | 256,768,200.00 | 10,681,433.28 | -15,623.06 | 1,802,878.93 | | 4,180,000.00 | -59,471,794.54 | 1,054,210,239.24 |
| 合计 | 869,988,011.19 | 256,768,200.00 | 10,681,433.28 | -15,623.06 | 1,802,878.93 | | 4,180,000.00 | -59,471,794.54 | 1,054,210,239.24 |

其他说明：
无

### 4、 营业收入和营业成本

#### (1). 营业收入和营业成本情况

√适用　□不适用

单位：元　币种：人民币

| 项目 | 本期发生额 | | 上期发生额 | |
|---|---|---|---|---|
| | 收入 | 成本 | 收入 | 成本 |
| 主营业务 | 4,605,156,440.59 | 3,691,011,791.29 | 3,991,059,783.62 | 3,251,273,922.28 |
| 其他业务 | 538,996,389.97 | 519,169,614.52 | 422,155,610.92 | 415,092,948.07 |
| 合计 | 5,144,152,830.56 | 4,210,181,405.81 | 4,413,215,394.54 | 3,666,366,870.35 |

**Addm. 142**

<u>Attachment B</u>

(Complaint, T.T. International Co. Inc. v. BMP International Inc. et al.,
No. 8:19-cv-02044 (M.D. Fla., filed Aug. 16, 2019))

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

T.T. INTERNATIONAL CO., LTD.,

           Plaintiff,

v.

BMP INTERNATIONAL INC.,
BMP USA, INC., and iGAS USA, INC.,

           Defendants.

CASE NO.:

## COMPLAINT

Plaintiff T.T. International Co., Ltd. ("T.T." or "Plaintiff") sues Defendants, BMP International, Inc., BMP USA, Inc., and iGas USA, Inc. (collectively the "Defendants"), and alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for damages arising out of T.T.'s shipment and the Defendants' acceptance of (a) over $14 million of refrigerants, disposable cylinders, and related products to Defendant BMP International; (b) over $58 million of refrigerants, disposable cylinders, and related products to Defendant BMP USA; and (c) over $1 million of refrigerants, disposable cylinders, and related products to Defendant iGas USA. Thus, the Defendants owe T.T. in excess of $70 million, plus interest.

2.      The shipments are evidenced by, among other things, invoices issued by T.T. to each of the three Defendants, as follows:

    a.   Complete, accurate, and authentic copies of the invoices for T.T.'s shipments to Defendant BMP International are attached as composite **Exhibit A** (the "BMP International Invoices"). These invoices are dated between June 9 and August 1, 2017.

    b.   Complete, accurate, and authentic copies of the invoices for T.T.'s shipments to Defendant BMP USA are attached as composite **Exhibit B** (the "BMP USA Invoices"). These invoices are dated between July 28, 2017 and May 25, 2018.

    c.   Complete, accurate, and authentic copies of the invoices for T.T.'s shipments to Defendant iGas USA are attached as composite **Exhibit C** (the "iGas USA Invoices"). These invoices are dated between July 10 and 25, 2018.

3.    The Defendants received, retained, and in all or some instances resold these goods. However, they have refused and failed to pay T.T. for these refrigerants, disposable cylinders and related products. Consequently, T.T has suffered damages in excess of $70 million.

## THE PARTIES

4.    Plaintiff T.T. is a company organized under the laws of the People's Republic of China, which at all material times had its principal place of business in Dalian, China.

5.    Defendant BMP International is a Florida corporation with its principal place of business in Tampa, Florida. Thus, it is a Florida citizen.

6.    Defendant BMP USA is a Florida corporation with its principal place of business in Tampa, Florida. Thus, it is a Florida citizen.

7.     Defendant iGas USA is a Florida corporation with its principal place of business in Tampa, Florida.  Thus, it is a Florida citizen.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and it is between the citizens of a State and a citizen of a foreign state.

9.     The Court has personal jurisdiction over BMP International because it is a citizen of Florida.

10.     The Court has personal jurisdiction over BMP USA because it is a citizen of Florida.

11.     The Court has personal jurisdiction over iGas USA because it is a citizen of Florida.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BMP International, BMP USA, and iGas USA reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

13.     T.T. is engaged in the business of manufacturing and selling of refrigerants, disposable cylinders, and related products.  T.T. often works with importers in countries such as the United States to sell its products into markets outside of China.  T.T. does not maintain any offices, employees, or agents within the United States.  Nor does T.T. itself import product into the United States.

