ORAL ARGUMENT NOT YET SCHEDULED

No. 21-14213

———————————————

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————————

RMS OF GEORGIA, LLC D/B/A CHOICE REFRIGERANTS,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

———————————————

Petition for Review of an Action of the
U.S. Environmental Protection Agency

———————————————

**RESPONDENT'S BRIEF**

———————————————

Of Counsel:

KAREN BIANCO
*Attorney*
U.S. Environmental Protection Agency

TODD KIM
*Assistant Attorney General*
SARAH A. BUCKLEY
*Attorney*
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7411
Washington, D.C. 20044
(202) 616-7554
sarah.buckley@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Cir. R. 28.1(b), Respondents provide the following list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporates that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

1.  A-Gas

2.  Advanced Specialty Gases

3.  Air Liquide USA

4.  Altair Partners

5.  Arkema

6.  Artsen

7.  AutoZone Parts

8.  AW Product Sales & Marketing

9.  Bianco, Karen – U.S. EPA, Office of General Counsel, Counsel for Respondents

10. Bluon

11. Buckley, Sarah – U.S. Department of Justice, Counsel for Respondents

12. Chemours

13. Combs Gas

14. ComStar International

15. Daikin America

16. Electronic Fluorocarbons

17. First Continental International

18. FluoroFusion Specialty Chemicals

19. GlaxoSmithKline

20. Harp USA

21. Honeywell International

22. Hudson Technologies

23. ICool USA

24. IGas Holdings

25. Iofina Chemical

26. Kim, Todd – Assistant Attorney General, Counsel for Respondents

27. Lenz Sales & Distribution

28. Linde

29. Mexichem Fluor DBA Koura

30. Mondy Global

31. National Refrigerants

32.    Nature Gas Import and Export

33.    Refrigerants, Inc.

34.    Regan, Michael S. – U.S. EPA Administrator, Respondent

35.    RMS of Georgia, D/B/A Choice Refrigerants – Petitioner

36.    Showa Chemicals of America

37.    Solvay Fluorides

38.    Technical Chemical

39.    Transocean Offshore Deepwater Drilling

40.    Tulstar Products

41.    U.S. Environmental Protection Agency, Respondent

42.    Walmart

43.    Waysmos USA

44.    Weitron

45.    Wilhelmsen Ships Service

46.    Williamson, David M. – Williamson Law + Policy, Counsel for

       Petitioner


                              /s/ *Sarah A. Buckley*

## STATEMENT REGARDING ORAL ARGUMENT

Respondents request oral argument. Argument is warranted to address the Court's questions on the application of 42 U.S.C. § 7607(b)(1)'s venue provision to the agency action challenged here and, if the Court wishes to reach the merits, to explain further EPA's application of its regulatory methodology for calculating the number of allowances allocated to entities in that action.

/s/ Sarah A. Buckley
SARAH A. BUCKLEY

## CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Respondents ("EPA") submits this certificate as to parties, rulings, and related cases.

### A.    Parties and Amici

All parties, intervenors, and amici appearing in this court are listed in the opening briefs for Petitioners.

### B.    Rulings Under Review

The agency action under review is EPA's action allocating production and consumption allowances for 2022 pursuant to the American Innovation and Manufacturing Act. The notice of this action published in the Federal Register was entitled "Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act," 86 Fed. Reg. 55,841 (Oct. 7, 2021). ("Allocation Action").

### C.    Related Cases

RMS of Georgia, LLC d/b/a Choice Refrigerants sought review of EPA's Allocation Action in the D.C. Circuit. *See RMS of Georgia v. EPA*, No. 22-1025 (D.C. Cir.). That case is currently being held in abeyance pending resolution of the venue question in the present petition for review. Order, No. 22-1025 (Mar. 14, 2022), Doc. No. 1939003.

/s/ *Sarah A. Buckley*

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................................iv

CERTIFICATE AS TO  PARTIES, RULINGS, AND RELATED
  CASES ..........................................................................................v

TABLE OF AUTHORITIES ...................................................................ix

GLOSSARY....................................................................................xv

INTRODUCTION ...............................................................................1

STATEMENT OF THE ISSUES....................................................................3

STATEMENT OF THE CASE.....................................................................4

I.  The AIM Act....................................................................................4

II.  Venue under the AIM Act .................................................................6

III.  The Framework Rule ..........................................................................7

   1.  Establishing production and consumption
     allowances ...............................................................7

   2.  Allocating production and consumption
     allowances. ...........................................................8

   3.  Import provisions .....................................................9

   4.  Choice's comments ..................................................10

IV.  Allocation action....................................................................11

V.  Petition for review and jurisdictional briefing.............................16

STANDARD OF REVIEW ...................................................................17

SUMMARY OF ARGUMENT ...............................................................19

ARGUMENT ...................................................................................22

I.   Venue is proper only in the D.C. Circuit because the Allocation
     Action is nationally applicable. .......................................................22

     A.   The Allocation Action applies nationally, and the
          individual impact of Choice's allocation is inseparable
          from the whole.......................................................................24

     B.   Choice's approach to venue defies the plain statutory
          text. ......................................................................................27

     C.   Choice's approach is contrary to precedent and hinges on
          a case that has been expressly overruled................................31

II.  EPA reasonably declined to base Choice's allocation on HFCs
     imported by Company A. .................................................................37

     A.   Declining to base Choice's allocation on HFCs brought
          into the United States by Company A was reasonable and
          consistent with the AIM Act regulations. ...............................38

          1.   Giving Company A, not Choice, credit for HFCs
               that Company A imported conforms to EPA's
               regulations, which provide allowances to "entities
               that imported." ...........................................................39

          2.   EPA's allocation mirrors the activities that require
               the expenditure of allowances in the phasedown. ...................43

     B.   EPA adequately explained the methodology and data
          applied to the Allocation Action and appropriately used
          data from the Greenhouse Gas Reporting program. ...........................45

     C.   EPA reasonably declined to credit Choice for imports by
          Company B...........................................................................50

CONCLUSION ................................................................................56

CERTIFICATE OF COMPLIANCE....................................................58

## TABLE OF AUTHORITIES

**CASES**                                                   **PAGE(S)**

*Am. Rd. & Transp. Builders Ass'n v. EPA*,
　705 F.3d 453 (D.C. Cir. 2013) ..................................................................35

*ATK Launch Sys., Inc. v. EPA*,
　651 F.3d 1194 (10th Circ. 2011) ....................................... 22, 25, 31, 34

*Brown & Williamson*,
　529 U.S. 120 (2000) ........................................................................40

*Camp v. Pitts*,
　411 U.S. 138 (1973) ........................................................................19

*Califano v. Sanders*,
　430 U.S. 99 (1977) ........................................................................19

*Christopher v. SmithKline Beecham Corp.*,
　567 U.S. 142 (2012) ........................................................................40

*Citizens to Pres. Overton Park, Inc. Volpe*,
　401 U.S. 402 (1971) ........................................................................19

*City of Oxford, Ga. v. FAA*,
　428 F.3d 1346 (11th Cir. 2005) ........................................................18

*Colorado River Water Conservation Dist. v. United States*,
　424 U.S. 800 (1976) ........................................................................53

*Dalton Trucking, Inc. v. EPA*,
　808 F.3d 875 (D.C. Cir. 2015) ................................................ 22, 32

*Dynatemp International, Inc., et al. v. RMS of Georgia, LLC*,
　Case No. 5:20-cv-00142 (E.D.N.C.) ..................................................53

*Fla. Power & Light Co. v. Lorion*,
　470 U.S. 729 (1985) ........................................................................18

*Fund for Animals, Inc. v. Rice*,
   85 F.3d 535 (11th Cir. 1996) ...................................................... 17, 18

*Heating, Air-Conditioning, & Refrigeration Distribs. Int'l, et al. v. EPA*,
   Case No. 20-1251 (D.C. Cir.) ..........................................................7, 16

*King v. Burwell*,
   576 U.S. 473 (2015) ........................................................................40

*Madison Gas & Electric Co. v. EPA*,
   4 F.3d 529 (7th Cir. 1993) .......................................... 20, 24, 32-33, 37

*Mahon v. U.S. Dep't of Agric.*,
   485 F.3d 1247 (11th Cir. 2007) ......................................................40

*Miss. Comm'n on Envtl. Quality v. EPA*,
   790 F.3d 138 (D.C. Cir. 2015) ........................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..........................................................................18

*National Parks Conservation Association v. McCarthy*,
   816 F.3d 989 (8th Cir. 2016) ..........................................................36

*NRDC v. Thomas*,
   838 F.2d 1224 (D.C. Cir. 1988) .............................................. 29, 30, 35

*RMS of Georgia v. EPA*,
   No. 21-1253 (D.C. Cir.) ...................................................................16

*RMS of Georgia v. EPA*,
   No. 22-1025 (D.C. Cir.) ...................................................................17

*S. Ill. Power Coop. v. EPA*,
   863 F.3d 666 (7th Cir. 2017) ...........................20, 22, 24, 28-30, 32-33

*Sierra Club v. EPA*,
   926 F.3d 844 (D.C. Cir. 2019) .................................................... 31, 32

*State of New York v. EPA*,
  133 F.3d 987 ...................................................................... 29, 30, 36

*State of Texas v. EPA*,
  983 F.3d 826 (5th Cir. 2020) ...................................................... 29, 35

*Texas v. EPA*,
  706 F. App'x 159 (5th Cir. 2017) ................................................ 35, 36

*Texas v. EPA*,
  No. 10-60961, 2011 WL 710598 (5th Cir. Feb. 24, 2011) ........................... 29, 34

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ......................................................31

*Texas Municipal Power Agency*,
  89 F.3d 858 (D.C. Cir. 1996)........................................................35

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952)............................................................... 39, 40

*Utah v. EPA*,
  765 F.3d 1257 (10th Cir. 2014) .....................................................22

*Vidiksis v. EPA*,
  612 F.3d 1150 (11th Cir. 2010) ................................................. 39, 40

*West Virginia Chamber of Commerce v. Browner*,
  166 F.3d 336 (4th Cir. 1198) .......................................................37