14.     The Defendants are business organizations that, among other things, import refrigerants, disposable cylinders, and related products to the United States.  The Defendants market themselves as wholesalers of refrigerant and related products.  Accordingly, the Defendants resell the refrigerant and related products that they receive from T.T. and presumably other suppliers.

15.     At all relevant times, the Defendants were controlled, in whole or in part and directly or indirectly, by Xianbin "Ben" Meng, who resides in the Tampa Bay area.

16.     On or about February 1, 2012, Meng contacted T.T. by email on behalf of BMP International.  Meng stated that he viewed T.T.'s materials at the AHR Expo in Chicago—an industry trade show—and that he wanted a price quotation for several refrigerants.

17.     At all relevant times, Meng controlled and directed the operations of BMP International.  On information and belief, Meng has served, and continues to serve, as BMP International's president.

18.     As Meng requested, T.T. provided a price quotation for refrigerants and related products.  Meng subsequently notified T.T. that BMP International accepted its proposed terms.

19.     Consequently, T.T. sent invoices and shipping documents for BMP International's first order to Meng.  In or about August 2012, T.T., through its shipping agent, shipped the refrigerants and related products that BMP International had ordered to an address in Tampa, Florida that Meng had provided.

20.     T.T.'s invoices for BMP International's orders placed in 2012 stated the number and type of packages, described the goods and quantity, provided shipping details, and

included the following terms of payment: "10% against proforma invoice, 90% balance before arriving".

21.      On or about March 27, 2015, T.T. transmitted the first invoice to BMP International that substituted "O/A 60 days" as the term of payment.  The term "O/A" means "open account."

22.      During the month of September 2015, T.T. transitioned to using "O/A 60 days from B/L date" as the term of payment on all invoices it sent to the Defendants and their related entities.  The term "B/L" means "bill of lading."

23.      At Meng's request, in or about June 2015, T.T. began shipping refrigerants and related products to Defendant BMP USA.

24.      The invoices and shipping documents that T.T. sent to BMP USA for these goods were identical or substantially similar in form to those that T.T. utilized for BMP International and, accordingly, they contained essentially the same information.

25.      At all relevant times, Meng controlled and directed the operations of BMP USA.  On information and belief, Meng has served, and continues to serve, as BMP USA's president.

26.      At Meng's request, in or about August 2015, T.T. began shipping refrigerants and related products to LM Supply, Inc.  Meng represented to T.T. that BMP International controlled LM Supply and was responsible for making payments on its behalf.

27.      The invoices and shipping documents that T.T. sent to LM Supply for these goods were identical or substantially similar in form to those that T.T. utilized for BMP International and BMP USA.  Accordingly, they contained essentially the same information.

28.     Thus, BMP International (a) placed orders with T.T. for LM Supply; and (b) paid for the refrigerants and related products that T.T. shipped to LM Supply from one of the same accounts which BMP International made payments for goods it received from T.T.

29.     At Meng's request, in or about March 2016, T.T. shipped refrigerants and related products to BMP International while invoicing "R Lines."  On information and belief, R Lines is controlled, in whole or in part and directly or indirectly, by Meng.  BMP International served as the consignee on the corresponding shipping documents and made payment for the goods shipped.

30.     The invoices and shipping documents that T.T. sent to R Lines for these goods were identical or substantially similar in form to those that T.T. utilized for BMP International and other Meng-controlled companies.  Accordingly, they contained essentially the same information.

31.     Thus, BMP International (a) placed orders with T.T. ostensibly in the name of R Lines; and (b) paid for the refrigerants and related products that T.T. shipped to BMP International with invoices in R Lines' name but with shipping documents showing BMP International as consignee.

32.     At Meng's request, in or about June 2016, T.T. began shipping refrigerants and related products sending invoices to Assured Comfort AC, Inc.  Meng represented that BMP International controlled Assured Comfort, and was responsible for making payments on its behalf.

33.     The invoices and shipping documents that T.T. sent to Assured Comfort for these goods were identical or substantially similar in form to those that T.T. utilized for BMP

International and other Meng-controlled companies.  Accordingly, they contained essentially the same information.

34.    Thus, BMP International (a) placed orders with T.T. for Assured Comfort; and (b) paid for the refrigerants and related products that T.T. shipped to Assured from one of the same accounts from which BMP International made payments for goods it received from T.T.