## STATUTES

5 U.S.C. § 706........................................................................19

5 U.S.C. § 706(2)(A)..................................................................17

19 U.S.C. § 1337 ................................................................ 55, 56

28 U.S.C. § 1391(e)(1)................................................................28

33 U.S.C. § 1369(b)(1)................................................................28

35 U.S.C. § 283........................................................................55

35 U.S.C. § 284........................................................................55

42 U.S.C. § 7607.......................................................................6

42 U.S.C. § 7607(b)....................................................................17

42 U.S.C. § 7607(b)(1)...........................................2, 19, 20, 22-24, 27-30

42 U.S.C. § 7675.......................................................................4

42 U.S.C. § 7675(b)(3)(A)(ii).........................................................4, 5

42 U.S.C. § 7675(b)(5).................................................................5

42 U.S.C. § 7675(b)(6)...................................... 5, 38, 41, 44, 45

42 U.S.C. § 7675(b)(7)(A)..............................................................4

42 U.S.C. § 7675(b)(11)................................................................5

42 U.S.C. § 7675(c)(1).................................................................5

42 U.S.C. § 7675(e) ............................................ 44, 45

42 U.S.C. § 7675(e)(1).................................................................5

42 U.S.C. § 7675(e)(1)(D).............................................................5

42 U.S.C. § 7675(e)(2)........................................... 4, 5, 44

42 U.S.C. § 7675(e)(2)(A).............................................................6

42 U.S.C. § 7675(e)(2)(B).............................................................5

42 U.S.C. § 7675(e)(2)(B)–(D)......................................... 23

42 U.S.C. § 7675(e)(2)(D)(i) ................................................................6

42 U.S.C. § 7675(e)(2)(D)(ii) ...............................................................6

42 U.S.C. § 7675(e)(3) ..........................................................................6

42 U.S.C. § 7675(e)(4)(B)(i) .................................................................6

42 U.S.C. § 7675(e)(4)(B)(iv) ...............................................................6

42 U.S.C. § 7675(k)(1)(C) ...............................................................6, 22

## RULES

Fed. R. App. P. 15(a)(2) ......................................................................30

## REGULATIONS

40 C.F.R. Part 84 ................................................................................15

40 C.F.R. § 84.11 ................................................................................40

40 C.F.R. § 84.11(1) ..................................................................... 25, 26

40 C.F.R. § 84.11(a) ..................................... 9, 10, 14, 21, 37-40, 42

40 C.F.R. § 84.3 ....................................... 10, 13, 38-41, 44, 47-48

40 C.F.R. § 84.35 ................................................................................52

40 C.F.R. § 84.5(a) ...............................................................................8

40 C.F.R. § 84.5(a)(2) .........................................................................44

40 C.F.R. § 84.5(b) ............................................................................8, 9

40 C.F.R. § 84.5(b)(1)(i) .....................................................................44

40 C.F.R. § 84.5(b)(2) ...................................................................................44

40 C.F.R. § 84.5(c) ..........................................................................................8

40 C.F.R. § 84.5(h) .........................................................................................52

40 C.F.R. § 84.9(a) ....................................................................................9, 38

40 C.F.R. § 98.2 .............................................................................................47

40 C.F.R. § 98.2(a) .........................................................................................49

40 C.F.R. § 98.4(e)(1) ....................................................................................13

40 C.F.R. § 98.6 ..............................................................................45, 48, 49

40 C.F.R. § 98.410(b) .....................................................................................13

40 C.F.R. § 98.411 ..........................................................................................13

40 C.F.R. § 98.418 ..........................................................................................13

## FEDERAL REGISTER

41 Fed. Reg. 56,767 (Dec. 30, 1976) .............................................................30

86 Fed. Reg. 27,150 (May 19, 2021) ..............................................................13

86 Fed. Reg. 55,116 (Oct. 5, 2021) ..................................................................4

86 Fed. Reg. 55,841 (Oct. 7, 2021) ................................................................11

86 Fed. Reg. 9059 (Feb. 11, 2021) .................................................................12

## GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act of 2020 |
| EPA | Environmental Protection Agency |
| HFCs | Hydrofluorocarbons |
| RTC | EPA's Response to Comments, EPA-HQ-OAR-2021-0044-0227-03 |

## INTRODUCTION

The American Innovation and Manufacturing Act of 2020 ("AIM Act") mandates the phasedown of the production and consumption of hydrofluorocarbons ("HFCs"), which are highly potent greenhouse gases, to fifteen percent of baseline levels by 2036. To accomplish the mandated phasedown, the AIM Act directs EPA to establish a system for the allocation and trading of allowances, which are required to produce or consume HFCs.

EPA established that system, along with complementary compliance-related measures, in a 2021 rule referred to as the "Framework Rule." Petitioner RMS of Georgia, LLC, d/b/a Choice Refrigerants ("Choice"), and others have challenged aspects of that rule in petitions for review pending in the D.C. Circuit.

The Framework Rule established a methodology by which allowances would be calculated and allocated. Applying that methodology, EPA took the "Allocation Action" challenged here. In that action, EPA issued allowances for 2022 to entities that have historically produced or consumed HFCs.

Choice challenges EPA's Allocation Action in the wrong court. The Allocation Action is "nationally applicable," because it is the division and assignment of a single, nationwide pool of HFC allowances to entities across the country according to the uniform, national methodology established in EPA's regulations. Each entity's allowance allocation is a relative share of that pool; thus,

1

any additional allowances awarded to Choice necessarily would disrupt the allocations to others. Under the applicable judicial review provision, the D.C. Circuit is the only proper forum for review of such "nationally applicable" agency action. 42 U.S.C. § 7607(b)(1). Allowing suits like this one to proceed anywhere else would thwart the venue provision's purpose of preventing inconsistent rulings as to this integrated nationwide program.

If the Court reaches the merits, it should deny the petition. Choice seeks to claim part of the allocation for "Company A." It contends that, in calculating entities' historic HFC consumption activity, EPA incorrectly credited Company A as having been the importer of bulk regulated substances that were sold, after import by Company A, to and for use by Choice. But EPA reasonably applied its governing regulations to include imports brought into the United States by Company A in the calculation for Company A's allowance allocation, as opposed to Choice's. In making the allocation decision, EPA reasonably relied on data reported to the Agency and certified as accurate, which was then verified against filings with U.S. Customs and Border Protection. The data uniformly indicated that Company A imported the HFCs for which Choice wishes to claim credit. EPA's approach was consistent with the allocation methodology established in the Framework Rule (which Choice does not challenge here), and the Agency's decision should be upheld.

Choice also contends that it should have received a higher HFC allowance allocation based on imports by another entity—"Company B"—because, according to Choice, that entity violated U.S. trade and patent laws. But EPA appropriately rejected Choice's request to credit Choice with imports by Company B. Neither the AIM Act nor EPA's implementing regulations gives EPA the authority to adjudicate patent disputes, and there is nothing in the Framework Rule that would allow, let alone require, EPA to credit patent holders with import activity by an unrelated entity. Similarly, EPA's Framework Rule does not authorize, let alone require, giving credit for HFC imports by an entity that allegedly violated trade rules to another entity that allegedly holds a patent for a particular HFC blend.

Accordingly, the petition should be dismissed or transferred to the proper venue, the D.C. Circuit. If this Court reaches the merits, the petition for review should be denied.

## STATEMENT OF THE ISSUES

1.      Is EPA's Allocation Action, which allocated a limited, nationwide pool of allowances among entities throughout the country using a common, nationwide analytical method, nationally applicable and therefore properly subject to review only by the D.C. Circuit?

2.      Did EPA reasonably determine that the calculation of Company A's allowance allocation should include HFCs that it brought into the country, paid

duties on, and reported to EPA and U.S. Customs, and that those same HFCs should not be included in the calculation of Choice's allowance allocation?

3.    Did EPA reasonably decline to consider alleged violations of patent or trade law in its allowance allocation calculation, consistent with the methodology established in the Framework Rule, and determine that the calculation of Choice's allowance allocation should not include HFCs that were brought into the country and reported to EPA and U.S. Customs by Company B?

## STATEMENT OF THE CASE

### I.    The AIM Act

The AIM Act, enacted on December 27, 2020, Pub. L. No. 116-260, Div. S, § 103, 134 Stat. 1182, 2255–71 (2020) (codified at 42 U.S.C. § 7675), mandates the phasedown of the production and consumption of hydrofluorocarbons, which are highly potent greenhouse gases. Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act. 86 Fed. Reg. 55,116, 55,123–25 (Oct. 5, 2021) ("Framework Rule"). The phasedown takes the form of stepwise percentage reductions down to fifteen percent of baseline by 2036. 42 U.S.C. § 7675(e)(2). "Produce" is defined as "the manufacture of a regulated substance from a raw material or feedstock chemical." *Id*. § 7675(b)(7)(A). "Consumption" is defined as the quantity of regulated substances produced and "imported" into the United

States, minus regulated substances exported. *Id*. § 7675(b)(3)(A)(ii). And "import" "means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States." *Id*. § 7675(b)(6).

The statute identifies eighteen HFCs, along with their isomers, as "regulated substances." *Id.* § 7675(b)(11), (c)(1).[1] The Act identifies these HFCs and assigns them an "exchange value," a common unit of measure that can be used to compare different HFCs based on values that are equivalent to their global warming potentials. *Id.* §§ 7675(b)(5), 7675(e)(1)(D); *see* 86 Fed. Reg. at 55,133 & n.34; *see also id.* at 55,121 n.5. To effectuate a phasedown of these regulated HFCs, the statute first directs EPA to determine the baselines for the production and consumption of all regulated substances in the United States. 42 U.S.C. § 7675(e)(1). The statute then provides a schedule for a gradual phasedown of production and consumption relative to those baselines. *Id.* § 7675(e)(2). The statute then directs EPA to "ensure that the annual quantity of all regulated substances produced or consumed in the United States does not exceed" the quantity permitted by the statutory phasedown schedule. *Id.* § 7675(e)(2)(B).

---

[1] For simplicity, this brief will refer to these regulated substances as "HFCs" generally, although not all HFCs are necessarily "regulated substances."

The statute requires EPA to establish "an allowance allocation and trading program." *Id.* § 7675(e)(3). An allowance is a limited authorization for the production or consumption of a regulated substance, and it does not constitute a property right. *Id.* § 7675(e)(2)(D)(ii). No person may produce or consume a regulated substance without a corresponding allowance. *Id.* § 7675(e)(2)(A).

The number of available allowances for the production or consumption of HFCs decreases over the years based on the statutory phasedown schedule. *Id.* § 7675(e)(2)(D)(i). For at least the first five-year period after enactment of the AIM Act, EPA must allocate some of those allowances for exclusive use in six specific applications identified by the statute. *Id.* § 7675(e)(4)(B)(iv). EPA may identify other essential uses that receive exclusive-use allowances. *Id.* § 7675(e)(4)(B)(i).