35.    During the period from July 2017 to May 2018, the orders T.T. received for refrigerants and related products: (a) decreased significantly from BMP International; and (b) increased significantly from BMP USA.  Thus, while Meng continued to place the orders for these goods, he increasingly directed T.T. to ship to and invoice BMP USA rather than BMP International.

36.    During the period from July 2017 to May 2018, Meng continued to direct some invoices to affiliate entities including: (a) R-Lines, and (b) Coolmaster USA, Inc.—another Meng-controlled entity.    During this period, T.T. understood—based upon Meng's representations among other things—that BMP USA and or BMP International would ultimately take responsibility for payment.

37.    Meng introduced Coolmaster USA as a related company to BMP USA and sought to have T.T. enter a relationship with Coolmaster USA as part of its continued relationship with BMP USA and BMP International.

38.    The invoices and shipping documents that T.T. sent to Coolmaster USA for these goods were identical or substantially similar in form to those that T.T. utilized for BMP USA and other Meng-controlled companies.  Accordingly, they contained essentially the same information.

39.    During 2018, Meng also directed T.T. to make shipments directly to customers and or suppliers of his companies including: (a) Materiales Electricos de Const. y Refrig., S.A.; (b) Lenz Sales & Distribution, Inc.; and (c) Puremann, Inc.  T.T. understood—based upon Meng's representations among other things—that if the customer and or supplier invoiced did not pay for the refrigerant gases and related products, BMP USA or BMP International would bear ultimate responsibility for the payment.

40.    At Meng's request, in or about June 2018, T.T. began shipping refrigerants and related products to Defendant iGas USA, another company controlled, in whole or in part by Meng.

41.    T.T.'s invoice and shipping documents to iGas USA were identical or substantially similar in form to those that T.T. utilized for BMP International and other Meng-controlled companies.  Accordingly, they contained essentially the same information.

42.    During July 2018, T.T. received orders for refrigerants and related products from Defendant iGas USA, but not from BMP International, BMP USA, or any of their affiliates.

43.    At all relevant times, the following companies were controlled, directly or indirectly and in whole or in part, by Meng:

    a.   BMP International, Inc.;

    b.   BMP USA, Inc.;

    c.   LM Supply, Inc.;

    d.   R Lines;

    e.   Assured Comfort AC;

    f.   iGas USA, Inc.; and

    g.   Coolmaster USA, Inc.

44.    From approximately February 2012 until approximately July 2018, T.T. maintained a business relationship with one or more of the Defendants. During that time, T.T. received orders from Meng or someone under his direction, who would inform T.T. of (a) the products and quantities requested, and (b) to which of the Defendants, affiliated companies, customers, or suppliers of a Defendant the order should be shipped.

45.    During this time period, T.T. maintained a custom and practice of consistently sending invoices and attendant shipping documents for the refrigerants and related products ordered by the Defendants, or by or for LM Supply, R Lines, Assured Comfort AC, or Coolmaster USA (collectively, the "affiliates"), which specified the type and quantity of goods, number and kind of packages, related shipping details, and terms of payment.

46.    From approximately August 2012 to approximately November 2018, the Defendants continued to make payments on account for amounts owed to T.T. for goods it supplied to them.

47.    When T.T. received a payment from the Defendants, it generally credited that payment to the oldest outstanding invoice or invoices. If, however, there was a newer invoice closer in amount to the payment received, T.T. would, at times, credit the payment to the invoice closer in amount due to the payment rather than to the oldest invoice.

48.    Thus, in its normal business operations, T.T. generally employed a balance forward system of accounting.

49.    However, the Defendants have not made any payments to T.T. since approximately November of 2018.

50.    In or about late July 2018, Meng, acting in his capacity as a representative of each of the Defendants, met with representatives of T.T. in Shanghai, China.  During that meeting, Meng stated that the Defendants no longer wished to purchase refrigerants and related products from T.T.

51.    Consequently, T.T. demanded that the Defendants pay all of the amounts due T.T. for goods it supplied to the Defendants and their affiliates.

52.    Moreover, T.T. provided Meng and, therefore, the Defendants, with a USB drive containing a statement of outstanding invoices rendered by T.T. to the Defendants.

53.    Thereafter, the Defendants did not dispute the amounts that T.T. had detailed that each Defendant owed.  Moreover, Defendants continued to make payments to T.T. until approximately November 2018.