## II. Venue under the AIM Act

The AIM Act provides that certain sections of the Clean Air Act "shall apply to" the AIM Act and "any rule, rulemaking, or regulation promulgated by the Administrator [of EPA] pursuant to [the AIM Act] as though [the AIM Act] were expressly included in title VI of [the Clean Air Act]." *Id.* § 7675(k)(1)(C). Among the applicable sections of the Clean Air Act is section 307, *id.* § 7607, which includes provisions on judicial review. Section 7607(b)(1) provides that, for any "nationally applicable regulations promulgated, or final action taken" by EPA "under this chapter," a petition for review "may be filed only in the United States

Court of Appeals for the District of Columbia." By contrast, petitions for review of final actions that are "locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." *Id*.

## III.    The Framework Rule

Following public notice and comment, EPA signed the Framework Rule on September 23, 2021. 86 Fed. Reg. at 55,117. In the Framework Rule, EPA established regulations implementing the prohibition on production or consumption of HFCs without an allowance, as well as compliance, record-keeping, and other requirements. EPA also applied statutory formulas to establish the baselines for the production and consumption of all HFCs in the United States. *Id.* at 55,118. EPA then applied the percentages in the statutory phasedown schedule to those baselines to determine the quantity of allowances that will be available nationwide for each calendar year. *Id.* EPA also established a methodology for allocating allowances. 86 Fed. Reg. at 55,143–48.[2]

### 1.    Establishing production and consumption allowances

The Framework Rule established regulations prohibiting the production or consumption of HFCs without expenditure of corresponding production or

---

[2] Any challenge to that methodology itself must therefore be brought in a challenge to the Framework Rule itself, which is presently before the D.C. Circuit. *See Heating, Air-Conditioning, & Refrigeration Distribs. Int'l, et al. v. EPA*, Case No. 21-1251 (and consolidated cases) (D.C. Cir.).

consumption allowances equal to the exchange value equivalent weight of the particular HFCs produced or consumed, beginning January 1, 2022. 86 Fed. Reg. at 55,138; 40 C.F.R. § 84.5(a). EPA established three types of allowances: production allowances, consumption allowances, and application-specific allowances. *Id.* at 55,142. Producing HFCs will require expending both production allowances and consumption allowances (or an application-specific allowance, if applicable). *Id.*; *see* 40 C.F.R. § 84.5(a). Importing HFCs will require expending only consumption allowances or an application-specific allowance. 86 Fed. Reg. at 55,142; *see* 40 C.F.R. § 84.5(b). Application-specific allowances are allotted exclusively for the production or importation of hydrofluorocarbons for use in six specific applications identified by statute. 86 Fed. Reg. at 55,142, 55,148; *see* 40 C.F.R. § 84.5(c). Only two activities—production and import—require the expenditure of allowances.

### 2.    Allocating production and consumption allowances.

EPA also established in the Framework Rule the methodology for allocating the limited quantity of allowances between entities for calendar years 2022 and 2023.[3] 86 Fed. Reg. at 55,118. Under this methodology, the six statutorily specified applications receive priority access to the pool of available allowances. *Id.* at

---

[3] EPA will establish the allowance allocation methodology for calendar year 2024 and beyond in a future rulemaking. 86 Fed. Reg. at 55,118.

55,147. For 2022, EPA also set aside a small set of allowances for allocation at a later time. *Id.* The remainder is the general allowance pool. *Id.* at 55,147.

To allocate allowances remaining in the general pool, the Framework Rule provided that EPA would issue production and consumption allowances to companies that historically produced or imported HFCs and continued to do so in 2020. *Id.* at 55,144; *see* 40 C.F.R. §§ 84.9(a), 84.11(a).

For those companies, EPA would issue allowances based on the average of their three (not necessarily consecutive) highest years of production or consumption between 2011 and 2019. 86 Fed. Reg. at 55,144–45; *see* 40 C.F.R. §§ 84.9(a), 84.11(a). EPA would divide each company's high-three average by the sum of all companies' averages to determine each company's share of the general allowance pool. 86 Fed. Reg. at 55,147; 40 C.F.R. §§ 84.9(a); 84.11(a). That calculation would result in the percentage of the general allowance pool allocated to each company.

### 3.    Import provisions

With respect to import, EPA's regulations state that "[n]o person may import bulk regulated substances, except . . . [b]y expending, at the time of the import, consumption or application-specific allowances in a quantity equal to the exchange-value weighted equivalent of the regulated substances imported." 40 C.F.R. § 84.5(b). For allocating allowances for import, EPA's regulations state that

9

it will issue "calendar year consumption allowances to *entities that imported* or produced a bulk regulated substance in 2020," according to the methodology described in Part III.2 above. 40 C.F.R. § 84.11(a) (emphasis added). "If multiple importers are related through shared corporate or common ownership or control," allowances will be allocated "to a single corporate or common owner." *Id*.

Mirroring the statutory definition, EPA's regulations define "import" as "to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States[.]" 40 C.F.R. § 84.3. The regulations further define "importer" as:

> any person who imports a regulated substance into the United States. "Importer" includes the person primarily liable for the payment of any duties on the merchandise or an authorized agent acting on his or her behalf. The term also includes:
>
> (1)    The consignee;
>
> (2)    The importer of record;
>
> (3)    The actual owner; or
>
> (4)    The transferee, if the right to draw merchandise in a bonded warehouse has been transferred.

40 C.F.R. § 84.3.

### 4.    Choice's comments

Choice submitted several letters in response to EPA's request for comment on the Framework Rule. One of those letters included Choice's own calculations of

what it contended should be its three highest importing years for purposes of the allowance allocation. Choice Letter (Sept. 29, 2021) (A37). In that letter, Choice contended it was entitled to credit for ███████ exchange-value weighted HFCs in ███ that were "imported by [Company A] for exclusive use by Choice to blend patented R-421A" or that were, in fact, "patented R-421A." *Id.* (A37–38). Choice also claimed ████████ exchange-value weighted imports in ████, which included some HFCs "imported by [Company A]," and a substantial amount of "unpatented R-421A imported by [Company B] subject to Commerce circumvention determination." *Id.* (A38). EPA declined to adopt the methodological approach that underlay Choice's calculations. EPA explained in its Response to Comments that it had not proposed and did not support an approach that would "issue allowances to the customers of importers" and that "the AIM Act does not give EPA authority to enforce patents or to limit allowances only to patent holders for various blends." Response to Comments ("RTC") at 191 (Addm. 66).

## IV.    Allocation action

EPA applied the Framework Rule's allocation methodology to allocate allowances to eligible entities in the action challenged here. Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act, 86 Fed. Reg. 55,841 (Oct. 7, 2021) ("Allocation Action"). As

provided in the Framework Rule, EPA relied on multiple sources of data to determine each entity's consumption or production history. These included:

1. Data reported through the Greenhouse Gas Reporting Program;

2. Data received in response to a "Notice of Data Availability" published February 11, 2021, which provided information related to the available Reporting Program data and identified possible data gaps and requested comment on how EPA could improve that data, 86 Fed. Reg. 9059 (Feb. 11, 2021); Framework Rule, 86 Fed. Reg. at 55,144–45 (explaining use of NODA information in allowance allocation)[4];

3. Data from the Department of Customs and Border Protection's "Automated Customs Environment" and confirmed through letters issued under EPA's Clean Air Act record inspection authority; and

4. Information submitted in comments on the proposed Framework Rule. 86 Fed. Reg. at 55,140.

Thus, to allocate calendar year 2022 allowances, EPA first gathered data reported to the Greenhouse Gas Reporting Program. Methodology Memo at 1 (A20). Under that Program, facilities that import, export, or destroy more than

---

[4] EPA encouraged entities with relevant past HFC activity to report that data to the Agency and to submit comments to the Framework Rule rulemaking docket that such information had been reported. Proposed Rule, 86 Fed. Reg. at 27,150.

25,000 metric tons of carbon dioxide equivalent HFCs or more must submit annual reports detailing their activities. *Id*.; *see* Proposed Rule, 86 Fed. Reg. 27,150, 27,164 (May 19, 2021). All HFC production must also be reported. *Id*.; *see* 40 C.F.R. §§ 98.410(b), 98.411. Data submitted through this Program are subject to certain verification and accuracy checks. 86 Fed. Reg. at 27,164. Data submitted to EPA must be certified as true, accurate, and complete under penalty of law. 40 C.F.R. § 98.4(e)(1). The Program "captures the vast majority of the bulk HFC production, import, and export in the United States." *Id*. Notably, "Import" and "importer" for purposes of the Reporting Program are substantially the same as under EPA's AIM Act regulations. *Compare* 40 C.F.R. § 98.418 (definition of "import" and "importer" for Reporting Program), *with* 40 C.F.R. § 84.3 (definition of "import" and "importer" for AIM Act purposes).

To provide an additional check, EPA compared the Reporting Program data to import data from U.S. Customs and Border Protection. Methodology Memo at 1 (A20). If the import amount an individual entity had previously reported to EPA was at least 20% greater than imports reported to Customs, EPA asked that entity to submit additional documentation to substantiate imports and/or correct the data previously submitted. *Id*. at 1–2 (A20–21). All 23 entities EPA contacted either corrected their prior EPA reports or submitted Customs documentation to verify their data. *Id*. at 2 (A21). "Company A," ███████████, did not have a

sufficiently large discrepancy between Reporting Program and Customs data, but did request and was ultimately granted consideration as one entity with a commonly held corporate entity, ███████████. *Id*. at 10 (A29). Choice ("RMS of Georgia") also did not have discrepancies between EPA and Customs data that met the threshold for follow up verification correspondence. *Id*. at 14–15 (A33–34).

EPA maintained a "master sheet" of facility-level, chemical-specific data from which it conducted its calculation for the allowance allocation. *Id*. at 2 (A21); *see* excerpts from Allocation Master List (Exhibits A & B). After compiling relevant data and reviewing requests for special consideration, EPA identified which entities were eligible for allowances; that is, entities that historically produced and/or imported between 2011 and 2019 *and* produced and/or imported in 2020, 40 C.F.R. § 84.11(a), or were granted special consideration. Methodology Memo at 3 (A22).

EPA calculated each eligible entity's annual production and/or consumption of HFCs, identified the entities' three highest years of production or consumption activity, and calculated the average. *Id*. at 4 (A23); Allocation Master List – Calculations, Ex. B. The resulting averages were summed together to create the general pool denominator for either production or consumption, as applicable, and then each entity's average was divided by the denominator to determine a relative

percentage. Methodology Memo at 4 (A23); Allocation Master List - Calculations, Ex. B. That percentage was then multiplied by the consumption or production baselines, less the portions allocated to the "set-aside" and application-specific uses.