54.    Throughout the period from approximately November 2018, until near the time this Complaint was filed, T.T. made repeated demands via email, telephone, and other messaging forms to Meng and the Defendants that the Defendants pay for the goods they received.

55.    In or about May 2019, a T.T. representative traveled from Dailan, China to Tampa, Florida, met with Meng, and demanded payment from the Defendants.

56.    Despite these repeated demands, the Defendants have made no payments since approximately November 2018, and have never disputed the amounts owed.

57.     Neither the Defendants, or any of their affiliates, have ever returned any of T.T.'s shipments as defective, deficient, or otherwise.  On the contrary, the Defendants and their affiliates retained the refrigerants and related products that they received from T.T.

58.     Moreover, on information and belief, the Defendants, either directly or through one or more of their affiliates, resold all or, at a minimum, a significant amount of the goods they received from T.T.  Nevertheless, the Defendants failed to pay T.T. in excess of $70 million that remains outstanding for refrigerants and related products.

59.     T.T. has engaged Dentons US LLP and Greenberg Traurig, P.A. to represent it in this action and is obligated to pay counsel reasonable fees for their services.

60.     All conditions precedent to the commencement of this action and the granting of the relief requested have occurred, have been satisfied, or have been waived.

### COUNT I - Breach Of Contract By BMP International

61.     T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

62.     T.T. made offers to enter into contracts with Defendant BMP International by transmitting invoices ahead of the transfer of goods that contained a description of the kind and quantity of the goods, the price of those goods, and attendant payments terms.  Complete, accurate, and authentic copies of each invoice are included in composite **Exhibit A**.

63.     T.T. rendered the BMP International Invoices between approximately June and August 2017.

64.     The BMP International Invoices require this Defendant to pay T.T. the amounts set forth on them—which totals in excess of $14 million in principal—for the refrigerants and related products BMP International received from T.T.

65.    All of the BMP International Invoices included the payment term "O/A 60 days from B/L date".

66.    As to each invoice, BMP International accepted T.T.'s offer by, among other things, accepting and retaining the refrigerants and related products that this Defendant received from T.T.

67.    T.T. shipped all of the goods in the quantity and kind specified by the BMP International Invoices.

68.    BMP International breached these contracts by failing to pay the total amounts due under the BMP International Invoices within the time specified by the payment term on each invoice.

69.    As a direct result of Defendant BMP International's breach of the contracts, T.T. has suffered damages.

WHEREFORE, T.T. demands judgment against BMP International for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT II - Breach of Contract by BMP USA

70.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

71.    T.T. made offers to enter into contracts with Defendant BMP USA by transmitting invoices ahead of the transfer of goods that contained a description of the kind and quantity of the goods, the price of those goods, and attendant payments terms.  Complete, accurate, and authentic copies of each invoice are included in composite **Exhibit B**.

72.    T.T. rendered the BMP USA Invoices between approximately July 2017 and May 2018.

73.    The BMP USA Invoices require this Defendant to pay T.T. the amounts set forth on them—which totals in excess of $58 million in principal—for the refrigerants and related products BMP USA received from T.T.

74.    All of the BMP USA Invoices included the payment term "O/A 60 days from B/L date".

75.    As to each invoice, BMP USA accepted T.T.'s offer by, among other things, accepting and retaining the refrigerants and related products that this Defendant received from T.T.

76.    T.T. shipped all of the goods in the quantity and kind specified by the BMP USA Invoices.

77.    BMP USA breached these contracts by failing to pay the total amounts due under the BMP USA Invoices within the time specified by the payment term on each invoice.

78.    As a direct result of Defendant BMP USA's breach of the contracts, T.T. has suffered damages.

WHEREFORE, T.T. demands judgment against BMP USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT III - Breach of Contract by iGas USA

79.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

80.   T.T. made offers to enter into contracts with Defendant iGas USA by transmitting invoices ahead of the transfer of goods that contained a description of the kind and quantity of the goods, the price of those goods, and attendant payments terms.  Complete, accurate, and authentic copies of each invoice are included in composite **Exhibit C**.

81.   T.T. rendered the iGas USA Invoices in or around July 2018.

82.   The iGas USA Invoices require this Defendant to pay T.T. the amounts set forth on them—which totals in excess of $1 million in principal—for the refrigerants and related products iGas USA received from T.T.