Based on the process established in the Framework Rule and codified into 40 C.F.R. Part 84, EPA found Choice consumed the following amounts of HFCs as measured in exchange-value equivalent:

| Year | Exchange value equivalent imports |
|------|-----------------------------------|
| 2017 | ███████ |
| 2018 | █████ |
| 2019 | █████ |
| High-3 Average | ██████ |

EPA therefore identified 2017, 2018, and 2019 as Choice's "high-three" years for consumption, resulting in an average of ██████. Allocation Master List – Calculations at 8, Ex. A. This total was summed with the other consumption averages. The resulting relative percentage for Choice was 0.62%, which, multiplied by the general pool of consumption allowances for 2022, resulted in an allocation of 1,615,592.9 calendar year 2022 consumption allowances. 86 Fed. Reg. at 55,843.

Likewise, EPA found that "Company A" consumed the following amounts of HFCs as measured in exchange-value equivalent:

| Year | Exchange value equivalent imports |
|------|-----------------------------------|
| 2013 | █████████ |
| 2016 | █████████ |
| 2019 | █████████ |
| High-3 Average | █████████ |

EPA therefore identified 2013, 2016, and 2019 as Company A's "high-three" years for consumption, resulting in an average of ██████. Allocation Master List – Calculations at 4–5, Ex. B. The resulting relative percentage for Company A was ██████, which resulted in an allocation of ████████████ ████████████. 86 Fed. Reg. at 55,843. Consistent with the Framework Rule approach, EPA did not include HFCs imported by Company A or Company B in Choice's allocation calculation.

## V.    Petition for review and jurisdictional briefing.

Choice filed this petition for review on December 6, 2021. Choice also filed a petition for review in the D.C. Circuit challenging both the Framework Rule and the Allocation Action. *RMS of Georgia v. EPA*, No. 21-1253 (D.C. Cir.), consolidated with *Heating, Air-Conditioning, & Refrigeration Distributors*

16

*International, et al. v. EPA*, Case No. 20-1251 (D.C. Cir.). Choice stated that its D.C. Circuit petition on the Allocation Action was protective only, as Choice believed that the challenge was properly filed in the Eleventh Circuit. *Id.* at 1 n.1. The portion of Choice's D.C. Circuit petition challenging the Allocation Action was severed and assigned its own docket. *RMS of Georgia v. EPA*, No. 22-1025 (D.C. Cir.). That case is being held in abeyance pending resolution of the venue question in this case.

On December 22, 2021, this Court issued a Jurisdictional Question asking for simultaneous briefing on whether Choice was required to file its petition for review in the D.C. Circuit. EPA's response stated its position that venue over Choice's petition was proper only in the D.C. Circuit, per 42 U.S.C. § 7607(b), because the action challenged is nationally applicable. EPA Response to Jurisdictional Question (January 18, 2022). On April 1, 2022, the Court ordered that the jurisdictional question be carried with the case and stated that the parties may address the venue issue in their merits brief as appropriate.

## STANDARD OF REVIEW

EPA's Allocation Action is a final agency action subject to judicial review under the Administrative Procedure Act ("APA"). Under the APA, courts may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This

standard is "exceedingly deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). Where EPA has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decisions must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts further give an "extreme degree of deference" to EPA's "evaluation of scientific data within its technical expertise." *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015); *see City of Oxford, Ga. v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005).

The Court's review is limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). EPA submitted a certified index to the administrative record for this case on February 1, 2022. In its merits brief, Choice refers to and relies on three documents that were not included in that certified index: EPA's Response to Comments regarding the Framework Rule (Addm. 53); Choice's July 6, 2021 comment letter (Addm. 112); July 2, 2021 FluoroFusion comment letter (Addm. 95). *See* Choice Br. at 10–17, 33 n.24, 39 & nn.26, 27. EPA agrees that the Court may properly consider these three documents, which were before EPA at the time of decision and which were inadvertently

excluded from the certified index.[5] Accordingly, EPA is filing a corrected certified index in a separate filing.

## SUMMARY OF ARGUMENT

1. Choice's petition for review should be dismissed in favor of its protective petition in the D.C. Circuit or transferred to that circuit. Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), which the AIM Act makes applicable here, provides that the D.C. Circuit is the sole forum for a petition for review of a "nationally applicable" final action. National applicability is determined from the face of the agency action itself, not from the scope of a petitioner's challenge. On its face, the Allocation Action distributes a limited, nationwide pool of allowances among entities throughout the country using a common analytical method and is, therefore, nationally applicable. Choice's contrary argument adopts the approach

---

[5] Without itself moving for supplementation, Choice contends that EPA's failure to include these documents in the record renders its action arbitrary and capricious. *See* Choice Br. at 8 n.10, 10. This argument is misplaced. The administrative record is composed of the documents that were before the Agency at the time of its decision, and EPA acknowledges that the documents in question were before EPA and should have been certified as a part of the record. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Camp v. Pitts*, 411 U.S. 138 (1973). The omission of these three documents from the record was inadvertent, and EPA is correcting the certified index to include these three documents. Because the index is not itself part of "the whole record" on which judicial review of EPA's action is premised, 5 U.S.C. § 706, any error in initial compilation of the index cannot be grounds for holding that action unlawful.

of a Seventh Circuit case, *Madison Gas & Electric Co. v. EPA*, 4 F.3d 529, 530

(7th Cir. 1993), that was expressly overruled as "inconsistent with the text of

§ 7607(b)(1)." *S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 671 (7th Cir. 2017). The

Court here should likewise reject that approach and dismiss or transfer the petition

on venue grounds.

2. If the Court reaches the merits, it should deny the petition. First, EPA

reasonably applied the approach set out in the Framework Rule and its codified

regulations to include HFCs brought into the country by Company A in that

company's allocation calculation rather than in Choice's allocation calculation. As

EPA said it would in the Framework Rule preamble, EPA relied on data reported

to the Agency as required by the Greenhouse Gas Reporting Program, as verified

against filings with U.S. Customs and Border Protection. All of the data indicated

that Company A imported the HFCs for which Choice wishes to claim credit. EPA

reasonably concluded that Choice's description of its relationship with Company A

described to EPA in advance of the Allocation Action made Choice the *customer*

of the entity that imported. Furthermore, EPA's approach was consistent with the

overall structure of the phasedown program, which requires consumption

allowances to be expended at the time of "import"—landing on, bringing into, or

introducing into the United States, not for purchase or subsequent use of HFCs.

Second, EPA appropriately rejected Choice's request to credit Choice with imports by Company B that Choice contends were in violation of trade or patent laws. EPA does not have the authority to adjudicate patent disputes as an element of its allowance allocation, and there is nothing in the Framework Rule that would allow, let alone require, EPA to credit patent holders with an unrelated entity's imports. Moreover, being a patent holder does not make one the "owner" of all fixations of that patent and there is thus no basis to conclude Choice was the "actual owner" of the Company B imports nor the "entit[y] that imported" them for purposes of the allocation calculation. 40 C.F.R. § 84.11(a). Choice's intellectual property allegations are irrelevant to the Allocation Action.

Similarly, EPA's Framework Rule does not authorize, let alone require, giving credit for HFC imports by an entity that allegedly violated trade rules to an unrelated patent-holder. Although EPA's Framework Rule established consequences for entities' failure to pay Anti-Dumping/Countervailing Duties levied by the Department of Commerce, *see* 86 Fed. Reg. at 55,170, those consequences do *not* include treating unrelated entities as the entity that imported the allegedly violating HFCs. *See id*. Furthermore, Choice's theory for being the "actual owner" of the Company B imports is based on pure speculation about their effect on Choice's share of the HFC market and is unmoored from any reasonable construction of that statutory term.

21

# ARGUMENT

## I.  Venue is proper only in the D.C. Circuit because the Allocation Action is nationally applicable.

The proper forum for this petition is the D.C. Circuit. Venue over Choice's petition for review is governed by section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1). *See* 42 U.S.C. § 7675(k)(1)(C) (applying section 307 to the AIM Act). Under that provision, the D.C. Circuit is the sole forum for a petition for review of a "nationally applicable" final action. *Id.* § 7607(b)(1) (petition for review of "nationally applicable" final action "may be filed only" in the D.C. Circuit). The Allocation Action is nationally applicable because it allocated a limited, nationwide pool of allowances among entities throughout the country using a "common, nationwide analytical method." *S. Ill. Power Coop.*, 863 F.3d at 671; *see also ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1197 (10th Cir. 2011). The Court should accordingly dismiss this case in favor of the protective petition Choice filed in the proper forum: the D.C. Circuit.[6]

---

[6] Although this Court described the forum question as a "Jurisdictional Question," it has not yet addressed whether the provisions of Section 7607(b)(1) are jurisdictional. That question need not be decided in this case. If jurisdictional, the provisions must be enforced in every case. *See* 42 U.S.C. § 7607(b)(1); *Utah v. EPA*, 765 F.3d 1257, 1258–59 (10th Cir. 2014) (concluding that other requirements of 42 U.S.C. § 7607(b)(1) are mandatory jurisdictional requirements). *But see Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 878–80 (D.C. Cir. 2015) (concluding that these provisions are non-jurisdictional venue provisions). If the circuit-

The Allocation Action is, on its face and in every way relevant to the venue analysis, nationally applicable. The AIM Act imposes a national cap on the total number of allowances available for each year for all entities nationwide. 42 U.S.C. § 7675(e)(2)(B)–(D). For 2022, there was a national pool of 344,299,157 production allowances and 273,498,315 consumption allowances available to distribute. The Allocation Action distributed that finite set of allowances consistent with the methodology EPA established in its nationally applicable Framework Rule. The entities receiving allowances are distributed nationwide, and allowances can be used nationwide, not limited by law or fact to any discrete locality or region. The Allocation Action is thus nationally applicable.

Choice's argument that the Action is "locally applicable" because Choice challenges only Choice's allocation is flawed for three reasons. First, Choice's individual allocation is inseparable from the Allocation Action as a whole because any change in Choice's allocation necessarily affects the allowances available to others. Indeed, Choice expressly argues that two other entities—Company A and Company B—were inappropriately credited with imports that should have gone to Choice. *See* Choice Br. at 31–32, 38. Second, Choice's argument that the scope of its challenge determines venue is contrary to the plain text of the governing venue

---

selection provisions in Section 7607(b)(1) are venue provisions, they must be enforced unless EPA has waived its venue objection, which it has not done here.

provision, 42 U.S.C. § 7607(b)(1). Third, Choice's argument is contrary to established precedent and hinges on a Seventh Circuit case, *Madison Gas & Electric Co. v. EPA*, 4 F.3d 529 (7th Cir. 1993), that has been expressly overruled.

### A.    The Allocation Action applies nationally, and the individual impact of Choice's allocation is inseparable from the whole.