83.   All of the iGas USA Invoices included the payment term "O/A 60 days from B/L date".

84.   As to each invoice, iGas USA accepted T.T.'s offer by, among other things, accepting and retaining the refrigerants and related products that this Defendant received from T.T.

85.   T.T. shipped all of the goods in the quantity and kind specified by the iGas USA Invoices.

86.   iGas USA breached these contracts by failing to pay the total amounts due under the iGas USA Invoices within the time specified by the payment term on each invoice.

87.   As a direct result of Defendant iGas USA's breach of the contracts, T.T. has suffered damages.

WHEREFORE, T.T. demands judgment against iGas USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT IV - Unjust Enrichment by BMP International

88.     T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

89.     From approximately June to approximately August 2017, T.T. shipped to Defendant BMP International refrigerant gas and related products worth in excess of $14 million with the expectation that BMP International would timely remit payment for the goods it received.

90.     BMP International acknowledged that the goods were sent and accepted the benefit of these refrigerant gas and related products by arranging for them to pass through United States Customs and subsequently taking possession.

91.     BMP International also accepted the benefit of the goods it received from T.T. by, among other things, reselling all or, at a minimum, a significant amount of these refrigerant gas and related products.

92.     BMP International failed to remit any payment to T.T. for the goods this Defendant received during this period.

WHEREFORE, T.T. demands judgment against BMP International for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT V - Unjust Enrichment by BMP USA

93.     T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

94.     From approximately August 2017 to approximately October 2018, T.T. shipped refrigerant gas and related products worth in excess of $58 million at the direction of Defendant

BMP USA with the expectation that BMP USA would timely remit payment for the goods it received.

95.    BMP USA acknowledged that the goods were sent and accepted the benefit of these refrigerant gas and related products by arranging for them to pass through United States Customs and subsequently taking possession.

96.    BMP USA also accepted the benefit of the goods it received from T.T. by, among other things, reselling all or, at a minimum, a significant amount of these refrigerant gas and related products.

97.    BMP USA failed to remit any payment to T.T. for the goods this Defendant received during this period.

98.    In addition, BMP USA directed T.T. to ship some refrigerant gas and related products to its customers and or suppliers with the promise that BMP USA would render payment to T.T.

99.    Upon information and belief, BMP USA retained the benefit of these goods by, among other things, accepting and retaining compensation and or product from customers and or suppliers that received goods from T.T.

100.    T.T. received no compensation from BMP USA for the goods BMP USA directed T.T. to ship to its customers and or suppliers.

101.    Furthermore, BMP USA directed T.T. to ship refrigerant gas and related products to its various affiliates with the promise that BMP USA would render payment to T.T.

USCA11 Case: 21-14213    Document 59    Date Filed: 05/02/2022    Page: 215 of 224
Case 8:19-cv-02044-CEH-AEP   Document 1   Filed 08/16/19   Page 17 of 26 PageID 17

Addm-159

102.    Upon information and belief, BMP USA retained the benefit of these refrigerant gas and related products by sharing in the proceeds realized by its affiliates from the resale of those goods.

103.    Despite BMP USA's promise to pay for goods received by its affiliates, T.T. has not received any compensation for the goods shipped to BMP USA's affiliates at its direction.

WHEREFORE, T.T. demands judgment against BMP USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT XII - Unjust Enrichment by iGas USA

104.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

105.    From approximately July to approximately August 2018, T.T. shipped to Defendant iGas USA refrigerant gas and related products worth in excess of $1 million with the expectation that iGas USA would timely remit payment for the goods it received.

106.    iGas USA acknowledged that the goods were sent and accepted the benefit of these refrigerant gas and related products by arranging for them to pass through United States Customs and subsequently taking possession.

107.    iGas USA also accepted the benefit of the goods it received from T.T. by, among other things, reselling all or, at a minimum, a significant amount of these refrigerant gas and related products.

108.    iGas USA failed to remit any payment to T.T. for the goods this Defendant received during this period.

WHEREFORE, T.T. demands judgment against iGas USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT VII - Account Stated by BMP International

109.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

110.    Before the institution of this action, T.T. and Defendant BMP International had business transactions between them beginning in 2012.

111.    T.T. stated the amounts due to it from BMP International by, among other things, issuing invoices for each transaction.

112.    The invoices issued to BMP International included those invoices from approximately June until approximately August 2017, for which the stated accounts remain unpaid.  Complete, accurate and authentic copies of these invoices are attached as composite **Exhibit A**.