Choice's contention that it is challenging its allocation alone, and thus that the "action" under review is "locally applicable," mischaracterizes the Allocation Action and the effect of Choice's challenge. The Allocation Action must be viewed in its entirety for purposes of a 42 U.S.C. § 7607(b)(1) analysis. As explained more fully below, under the "straightforward (if wordy) statutory text, venue depends entirely on—and is fixed by—the nature of the agency's action; the scope of the petitioner's challenge has no role to play in determining venue." *S. Ill. Power*, 863 F.3d at 670.

On its face, the Allocation Action is nationally applicable. The Federal Register notice for the Allocation Action expressly states that the Action is the issuance of "calendar year 2022 allowances for the production and consumption of hydrofluorocarbons in accordance with the Agency's regulations established under the [AIM Act]." 86, Fed. Reg. at 55,841; *see also id*. at 55,843 (table reflecting allocation of "calendar year 2022 consumption allowances" to 40 entities). Those allowances were not issued to any individual or geographically discrete group of entities; they were issued to entities nationwide. As the Tenth Circuit explained in

*ATK Launch Systems*, 651 F.3d at 1197, that an action "reaches geographic areas from coast to coast and beyond is, at a minimum, a strong indicator that the regulation is nationally applicable." In addition, all of the "standards and methodologies" applied in the Allocation Action "are part of EPA's nationwide approach" to implementing the AIM Act. *Id*. at 1198.

Choice's focus on the scope of its own claims for the determination of venue is therefore misplaced. Because the Allocation Action distributes a finite allowance pool among entities nationwide, Choice's claim that it is entitled to a larger portion of that pool necessarily diminishes the amount remaining that can be divided among other entities. Consequently, even if Choice were correct that its allocation is based solely on "Choice's particular historical participation in the refrigerant market," Pet. Resp. to Jurisdictional Question at 9, any change in Choice's allocation would necessarily have direct effects across the country.

But Choice's premise is not correct, in any event. The Allocation Action's methodology necessarily makes the number of allowances available to any one entity dependent on the allowances issued to others. Each entity's allocation is a relative percentage of the pool as a whole. More concretely, in the calculation of an entity's portion of the 2022 consumption allowance pool, the denominator in the equation to calculate its relative percentage is the sum of the average high-three consumption years of *all* consuming entities, wherever they are located. 40 C.F.R.

§ 84.11(1). Choice's ultimate allocation is thus *not* based on factors specific to Choice alone, and the action cannot be construed as locally applicable.

Choice's argument that "the agency's calculation of allowances for each individual company is based on company-specific data for 'each entity,'" Pet. Resp. to Jurisdictional Question at 17, is thus only half true. Both because the allowances are distributed from a single, finite, national pool, and because an individual entity's allocation is based on its historic consumption *relative* to other entities, the Allocation Action is facially nationally applicable.

What is more, Choice's characterization of its challenge as limited to Choice-specific facts alone is belied by its merits arguments, which assert that allowances were inappropriately allocated to *others*—Company A and Company B—instead of Choice. *See* Choice Br. at 31 ("[I]t was arbitrary and capricious for EPA to have given allowances to other companies and not to have allocated allowances to Choice."). Resolving whether EPA correctly credited Company A as the "entity that imported" the HFCs that Choice contends were earmarked for its domestic use, *see* Choice Br. at 31–38, necessarily implicates the allowances allocated to Company A, too. Likewise, Choice's argument that EPA should not have credited Company B with imports that Choice contends infringed on Choice's patent and were brought into the country in violation of a Department of

Commerce anti-dumping order, *see* Choice Br. at 38–41, necessarily implicates Company B's allowances.

Furthermore, EPA did not need to "designate" the action as "nationally applicable" in the Allocation Action for the action to be, in fact, nationally applicable. Choice suggests that "EPA had the statutory authority to designate its action as nationally applicable under section 307(b)(1) of the Clean Air Act, but declined to do so, and should be considered to have waived that position." Choice Br. at 3. Choice appears to confuse "nationally applicable" with the authority for EPA to find in its discretion that an otherwise locally applicable action is "based on a determination of nationwide scope or effect." 42 U.S.C. § 7607(b)(1). If EPA so finds and publishes that finding, then review of that action—even though it is otherwise facially locally or regionally applicable—may only be had in the D.C. Circuit. *Id*. This exception does not apply here because, for the reasons given elsewhere in this Part, the Allocation Action is facially nationally applicable.

### B. Choice's approach to venue defies the plain statutory text.

Choice's argument that the scope of its challenge to the Allocation Action dictates that the action is "locally applicable" is contrary to the text of section 7607(b)(1). That text makes clear that the exclusive focus of the venue inquiry is on the nature or scope of the *action* taken, not on the petitioner or its arguments. The provision thus stands in contrast to other statutes that instead assign venue

27

based in whole or in part on the identity or the claims of the party challenging EPA's action. *E.g.*, 28 U.S.C. § 1391(e)(1) (general venue statute authorizing suit in judicial district where plaintiff resides and where substantial events giving rise to claim occurred); 33 U.S.C. § 1369(b)(1) (authorizing Clean Water Act suit in regional circuits where petitioner resides or transacts affected business).

Choice's argument that the statutory term "applicable" must be read to mean "applicable to the *subject* of the regulation," Pet. Resp. to Jurisdictional Question at 8 (emphasis added), ignores the words that "applicable" modifies: "regulations" and "action." 42 U.S.C. § 7607(b)(1) (referring to "other nationally applicable regulations promulgated, or final action taken"). The statute's focus is, therefore, the national character of the challenged *action*, not the nature of the petitioner's challenge to that action.

This makes sense: nationally applicable actions commonly have effects in numerous localities. Petitioners' proposed construction of section 7607(b)(1), in which only *some* effects of a nationally applicable action would be considered for purposes of venue, would vitiate the distinction between nationally and locally applicable actions and render the Act's plain language meaningless. *See S. Ill. Power Coop.*, 863 F.3d at 673 (explaining that section 7607(b)(1) provides "no explicit or implicit exception for challenges to nationally applicable rules based on local or regional 'factors' or 'effects'").

Moreover, Congress directed the consolidation of review of nationally applicable action in the D.C. Circuit to ensure that those actions are not subject to multiple, conflicting judicial interpretations. *See State of Texas v. EPA*, 983 F.3d 826, 835 (5th Cir. 2020) ("All nationally applicable actions go to the D.C. Circuit, which promotes national uniformity."); *see also Texas v. EPA*, No. 10-60961, 2011 WL 710598, at \*4 (5th Cir. Feb. 24, 2011) (concluding that "Congress intended the D.C. Circuit to review matters on which national uniformity is desirable" because, *inter alia*, "[c]entralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results" (citations and internal quotation marks omitted)). Determining forum based merely on some of a nationally applicable action's impacts frustrates Congress' intent by subjecting that same action to judicial review in several circuits. *See id.*; *see also S. Ill. Power Coop.*, 863 F.3d at 673. This could result in inconsistent decisions on the same issues, and it would be at odds with the language and purpose of section 7607(b)(1).

Additionally, the "local effects" approach Choice advocates would unnecessarily complicate the venue inquiry. Courts have repeatedly cautioned against interpreting section 7607(b)(1) in ways that "might raise complex factual and line drawing problems" that "would waste time and serve little purpose." *NRDC v. Thomas*, 838 F.2d 1224, 1249 (D.C. Cir. 1988); *State of New York v.*

*EPA*, 133 F.3d 987, 990 (rejecting "vague criteri[a]" for determining venue under section 7607(b)(1), because "[j]urisdictional criteria should be precise, so that litigation does not become entangled in issues that are unrelated to the merits").[7] Consequently, courts have rejected approaches, like the one Choice advocates here, that would have venue "turn[] on the *de facto* scope of the regulation," *Thomas*, 838 F.2d at 1249, or the scope of a particular petitioner's challenge, *S. Ill. Power*, 863 F.3d at 671. An approach that requires an analysis of the particular issues raised by an individual petitioner would, at a minimum, invite forum-shopping, uncertainty, and inefficient motions practice.

Choice's approach also has a serious practical problem. It means that venue cannot be definitively determined at the outset of the case and must instead await a petitioner's merits brief. A petition for review need only name the parties and the agency action to be reviewed. Fed. R. App. P. 15(a)(2). A court assessing venue should not have to await merits briefing to determine where the case should be heard.

_____

[7] The judicial review structure Congress adopted was influenced by the recommendations of the Administrative Conference of the United States, *see* H. Rep. No. 95-294 at 324, which urged attention to "the principle that jurisdictional provisions should draw bright lines to minimize the waste and expense of litigation over whether a case has been brought in the right court." 41 Fed. Reg. 56,767, 56,767 (Dec. 30, 1976).

Section 7607(b)(1) creates a much more efficient system. By basing the forum on the nature of EPA's final action, the proper forum for *any* challenges by *anyone* to the action is fixed on the date the final action is taken. The scope of potential issues to be raised in a petition for review has no relevance and thus creates no uncertainty. A single court can address all issues presented by a particular action, not just purportedly "local" ones. Choice's approach, which would make venue over an agency action depend on the particular petitioner bringing suit and the particular issues they elect to raise, is contrary to section 7607(b)(1)'s text.

## C.    Choice's approach is contrary to precedent and hinges on a case that has been expressly overruled.

Several courts of appeals have rejected the approach that Choice advocates here: that a petitioner could fashion its challenge to a specific local aspect or effect of an otherwise nationally applicable action and thereby manufacture venue in a regional circuit. *See ATK Launch Sys.*, 651 F.3d at 1197 (holding that "this court must analyze whether the regulation itself is nationally applicable, not whether the effects complained of or the petitioner's challenge to that regulation is nationally applicable"); *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) ("The question of applicability turns on the legal impact of the action *as a whole*." (emphasis added)). Consistent with that approach, the D.C. Circuit holds that, to determine whether an action is "nationally applicable," courts "need look only to the face of

the agency action." *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019);

*Dalton Trucking*, 808 F.3d at 881.

The outlier on which Choice hangs its hat is the Seventh Circuit's decision

in *Madison Gas & Elec. Co. v. EPA*, 4 F.3d 529, 530 (7th Cir. 1993), which that

court expressly overruled in *Southern Illinois Power Cooperative v. EPA*, 863 F.3d

666 (7th Cir. 2017); *see id.* at 668 n.1 (noting that the opinion had been circulated

pursuant to 7th Cir. R. 40(e) and no judge wished to hear the case *en banc*). Pet.

Resp. to Jurisdictional Question at 11 (describing *Madison Gas* as the "most

instructive precedent"). To be precise, the court there held that "*Madison Gas* is

inconsistent with the text of § 7607(b)(1) and is therefore overruled." *S. Ill. Power

Coop.*, 863 F.3d at 668.