113.    The total value of these business transactions was in excess of $14 million.

114.    In addition, T.T. provided BMP International, through Meng, with a USB drive containing a statement of all amounts due on or about July 30, 2018.

115.    The USB drive contained a statement of BMP International and BMP USA's accounts itemized by invoice number.  Thus, BMP International could engage in simple arithmetic to confirm the total of its unpaid invoices to T.T. according to the stated account.

116.    T.T. continued to demand payments through at least May of 2019.

117.    During the period T.T. demanded payments, BMP International did not dispute the total amounts due.

118.    BMP International implicitly promised to make payment to T.T. on the account by, among other things: (a) retaining the refrigerants and related products that it received from T.T.; (b) reselling these goods to customers; (c) not objecting to the stated amounts due; and (d) continuing to make payments on the account after receiving the stated balances.

119.    Nevertheless, BMP International ceased making payments in or about November 2018, leaving a balance due on the account in excess of $14 million.

WHEREFORE, T.T. demands judgment against BMP International for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT VIII - Account Stated as to BMP USA

120.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

121.    Before the institution of this action, T.T. and Defendant BMP USA had business transactions between them beginning in 2015.

122.    T.T. stated the amounts due to it from BMP USA by, among other things, issuing invoices for each transaction.

123.    The invoices issued to BMP USA included those invoices from approximately July 2017 until approximately May 2018, for which the stated accounts remain unpaid. Complete, accurate and authentic copies of these invoices are attached as composite **Exhibit B**.

124.    The total value of these business transactions was in excess of $58 million.

125.    In addition, T.T. provided BMP USA, through Meng, with a USB drive containing a statement of all amounts due on or about July 30, 2018.

126.    The USB drive contained a statement of BMP USA and BMP International's accounts itemized by invoice number.  Thus, BMP USA could engage in simple arithmetic to confirm the total of its unpaid invoices to T.T. according to the stated account.

127.    T.T. continued to demand payments through at least May of 2019.

128.    During the period T.T. demanded payments, BMP USA did not dispute the total amounts due.

129.    BMP USA implicitly promised to make payment to T.T. on the account by, among other things: (a) retaining the refrigerants and related products that it received from T.T.; (b) reselling these goods to customers; (c) not objecting to the stated amounts due; and (d) continuing to make payments on the account after receiving the stated balances.

130.    Nevertheless, BMP USA ceased making payments in or about November 2018, leaving a balance due on the account in excess of $58 million.

WHEREFORE, T.T. demands judgment against BMP USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT IX - Account Stated as to iGas

131.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

132.    Before the institution of this action, T.T. and Defendant iGas USA had business transactions between them beginning in 2018.

133.    T.T. stated the amounts due to it from iGas USA by, among other things, issuing invoices for each transaction.

134.    The invoices issued to iGas USA included those invoices from in or around July 2018, for which the stated accounts remain unpaid.  Complete, accurate and authentic copies of these invoices are attached as composite **Exhibit C**.

135.    The total value of these business transactions was in excess of $1 million.

136.    In addition, T.T. provided iGas USA, through Meng, with a USB drive containing a statement of all amounts due on or about July 30, 2018.

137.    The USB drive contained a statement of iGas USA's accounts itemized by invoice number.

138.    T.T. continued to demand payments through at least May of 2019.

139.    During the period T.T. demanded payments, iGas USA did not dispute the total amounts due.

140.    iGas USA implicitly promised to make payment to T.T. on the account by, among other things: (a) retaining the refrigerants and related products that it received from T.T.; (b) reselling these goods to customers; and (c) not objecting to the stated amounts due.

141.    Nevertheless, iGas USA did not make payments, leaving a balance due on the account in excess of $1 million.

WHEREFORE, T.T. demands judgment against iGas USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

**COUNT X - Open Account as to BMP International**

142.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

143.    From approximately June to approximately August 2017, T.T. sold Defendant BMP International refrigerant gas and related products worth in excess of $14 million.

144.    Throughout T.T.'s business relationship with BMP International, T.T. maintained an account for this Defendant containing charges and payments for all sales transactions between the companies.  T.T. kept Defendants BMP International's and BMP USA's accounts in a ledger and determined the amounts due from each Defendant by itemizing each of their respective invoices.