Choice contends that its position is consistent with both *Southern Illinois

Power* and *Madison Gas*. Pet. Resp. to Jurisdictional Question at 11 n.10. But that

is neither accurate nor possible. The court in *Southern Illinois Power* expressly

stated that its decision "conflicts with *Madison Gas*." 863 F.3d at 668. It explained

that "the analytical method adopted in *Madison Gas* stands in direct conflict with

the actual text of the venue provision . . . . *Id*. at 672. The court considered whether

*Madison Gas* could be "meaningfully distinguished" but decided it could not: "The

two cases are materially the same," the court concluded. *Id*. at 673. It reasoned that

both cases "involve EPA rules of national applicability that explain and list in table

format the agency's determinations about areas and entities across the country." *Id*. It therefore rejected *Madison Gas*'s approach because it "cannot be reconciled with the plain text of § 7607(b)(1)." *Id*.

There is no daylight between the approach Choice advocates and that rejected in *Southern Illinois Power* when that court overruled *Madison Gas*. In *Madison Gas*, petitioners challenged EPA acid rain regulations that created a limited national pool of allowances to emit sulfur dioxide and allocated those allowances to certain pollutant sources. *Madison Gas*, 4 F.3d at 530. The court described petitioner's objection to the number of allowances it received as being based on "an entirely local factor": the petitioner's generating capacity. *Id*. at 530–31. Just as in *Madison Gas*, Choice objects to the number of allowances it was allocated from a national pool, and it contends that that allocation and Choice's challenge is limited to factors specific to Choice alone. Choice Br. at 2. Choice thus contends that the purportedly limited scope of its challenge should lead the Court to conclude the action is locally applicable. *Id*.

Choice's argument stands in direct conflict with *Southern Illinois Power*. As the Seventh Circuit correctly concluded, section 7607(b)(1) "allocates venue to the D.C. Circuit or the regional circuits based *solely* on the nature of the agency action in question." *S. Ill. Power Coop.*, 863 F.3d at 673 (emphasis in original). "The text of the statute leaves no room for an intermediate case; there is no explicit or

33

implicit exception for challenges to nationally applicable rules based on local or regional 'factors' or 'effects.'" *Id*. In other words, if the action is nationally applicable, it makes no difference that it may involve some local or regional "factors" or "effects"; a nationally applicable action can only be challenged in the D.C. Circuit. *See Texas v. EPA*, 2011 WL 710598, at *3 (explaining that "all relevant EPA actions" are "either 'nationally applicable' or 'locally or regionally applicable'"). Furthermore, the *Southern Illinois Power Cooperative* court rejected the idea that a purportedly "local" element of a national allowance allocation could be reviewed in isolation. *ATK Launch Sys.*, 651 F.3d at 674.

Choice's approach is also in conflict with other decisions in other circuits that have rejected the approach taken in *Madison Gas*. For instance, the Tenth Circuit in *ATK Launch Systems*, 651 F.3d at 1197, held that "[t]he language of [section 7607(b)(1)] makes clear that this court must analyze whether the regulation itself is nationally applicable, not whether the effects complained of or the petitioner's challenge to that regulation is nationally applicable." The court did *not* cite *Madison Gas* "approvingly," as Choice contends, Pet. Resp. to Jurisdictional Question at 14, but rather expressly rejected *Madison Gas*'s suggestion "that the manner in which a petitioner frames his challenge to a regulation may alter the court in which the suit belongs" as "inconsistent with the language of the Act's judicial review provision." *Id*. at 1199.

34

The D.C. Circuit has also rejected *Madison Gas*'s approach. In *Texas Municipal Power Agency*, 89 F.3d 858, 861 (D.C. Cir. 1996), the court similarly dealt with a challenge to the allocation of allowances from a national pool. Consistent with *Southern Illinois Power*, the court explained that its own precedent would have held "the nationwide scope of the database allocation rule should control, rather than the local incidence of any one allowance allocation." *Id*. at 866 (explaining *NRDC v. Thomas*, 838 F.2d 1224, 1249 (D.C. Cir. 1988)). Acknowledging the contrary approach in *Madison Gas*, the court said that reconciling that case's "distinction between 'entirely local' and 'local but having national effect'" was "rather elusive." *Texas Municipal Power Agency*, 89 F.3d at 867. Ultimately, the court held that it did not have to resolve the issue because it determined EPA had waived its venue objection. *Id*.

Nevertheless, the D.C. Circuit has elsewhere expressly adopted an approach consistent with *Southern Illinois Power* and contrary to *Madison Gas*. *See Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013) (holding that to determine an action's "applicability," a court "need look only to the face of the rulemaking, rather than to its practical effects"). The Fifth Circuit has taken the same approach to determining applicability. *See State of Texas*, 983 F.3d at 833 (finding action "directed only at four contiguous Texas counties" was "locally applicable"); *Texas v. EPA*, 706 F. App'x 159, 163 (5th Cir. 2017) (holding "when

35

a final rule, by its terms, regulates only people or entities in a single judicial district, the action is not nationally applicable").

The other cases Choice cites pre-date *Southern Illinois Power* and present facts distinct from the Allocation Action. For instance, the Seventh Circuit in *State of New York v. EPA*, 133 F.3d 987 (7th Cir. 1998), explained that the challenged action—a rule exempting a discrete group of states in a single region from certain Clean Air Act requirements—was not "nationally applicable" because the exemption "is limited to a cluster of states" and was therefore "regional in a literal sense." 133 F.3d at 990. Thus, the Seventh Circuit did not employ the approach Choice urges here, and, regardless, has since explicitly rejected it.

Similarly, *National Parks Conservation Association v. McCarthy*, 816 F.3d 989 (8th Cir. 2016), dealt with a geographically limited action: EPA's approval of Minnesota's regional haze plan. *Id.* at 992. There, the Eighth Circuit cited *Madison Gas* in finding that a challenge to the approval of that single state plan, which followed directly from a separate national rule, was a challenge to a local "element of a national program." *Id.* at 993–94. But the "national program" was not the agency action under review; it was an individual state plan implementing the national rule in that particular state. Here, by contrast, the action Choice challenges

36

*is* the "national program": the *national* distribution of allowances from a single, nationwide pool, based on a common, nationally uniform methodology.[8]

Finally, even if *Madison Gas* were still good law, it would be distinguishable from the present case because here—as described in Part I.A., *supra*—no single entity's allocation is based entirely on a local factor. And even under *Madison Gas*'s flawed, overruled approach, the court acknowledged that the petitioner's challenge could have been construed as nationally applicable if, as here, disposition of that challenge would have an impact on the national program. *Madison Gas*, 4 F.3d at 531.

The Allocation Action is nationally applicable. The Court should dismiss in favor of Choice's protective petition before the D.C. Circuit or transfer this petition to that court.

## II.  EPA reasonably declined to base Choice's allocation on HFCs imported by Company A.

Consistent with the AIM Act and its implementing regulations, EPA's Allocation Action reasonably distributed HFC consumption allowances to "entities that imported" HFCs "in 2020," according to their relative import activity between

---

[8] The Fourth Circuit discussed *Madison Gas* in dicta in its unpublished and non-precedential decision in *West Virginia Chamber of Commerce v. Browner*, 166 F.3d 336 (Table) (4th Cir. 1998), but concluded that the D.C. Circuit was the proper forum because petitioners a "national aspect" of a nationally applicable rule. *Id*. at *8.

2011 and 2019. 40 C.F.R. § 84.11(a). The decision not to base Choice's allocations on HFCs imported by Company A, reported to U.S. Customs and Border Protection and EPA as imported by Company A, and for which Company A paid import duties, was reasonable under EPA's regulations and consistent with the structure of the AIM Act. Furthermore, EPA adequately explained the data and methodology on which the Allocation Action was based. Finally, EPA reasonably declined to base Choice's allocation on HFCs imported by Company B on the basis of Choice's allegation that those imports violated trade and patent laws.

### A. Declining to base Choice's allocation on HFCs brought into the United States by Company A was reasonable and consistent with the AIM Act regulations.

EPA's Allocation Action appropriately did not base Choice's allocation on HFCs that were actually "br[ought] into" the United States by Company A. *See* 42 U.S.C. § 7675(b)(6); 40 C.F.R. § 84.3 (definition of "import"). Under the Framework Rule, allowances are allocated to "entities that imported" in amounts commensurate to the amount the entity historically imported or produced. 40 C.F.R. §§ 84.9(a), 84.11(a).

EPA's determination to base Company A's allocation on HFCs that that company imported, and not to provide that credit to Choice, which received the HFCs after they were brought into the country, is consistent with and the best interpretation of the Framework Rule regulations. It was also consistent with data

from the Greenhouse Gas Reporting Program and U.S. Customs and Border

Protection.

> **1.    Giving Company A, not Choice, credit for HFCs that Company A imported conforms to EPA's regulations, which provide allowances to "entities that imported."**

EPA's regulations state that it will issue consumption allowances "to *entities*

*that imported* or produced" HFCs in 2020 in quantities based, in relevant part, on

"consumption amounts." 40 C.F.R. § 84.11(a) (emphasis added). In other words,

the regulations provide that allowances will go to entities that "imported," meaning

the entities responsible for the "land[ing] on, bring[ing] into, or introduc[ing] into"

the United States. 40 C.F.R. § 84.3 (definition of "import"). Company A, not

Choice, landed, brought, and introduced the disputed HFCs into the country, and

EPA therefore reasonably credited Company A, not Choice with those imports for

purposes of the Allocation Action. *See* RTC at 191 (Addm. 66); Allocation Master

List – Calculations, Ex. B.

Choice's argument rests on its claim to be the "actual owner" of the

contested imported HFCs.[9] But the term "actual owner" cannot be read in isolation;

---

[9] Although Choice contends in its brief that it was the "consignee" of the disputed HFC imports, Choice Br. at 25–26, it did not make that assertion in its comments on the Framework Rule or the allowance allocation. To the contrary, Choice stated in its comments that "the distributor's name"—*i.e.*, Company A's name—"appears on customs records." Choice Letter (July 6, 2021) (Addm. 112). Accordingly, the "consignee" argument is waived. *See United States v. L.A. Tucker Truck Lines,*

it must be understood in the broader regulatory context. *King v. Burwell*, 576 U.S. 473, 486 (2015) (explaining words of a statute must be interpreted "with a view to their place in the overall statutory scheme" (quoting *Brown & Williamson*, 529 U.S. 120, 132 (2000)); *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161 (2012) (employing "traditional tools of interpretation" to regulation). That context confirms the reasonableness of EPA's determination that Choice was not the "actual owner" of the HFCs in question.