145.    T.T. generally included the charges invoiced to BMP International's affiliates in the account as it was BMP International's practice to (a) direct T.T. to ship to and or invoice the affiliates and (b) pay T.T. for goods shipped to and or invoiced to the affiliates.

146.    Until approximately November 2018, BMP International made payments on its account, which T.T. duly recorded.

147.    Since approximately November 2018, BMP International has not made a payment on its account with T.T.

148.    Through simple analysis of the itemized invoice numbers in the account, T.T. could identify the transactions for which BMP International was responsible.

149.    A complete, accurate, and authentic copy of BMP International's itemized account with T.T. is attached as **Exhibit D**.

150.    As set forth on **Exhibit D**, BMP International owes the principal amount stated in the open account, which is in excess of $14 million, for goods this Defendant received and accepted from T.T.

WHEREFORE, T.T. demands judgment against BMP International for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT VIII - Open Account as to BMP USA

151.     T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

152.     From approximately July 2017 to approximately May 2018, T.T. sold Defendant BMP USA refrigerant gas and related products worth in excess of $58 million.

153.     Throughout T.T.'s business relationship with BMP USA, T.T. maintained an account for this Defendant containing charges and payments for all sales transactions between the companies.

154.     T.T. kept Defendants BMP USA's and BMP International's accounts in a ledger and determined the amounts due from each Defendant by itemizing each of their respective invoices.

155.     T.T. generally included the charges invoiced to BMP USA's affiliates in the account as it was BMP USA's practice to (a) direct T.T. to ship to and or invoice the affiliates and (b) pay T.T. for goods shipped to and or invoiced to the affiliates.

156.     T.T. generally included charges invoiced to BMP USA's customers and or suppliers in the account when BMP USA directed T.T. to ship refrigerant gas and related products to those customers and or suppliers with the promise that BMP USA would pay T.T. for the goods.

157.     Until approximately November 2018, BMP USA made payments on its account, which T.T. duly recorded.

158.    Since approximately November 2018, BMP USA has not made a payment on its account with T.T.

159.    Through simple analysis of the itemized invoice numbers in the account, T.T. could identify the transactions for which BMP USA was responsible.

160.    A complete, accurate, and authentic copy of BMP USA's itemized account with T.T. is attached as **Exhibit D**.

161.    As set forth on **Exhibit D**, BMP USA owes the principal amount stated in the open account, which is in excess of $58 million, for goods this Defendant received and accepted from T.T.

WHEREFORE, T.T. demands judgment against BMP USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

### COUNT XII - Open Account as to iGas USA

162.    T.T. incorporates the allegations set forth in paragraphs 1 through 60, above.

163.    From approximately June to approximately July 2018, T.T. sold Defendant iGas USA refrigerant gas and related products worth in excess of $1 million.

164.    Throughout T.T.'s business relationship with iGas USA, T.T. maintained an account for this Defendant containing charges and payments for all sales transactions between the companies.

165.    T.T. kept Defendant iGas USA's accounts in a ledger itemized by each of its invoices.

166.    Until approximately October 2018, iGas USA made payments on its account, which T.T. duly recorded.

167.    Since approximately October 2018, iGas USA has not made a payment on its account with T.T.

168.    A complete, accurate, and authentic copy of iGas USA's itemized account with T.T. is attached as **Exhibit E**.

169.    As set forth on **Exhibit E**, iGas USA owes the principal amount stated in the open account, which is in excess of $1 million, for goods this Defendant received and accepted from T.T.

WHEREFORE, T.T. demands judgment against iGas USA for damages, prejudgment and post-judgment interest, and such further relief as is appropriate to protect T.T.'s rights and interests.

[Attorney's Signature Appears on Following Page]

Dated: August 16, 2018                  Respectfully submitted,

*/s/ David B. Weinstein*

David B. Weinstein (FBN 604410)
weinsteind@gtlaw.com
Ryan T. Hopper (FBN 0107347)
hopperr@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 East Kennedy Blvd., Suite 1900
Tampa, Florida 33602
(813) 318-5700 - telephone
(813) 318-5900 - facsimile

*and*

Mark G. Trigg
*Application for Special Admission will be submitted*
Roy Xiao
*Application for Special Admission will be submitted*
**DENTONS US LLP**
303 Peachtree Street, NE, Suite 5300
Atlanta, GA 30308
(404) 527-4000 - telephone
(404) 527-4198 - facsimile
mark.trigg@dentons.com
roy.xiao@dentons.com