The AIM Act regulations state that consumption allowances will be issued "to entities that imported." 40 C.F.R. § 84.11(a). Accordingly, in the context of allocation, the definition of "importer" should be read in service of the definition of "import," which, again, means to "land on," "bring into," or "introduce into" the United States. 40 C.F.R. § 84.3. "Import" does not speak to the movement or use of the imported HFCs *after* they arrive in the country, and the provision for consumption allowance allocations, 40 C.F.R. § 84.11, places emphasis on the act of bringing HFCs into the country, not underlying contracts regarding where the HFCs are destined once they are brought in. Based on Choice's description of its

---

*Inc.*, 344 U.S. 33, 37 (1952); *Vidiksis v. EPA*, 612 F.3d 1150, 1158 (11th Cir. 2010) ("Under ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency." (quoting *Mahon v. U.S. Dep't of Agric.*, 485 F.3d 1247, 1254–55 (11th Cir. 2007)). However, even if properly raised before this court, EPA still reasonably included the disputed imports in Company A's allocation calculation, not Choice's.

relationship to Company A and the underlying HFC imports, it was therefore reasonable for EPA to conclude that Choice was the "customer" of an importer for purposes of the allowance allocation, not the entity that imported. RTC at 191 (Addm. 66).

Indeed, by Choice's own description, it was Company A, not Choice, who actually brought the disputed HFCs into the United States. Choice concedes that Company A "arranged with U.S. customs for the imports" and "advanced" the cost of shipping from overseas to the United States, and that Company A's "name appears on customs records." Choice Br. at 13. Choice describes Company A as providing "import services." *Id*. at 14; *see also* Addm. 96. And Company A reported the imports to the Greenhouse Gas Reporting Program, which, as described further below, requires *inter alia*, entities that import HFCs over a certain threshold amount to report those imports to EPA. In addition, EPA confirmed that the Reporting Program import data for both Company A (███████) and Choice was consistent with U.S. Customs and Border Protection import data. Methodology Memo at 10, 14–15 (A29, A33–34).

Further, nothing about Choice's description of its own relationship to these HFCs reflects that it was Choice, and not Company A, who caused the HFCs to be "land[ed] on, [brought] into, or introduc[ed] into" the United States. 42 U.S.C. § 7675(b)(6); 40 C.F.R. § 84.3. Choice asserts that it had a "commercial

distribution arrangement" with Company A, that the disputed HFC imports "were shipped through a U.S. port of entry . . . to Choice's production facility in Alpharetta," and that the HFCs "were earmarked for and used exclusively by Choice for the production of its proprietary HFC products." Choice Br. at 12. But none of these facts—business contracts with Company A, domestic transport to Choice's facility, or purchase and ultimate use by Choice—demonstrates that EPA erred in concluding that Company A engaged in the pertinent "import" activity. And Choice did not provide anything beyond its own description of its business relationship with Company A to substantiate its claims.[10]

Company A is thus the entity that best fits the description of an "entit[y] that imported," and consequently entitled to the pertinent credit in its allowance allocation calculation. 40 C.F.R. § 84.11(a). EPA reasonably concluded that the

---

[10] Choice contends that its relationship to Company A "appears substantially identical to the shipping agent relationship EPA recognized as valid in crediting shipments by Company A for other companies in years after Company A ceased importing on behalf of Choice." Choice Br. at 33 n.24. Choice appears to be referring to EPA's decision to treat Company A and a related company with common ownership as a single entity for purposes of calculating their allowance share. *See* RTC at 152 (Addm. 59). Comments from those two companies described how one company "was founded in 2018 as a collaboration" with Company A, which began transitioning its import responsibilities" to the related company in 2019. *Id*. EPA reasonably considered the companies as one entity for purposes of the allowance calculation and allocated this combined single entity allowances based on the two companies' collective imports.

disputed HFCs belonged in Company A's allowance allocation calculation, rather than Choice's.

### 2.    EPA's allocation mirrors the activities that require the expenditure of allowances in the phasedown.

EPA's conclusion that Company A, rather than Choice, was entitled to allocation calculation credit for the disputed HFCs is consistent with the overall structure of the AIM Act and the HFC phasedown.

First, EPA's approach ensures that only one entity receives credit as the "entity that imported" particular HFCs. EPA explained that Choice's approach "would likely double-allocate allowances," because "both the importer and the importer's customer" would receive credit for the same HFCs. RTC at 191 (Addm. 66). Choice has no answer to this double counting problem and acknowledges that, under its preferred approach, multiple entities could count as importers for the same HFCs, entitled to credit for the same HFC imports in the allowance allocation.. Choice Br. at 24 n.18. That would distort the allowance system and jeopardize the AIM Act phasedown's ultimate goal: reducing HFC import and production.

Second, EPA's Allocation Action mirrors the AIM Act's phasedown provisions by distributing allowances to those entities that historically conducted the same activities now prohibited absent the expenditure of allowances. The AIM Act and implementing regulations provide that "no person" shall "produce" or

43

"consume" HFCs "without a corresponding quantity of production or consumption allowances." 42 U.S.C § 7675(e)(2); 40 C.F.R. §§ 84.5(a)(2), 84.5(b)(2). Although the term "consume" could be broadly construed, the Framework Rule makes clear that the prohibition on "consumption" without corresponding allowances applies specifically to the act of import. *See* 42 U.S.C. § 7675(b)(6) (defining import as landing on, bringing into, or introducing into the United States); 40 C.F.R § 84.3 (same); 40 C.F.R. § 84.5(b)(1)(i) (requiring consumption allowances "at the time of the import"). Accordingly, the regulations prohibit importing HFCs without corresponding allowances, and state that consumption allowances must be expended "at the time of import." 40 C.F.R. § 84.5(b)(1)(i). In short, allowances are required for the act of *importing*, not subsequent transport, blending, or sale of HFCs that have already been produced in or "imported" into the United States. *See, e.g.*, 86 Fed. Reg. at 55,122 n.7 (explaining that "EPA does not believe that Congress intended for every possible use of an HFC to require the expenditure of allowances").

The consumption baseline against which the phasedown is measured is also calculated based on import only, not subsequent activities. The AIM Act requires EPA to calculate the consumption baseline based on HFC consumption between 2011 and 2013, as well as specified percentages of the consumption levels of related substances in 1989. 42 U.S.C. § 7675(e). To determine consumption during

44

that time period, EPA relied on production and import data reported to the Greenhouse Gas Reporting Program. As discussed in more detail in Part II.B below, the Reporting Program uses the same definition of "import" as the AIM Act, *compare* 40 C.F.R. § 98.6 (Greenhouse Gas Reporting Rule), *with* 42 U.S.C. § 7675(b)(6) (AIM Act). As with the prohibition provisions, then, the baseline therefore captures HFCs at the time of import.

Paralleling these provisions, and consistent with the Framework Rule, EPA allocated allowances to entities whose past activities would now require consumption allowances: those that actually brought, landed, or introduced HFCs to the United States. As described above, EPA reasonably concluded that that entity was Company A. *See supra* Part II. Based on Choice's description of its relationship to the HFCs imported by Company A, that past activity would *not* require an allowance today. EPA's approach is thus consistent with the overall structure of the AIM Act phasedown.

**B.    EPA adequately explained the methodology and data applied to the Allocation Action and appropriately used data from the Greenhouse Gas Reporting program.**

Contrary to Choice's contention that EPA conducted its allowance calculation "in a black box," Choice Br. at 15, EPA adequately explained and gave notice of its allocation methodology and reasonably selected comprehensive, reliable data sources.

Choice's contention (at 37) that "EPA provided absolutely no explanation at all in the record of its decision with regard to Choice Refrigerants," is unfounded. First, the Framework Rule established EPA's allocation methodology through a notice-and-comment rulemaking. In the preamble to the Framework Rule, EPA provided notice of and explained the process by which EPA intended to identify importers, quantify historic imports, and that it would use Reporting Program and U.S. Customs data to do so. *See* 86 Fed. Reg. at 55,143–47. The Response to Comments on the Framework Rule also explains the Agency's approach to that data. *See, e.g.*, RTC at 191 (Addm. 66). Second, EPA's Methodology Memorandum for the Allocation Action—filed under seal because it contains protected information—describes the steps the Agency took to gather and apply the data according to that methodology. Methodology Memo (A20). Third, the Allocations Master List excel spreadsheet "pivot by company" sheet shows company-specific consumption and production data by year, and its "calculations" sheet showing the calculations shows the calculations made to establish the aggregate of all entities' high-three consumption and production years and each entity's relative percentage. *See* Exs. A, B.

Choice's argument that EPA failed to provide adequate explanation for its action is based on its unreasonable view that the Notice of the Allocation Action published in the Federal Register needed to recite the full explanation of EPA's

calculation. But, as Choice is well aware, the Greenhouse Gas Reporting Program data EPA principally relied on is, by the terms of its implementing regulations, protected from public disclosure. *See* 86 Fed. Reg. at 55,192. In fact, Choice itself asked EPA to treat its comments describing its claim to import credit based on its relationship to Company A and Company B as confidential business information. Letter from Choice to EPA at 2 (Sept. 29, 2021) (A38). The information that EPA could provide publicly was thus necessarily limited. Nevertheless, the administrative record for the Allocation Action contains ample explanation and support for the decision.

Further, contrary to Choice's argument, EPA's decision to use data reported through the Greenhouse Gas Reporting Program was reasonable. The Greenhouse Gas Reporting Program was established in 2009 and requires various facilities and suppliers to annually report data related to greenhouse gases, including HFCs, to EPA. *See* Framework Rule, 86 Fed. Reg. at 55,140; *see* 40 C.F.R. § 98.2. The data submitted via the Reporting Program comprises a longstanding, comprehensive dataset that "captures the vast majority of the bulk HFC production, import, and export in the United States." Proposed Framework Rule, 86 Fed. Reg. at 27,164. The data also aligns precisely with the types of activities that EPA needed to measure to establish the allowance system and allocate allowances. *Id.* Indeed, the regulations governing the Reporting Program use a substantially similar definition

of "importer" as the Framework Rule. *Compare* 40 C.F.R. § 98.6, *with id*. § 84.3.

EPA's choice to rely on Reporting Program import data would therefore

reasonably capture the very same "importers" and "imports" relevant to the

Allocation Action.

EPA also reasonably acknowledged and gathered additional information to

fill gaps in the Reporting Program data. *See* 86 Fed. Reg. at 55,141. EPA explained

that the Reporting Program data may not capture all HFC imports because

companies importing fewer than the reporting threshold amount of HFCs are

exempt from reporting, although analyses indicated the unreported amounts would

be small. Proposed Rule, 86 Fed. Reg. at 27,164. Based on comparisons with U.S.

Customs and Border Protection import data, EPA also explained that it appeared

that some entities had not made required reports in violation of federal regulations.

To address these data gaps, EPA published a "Notice of Data Availability"

inviting the public to provide additional data and identify other potential gaps in

EPA's knowledge. 86 Fed. Reg. at 27,165. EPA also compared Reporting Program

data to Customs data, which has significantly lower reporting thresholds,

Framework Rule, 86 Fed. Reg. at 55,141, and specifically contacted entities whose

Reporting Program imports varied by more than 20 percent from imports reported

to Customs. *See* Methodology Memo at 1–2 (A20–21); Framework Rule, 86 Fed.

Reg. at 55,140–41. EPA also attempted to contact via mail and electronic mail any

entity that reported imports of HFCs to U.S. Customs and Border Protection for the relevant timeframe. Framework Rule, 86 Fed. Reg. at 55,141–42. Further, EPA held stakeholder meetings to solicit comments and additional data. Proposed Rule, 86 Fed. Reg. at 27,165. In short, EPA took reasonable steps to verify and supplement the data from the Reporting Program to ensure that all HFC imports were accounted for.

Notwithstanding EPA's reasonable data collection, Choice contends that the Reporting Program data is unreliable because it does not accurately capture the full scope of the commercial relationships that Choice contends is necessary to determine who was truly the "importer" of particular HFCs. *See* Choice Br. at 27–29. Yet, as noted above, the Reporting Program and the AIM Act regulations employ substantially the same definition of "imports" and "importer," and it is "importers" who are required to report under the Mandatory Greenhouse Gas Reporting regulations. *See* 40 C.F.R. § 98.2(a) (requiring "suppliers" to report, where "suppliers" is defined at 40 C.F.R. § 98.6 to include an "importer"). Furthermore, EPA compared this data to independently reported data from Customs and invited entities to supplement or revise their Reporting Program reports through the Notice of Data Availability.

Choice also contends that, had it known that HFC allowances might have been allocated based on Reporting Program data, it may have structured its

49

business contracts differently. Choice Br. at 29–30. But Choice does not point to any alternative data source that EPA could have relied on to assess historic consumption activity. Moreover, the fact that the data predates the establishment of an allocation system provides some measure of objectivity, ensuring that entities did not enter into the import market in a bid to manipulate an eventual allocation. *See id*. at 27,170. Thus, for the reasons described above, EPA reasonably relied on the Reporting Program data, supplemented by other sources, and used it consistently in the design of the phasedown program as a whole. Choice's argument with respect to imports by Company A should be rejected and its petition for review dismissed.

## C. EPA reasonably declined to credit Choice for imports by Company B.

Choice next contends that EPA's allowance calculation should have credited Choice with HFC imports by a third company, which it refers to as "Company B." Choice alleges that Company B imported blended HFC products that infringed on Choice's patents, and that doing so unlawfully circumvented a Department of Commerce Anti-Dumping Duties Order. Choice contends that because it owns intellectual property for those blends, it is the "actual owner" of the imported HFCs for purposes of the definition of "importer," and, by extension, the allocation of allowances. Choice Br. at 38.

EPA reasonably rejected this argument. First, nothing in the AIM Act or its implementing regulations provides EPA with the authority or direction to account for alleged patent infringement claims in its allowance allocation methodology—let alone to then base another company's allocation on those imports. *See* RTC at 191 (Addm. 66). The regulations establishing the allocation methodology applied in the Allocation Action do not address intellectual property at all. To the extent Choice suggests that the AIM Act "requires" EPA to credit Choice with the allegedly infringing imports, *see* Choice Br. at 38, its grievance is with the Framework Rule, not the Allocation Action. *See supra* note 2. Choice accordingly cannot raise this objection in its petition for review of the Allocation Action.

Second, nothing in the AIM Act or its implementing regulations entitles Choice to have EPA consider HFC imports by others in Choice's allocation calculation when those imports allegedly violate anti-dumping orders. EPA confronted concerns with allocating allowances to entities that the Department of Commerce has determined are "dumping" HFCs onto the U.S. market. Proposed Rule, 86 Fed. Reg. at 55,170. "Dumping refers to 'when a foreign producer sells a product in the United States at a price that is below that producer's sales price in the country of origin . . . or at a price that is lower than the cost of production.'" 86 Fed. Reg. at 55,170 (quoting U.S. Antidumping and Countervailing Duties," *Trade.gov*, International Trade Administration).

To address anti-dumping concerns, EPA adopted, in the Framework Rule, regulations giving the Agency discretion to revoke, retire, or withhold allowances for the year that an entity fails to pay assessed anti-dumping/countervailing duties. 40 C.F.R. § 84.5(h); *see* 86 Fed. Reg. at 55,170. In addition, EPA may reduce future allowance allocations or ban a company from receiving future allowances for failure to pay duties. *Id*.; *see* 40 C.F.R. § 84.35. EPA's codified methodology for calculating allowance allocations does not provide for shifting credit for historic imports from an entity that violated an anti-dumping order to any other entity. Choice's argument that its allocation, without the Company B imports, was inconsistent with the Framework Rule is baseless. And if Choice believes that the Framework Rule *should* provide for transferring credit for historic imports by those that violate anti-dumping orders to different entities, then its objection is to the Framework Rule itself and does not belong in this case.

Further, as EPA noted in its Response to Comments, Choice's allegations are unproven. RTC at 191 (Addm. 66). Choice contends that because its allegations are "unrefuted" in the record, EPA was obligated to credit them. Notably, because Choice's comments laying claim to imports by Company A and Company B were claimed as confidential business information, *see* Letter from Choice to EPA at 2 (Sept. 29, 2021) (A38), it is unlikely that any other entity was aware of Choice's

allegations. Therefore, Choice's claim that their contentions are "unrefuted" carries little weight.

Regardless, EPA reasonably declined to credit Choice's conclusory assertions. Although Choice asserts in its brief that Company B has infringed its patent, it points to no finding or adjudication of that fact. In its July 6, 2021 comment letter, Choice cites its counter-claim complaint before the Federal District Court for the Western District of North Carolina in *Dynatemp International, Inc., et al. v. RMS of Georgia, LLC*, Case Number 5:20-cv-00142 (E.D.N.C.). The docket for that case shows that the parties each assert trademark infringement, false advertising, and other tort claims (none for patent infringement) against each other and that the case has not yet been resolved. *See* Docket for Case No. 5:20-cv-00142 (E.D.N.C.), Ex. C. The determination of liability and imposition of an appropriate remedy is appropriately left to the federal district court currently hearing the case. *See* RTC at 191 (Addm.66) ("Other laws and authorities are the appropriate avenue" for Choice to address its alleged patent violations); *cf. Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (explaining that when two federal district courts have before them proceedings involving the same matter, "the general principle is to avoid duplicative litigation").

Finally, Choice's argument that the alleged patent infringement or anti-dumping circumvention means that Choice is the "actual owner" of additional HFC imports defies even the most tortuous construction of the term "owner." There is certainly nothing in the AIM Act or implementing regulations indicating that "actual owner" in the definition of "importer" could reasonably be interpreted as the as-yet-unvindicated owner of intellectual property rights in the particular HFC product. As explained above, *see supra* Part II.A, the definition of "importer" in the Framework Rule must be interpreted in light of the term "import" and the general structure of the phasedown and allowances system. These all point to the entity that actually caused HFCs to be brought into the country; nothing suggests an entity would be entitled to allowances based on an allegation that it has intellectual property rights in the imported products.

Indeed, given the AIM Act's and the Framework Rule's focus on particular HFC components—the *constituents* of blends—a patent claim to a particular blend of HFCs has little relevance. In its implementing regulations, EPA explained that allowances would be needed only for the HFC components of blends, and not blends themselves. 86 Fed. Reg. at 55,142. Choice's argument that its intellectual property rights are relevant to its allocation determination is thus misplaced.

Furthermore, Choice's argument that it is entitled to more AIM Act allowances is remote from any remedy available for the alleged patent

infringement. By statute, the default remedy for patent infringement is damages or an injunction "to prevent the violation of any right secured by patent." 35 U.S.C. § 283; *see id*. § 284. None of the statutory remedies for patent infringement include converting ownership of the actual product or product components that infringed the patent to the patent holder. Even assuming Choice's patent infringement claims are correct, it was not the "owner" of Company B's HFC refrigerant blends and it did not "import" them.

Similarly, the Department of Commerce anti-dumping order does not convert Choice into the "owner" of Company B's imported HFCs. Upon a final finding of dumping, Commerce establishes anti-dumping/countervailing duties which help "negate the value of the dumping/subsidization for foreign products into the United States" and "attempts to "eliminate the unfair pricing or subsidies and the injury caused by such imports." 86 Fed. Reg. at 55,170.[11] Further the Department of Commerce Order that Choice points to undermines its own argument: the finding that "unpatented R-421A, is circumventing the order on HFC blends from China" is only "retroactive to June 18, 2019," and does not affect imports in 2017, the year Choice seeks credit for Company B imports. *See* Addm.

---

[11] Additionally, the Tariff Act gives the International Trade Commission the authority to impose penalties, such as excluding the articles from entry, for importing goods that infringe on a legally enforceable patent. 19 U.S.C. § 1337.

70; A.38. The finding, therefore, does not reach the imports that Choice is now attempting to claim in its own allowance allocation calculation.

Choice's other theory for its "ownership" claim to the Company B imports is pure speculation. Choice contends that "if Company B had not illegally imported this quantity of pirated R-421A, Choice Refrigerants would have supplied that market demand with its genuine R-421A." Choice Br. at 17. With higher demand, Choice asserts it would have imported more products, and would thus have been awarded more allowances in the Allocation Action. *Id*. This attenuated logic has no limiting principle and is entirely divorced from the text, structure, or purpose of the AIM Act or its implementing regulations. Any number of unfulfilled contingencies may have led to Choice importing more HFCs in prior years.

EPA reasonably rejected Choice's claim to credit for Company B's imports based on speculation about market share and, consistent with the Framework Rule, allocated allowances based on actual historic production and consumption data. Choice's petition for review should be denied.

## CONCLUSION

The petition should be dismissed or transferred for lack of venue. Should the Court determine that venue is proper in this Court, the petition should be denied.

Respectfully submitted,

/s/ *Sarah A. Buckley*
TODD KIM
*Assistant Attorney General*
SARAH A. BUCKLEY
*Attorney*
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7411
Washington, D.C. 20044
(202) 616-7554
sarah.buckley@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,961 words.

2.      This document complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

/s/ *Sarah A. Buckley*
SARAH A. BUCKLEY
